IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| SUNGEVITY, INC., *et al.*,[1] | ) Chapter 11 |
| | ) |
| | ) Case No. 17-10156 (___) |
| Debtors. | ) |
| | ) Joint Administration Pending |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING ON SUPERPRIORITY, SENIOR SECURED BASIS AND (B) USE OF CASH COLLATERAL, (II) GRANTING (A) LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

By this motion (the "<u>Motion</u>"), the above-captioned debtors and debtors-in-possession

(collectively, the "<u>Debtors</u>") seek entry of interim and final orders:

a)   authorizing the Debtors to obtain postpetition financing from LSHC Solar Holdings LLC (the "<u>DIP Lender</u>")[2], consisting of secured term loans in the aggregate principal amount of up to $20,000,00.00 (the "<u>DIP Facility</u>") to be used to fund working capital and other general corporate expenses of the Debtors, including the payment of Administrative Expenses and other costs as described in the that certain *Debtor-In-Possession Loan and Security Agreement* by and among the DIP Lender, as lender, Sungevity, Inc. and Sungevity Development, LLC ("<u>Sungevity Development</u>"), as borrowers (the "<u>DIP Borrowers</u>"), and Sungevity SD, LLC and Sungevity International Holdings LLC as guarantors (the "<u>Subsidiary Guarantors</u>") and Wilmington Trust, N.A. as the administrative agent for the DIP Lender (the "<u>DIP Agent</u>") (substantially in the form attached to this Motion as <u>Exhibit A</u>, together with all schedules, exhibits, and annexes thereto, and as may be amended, the "<u>DIP Loan Agreement</u>"),[3] of which amount $10 million will be available on an interim basis with an initial draw of $5 million at the Closing, on the terms and conditions set forth in the DIP Loan Agreement and

---

[1] The Debtors in the above-captioned chapter 11 cases (the "<u>Cases</u>"), along with the last four digits of each Debtor's federal tax identification number, are: Sungevity, Inc. (4328), Sungevity SD, LLC (4847), Sungevity Development, LLC (0323), and Sungevity International Holdings LLC (5598). The principal place of business for each of the Debtors is 66 Franklin Street, Suite 310, Oakland, CA 94607.

[2] LSHC Solar Holdings, LLC ("<u>LSHC</u>") is an investment vehicle created for this transaction by Northern Pacific Group ("<u>NPG</u>"). International SIF SICAV SA ("<u>International</u>") is a limited partner of NPG and, as a result, will have an indirect interest in LSHC. Prepetition, International was a provider of capital to the Debtors through various debt and equity financings. Prepetition all of the debt and equity was transferred to an affiliate, Helios Invest LLC. Johan Symmons, an Investment Advisor to International, is a member of the board of directors of Sungevity, Inc. Mr. Symmons recused himself from all discussions and deliberations regarding the filing of the Cases, the debtor-in-possession financing and the selection of the stalking horse bid.

[3] All terms not otherwise defined herein shall be given the meanings ascribed to them in the DIP Loan Agreement.

any other documents ancillary thereto (collectively, the "<u>DIP Credit Documents</u>") and in the proposed interim order substantially in the form attached to this Motion as <u>Exhibit B</u> (the "<u>Interim Order</u>");

b)  authorizing the Debtors to execute and enter into the DIP Credit Documents and to perform all such other and further acts as may be required in connection with the DIP Credit Agreement;

c)  authorizing the Debtors to use proceeds of the DIP Facility solely as expressly permitted in the DIP Credit Agreement and in accordance with the Interim and Final Orders (as defined below);

d)  granting automatically perfected (i) priming security interests in and liens on all of the Collateral (as defined in the DIP Loan Agreement), (ii) non-priming security interests in and liens on all Collateral and assets of the DIP Borrowers and Subsidiary Guarantors upon which there are pre-existing permitted senior liens or no pre-existing liens to the extent provided in the DIP Loan Agreement and the Interim and Final Orders, and (iii) granting superpriority administrative expense status to the Secured Obligations (as defined in the DIP Loan Agreement) subject only to the Carve-Out and Senior Carve-Out (each as defined below);

e)  authorizing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Credit Documents as such amounts become due and payable;

f)  authorizing the Debtors to use Cash Collateral (as defined below) subject to the terms of the DIP Credit Agreement and the Interim and Final Orders;

g)  providing adequate protection to the Prepetition Lenders (as defined below) to the extent of any diminution in value of its interests in the Collateral and subject to the Carve-Out (as defined below);

h)  vacating and modifying the automatic stay pursuant to section 362 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "<u>Bankruptcy Code</u>") to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the DIP Credit Documents;

i)  subject only to and effective upon entry of a final order approving the relief requested herein (the "<u>Final Order</u>"), waiving the Debtors' ability to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code;

j)  subject only to and effective upon entry of the Final Order, granting liens to the DIP Lender on the proceeds of the Debtors' claims and causes of action arising under chapter 5 of the Bankruptcy Code;

k)  approval of the Milestones (defined below);

l) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing on this Motion; and

m) granting the Debtors such other and further relief as is just and proper.

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to rule 9013-l(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested in the Motion are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, rules 2002, 4001, 6003 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 4001-2.

## BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2 CONCISE STATEMENTS AND HIGHLIGHTED PROVISIONS

4. Pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rules 4001-2(a)(i) and (ii), the Debtors submit the following concise statements of the relief requested and the material terms of the Interim Order and highlighted provisions:[4]

---

[4] This summary is provided in accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2(a) and is qualified in its entirety by reference to the provisions of the DIP Loan Agreement. Each capitalized term used and

3

| Applicable Rule/Requirement | Description of Relief/Provision |
|---|---|
| **Parties with Interest in Cash Collateral** | Hercules, MMA Energy Capital LLC, MHA Trust, LLC and Wilmington Fund Society, FSB, as agent |
| *Bankruptcy Rule 4001(b)(1)(B)(i)* | *See* Interim Order ¶ E.(i)-(iii). |
| **Purposes for Use of Cash Collateral** | Finance the Debtors' Operations, administer and preserve value to the Debtors' estates and complete sales process. |
| *Bankruptcy Rule 4001(b)(1)(B)(ii)* | *See* Interim Order at ¶ 3. |
| **Terms of Use of Cash Collateral** | The Debtors' right to use Cash Collateral subject to the restrictions in the DIP Credit Documents, the Interim Order and the DIP Budget. |
| *Bankruptcy Rule 4001(b)(1)(B)(iii)* | *See* Interim Order at ¶ 1. |
| **DIP Borrowers** | Sungevity, Inc., and Sungevity Development, LLC |
| *Local Rule 4001-2(a)(ii)* | *See* DIP Loan Agreement Preamble. |
| ***Guarantors*** | Sungevity SD, LLC and Sungevity International Holdings LLC |
| *Local Rule 4001-2(a)(ii)* | *See* DIP Loan Agreement Preamble. |
| **DIP Lender** | LSHC Solar Holdings LLC |
| *Local Rule 4001-2(a)(ii)* | |
| **DIP Facility Amount** | The Aggregate Commitment is up to $20 million. |
| *Local Rule 4001-2(a)(ii)* | *See* DIP Loan Agreement Recital B. |
| **Interim Funding** | The amount available on an interim basis is $10 million with a $5 million Initial Term Loan to be drawn on the Closing Date. The Delayed Draw Term Loans are $15 million, of which $ 10 million will be available after the entry of the Final Order, subject to the terms of the DIP Loan Agreement. |
| *Local Rule 4001-2(a)(ii)* | *See* DIP Loan Agreement Section 2.2(a) (i) and Interim Order recitals (i) and (iii). |
| **Interest Rate** | Fixed rate equal to fifteen (15%) per annum, payable in kind. |
| *Local Rule 4001-2(a)(ii)* | *See* DIP Loan Agreement Definition of Term Loan Interest Rate and Section 2.2(c). |
| **Default Interest** | An additional fixed rate of interest equal to four percent (4%) per annum. |
| *Local Rule 4001-2(a)(ii)* | *See* DIP Loan Agreement Section 2.4. |

not otherwise defined herein shall have the meaning assigned thereto in the DIP Loan Agreement or proposed Interim Order, as applicable. To the extent there exists any inconsistency between this summary and the provisions of the DIP Credit Agreement, the Interim Order or the Final Order, the provisions of the DIP Credit Agreement, the Interim Order and the Final Order, as applicable, shall control.

| | |
|---|---|
| **Fees**<br><br><br><br><br><br><br>*Local Rule 4001-2(a)(ii)* | <u>Facility Charge</u>:  $500,000.00 to be paid on the Closing Date.<br><u>Work Fee</u>:  $250,000.00 to be paid on the Closing Date.<br><u>Commitment Fee</u>: 2.00% per annum for the undrawn portion of the Delayed Draw Term Commitments, payable monthly in cash in arrears.<br><br>*See* DIP Loan Agreement definitions of Facility Charge and Work Fee and Section 2.9. |
| **DIP Budget**<br><br><br><br>*Local Rule 4001-2(a)(ii)* | The use of the proceeds of the DIP Facility shall be in compliance with the DIP Budget, which is attached hereto as <u>Exhibit C</u> and the DIP Budget may be adjusted only in accordance with the DIP Loan Agreement.<br><br>*See* DIP Loan Agreement Section 7.26 and <u>Exhibit C</u>. |
| **Use of DIP Facility**<br><br><br><br><br>*Local Rule 4001-2(a)(ii)* | The proceeds of the DIP Facility will be used to finance the Debtors' working capital expenses, fund the Debtors' general corporate expenses and to finance transaction fees, costs and expenses in accordance with the DIP Budget.<br><br>*See* DIP Loan Agreement Section 5.17; Interim Order ¶¶ G.i and 10. |
| **Milestones**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>*Local Rule 4001-2(a)(ii)* | The Debtors need to comply with the following milestones (as they may be extended from time to time with the consent of the DIP Agent (given at the direction of the Required Lenders)):<br><br>(i)      file the Bankruptcy Sale Motion on the Petition Date;<br>(ii)     obtain entry of the Interim Order by the Bankruptcy Court on or before the date that is 3 Business Days after the Petition Date;<br>(iii)    obtain entry of the Bidding Procedures Order (such date, the "<u>Bidding Procedures Order Date</u>") by the Bankruptcy Court on or before the date that is 15 days after the Petition Date;<br>(iv)    the Final Order shall have been entered by the Bankruptcy Court on or before the date that is 30 days after the Petition Date;<br>(v)     the bid deadline set forth in the Bidding Procedures Order shall occur on or before the date that is 10 days after the Bidding Procedures Order Date;<br>(vi)    if qualifying bids are received in accordance with the Bidding Procedures Order, the Credit Parties shall hold an auction with respect to the Bankruptcy Sale on or before the date that is 11 days after the Bidding Procedures Order Date; and<br>(vii)   the Credit Parties shall obtain entry of court orders of the Bankruptcy Court authorizing the Bankruptcy Sale to the successful bidder in accordance with the Bidding Procedures Order, in each case in form and substance reasonably acceptable to the Required Lenders on or before the date that is 12 days after the Bidding Procedures Order Date.<br><br>*See* DIP Loan Agreement Section 7.23. |
| **Credit Bid** | The DIP Lender and the Prepetition Secured Parties shall have the unqualified right to credit bid up to the full amount of the DIP Obligations and their claims, respectively, in any sale of the DIP Collateral (or any part thereof), without the need for further Court order authorizing the same, and regardless of whether such sale is effectuated through section 363 or 1129 |

| | |
|---|---|
| | of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. |
| *Local Rule 4001-2(a)(ii)* | Interim Order at ¶ 43. |
| **Termination Date of DIP Facility and Cash Collateral**<br><br><br><br><br><br><br><br><br><br><br><br><br><br>*Bankruptcy Rule 4001(b)(1)(B)(iii)*<br><br>*Local Rule 4001-2(a)(ii)* | The earliest to occur of (i) thirty (30) days after the Petition Date unless the Final Order, acceptable to the DIP Lender, has been entered, (ii) delivery of Default Notice of the occurrence of an Event of Default, (iii) conversion of any of Case to chapter 7 case,  (iv) 45 days following the Petition Date, (v) the consummation of a sale of all or substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code (including the Bankruptcy Sale); (vi) the effective date of a plan of reorganization or liquidation in the Cases; (vii) the date of filing or support by the DIP Borrower of a plan of reorganization that does not provide for indefeasible payment in full in cash of all obligations under the DIP Loan Agreement, or (viii) the  termination date of the Term Commitments and the acceleration of any outstanding extensions of credit under the  DIP Loan Agreement.<br><br><br><br>*See* DIP Loan Agreement definition of Term Loan Maturity Date and Section 9, Interim Order ¶ 26. |
| **Security to DIP Lender**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>*Local Rule 4001-2(a)(ii)* | The DIP Lender is granted valid, binding, enforceable non-avoidable and automatically and properly perfected security interests in and liens upon all of each DIP Borrowers' and each Subsidiary Guarantors' right, title and interest in and to all of its personal property, in each case whether now owned or existing or hereafter acquired, possessed or arising, whether tangible or intangible, wherever located (all of which collectively shall hereinafter be referred to as the "<u>Collateral</u>") including, without limitation: all Accounts and Receivables; all Chattel Paper; all cash and all Deposit Accounts, together with all amounts on deposit from time to time in such Deposit Accounts; all Documents; all General Intangibles, including Payment Intangibles and all Intellectual Property; all Goods, including Inventory, Equipment, Farm Products and Fixtures; all Instruments; all Investment Property; all Letter-of-Credit Rights and other Supporting Obligations; all Records; all Commercial Tort Claims; all books and records relating to any of the foregoing; and all Proceeds and Accessions with respect to any of the foregoing.  The Collateral shall exclude Excluded Collateral and Avoidance Actions, but shall include the proceeds thereof, subject to entry of the Final Order.<br><br>*See* DIP Loan Agreement Section 3.1. |
| **DIP Superpriority Claims**<br><br><br><br><br><br><br><br><br>*Bankruptcy Rule 4001(c)(1)(B)(i)* | Subject and subordinate to the Carve-Out and Senior Carve-Out and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the DIP Obligations constitute allowed superpriority administrative expense claims (the "<u>DIP Superpriority Claims</u>") with priority over any and all administrative expenses of the Debtors, provided, that (i) the DIP Superpriority Claims in respect of the DIP Facility shall rank equally in priority and share on a pro rata basis (based on the outstanding principal amount of the DIP Facility) with respect to all amounts payable in respect of such superpriority administrative expense claims other than claims in respect of the Carve-Out and the Senior Carve-Out, and (ii) upon the entry |

6

| | |
|---|---|
| | of the Final Order, the DIP Superpriority Claims shall attach to the proceeds of the Avoidance Actions. |
| *Local Rule 4001-2(a)(ii)* | *See* Interim Order ¶ 8. |
| **Priming** | The Liens under the DIP Facility are first priority priming liens with seniority over all of the Prepetition Secured Parties (as defined below) except for the Senior Carve-Out and the Carve-Out. |
| *Bankruptcy Rule 4001(c)(1)(B)(i)* | The Senior Prepetition Lender has consented to the priming liens subject to the Senior Carve-Out.  The prepetition subordinated secured lenders MMA, MHA and the Bridge Agent have not consented to the priming of their liens. |
| *Local Rule 4001-2(a)(i)(G)* | *See* DIP Loan Agreement definition of Permitted Indebtedness; Interim Order ¶ 6. |
| *Local Rule 4001-2(a)(ii)* | |
| **Adequate Protection to Prepetition Secured Lenders** | As adequate protection for the interest of the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral) on account of the granting of the DIP Liens, subordinated to the Carve-Out and Senior Carve-Out, the Debtors' use of Cash Collateral and to the extent of any decline in value arising out of the automatic stay and/or the Debtors' use, sale or disposition of the Prepetition Collateral ("Diminution in Value"), the Prepetition Secured Parties shall receive the following adequate protection: |
| | (i)     *Milestones.*  Approval of the Milestones. |
| | (ii)    *Liens on Unencumbered Assets.*  Pursuant to sections 361 and 362(c)(2) of the Bankruptcy Code, and solely to the extent of the Diminution in Value of the Prepetition Collateral, the Prepetition Lenders shall have additional security interests and liens in the unencumbered collateral, which shall be junior only to the DIP Liens, the DIP Superpriority Claims, the Senior Carve-Out, and the Carve-Out, and shall, in each case, be subject to the terms of the Prepetition Intercreditor Agreement. |
| | (iii)   *Prepetition Replacement Liens.* Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, in exchange for the subordination of their liens to the DIP Liens, and only to the extent of a Bid (as defined in the Asset Purchase Agreement) by the DIP Lender, the Senior Prepetition Creditor shall have additional and replacement security interests and liens in the DIP Collateral (the "<u>Replacement Liens</u>"), which shall be junior only to the DIP Liens, the DIP Superpriority Claims, the Senior Carve-Out, and the Carve-Out, and shall, in each case, be subject to the terms of the Prepetition Intercreditor Agreement. |
| | (iv)   *Prepetition Secured Lender Superpriority Claim.*  Pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, and solely to the extent of the Diminution of the Value of the Prepetition Collateral, and subject to the DIP Superpriority Claims, the Senior Carve-Out and the Carve-Out, the Prepetition Lenders shall have an allowed superpriority administrative expense |

01:21672815.1

| | |
|---|---|
| | claim with priority over all administrative expense claims (other than claims in respect of the Carve-Out and the Senior Carve-Out) and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever. Other than the DIP Liens, the DIP Superpriority Claims, the Senior Carve-Out, and the Carve-Out, (a) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and (b) no priority claims are, or will be, senior to, prior to or on a parity with the Prepetition Superpriority Claims. |
| *Bankruptcy Rule 4001(c)(1)(B)(ii)* | (v)    *Adequate Protection upon Sale of Prepetition Collateral.* The sale of any Prepetition Collateral pursuant to section 363 of the Bankruptcy Code shall be sold free and clear of all liens; provided, however, that such Senior Secured Liens and Junior Secured Liens shall be distributed and/or attach to the proceeds of any such sale in the order and priority as set forth in this Interim Order, the Prepetition Intercreditor Agreement and the DIP Intercreditor Agreement. |
| *Local Rule 4001-2(a)(ii)* | *See* Interim Order ¶ 12. |
| **Automatic Perfection of DIP Liens and Replacement Liens** <br><br> *Bankruptcy Rule 4001(c)(1)(B)(vii)* | The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Replacement Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, real property mortgage or aircraft security agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or the Replacement Liens, or to entitle the DIP Lender and the Prepetition Secured Parties to the priorities granted herein. <br><br> *See* Interim Order at ¶ 17. |
| **Carve-Out** | The claims and liens against the Debtors shall be subject to the Carve-Out as follows: <br><br> (i)    all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below and, as to the U.S. Trustee, in such amounts as agreed to by the U.S. Trustee or as determined by the Court); <br><br> (ii)    all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice below set forth in (iii) below (the "Trustee's Carve-Out"); <br><br> (iii)    to the extent allowed at any time, whether by interim order, |

01:21672815.1

| | |
|---|---|
| | procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors or any Committee pursuant to sections 327, 328, 363, and 1103 of the Bankruptcy Code (the "Estate Professionals") at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and |
| | (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice (the amounts set forth in this clause (d) being the "Post Carve-Out Trigger Notice Cap"). |
| *Local Rule 4001-2(a)(ii)* | *See* Interim Order ¶ 33. |
| **Senior Carve-Out** | Means the first $15 million of the Senior Secured Obligations. |
| *Local Rule 4001-2(a)(ii)* | *See* Interim Order ¶ 7. |
| **Relief from the Automatic Stay for DIP Lenders and DIP Agent** | Unless otherwise ordered by the Court in accordance with the terms hereof, as of 12:00 a.m. prevailing Eastern Time on the third (3rd) business day after the date the DIP Agent or DIP Lender files a notice of an Event of Default on the docket of the Debtors' chapter 11 cases (such period, the "Default Notice Period"), the automatic stay under section 362 of the Bankruptcy Code will be automatically lifted without further order of the Court to allow the applicable DIP Agent or DIP Lender to take any and all actions permitted by law, as if no case were pending under the Bankruptcy Code, subject to the terms and conditions of the DIP Credit Documents (including the DIP Intercreditor Agreement).  The Debtors and other parties-in-interest may request an expedited hearing on any motion regarding an alleged Event of Default, and the DIP Lender and Prepetition Secured Parties shall consent to such expedited hearing, *provided* that the only issue that the Debtors may raise at such hearing is whether an Event of Default has occurred. |
| | *See* DIP Loan Agreement Section 10.1 and Interim Order ¶ 25. |
| *Bankruptcy Rule 4001(C)(1)(B)(iv)* | |
| *Local Rule 4001-2(a)(ii)* | |
| **Events of Default - Facility and Cash Collateral** | Usual and customary for comparable financings including, without limitation: |
| | (i)   Credit Parties failure to satisfy any covenant; |
| | (ii)   Payment default; |
| | (iii)   Occurrence of Material Adverse Effect; |
| | (iv)   Any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; |
| | (v)   A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the |

| | |
|---|---|
| | operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Debtors; |
| | (vi)    Entry of a Bankruptcy Court Order denying or terminating use of Cash Collateral by the Credit Parties; |
| | (vii)   The consummation of any sale of all or substantially all of the assets of the Credit Parties pursuant to Section 363 of the Bankruptcy Code, other than the Bankruptcy Sale; and |
| | (viii)  Failure to meet Milestones. |
| *Bankruptcy Rule 4001(b)(1)(B)(iii)*<br><br>*Local Rule 4001-2(a)(ii)* | *See* DIP Loan Agreement Section 9 and Interim Order ¶ 24. |
| **Avoidance Actions**<br><br><br><br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)*<br><br>*Local Rule 4001-2(a)(i)(D)* | The Collateral shall not include claims or causes of action for preferences, fraudulent conveyances or other avoidance actions under Sections 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code or any other avoidance action under the Bankruptcy Code, state law or other Debtor Relief Laws (the "Avoidance Actions") but, upon entry of the Final Order, shall include the proceeds of any Avoidance Actions.<br><br>*See* DIP Loan Agreement Section 3.1 and Interim Order ¶ 8. |
| **Indemnification**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Debtors shall indemnify and hold harmless the DIP Agent, the DIP Lender, and the Prepetition Secured Parties, and each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investor funds, advisors, attorneys, professionals, representatives, investment bankers, and consultants, each in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, or causes of action, whether groundless or otherwise, and costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Credit Documents, the Prepetition Financing Documents, or the transactions contemplated thereby and by the Interim Order, except to the extent resulting from such indemnified party's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the DIP Agent's and DIP Lender's exercise of discretionary rights granted under the DIP Credit Documents and/or the Prepetition Financing Documents, as applicable.<br><br>*See* Interim Order at ¶ 29. |
| **Releases** | Subject Challenge (as defined in the Interim Order) rights, the Debtors waive any and all actions related to, and hereby release, each |

| | |
|---|---|
| | of (a) the DIP Lender, (b) the DIP Agent, (c) the Prepetition Secured Parties, and (d) each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants, each in their respective capacity as such (each such person or entity identified in sub-clauses (a) through (d) of this paragraph 31, a "Released Party" and, collectively, the "Released Parties") from any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, or any Challenge, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising prior to the Petition Date and to the extent related to the Prepetition Financing Documents, the DIP Credit Documents, or the Interim Order, any documents related to the Prepetition Financing Documents, the DIP Credit Documents, or the Interim Order, any aspect of the prepetition relationship with the Released Parties, any Debtor, or any other acts or omissions by the Released Parties in connection with the Prepetition Financing Documents, the DIP Credit Documents, or the Interim Order, any documents related to the Prepetition Financing Documents, the DIP Credit Documents, or the Interim Order, or any aspect of their prepetition relationship with any Debtor. |
| *Bankruptcy Rule 4001(c)(1)(B)(x)* | *See* Interim Order at ¶30. |
| **Covenants** | The DIP Loan Agreement requires compliance with affirmative and negative covenants that are usual and customary for DIP financings. |
| *Local Rule 4001-2(a)(ii)* | *See* DIP Loan Agreement Section VII. |
| **Stipulations**<br><br><br><br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii)*<br><br>*Local Rule 4001-2 (a)(i)(B)* | The Debtors make certain customary admissions and stipulations with respect to the amounts outstanding under the prepetition financing documents, the validity, perfection, enforceability and priority of liens and security interest securing the Senior and Junior Secured Indebtedness, the Debtors' petition defaults under the prepetition financing documents and the non-existence of any grounds for the Debtors to challenge any aspect of the prepetition financing documents or the respective holders thereof.<br><br>*See* Interim Order ¶ E. |
| **Challenge Deadline**<br><br><br><br>*Local Rule 4001-2 (a)(i)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | Twenty-one (21) days after the entry of the Final Order.  In the event that the case is converted to chapter 7 or a chapter 11 trustee is appointed before expiration of the Challenge Period, the Challenge Period shall not expire until 60 days after the trustee's appointment.<br><br>*See* Interim Order ¶ 36. |
| **506(c) Waiver** | Effective upon entry of the Final Order, no costs or expenses of |

01:21672815.1

| | |
|---|---|
| *Bankruptcy Rule 4001(c)(1)(A)(x)* | administration shall be imposed upon any DIP Lender or any of the Collateral pursuant to Section 506(c) of the Bankruptcy Code. |
| *Local Rule 4001-2(a)(i)(C)* | *See* DIP Loan Agreement Sections 9.20, 9.21and 9.24 and Interim Order ¶ 38. |

5. In accordance with Local Rule 4001-2(a)(i)(A)-(G), the Debtors also draw the Court's attention to certain material provisions of the DIP Facility and the relief set forth in the Interim Order:

    a. Provisions that Grant Cross-Collateralization Protection (Other than Replacement Liens or Other Adequate Protection) to the Prepetition Secured Creditors (Local Rule 4001-2(a)(i)(A)). Not applicable.

    b. Binding the Estate to Validity, Perfection or Amount of Secured Debt or Limitations on Investigation (Local Rule 4001-2(a)(i)(B)). Interim Order ¶¶ E and 36.

    c. Waiver of Section 506 (c) Rights (Local Rule 4001-2(a)(i)(C)). Effective upon entry of the Final Order, no costs or expenses of administration shall be imposed upon any DIP Lender or any of the Collateral pursuant to Section 506(c) of the Bankruptcy Code. DIP Loan Agreement Sections 9.20, 9.21 and 9.24 and Interim Order ¶ 38.

    d. Liens on the Debtors Claims and Causes of Action Arising Under Chapter 5 of the Bankruptcy Code (Local Rule 4001-2(a)(i)(D)). Liens on proceeds of avoidance actions subject to entry of the Final Order. DIP Loan Agreement Section 3.1 and Interim Order ¶ 6.

    e. Roll-Over Provisions (Local Rule 4001-2(a)(i)(E)). Not applicable.

    f. Disparate Treatment of Professionals ((Local Rule 4001-2(a)(i)(F)). Not applicable.

    g. Priming Lien (Local Rule 4001-2(a)(i)(G)). The Liens under the DIP Facility are first priority priming liens with seniority over all of the Prepetition Secured Parties except for the Senior Carve-Out and the Carve-Out. The Senior Prepetition Lender has consented to the priming liens subject to the Senior Carve-Out. The prepetition subordinated secured lenders, MMA, MHA and the Bridge Agent have not consented to the priming of their liens. DIP Loan Agreement definition of Permitted Indebtedness; Interim Order ¶ ¶ G. (ii) and 6.

6. The DIP Lender would not provide the DIP Facility and the Senior Prepetition Lender would not consent to the use of Cash Collateral without the inclusion of the provisions

12

listed above, each of which was heavily negotiated among the parties.   Moreover, these "extraordinary" provisions are justified under the circumstances for the reasons set forth below. Finally, the Debtors have determined in their sound business judgment that agreeing to such provisions was appropriate under the circumstances of these Cases to afford the Debtors immediate and much needed liquidity on the most competitive terms available to the Debtors.

## BACKGROUND

### A.      General Background

7.      On March 13, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these Cases pursuant to Bankruptcy Rule 1015(b).  No party has requested the appointment of a trustee or examiner in these Cases, and no statutory committees have been appointed or designated.

8.      A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the above-captioned Cases, are set forth in greater detail in the *Declaration of Andrew Birch in Support of Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

### B.      Background Specific to the Relief Requested

#### *(1)      The Debtors' Prepetition Indebtedness*

##### a.      Hercules Senior Prepetition Credit Agreement

9.      As of the Petition Date, the Debtors have outstanding obligations under that certain Loan and Security Agreement, dated as of March 31, 2015 (as amended, the "Senior

Prepetition Credit Agreement"), by and between Sungevity, Inc. and Sungevity Development, as borrowers, certain of Sungevity, Inc.'s domestic subsidiaries, as guarantors (the "Prepetition Subsidiary Guarantors"), and Hercules Capital, Inc., formerly known as Hercules Technology Growth Capital, Inc. ("Hercules"), as lender and agent (in such capacity, the "Senior Prepetition Lender"). The Senior Prepetition Credit Agreement consists of a term loan facility (the "Term Loan Facility", and the loans under such Term Loan Facility, the "Term Loans") in an aggregate principal amount of $35.0 million and a revolving loan facility (the "Revolving Loan Facility", and collectively with the Term Loan Facility, the "Hercules Facility", and the loans under such Revolving Loan Facility, the "Revolving Loans", and together with the Term Loans, the "Senior Prepetition Loans") in an aggregate principal amount of up to $20 million. The availability under the Revolving Loan Facility is based on a borrowing base consisting of accounts receivable and inventory. The Senior Prepetition Credit Agreement, together with any other agreement, note, instrument, guaranty, mortgage, fixture filing, deed of trust, financing statement, pledge, assignment, and other document executed at any time in connection therewith, in each case as the same may be amended, modified, restated or supplemented from time to time, are hereinafter referred to collectively as the "Senior Prepetition Loan Documents".

10.     The interest rate on advances under both the Term Loan Facility and the Revolving Loan Facility is the sum of (a) the greater of the prime rate as reported in the Wall Street Journal or 3.25% plus (b) 3.70%. Interest on both the Term Loan and the Revolving Loans is payable monthly. Payments of interest on the Term Loan Facility were required as of January 2, 2017, and the payment of principal was originally required as of January 2, 2017, but the Senior Prepetition Credit Agreement was subsequently amended so that the payments of principal would commence on April 1, 2017. The Term Loan Facility and the Revolving Loan Facility have a maturity date of October 1, 2017.

11.     The obligations under the Senior Prepetition Credit Agreement are secured by: (a) substantially all of Sungevity, Inc.'s assets other than: (i) intellectual property; (ii) collateral securing the obligations of Sungevity, Inc.'s backlevered financing with Atalaya (as defined below) (consisting of the equity interests of Sungevity Short Hills 2012, LLC and any assets of Sungevity Short Hills 2012 LLC and its subsidiaries); (iii) equity interests in excess of 65% of any direct foreign subsidiaries; and (iv) certain other excluded assets (collectively, the "Excluded Assets"); and (b) substantially all of the assets (other than intellectual property) of Sungevity Development and the Prepetition Subsidiary Guarantors (collectively, (a) and (b) are the "Senior Prepetition Collateral").    Sungevity, Inc. has also granted Hercules a negative pledge with respect to its intellectual property, which, among other things, prohibits Sungevity, Inc. from selling, transferring, assigning, mortgaging, pledging, leasing, granting a security interest in or otherwise encumbering its intellectual property (the "Negative Pledge").    The Senior Prepetition Credit Agreement includes negative covenants that restrict Sungevity, Inc.'s ability to obtain further debt financing beyond certain immaterial amounts (the "Negative Covenants").    The Senior Prepetition Credit Agreement provides that the occurrence of a circumstance that has a material adverse effect on Sungevity's business would be an event of default under the agreement.

12.     If Sungevity defaults under the Senior Prepetition Credit Agreement or wants to prepay or refinance the Senior Prepetition Credit Agreement, it must pay (a) an end of term charge of approximately $3.5 million and (b) a prepayment fee equal to 1% of the outstanding amount being prepaid. In the event of a default, there is a 4% default interest charge.    Prior to the Petition Date, the Debtors were in default under the terms of the Senior Prepetition Credit Agreement.    In addition, the commencement of the Cases is an event of default under the Senior Prepetition Credit Agreement.

15

13.     As of the Petition Date, $35 million is outstanding under the Term Loan Facility and $20 million is outstanding under the Revolving Loan Facility (collectively, the "Senior Prepetition Secured Obligations"), with no remaining amounts available to borrow under the Senior Prepetition Credit Agreement.

### b.     MMA LSA

14.     On September 20, 2016, Sungevity, Inc. and Sungevity Development entered into a secured loan and security agreement (the "MMA LSA") with MMA Energy Capital, LLC ("MMA"), for a term loan in the aggregate principal amount of $10 million (the "MMA Loan"). The MMA Loan is guaranteed by the Prepetition Subsidiary Guarantors.  The interest rate on advances of the MMA Loan  is 13.5% per annum and is payable monthly.  The MMA Loan is due on the earlier of an initial public offering of Sungevity, Inc. or September 20, 2018.

15.     The MMA Loan is secured by second priority security interests and liens on the Senior Prepetition Collateral (as more fully described in the definition of "Collateral" in the MMA LSA, ("MMA Loan Collateral").  Sungevity, Inc. also granted MMA a Negative Pledge and a Negative Covenant.

### c.     MHA LSA

16.     On November 10, 2016, Sungevity, Inc. and Sungevity Development entered into a loan and security agreement (as amended, the "MHA LSA") with MHA Trust LLC ("MHA"), for a term loan in the aggregate principal amount of $5.0 million (the "MHA Loan").  The MHA Loan is guaranteed by the Prepetition Subsidiary Guarantors.  The interest rate on advances of the MHA Loan is 13.5% per annum and is payable monthly.  The MHA Loan is due on the earlier of an initial public offering of Sungevity, Inc. or September 20, 2018.

17.     The MHA Loan is secured by second priority security interests and liens on the Prepetition Senior Collateral (as more fully described in the definition of "Collateral" in the

01:21672815.1

MHA LSA, the "MHA Loan Collateral"). Sungevity, Inc. has also granted MHA a Negative Pledge and a Negative Covenant.

### d.    Bridge Loan

18.    In January 2017, Sungevity and its advisors engaged in lengthy negotiations with Hercules, MMA, MHA, and other parties regarding a potential bridge financing to address Sungevity's immediate short term working capital needs.  These negotiations culminated in the execution of a bridge loan agreement dated January 30, 2017 (the "Bridge Loan Credit Agreement") by and between Sungevity, Inc. and Sungevity Development, as borrowers, the Prepetition Subsidiary Guarantors, as guarantors, Wilmington Savings Fund Society, FSB, as collateral agent (the "Bridge Agent"), and the lenders party thereto (the "Bridge Lenders") for a $9.5 million term loan (the "Bridge Loan" and, collectively with the MMA Loan and the MHA Loan, the "Junior Secured Obligations").   The maturity date of the Bridge Loan is September 20, 2018.  The mandatory prepayment obligations require certain prepayments upon the closing of an equity financing or a sale of Sungevity.  The Bridge Loan is secured by the Senior Prepetition Collateral (as more fully described in the definition of "Collateral" in the Bridge Loan Credit Agreement, the "Bridge Loan Collateral")  Sungevity, Inc. has also granted the Bridge Lenders a Negative Pledge and a Negative Covenant.

19.    The liens granted under the Bridge Loan, MMA Loan, and MHA LSA (collectively, the "Junior Secured Liens") on the Bridge Loan Collateral, MMA Loan Collateral, and MHA Loan Collateral, respectively (collectively, the "Junior Collateral") are *pari passu* with each other and are all junior to the Senior Secured Liens.

20.    Sungevity's prepetition indebtedness described in paragraphs 9 – 19 above is subject to a second amended and restated intercreditor agreement dated as of January 30, 2017 (the "Prepetition Intercreditor Agreement") among Hercules, MMA, MHA and the Bridge Agent

on behalf of the Bridge Lenders (collectively, the "Prepetition Secured Parties").  The Prepetition Intercreditor Agreement governs the relative contractual rights of Hercules as senior lender, on the one hand, and MMA, MHA and the Bridge Lenders as subordinated lenders (collectively, the "Subordinated Lenders"), on the other hand.

### e.    Atalaya Term Loan

21.    On December 12, 2016, Sungevity Short Hills 2012, LLC, a non-debtor subsidiary of Sungevity, Inc., entered into a credit agreement with Atalaya Administrative LLC, as agent, and Atalaya Special Opportunities Fund VI LP, as lender (together, "Atalaya") for a term loan in the aggregate principal amount of $32 million.  Sungevity, Inc. has agreed to guarantee up to $ 7 million of Sungevity Short Hills 2012, LLC's obligations to Atalaya in a payment guaranty agreement and indemnity guaranty agreement.  Sungevity, Inc. has granted Atalaya a Negative Pledge.

### (2)    *The Debtors' Efforts to Obtain DIP Financing*

22.    As described in the First Day Declaration, after the merger agreement with Easterly Acquisition was terminated in December 2016, the Debtors were left with a near term liquidity shortfall and longer term capital needs.  Significantly, in connection with the merger agreement, the parties had agreed to a no-shop provision that prevented the Debtors from seeking alternative sources of financing prior to December 31, 2016, without incurring significant financial penalties.  As a result, the entry into, and ultimate termination of, the merger agreement exacerbated Sungevity's existing liquidity shortfall and deprived the Debtors of a timely solution for its longer term capital needs.  In the two and a half months following the termination of the Easterly transaction, the Debtors quickly pivoted to the exploration of strategic alternatives to solve both its short and long term cash needs.

23.     On January 23, 2017, the Debtors engaged  Ducera Securities LLC ("Ducera"), as a restructuring advisor to advise the Debtors regarding potential restructuring opportunities,  to identify potential sources of capital and buyers, and to assist in arranging and executing a potential sale of the Debtors' business.  At that time, the Debtors also began working with Greentech Capital Advisors.  *See Declaration of Joshua S. Scherer in Support of the Postpetiton Financing Motion* (the "Scherer Declaration") at ¶ 6.

24.     Immediately after its retention, Ducera, together with the Debtors and the Debtors' other advisors, began exploring various strategic alternatives for these Cases, including a chapter 11 plan of reorganization and a transaction involving the sale of all or substantially all of the Debtors' assets.  To ensure that the Debtors had sufficient liquidity to continue operating while that process was underway, on January 30, 2017, Sungevity, Inc. and Sungevity Development obtained a $9.5 million Bridge Loan (as discussed above).  The proceeds of the Bridge Loan were used to provide Sungevity with additional liquidity and runway to run a comprehensive restructuring and sale process, to run a comprehensive restructuring and sale process, negotiate debtor-in-possession financing terms, and prepare the company and its operations for a soft-landing once in chapter 11.  *See Scherer Declaration* at ¶ 7.

25.     Ultimately, given the Debtors' liquidity constraints and difficulty securing long term financing necessary to support a refinancing, the Debtors and their professionals determined that the best way to maximize value for the Debtors' estates was via a sale of all, or substantially all of the Debtors' assets.  *See Scherer Declaration* at ¶ 8.  Ducera, in combination with the Debtors' management team, the Strategic Committee of the Board of Directors of Sungevity, Inc. (the "Strategic Committee"), and the Debtors' other advisors, sought to identify potential strategic and financial investors for an asset sale pursuant to section 363 of the U.S. Bankruptcy Code.  *Id.* at ¶ 8.

01:21672815.1

26.     On February 10, 2017 the Strategic Committee authorized Ducera to reach out to potential providers of debtor-in-possession ("DIP") financing.   Ducera initially reached out to eight (8) potential DIP financing parties to discuss the opportunity on a "no-names" basis.  Of these parties, only three (3) parties decided to sign a non-disclosure agreement and receive materials about the Debtors to help them evaluate the DIP financing opportunity.  Ultimately, all three (3) parties declined to pursue the opportunity or provide a proposal due to several factors, including the limited assets of the Debtors, the Debtors' history of negative cash flows, and the likely necessity to engage in a "priming fight" with the Debtors' existing senior secured lender, Hercules.  *Id. at* ¶ 9.  At various points in time, Ducera and representatives of the Debtors, asked Hercules if they would consider providing DIP financing for a sale of assets pursuant to section 363 of the Bankruptcy Code.  At no point did Hercules indicate any willingness to provide DIP Financing.  *Id*. at 9.

27.     On February 24, 2017, the Strategic Committee authorized Ducera to contact parties to discuss a potential 363 auction process (or, in the alternative, a sponsored plan of reorganization) and solicit non-binding indications of interest from such parties.   Between February 24th and February 26th the Debtors held conversations with six (6) parties to discuss their interest in providing a stalking horse bid.  One party immediately declined, while the others indicated varying levels of interest; the interested parties were subsequently sent letters providing procedures and a deadline for submission of non-binding indications of interest.  The initial deadline of February 27th was extended to February 28th to allow additional time for parties to express their interest.  As of the deadline, no parties had submitted non-binding indications of interest, although conversations with multiple parties were still ongoing.  *Id. at* ¶ 10.

28.     Ultimately, one party, NPG, indicated interest in participating in a sale process or plan of reorganization of the Debtors through a bankruptcy process.  The Debtors and NPG had originally considered a plan of reorganization to be sponsored by NPG, but over the course of the

next eleven (11) days, as Sungevity's liquidity became increasingly strained, Ducera, the Debtors, and the Debtors' other professional advisors engaged in intensive negotiations with NPG regarding the structure and terms of an asset sale. The Debtors and their professional advisors also engaged in extensive discussions with Hercules, the Debtors' senior secured prepetition lender, regarding the terms of access to cash collateral and a debtor-in-possession financing facility. On March 6, 2017, all of the parties reached an agreement in principle regarding DIP financing and an in-court sale process under Bankruptcy Code section 363. *Id. at* ¶ 11.

29.      On March 13, 2017, the Debtors entered into the DIP Loan Agreement with LSHC as DIP Lender and the DIP Agent. To continue operating their business in the ordinary course to preserve the value of the Debtors' assets and complete the sale process, it is critical that the Debtors have access to the DIP Facility. The DIP Facility, coupled with the use of Cash Collateral, will also permit the Debtors to fund the administration of these Cases and is vital to the confidence of the Debtors' employees, customers, installers, suppliers, and vendors and the preservation and maintenance of the going-concern value of the Debtors' estates. Without Court approval of the DIP Facility, the Debtors will not have sufficient cash to make timely payments to suppliers, vendors, and employees that are required to support and maintain the Debtors' continued operations and complete the sale process. Absent the DIP Facility, there would be no choice but to immediately liquidate the Debtors' assets to the detriment all of their creditors, employees, customers and other interested parties. *Id. at* ¶ 12.

30.      The DIP Loan Agreement permits the Debtors to incur expenditures in accordance with a budget (the "DIP Budget") satisfactory to the DIP Lender, a copy of which is attached hereto as Exhibit C. The proceeds of the DIP Facility will be used (a) for working capital and general corporate purposes of the Debtors and (b) to pay fees and expenses related to the DIP Facility and these Cases.

21

31.     The terms of the DIP Facility require the Debtors to complete the sale of their assets in accordance with certain milestones.  To maximize the value of their estates, and in compliance with the milestones under the proposed DIP Facility, the Debtors have contemporaneously with this Motion filed a motion seeking authority to conduct an auction process by which the Debtors will solicit offers and, ultimately, seek approval to sell substantially all of their assets to the Stalking Horse Purchaser or such other qualified bidder with the highest or otherwise best offer.

### (3)     *Proposed Adequate Protection and Use of Cash Collateral*

32.     All cash, securities, and other property (other than Excluded Assets) of the Debtors as of the Petition Date, including, without limitation, all amounts on deposit or maintained by any Debtor in any account, was subject to rights of setoff or to (a) valid, perfected, enforceable first-priority liens under the Senior Prepetition Loan Documents and applicable law, and (b) valid, perfected, enforceable Junior Liens.  The Debtors' cash balances are cash collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code. All such cash (including, without limitation, all proceeds of Prepetition Collateral and all proceeds of property encumbered by liens and security interests granted under the Interim Order) is referred to herein as "Cash Collateral."  In addition to the DIP Facility, the Debtors require the use of the Cash Collateral.

33.     The proceeds of the DIP Facility, coupled with the use of the Cash Collateral (consistent with the DIP Budget), are necessary to provide the Debtors with the capital required to operate, preserve the value of their business and complete the sale process.

34.     The Senior Prepetition Lender has consented to the use of the Cash Collateral pursuant to the terms of the Interim and Final Orders.  The Subordinated Prepetition Lenders have not yet consented.

35.    The Debtors submit that the Prepetition Secured Lenders are entitled to receive adequate protection pursuant to sections 361, 363, and 364 of the Bankruptcy Code for, and to the extent of, any postpetition diminution in the value of their interest in the Prepetition Collateral (including Cash Collateral) resulting from the Debtors' use, sale, or lease of such collateral, the imposition of the automatic stay, and the subordination to the Carve-Out and the DIP Facility (collectively, the "Diminution in Value").  Accordingly, the Debtors will provide the following primary forms of adequate protection (the "Adequate Protection Package"):

a)    approval of the Milestones for the benefit of the Prepetition Secured Lenders;

b)    additional liens on unencumbered prepetition assets to the Prepetition Secured Lenders, junior only to the DIP Liens, the DIP Superpriority Claims, the Senior Carve-Out and the Carve-Out and, in each case, subject to the terms of the Prepetition Intercreditor Agreement.

c)    replacement security interests and liens in the DIP Collateral to the Prepetition Secured Creditor in exchange for the subordination of their liens to the DIP Liens, and only to the extent of a Bid (as defined in the Asset Purchase Agreement) by the DIP Lender, which shall be junior only to the DIP Liens, the DIP Superpriority Claims, the Senior Carve-Out, and the Carve-Out, and shall, in each case, be subject to the terms of the Prepetition Intercreditor Agreement;

d)    a superpriority administrative expense claim to the Prepetition Secured Lenders with priority in payment over all administrative expenses other than the DIP Superpriority Claim, the Carve-Out, and the Senior Carve-Out;  and

e)    the Senior Secured Liens and Junior Secured Liens shall attach to the proceeds of the sale of any Prepetition Collateral in the order and priority as they existed before the Petition Date.

36.    The Debtors submit that the Adequate Protection Package will adequately protect the Prepetition Secured Lenders' respective interests in the Prepetition Collateral from Diminution in Value, as well as for any decline in, or diminution of, the value of the Prepetition Secured Lender's liens or security interests under their respective prepetition loan documents. Further, the Debtors' preservation of estate assets through the use of Cash Collateral serves as its own form of adequate protection.  The Prepetition Secured Lender will benefit inherently from

the Debtors' proposed use of the Cash Collateral, which will prevent Diminution in Value and enhance the likelihood of preserving and maximizing the Debtors' overall going-concern value.

37.     In addition, the Debtors request that the Court schedule a hearing (the "Final Hearing") as soon as practicable after the twenty-first day following the entry of the Interim Order to consider approval of the relief requested by the Motion on a final basis and establish the date that is seven days prior to the Final Hearing as the deadline for parties to file objections to the Motion.

**BASIS FOR RELIEF REQUESTED**

**A.     Entry into the Proposed DIP Loan Agreement Should Be Authorized**

38.     Absent the DIP Facility, and in particular the Interim Facility, there would be no choice but to immediately shutdown the Debtors' operations and promptly liquidate their assets resulting in the immediate loss of all employees and no company for the Debtors' numerous customers, vendors and suppliers to do business with.  A liquidation of the Debtors' assets would allow for a recovery of approximately $10 million, significantly less than the more than $55 million owed to Hercules as Senior Prepetition Lender.  *See  Scherer Declaration at ¶* 14.

**B.     Approval Under Sections 364(c) and 364(d) of the Bankruptcy Code is Merited**

39.     The Debtors propose to obtain the DIP Facility by providing to the DIP Lender security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]...."  11 U.S.C. § 364(c).

40.     Section 364(c) financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  *See In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying motion for authorization to

24

enter into postpetition credit facility where debtors could not prove that they were unable to obtain unsecured credit allowable as an administrative expense).

41.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a)      the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

b)      the credit transaction is necessary to preserve the assets of the estate; and

c)      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*L.A. Dodgers*, 457 B.R. at 312 (citation omitted).  As is fully set forth below, the Debtors have satisfied each of these conditions.

42.     Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, after notice and a hearing, where the debtor is unable to "obtain such credit otherwise" and there is "adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. §364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Lenders consented or (b) the Prepetition Secured Lender's interests in in their respective collateral are adequately protected.

43.     Here, the Senior Prepetition Lender has consented. The Subordinated Prepetition Lenders have not affirmatively consented to the relief, however, their rights are limited pursuant

25

to the Prepetition Intercreditor Agreement and such consent is not required because their interests in their respective Prepetition Collateral are adequately protected as described below.

### C.    The Debtors Do Not Have an Alternative to the DIP Facility

44.    Financing of the type and in the amount needed in these cases was unobtainable on an unsecured basis. *See Scherer Declaration at ¶¶* 9 and 15.  In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984) (finding that the debtor satisfied its burden to show an inability to obtain credit on other terms through time and effort).

45.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and 364(d) of the Bankruptcy Code. *See Snowshoe*, 789 F.2d at 1088; *see also In re Antico Mfg. Co.*, 31 B.R. 103, 105 (Bankr. E.D.N.Y. 1983).  Moreover, where there are few lenders likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).  Here, the Senior Prepetition Lender, would not provide DIP financing and would only consent to a partial priming of its liens under the specific terms of this this DIP Facility.  Thus, the Debtors submit that they can satisfy the requirements of sections 364(c) and 364(d) of the Bankruptcy Code that alternative credit was not available on an unsecured basis allowable as an administrative claim under section 503(b)(1) of the Bankruptcy Code or on a non-priming basis.

01:21672815.1

**D.**      **The DIP Facility is Necessary to Preserve the Assets of the Debtors' Estates**

46.      It is imperative that the Debtors promptly obtain access to financing. Access to substantial credit is necessary to meet the day-to-day costs associated with operating the Debtors' business, including funding for employee wages and other costs necessary for operations pending completion of the sale process. Immediate access to sufficient cash is therefore critical to the Debtors. In the absence of immediate liquidity, many of the Debtors' employees and contractors may refuse to continue providing services to the Debtors, rendering the Debtors unable to operate their business. A loss of confidence among employees and other interested parties in the Debtors' ability to access credit at this crucial time would have a material adverse impact on the Debtors and their estates.

47.      For these reasons, direct access to the funds available under the DIP Loan Agreement is critical to the Debtors. The ongoing operations of their business demand that the Debtors not be delayed in receiving the beneficial effects of the DIP Facility; any substantial delay could have the same impact as denial of this Motion.

**E.**      **The DIP Loan Agreement is Fair, Reasonable, and Appropriate**

48.      The DIP Facility reflects the exercise of the Debtors' sound and prudent business judgment. As described above, the Debtors were not able to obtain alternative financing on an unsecured basis, nor were they able to obtain any financing on terms as favorable to them as the terms negotiated with the DIP Lender. The proceeds of the DIP Facility are sized to support the Debtors through the anticipated sale process, fund administrative costs of the Debtors' estates and preserve and promote the health and viability of the business. Specific to these Cases, the DIP Facility sets certain Milestones and related deadlines for the sale process and entitles the DIP Lender to certain fees. Based on the extensive negotiations that took place, the Debtors believe that these are the only terms on which the DIP Lender will provide the financing.

01:21672815.1

Moreover, the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind. The Debtors believe that the terms of the DIP Loan Agreement provide sufficient flexibility for them to maximize value to their estates and pursue the sale of their assets. Significantly, although the DIP Lender and the Stalking Horse Purchaser are the same entity, the Debtors have preserved the ability to pursue higher and better offers for their assets through the sale process.

49.     The DIP Loan Agreement provides that the security interests and administrative expense claims granted to the DIP Lender are subject to the Carve-Out. In *Ames Department Stores*, the bankruptcy court found that such "carve outs" are not only reasonable, but are necessary to ensure that official committees and debtors' estates will be assured of the assistance of counsel. *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

50.     The terms and conditions of the DIP Loan Agreement are fair and reasonable and were negotiated by the parties in good faith and at arm's-length. The interest rate under the DIP Loan Agreement is within the range of market rates and fair and reasonable in light of the credit profile of the Debtors, the nature and extent of the Collateral, and the business risks associated with lending to the Debtors in these Cases, particularly given the fact that interest is payable in kind. Accordingly, the Debtors submit that the DIP Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code.

**F.      The Debtors Have Exercised Sound Business Judgment in Determining that the DIP Facility Is Necessary**

51.     As described about and in the Scherer Declaration, after appropriate investigation and analysis, and given the exigencies of the circumstances, the Debtors have concluded that alternative credit of the type and in the amount required by the Debtors is not available on an unsecured basis. *See Scherer Declaration* at ¶ 6-9 and 15. Bankruptcy courts routinely defer to

28

a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard. *See Trans World Airlines*, *Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility, and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors."); *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) (stating that debtor "is entitled to some free reign in fulfilling its perceived mission of . . . keeping an ongoing business afloat…"). Indeed, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

52.     The Debtors have exercised sound business judgment in determining that the DIP Facility is not only appropriate, but that it is necessary. Without the liquidity provided by the DIP Facility, the Debtors would be unable to pay employees, installers, suppliers, and vendors, and other constituencies that are essential to the operation of the business. Furthermore, the Debtors believe that they will satisfy the legal prerequisites to borrow under the DIP Loan Agreement. The terms of the DIP Loan Agreement are fair and reasonable and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Loan Agreement, to borrow funds on the secured basis described above, and to take the other actions contemplated by the DIP Loan Agreement and as requested herein.

### G.     The Prepetition Secured Lenders Are Adequately Protected

53.     As noted above, the Senior Prepetition Lender has consented to the priming of the DIP Facility and the use of Cash Collateral. Without the DIP Facility and the use of Cash

29

Collateral, the only option would be to immediately liquidate all of the Debtors' assets, which would allow for a recovery of approximately $10 million, which is significantly less than the $55 million plus owed to the Senior Prepetition Lender. *See Scherer Declaration* at ¶ 14. In a liquidation, Subordinated Prepetition Lenders would receive nothing, so they are not harmed by the DIP Facility or the use of Cash Collateral and do not require any additional adequate protection.

54.     Even if the Debtors were able to complete the sale process without DIP financing, which they cannot do, based upon the anticipated sale price, there is very likely to be no value to the Subordinated Prepetition Lenders pursuant to the sale under any reasonable set of assumptions. *See Scherer Declaration* at ¶ 14. As a result, the Subordinated Prepetition Lenders are not harmed by the DIP financing. Instead, the DIP Facility and use of Cash Collateral are themselves additional forms of adequate protection by maintaining the value of the collateral because it is clear that the sale value of the Debtors exceeds the liquidation value. As a result, the DIP Facility and use of Cash Collateral adequately protects the Subordinated Prepetition Creditors because there is no value in the Prepetition Collateral for them otherwise and the DIP Facility and the use of Cash Collateral give them their only possible chance of a recovery.

55.     Finally, even if there arguably could be some diminution in value to the Subordinated Prepetition Creditors as a result of the DIP Facility, which the Debtors do not think is the case, the Adequate Protection Package is sufficient because it includes additional liens on unencumbered assets (including proceeds from Avoidance Actions, intellectual property and other Excluded Assets), and a superpriority claim that will help to protect against any possible diminution. As a result, the Prepetition Secured Parties are adequately protected and the relief requested is appropriate.

01:21672815.1

### H.      Use of Cash Collateral Should Be Approved

56.      Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use … in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  The Debtors require the use of the Cash Collateral to fund their operations in accordance with the DIP Loan Agreement.  Indeed, absent such relief, the Debtors would be unable to maintain operations, which would result in damaging consequences for the Debtors and their estates and creditors.  As noted herein, the interests of the Prepetition Secured Lenders in the Cash Collateral will be protected by the Adequate Protection Package.  Moreover, the Senior Prepetition Lender has consented to the use of the Cash Collateral.  Accordingly, as part of the DIP Facility, the Debtors' request to use the Cash Collateral in the operation of their business and administration of the Cases should be approved.

### I.      The Proposed Adequate Protection Package Should Be Authorized

57.      Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used [by a debtor-in-possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief.  *See* 11 U.S.C. § 361.  What constitutes adequate protection must be decided on a case-by-case basis.  *See MBank Dall., N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1396–97 (10th Cir. 1987); *Martin v. United States (In re Martin),* 761 F.2d 472, 474 (8th Cir. 1985); *Shaw Indus., Inc. v. First Nat'l Bank of Pa. (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003).  The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.

31

*See Resolution Trust Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)* 16 F.3d 552, 564 (3d Cir. 1994) ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy." (internal citations omitted)).

58.     As detailed above, as adequate protection for the interests of the Prepetition Secured Lenders, the Debtors will provide them the Adequate Protection Package. Without access to the proposed DIP Facility and use of the Cash Collateral, the Debtors' liquidity will quickly dry up, and the Debtors will be forced to cease operations, destroying the value of these estates to the detriment of all interested parties.

59.     For the reasons set forth above, the Adequate Protection Package will sufficiently protect the Prepetition Lender's interest in their collateral.  Accordingly, the Adequate Protection Package is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

## J.    Request for Modification of Automatic Stay for DIP Lender and DIP Agent

60.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The proposed DIP Loan Agreement contemplates a modification of the automatic stay, to the extent applicable, to permit the DIP Lender and DIP Agent to exercise of all their rights and remedies provided for in the DIP Loan Agreement upon the occurrence and during the continuation of any Event of Default (as defined in the DIP Loan Agreement), provided that prior to the exercise of any enforcement remedies against the Collateral, the DIP Lender shall be required to give three (3) business days' notice to the DIP Borrowers as provided for section 10.1 of the DIP Loan Agreement and in paragraph 25 of the Interim Order.  These provisions allowing for a modification of the automatic stay are an

32

appropriate feature of the DIP Facility and, in the Debtors' business judgment, are reasonable under the present circumstances.

### K.    Request for Immediate Interim Relief

61.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than fourteen days after the service of such motion. *See* Bankruptcy Rules 4001(b)(2), 4001(c)(2).  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the obtaining and use of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.  *See* Local Rule 4001-2(b).  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See*, *e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  After the fourteen-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business.  A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  *See*, *e.g.*, *id.* at 449; *Ames Dep't Stores*, 115 B.R. at 36.

62.    Pending the Final Hearing, the Debtors require immediate use of funds up to the amount the Term Loan commitments for, among other things, employee wages and other working capital needs.  It is essential that the Debtors immediately have the ability to pay for postpetition operating expenses, as well as the prepetition expenses approved in the various first-day orders pending before the Court, to minimize the damage occasioned by their constrained liquidity.

63.    Absent immediate use of the DIP Facility, the Debtors will be unable to pay ongoing operational expenses and will not be able to continue to make payments to key constituencies, such as employees and vendors, who are integral to the operation of the Debtors'

business.  Consequently, if interim relief is not obtained, the Debtors' efforts in these Cases will be jeopardized immediately and irreparably harmed to the detriment of the Debtors' estates, their creditors, and other parties in interest.

64.    As noted above, the Debtors are unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code or credit on a non-priming basis that would be sufficient to maintain their operations.  Without the DIP Facility, the Debtors' objective of stabilizing operations and facilitating their sale process will be severely jeopardized.  The terms and conditions of the DIP Loan Agreement are fair and reasonable, and were negotiated by well-represented parties in good faith and at arm's-length.  In these circumstances and, importantly, in light of the risk of possible material irreparable harm to the Debtors' operations, the Debtors respectfully submit that granting the relief requested by this Motion is warranted.

**L.    The DIP Financing Should Be Accorded the Benefits of Section 364(e) of the Bankruptcy Code**

65.    Because the DIP Loan Agreement has been negotiated in good faith and at arm's-length, and no consideration is being provided to any party for obligations arising under the DIP Loan Agreement, other than as disclosed therein, the Debtors request that the DIP Loan Agreement be accorded the benefits of section 364(e) of the Bankruptcy Code.

**M.    Payment of Fees is Reasonable and Appropriate**

66.    As described above, the Debtors have agreed, subject to Bankruptcy Court approval, to pay certain fees to the DIP Agent and the DIP Lender in connection with the DIP Facility.  Specifically, the Debtors will pay certain fees to the DIP Agent and the Work and Commitment Fees and a Facility Charge to the DIP Lenders.  The Debtors believe that that the fees payable to the DIP Agent and the DIP lenders under the DIP Loan Agreement are reasonable and appropriate and give the Debtors access to DIP financing on the most favorable

34

terms on which the DIP Lender would agree to make the DIP Facility available. The Debtors considered these fees when determining in the exercise of their sound business judgment that the DIP Facility constitutes the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and conduct a fair and robust sale process. As a result, paying the fees is order to  obtain the DIP Facility is in the best interests of the Debtors' estates.

## SATISFACTION OF BANKRUPTCY RULE 6003

67.     Bankruptcy Rule 6003 provides that the relief requested in the Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm . . . ." *See* Fed. R. Bankr. P. 6003.  As described herein, the Debtors' estates will suffer immediate and irreparable harm if they are not granted immediate use of the DIP Facility in order to pay ongoing operational expenses.     Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## WAIVER OF BANKRUPTCY RULE 6004(h)

68.     To implement the relief requested herein successfully, the Debtors respectfully request that the Interim Order and Final Order provide that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

69.     Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee; (b) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis, excluding insiders); (c) Hercules Capital, Inc.; (d) MMA Energy Capital, LLC; (e) MHA Trust LLC; (f) Atalaya Special

Opportunities Fund VI LP; (g) Wilmington Savings Fund Society, FSB; (h) Wilmington Trust, National Association; (i) the Securities & Exchange Commission; (j) the Office of the United States Attorney General for the District of Delaware; (k) the Internal Revenue Service; (l) the U.S. Department of Justice; (m) the offices of the attorneys general for the states in which the Debtors operate; (n) LSHC Solar Holdings LLC; and (o) Bridge Bank.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court:  (a) enter the Interim Order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested in this Motion on an interim basis; (b) after the Final Hearing, enter the Final Order substantially in the form that shall be filed with the Court; and (c) grant such other and further relief as may be just and proper.

01:21672815.1

Dated:   March 13, 2017              YOUNG CONAWAY STARGATT & TAYLOR, LLP
         Wilmington, Delaware

                                     */s/ Jaime Luton Chapman*
                                     M. Blake Cleary (No. 3614)
                                     Jaime Luton Chapman (No. 4936)
                                     Kenneth A. Listwak (No. 6300)
                                     Rodney Square
                                     1000 North King Street
                                     Wilmington, Delaware 19801
                                     Telephone: (302) 571-6600
                                     Facsimile: (302) 571-1253

                                     -and-

                                     Jonathan I. Levine (pro hac vice admission pending)
                                     Jennifer L. Marines (pro hac vice admission pending)
                                     Melissa A. Hager (pro hac vice admission pending)
                                     Erica J. Richards (pro hac vice admission pending)
                                     MORRISON & FOERSTER LLP
                                     250 West 55th Street
                                     New York, New York 10019
                                     Telephone: (212) 468-8000
                                     Facsimile: (212) 468-7900

                                     *Proposed Counsel for Debtors*
                                     *and Debtors-in-Possession*

37