## **EXHIBIT B**

**DIP Loan Agreement**

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT is made and dated as of March [__], 2017 and is entered into by and between SUNGEVITY, INC., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code ("Parent"), SUNGEVITY DEVELOPMENT, LLC, a Delaware limited liability company and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code ("Sungevity Development" and together with Parent, "Borrower") and certain of Parent's Domestic Subsidiaries as Guarantors and Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code (each a "Subsidiary Guarantor" and, together with Parent and Sungevity Development, each a "Credit Party" and collectively, the "Credit Parties"), the several banks and other financial institutions or entities from time to time parties to this Agreement (each, a "Lender" and collectively, the "Lenders") and WILMINGTON TRUST, NATIONAL ASSOCIATION, a national banking association, in its capacity as administrative agent for itself and the Lenders (in such capacity, the "Agent").

## RECITALS

A.    On March [___], 2017 (the "Petition Date"), the Credit Parties (in such capacity, each a "Debtor" and collectively the "Debtors") filed voluntary petitions with the Bankruptcy Court initiating cases pending under Chapter 11 of the Bankruptcy Code (collectively, the "Cases" and each a "Case") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

B.    Borrower has requested that the Lenders make available to the Credit Parties debtor-in-possession term loans in an aggregate principal amount of up to Twenty Million Dollars ($20,000,000) (each a "Term Loan" and collectively, the "Term Loans"); and

C.    The Lenders are willing to make the Term Loans on the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, the Credit Parties, Agent and the Lenders agree as follows:

## SECTION 1   DEFINITIONS AND RULES OF CONSTRUCTION

1.1    Unless otherwise defined herein, the following capitalized terms shall have the following meanings:

"Actual Line Item Disbursement Amount" means expenditures made by the Credit Parties during the relevant period of determination which correspond to each of the budgeted expenditures described in the line items (i) "Rent and operating leases", (ii) "Insurance", (iii) "Net Intercompany – operating", and (iv) "First Day Motion Payments" contained in the Budget, as determined in a manner consistent with the Budget.

"Actual Net Cash Flows" means the sum of all cash receipts received by the Credit Parties (excluding any borrowings), *minus* the sum of all cash disbursements, expenses

and payments (excluding repayments of any borrowings) made by the Credit Parties, in each case, during the relevant period of determination, as determined in a manner consistent with the Budget.

"Actual Operating Net Cash Flows" means the sum of all cash receipts received by the Credit Parties (excluding "non-operating" lien items and any borrowings), *minus* the sum of all cash disbursements, expenses and payments (excluding "non-operating" lien items and repayments of any borrowings) made by the Credit Parties, in each case, during the relevant period of determination, as determined in a manner consistent with the Budget.

"Adequate Protection Payments" has the meaning given to it in Section 7.27.

"Advance Date" has the meaning given to it in Section 2.2(b).

"Advance Request" means a request for a Loan submitted by Borrower to Agent in substantially the form of Exhibit A.

"Affiliate" means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors and partners.

"Agent" has the meaning given to it in the preamble to this Agreement.

"Agent's Fee Letter" means the fee letter, dated on or about the date hereof, between the Borrower and the Agent, as may be amended, restated or modified from time to time.

"Agreement" means this Debtor-in-Possession Loan and Security Agreement, as may be amended, restated or modified from time to time.

"Anti-Terrorism Law" means any requirement of law related to money laundering or financing terrorism including the PATRIOT Act, The Currency and Foreign Transactions Reporting Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959) (also known as the "Bank Secrecy Act"), the Trading With the Enemy Act (50 U.S.C. § 1 et seq.) and Executive Order 13224 (effective September 24, 2001).

"Asset Purchase Agreement" means the asset purchase agreement filed on the Petition Date with respect to the Bankruptcy Sale, in form and substance acceptable to the Required Lenders.

"Assignee" has the meaning given to it in Section 12.13.

"Atalaya" means Atalaya Capital Management LP and all Affiliates thereof.

"Atalaya Credit Agreement" means the Credit Agreement, dated as of December 12, 2016, among Sungevity Short Hills, as borrower, Atalaya Administrative LLC, as administrative agent and Atalaya Special Opportunities Fund VI LP, as the lender.

"Authorized Officer" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president, chief restructuring officer, vice president (or the equivalent thereof), chief financial officer, treasurer or controller of such Person; provided that the secretary or assistant secretary of such Person shall have delivered an incumbency certificate to the Agent as to the authority of such Authorized Officer.

"Avoidance Action" means any claim and cause of action that constitutes an avoidance action under Sections 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code or any other avoidance action under the Bankruptcy Code, state law or other Debtor Relief Laws and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for Delaware or any appellate court having jurisdiction over the Cases from time to time.

"Bankruptcy Sale" means a sale pursuant to Section 363 of the Bankruptcy Code of all of the assets and other rights of Parent and its Subsidiaries to the Stalking Horse Purchaser on the terms set forth in the Asset Purchase Agreement or such other terms acceptable to the Required Lenders.

"Bankruptcy Sale Motion" means a motion, in form and substance acceptable to the Required Lenders, seeking entry of the Bidding Procedures Order and the Bankruptcy Sale Order.

"Bankruptcy Sale Order" means an order of the Bankruptcy Court, in form and substance acceptable to the Required Lenders, approving and authorizing the Bankruptcy Sale.

"Bidding Procedures Order" means an order of the Bankruptcy Court, in form and substance acceptable to the Required Lenders, approving (i) bidding procedures relating to the Bankruptcy Sale and procedures for assuming executory contracts and unexpired leases, (ii) appointing the Stalking Horse Purchaser as the purchaser of the "Acquired Assets" as defined in the Asset Purchase Agreement, (iii) authorizing the Borrower to enter into the Asset Purchase Agreement, and (iv) approving bid protections for the Stalking Horse Purchaser, in each case on terms acceptable to the Required Lenders and in all respects consistent with those terms set forth in the Asset Purchase Agreement.

"Bidding Procedures Order Date" has the meaning assigned to such term in Section 7.23(c).

"Blocked Person" means any Person that (a) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the Office of Foreign Assets Control of the US Department of the Treasury ("OFAC") or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs, or (b) is publicly identified as prohibited from doing business with the

United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other Requirement of Law.

"Borrower Products" means all products, software, service offerings, technical data or technology currently being designed, manufactured or sold by any Credit Party or which any Credit Party intends to sell, license, or distribute in the future including any products or service offerings under development, collectively, together with all products, software, service offerings, technical data or technology that have been sold, licensed or distributed by any Credit Party since its incorporation.

"Budget" means a 6-week cash flow projection and initial debtor-in-possession budget in form and substance acceptable to the Required Lenders in their sole and absolute discretion; provided, that with the consent of the Required Lenders (not to be unreasonably withheld), the budget may be updated in accordance with Section 7.1(l).

"Budget Variance Report" means a weekly report provided by the Borrower to the Agent (i) showing by line item the Actual Net Cash Flow, the Actual Operating Net Cash Flow and the Actual Line Item Disbursement Amount for each applicable line item, and total available liquidity for the last day of the Cumulative Period, noting therein all variances, on a line-item and cumulative basis, from the amounts set forth for such period in the Budget, and shall include explanations for all material variances, and (ii) certified by an Authorized Officer of the Borrower.

"Budgeted Line Item Disbursement Amount" means the expenditures described in the line items (i) "Rent and operating leases", (ii) "Insurance", (iii) "Net Intercompany – operating", and (iv) "First Day Motion Payments" contained in the Budget during the relevant Period of determination on a line item basis.

"Budgeted Net Cash Flows" means the "Total Net Increase (Decrease) in Cash" line item contained in the Budget, in each case, during the relevant Period of determination.

"Budgeted Operating Net Cash Flows" means the sum of the line items contained in the Budget above the headings "Total Cash Receipts" *minus* the sum of the line items contained in the Budget above the heading "Total Operating Cash Disbursements", in each case, during the relevant Period of determination.

"Business Day" means any day other than Saturday, Sunday and any other day on which banking institutions in the State of New York are closed for business.

"Carve Out" has the meaning assigned to such term in the applicable Order.

"Case" and "Cases" have the respective meanings set forth in the recitals.

"Cash" means all cash and liquid funds.

"Change in Control" means the direct or indirect acquisition by any person (as such term is used in Section 13(d) and Section 14(d)(2) of the Exchange Act, but excluding any employee benefit plan of Parent or its Subsidiaries, or any person or entity acting it its capacity

as trustee, agent or other fiduciary or administrator of any such plan) or related persons constituting a group (as such term is used in Rule 13d-5 under the Exchange Act) (other than as a result of a bona fide equity financing involving venture capital, private equity and/or strategic investors) of (i) beneficial ownership of the issued and outstanding shares of voting stock or similar equity interest of Parent, the result of which acquisition is that such person or group possesses in excess of 50% of the combined voting power of all then-issued and outstanding voting stock of Parent, or (ii) the power to elect, appoint, or cause the election or appointment of at least a majority of the members of the board of directors of Parent.

"Change in Law" means the occurrence, after the date of this Agreement, of the adoption or taking effect of any new or changed law, rule, regulation or treaty, or the issuance of any request, rule, guideline or directive (whether or not having the force of law) by any governmental authority; provided, that (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives issued in connection with that Act, and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Claims" has the meaning given to it in Section 12.10.

"Closing Date" means the date on which the conditions specified in Section 4.1 are satisfied.

"Collateral" has the meaning given to it in Section 3.

"Committee" means an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

"Confidential Information" has the meaning given to it in Section 12.12.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any Indebtedness, lease, dividend, letter of credit or other obligation of another, including any such obligation directly or indirectly guaranteed, endorsed, co-made or discounted or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards or merchant services issued for the account of that Person; and (iii) all obligations arising under any interest rate, currency or commodity swap agreement, interest rate cap agreement, interest rate collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit or inchoate indemnification obligations in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in

respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"Copyright License" means any written agreement granting any right to use any Copyright or Copyright registration, now owned or hereafter acquired by any Credit Party or in which any Credit Party now holds or hereafter acquires any interest.

"Copyrights" means all copyrights, whether registered or unregistered, held pursuant to the laws of the United States, any State thereof, or of any other country.

"Credit Parties" has the meaning set forth in the recitals.

"Cumulative Period" means the period from the Petition Date through the most recent week ended.

"Debtor" has the meaning set forth in the recitals.

"Debtor Professional Fee Report" means a weekly report provided by the Borrower to the Agent and Lenders showing an estimate of the aggregate amount of Professional Fees of the Debtor (and for the avoidance of doubt, excluding any Professional Fees of any Committee) incurred through the Cumulative Period.

"Delayed Draw Term Commitment" means as to any Lender, the obligation of such Lender, if any, to make a Delayed Draw Term Loan to the Borrowers in a principal amount not to exceed the amount set forth under the heading "Delayed Draw Term Commitment" opposite such Lender's name on Schedule 1.1.

"Delayed Draw Term Loan" has the meaning given to it in Section 2.2(a)(ii).

"Deposit Accounts" means any "deposit accounts," as such term is defined in the UCC, and includes any checking account, savings account, or certificate of deposit.

"Domestic Subsidiary" means any Subsidiary that is not a Foreign Subsidiary.

"ERISA Affiliate" means an entity, whether or not incorporated, that is or was, at a relevant time with respect to which a Credit Party continues to have liability, under common control with the Credit Party within the meaning of §4001 of ERISA or is part of a group that includes a Credit Party and that is or was, at a relevant time with respect to which a Credit Party continues to have liability, treated as a single employer under §414 of the Code.

"ERISA Event" means (a) a Reportable Event with respect to a Single Employer Plan; (b) the withdrawal of a Credit Party or any ERISA Affiliate from a Single Employer Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Credit Party or any ERISA Affiliate from a Multiemployer Plan or notification

that a Multiemployer Plan is insolvent; (d) the filing of a notice of intent to terminate, the treatment of a Single Employer Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the Pension Benefit Guaranty Corporation of proceedings to terminate a Single Employer Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Single Employer Plan; (g) the determination that any Single Employer Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; (h) the failure to make minimum required contributions as required under Section 412 and 430 of the Code; and (i) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Credit Party or any ERISA Affiliate.

"Event of Default" has the meaning given to it in Section 9.

"Excluded Deposit Account" means (i) the bank account maintained at Bridge Bank solely for the purpose of maintaining cash collateral for the existing letter of credit, (ii) deposit accounts established solely as payroll and other zero balance accounts, and (iii) accounts established to hold funds for flexible spending purposes of employees of Borrower.

"Excluded Collateral" means, collectively, (i) so long as the Sungevity Short Hills Facility is outstanding, the Sungevity Short Hills Collateral; provided that, upon repayment in full in immediately available funds of all indebtedness and other obligations owed by Sungevity Short Hills to the Sungevity Short Hills Lender, Agent's Lien in the Sungevity Short Hills Collateral shall be reinstated and shall constitute "Collateral" hereunder and the other Loan Documents; (ii) the Excluded Deposit Accounts; and (iii) more than sixty five percent (65%) of outstanding capital stock of any Foreign Subsidiary that is a "controlled foreign corporation" (as defined in 26 U.S. Code § 957) which shares entitle the holder thereof to vote for directors or any other matter.

"Excluded Domestic Subsidiaries" means Sungevity Short Hills, the Subsidiaries of Sungevity Short Hills, and such other Domestic Subsidiaries from time to time consented to by the Agent.

"Excluded Subsidiary" means each Excluded Domestic Subsidiary, each Foreign Subsidiary and each Tax Equity Fund.

"Excluded Taxes" means in the case of each Lender, the Agent and any other recipient of any payment to be made by or on account of any obligation of Borrower or any Credit Party under any other Loan Document, (a) Taxes imposed on (or measured by) its net income (however denominated) or overall gross income (in lieu of net income) including branch profits and franchise (and similar) Taxes imposed on it in lieu of net income (i) as a result of it being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any U.S. federal withholding Tax to the extent such Tax is imposed under the law in effect on the date the Agent or Lender becomes a party to this Agreement (or designates a new lending office) except to the extent that such Person, (or its assignor, as applicable) was entitled (immediately prior to such assignment

7

or designation of lending office) to gross-up payments or indemnification in respect of such Tax under Section 12.20, (c) any Taxes attributable to such Lender's failure to comply with Section 12.20(g) and (d) any Taxes imposed by FATCA.

"Facility Charge" means $500,000.

"FATCA" means  Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with), and any regulations, official interpretations or other guidance issued in connection therewith, including any such regulations, official interpretations or other guidance issued after the date of this Agreement and any agreements entered into pursuant to Section 1471(b) of the Code and any applicable governmental agreements with respect thereto.

"Final Order" means a final order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications are satisfactory in form and substance to the Required Lenders in their sole discretion) and authorizing the Loans.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Statements" has the meaning given to it in Section 7.1.

"Foreign Subsidiary" means any Subsidiary other than a Subsidiary organized under the laws of any state within the United States.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time.

"Guaranty" means a Guaranty in a form reasonably acceptable to the Lenders, which shall include Section 12.19 hereof.

"Hercules" means Hercules Capital, Inc., a Maryland corporation (f/k/a Hercules Technology Growth Capital, Inc.).

"Indebtedness" means indebtedness of any kind, including (i) all indebtedness for borrowed money or the deferred purchase price of property or services (excluding trade credit entered into in the ordinary course of business, including reimbursement and other obligations with respect to surety bonds and letters of credit, (ii) all obligations evidenced by notes, bonds, debentures or similar instruments, (iii) all capital lease obligations, and (iv) all Contingent Obligations.

"Indemnified Person" has the meaning given to it in Section 6.3.

"Indemnified Taxes" means (a) all Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower or any

Credit Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Initial Term Commitment" means as to any Lender, the obligation of such Lender, if any, to make an Initial Term Loan to the Borrowers in a principal amount not to exceed the amount set forth under the heading "Initial Term Commitment" opposite such Lender's name on Schedule 1.1.

"Initial Term Loan" has the meaning given to it in Section 2.2(a)(i).

"Insolvency" with respect to any Multiemployer Plan, means such Plan is insolvent within the meaning of §4245 of ERISA.

"Insolvency Proceeding" is any proceeding by or against any Person under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intellectual Property" means all of each Credit Party's URLs; domain names; Copyrights; Trademarks; Patents; Licenses; trade secrets and inventions; mask works; each Credit Party's applications therefor and reissues, extensions, or renewals thereof; and each Credit Party's goodwill associated with any of the foregoing, together with each Credit Party's rights to sue for past, present and future infringement of Intellectual Property and the goodwill associated therewith.

"Intercreditor Agreement" means that certain intercreditor agreement among Borrower, Hercules, Agent and the other creditors party thereto dated as of March [   ], 2017.

"Interim Order" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) in the form set forth as Exhibit B, with changes to such form as are satisfactory to the Required Lenders in their sole discretion, approving the Loan Documents and authorizing the Initial Term Loan.

"Interim Order Entry Date" means the date on which the Interim Order is entered by the Bankruptcy Court.

"Investment" means any beneficial ownership (including stock, partnership or limited liability company interests) of or in any Person, or any loan, advance or capital contribution to any Person or the acquisition of all, or substantially all, of the assets of another Person.

"Joinder Agreements" means a completed and executed Joinder Agreement in substantially the form attached hereto as Exhibit G, executed by a Subsidiary who is required to become a Subsidiary Guarantor hereunder.

"Lender" and "Lenders" have the meaning given to it in the preamble to this Agreement.

"License" means any Copyright License, Patent License, Trademark License or other license of rights or interests.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, and any lease in the nature of a security interest.

"Loan" means the Initial Term Loans and Delayed Draw Term Loans.

"Loan Documents" means this Agreement, the Notes (if any), the Joinder Agreements, all UCC Financing Statements, the Intercreditor Agreement, the Agent's Fee Letter, and any other documents executed in connection with the Secured Obligations or the transactions contemplated hereby, as the same may from time to time be amended, modified, supplemented or restated.

"Material Adverse Effect" means a material adverse effect upon: (i) the business, operations, properties, assets or financial condition of Parent and its Subsidiaries taken as a whole; or (ii) the ability of any Credit Party to perform the Secured Obligations in accordance with the terms of the Loan Documents as and when due, or the ability of Agent or the Lenders to enforce any of their rights or remedies with respect to the Secured Obligations; or (iii) the Collateral or Agent's Liens on the Collateral or the priority of such Liens; provided that the term "Material Adverse Effect" will not be deemed to exist as a result of the Cases or the circumstances and events leading up thereto.

"Maximum Rate" shall have the meaning assigned to such term in Section 2.3.

"Milestone" has the meaning given to it in Section 7.23.

"Multiemployer Plan" means a Plan which is a multiemployer plan (as defined in Section 4001(a)(3) of ERISA to which a Credit Party contributes or is obligated to contribute or with respect to which a Credit Party has or may have any liability, including as a consequence of a Credit Party, together with an ERISA Affiliate, being treated as a single employer under Section 414 of the Code.

"Note" means any Promissory Note in substantially the form of Exhibit B-l.

"Orders" means collectively, the Interim Order and the Final Order.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means any present or future stamp or documentary Taxes and any other excise Taxes, sales Taxes or property Taxes, charges or similar levies which arise from any

payment made hereunder or under any Note or from the execution, delivery, enforcement or registration of, or otherwise with respect to, this Agreement or any Note, Guarantee or Collateral, excluding, in each case, such amounts that result from the Agent or Lender's grant of a transfer or assignment to or designation of a new applicable lending office or other office for receiving payments under this Agreement or any other Loan Document.  For the avoidance of doubt, Other Taxes shall not include any Excluded Taxes.

"Patent License" means any written agreement granting any right with respect to any invention on which a Patent is in existence or a Patent application is pending, in which agreement a Credit Party now holds or hereafter acquires any interest.

"Patents" means all letters patent of, or rights corresponding thereto, in the United States or in any other country, all registrations and recordings thereof, and all applications for letters patent of, or rights corresponding thereto, in the United States or any other country.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Permitted Indebtedness" means: (i) Indebtedness of any Credit Party in favor of the Lenders or Agent arising under this Agreement or any other Loan Document; (ii) Indebtedness existing on the Closing Date which is disclosed in Schedule 1A; (iii) Indebtedness that also constitutes a Permitted Investment; (iv) prior to entry of the Final Order, the Prepetition Subordinated Indebtedness in the aggregate principal amount outstanding as of the Petition Date; (v) Indebtedness relating to letters of credit or security deposits set forth on the Schedule 1A, (vi) Indebtedness under the Prepetition Hercules Loan Agreement in the aggregate principal amount outstanding as of the Petition Date; and (vii) Professional Fees, fees payable to the U.S. Trustee, and fees payable to the Clerk of the Bankruptcy Court.

"Permitted Investment" means: (i) Investments existing on the Closing Date which are disclosed in Schedule IB; (ii) (a) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one year from the date of acquisition thereof, (b) commercial paper maturing no more than one year from the date of creation thereof and currently having a rating of at least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Service, (c) certificates of deposit issued by any bank with assets of at least $500,000,000.00 maturing no more than one year from the date of investment therein, and (d) money market accounts; (iii) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of any Credit Party's business; (vi) Investments consisting of travel advances in the ordinary course of business; (v) intercompany Investments consisting of (a) Investments between Credit Parties, (b) Investments made by Domestic Subsidiaries that are not Credit Parties to other Domestic Subsidiaries and (c) Investments by Foreign Subsidiaries to other Foreign Subsidiaries; and (vi) existing Investments in Foreign Subsidiaries set forth on Schedule IB.

"Permitted Liens" means any and all of the following: (i) Liens in favor of Agent or the Lenders; (ii) Liens existing on the Closing Date which are disclosed in Schedule 1C; (iii)

Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings; provided, that each Credit Party maintains adequate reserves therefore in accordance with GAAP; (iv) Liens securing claims or demands of materialmen, artisans, mechanics, carriers, warehousemen, landlords and other like Persons arising in the ordinary course of each Credit Party's business and imposed without action of such parties; provided, that the payment thereof is not yet required unless the obligation to make such payment is being contested in good faith and by appropriate proceedings with adequate reserves established in accordance with GAAP; (v) Liens arising from judgments, decrees or attachments in circumstances which do not constitute an Event of Default hereunder; (vi) the following deposits, to the extent made in the ordinary course of business: deposits under worker's compensation, unemployment insurance, social security and other similar laws, or to secure the performance of bids, tenders or contracts (other than for the repayment of borrowed money) or to secure indemnity, performance or other similar bonds for the performance of bids, tenders or contracts (other than for the repayment of borrowed money) or to secure statutory obligations (other than Liens arising under ERISA or environmental Liens) or surety or appeal bonds, or to secure indemnity, performance or other similar bonds; (vii) [reserved]; (viii) Liens incurred in connection with Prepetition Subordinated Indebtedness; (ix) leasehold interests in leases or subleases and licenses granted in the ordinary course of business and not interfering in any material respect with the business of the licensor; (x) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties that are promptly paid on or before the date they become due; (xi) Liens on insurance proceeds securing the payment of financed insurance premiums that are promptly paid on or before the date they become due (provided that such Liens extend only to such insurance proceeds and not to any other property or assets); (xii) statutory and common law rights of set-off and other similar rights as to deposits of cash and securities in favor of banks, other depository institutions and brokerage firms; (xiii) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business so long as they do not materially impair the value or marketability of the related property; (xiv) Liens on cash or cash equivalents securing obligations permitted under clause (v) of the definition of Permitted Indebtedness; (xv) Liens existing under the Prepetition Hercules Loan Agreement; and (xvi) the Carve Out.

"Permitted Transfers" means (i) sales and leases of Inventory (including Equipment constituting Inventory) in the ordinary course of business (including to Affiliates), (ii) licenses and similar arrangements for the use of Intellectual Property in the ordinary course of business and licenses that could not result in a legal transfer of title of the licensed property but that may be (a) with respect to trademark licenses, may be unlimited except that they cannot be exclusive as to keep Parent and its Subsidiaries from using such trademarks and (b) with respect to licenses of Intellectual Property other than trademarks, non-exclusive licenses and exclusive licenses for the use of Parent's or any Subsidiary's Intellectual Property in the ordinary course of business, so long as with respect to any exclusive license (1) no Event of Default has occurred and is continuing at the time of such transfer or would result therefrom, (2) such license constitutes an arms-length transaction in the ordinary course of business (and in the case of an exclusive license, made in connection with a bona fide corporate transaction for fair value in the ordinary course of business and approved by the board of directors of the applicable licensor) and the terms of which, on their face, do not provide for a sale or assignment of any Intellectual Property, (3) the applicable licensor delivers seven (7) Business Days prior written notice and a brief summary of the terms of such license to Agent and (4) the applicable licensor delivers to

Agent copies of the final executed licensing documents in connection with such license within five (5) Business Days upon consummation of such license, (iii) dispositions of worn-out, obsolete or surplus Equipment at fair market value in the ordinary course of business, (iv) Transfer consisting of Permitted Liens and Permitted Investments, (v) Transfers made in connection with customary settlements with trade creditors or customers of a Credit Party or a Subsidiary of a Credit Party in the ordinary course of business; (vi) Transfers made by Domestic Subsidiaries that are not Credit Parties to other Domestic Subsidiaries; and (vii) Transfers by Foreign Subsidiaries in and to other Foreign Subsidiaries.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, other entity or government.

"Petition Date" has the meaning set forth in the recitals.

"Plan" at any one time, means any "employee benefit plan" (as such term is defined under Section 3(3) of ERISA that is maintained or contributed to by a Credit Party or with respect to which a Credit Party has or may have any liability, including as a consequence of the Credit Party, together with an ERISA Affiliate, being treated as a single employer under Section 414 of the Code.

"Potential Equity Investor" means First Solar, Inc.

"Preferred Stock" means at any given time any equity security issued by Parent that has any rights, preferences or privileges senior to Parent's common stock.

"Prepetition Hercules Loan Agreement" means that certain Loan and Security Agreement, by and between Borrower and Hercules, dated as of March 31, 2015, together with any and all extensions, renewals, modifications, amendments, restatements, supplements and substitutions thereto.

"Prepetition Loan Documentation" means (a) the "Loan Documents" as defined in the Prepetition Hercules Loan Agreement and (b) the Prepetition Subordinated Indebtedness Documentation.

"Prepetition Subordinated Indebtedness" means the Indebtedness of the Parent and Borrower existing as of the Closing Date pursuant to (a) that certain Loan and Security Agreement, dated as of September 20, 2016, as the same may be amended, supplemented and/or otherwise modified from time to time, among the Borrower, the subsidiaries of Parent from time to time party thereto as subsidiary guarantors and MMA Energy Capital, LLC, (b) that certain Loan and Security Agreement, dated as of November 10, 2016, as the same may be amended, supplemented and/or otherwise modified from time to time, among Borrower and Parent as borrowers, the subsidiaries of Parent from time to time party thereto as subsidiary guarantors and MHA Trust LLC and (c) that certain Loan and Security Agreement, dated as of January 30, 2017, as the same may be amended, supplemented and/or otherwise modified from time to time, among Borrower and Parent as borrowers, the subsidiaries of Parent from time to time party thereto as subsidiary guarantors, the lenders party thereto and Wilmington Savings Fund Society, FSB, as agent.

"Prepetition Subordinated Indebtedness Documentation" means the documentation governing any (or all) of the Prepetition Subordination Indebtedness.

"Principal Office" means Agent's "Principal Office" as set forth on Schedule 1.2, or such other office or office of a third party or sub-agent, as appropriate, as Agent may from time to time designate in writing to Borrower and each Lender.

"Professional Fees" means the fees and reimbursable expenses of Professional Persons.

"Professional Person" means a Person who is an attorney, financial advisor, accountant, appraiser, auctioneer, investment banker or other professional person and who is retained, with Bankruptcy Court approval, by (a) any Debtor pursuant to Section 327 or 328 of the Bankruptcy Code or (b) a Committee pursuant to Section 328 or 1103(a) of the Bankruptcy Code.

"PV System" means a photovoltaic system, including photovoltaic panels, racks, wiring and other electrical devices, conduit, weatherproof housing, hardware, one or more inverters, remote monitoring systems, connectors, meters, disconnects and over current devices.

"Receivables" means (i) all of the Credit Parties Accounts, Instruments, Documents, Chattel Paper, Supporting Obligations, letters of credit, proceeds of any letter of credit, and Letter of Credit Rights, and (ii) all customer lists, software, and business records related thereto.

"Recipient" means the Agent or any Lender, as applicable.

"Reportable Event" means any of the events set forth in §4043 (c) of ERISA, other than those events as to which the thirty day notice period is waived.

"Required Lenders" means at any time, the holders of more than fifty percent (50%) of the aggregate unpaid principal amount of the Term Loans then outstanding.

"Secured Obligations" means the Credit Parties obligations under this Agreement and any other Loan Document, including any obligation to pay any amount now owing or later arising and shall include the Liabilities (as defined in Section 6.3) and all other obligations of the Credit Parties to the Agent.

"Securities Act" means the Securities Act of 1933, as amended.

"Single Employer Plan" means any Plan that is covered by Title IV of ERISA, other than a Multiemployer Plan.

"Solar Incentive Programs" means the California Solar Initiative program, and any other similar solar incentive or rebate programs created under any state of the United States of America.

"Stalking Horse Purchaser" means LSHC Solar Holdings LLC, appointed as the stalking horse purchaser with respect to the Bankruptcy Sale.

"Subsidiary" means an entity, whether corporate, partnership, limited liability company, joint venture or otherwise, in which any Credit Party owns or controls 50% or more of the outstanding voting securities, including each entity listed on Schedule 5.14 hereto.

"Subsidiary Guarantor" has the meaning set forth in the recitals.

"Sungevity Short Hills" means Sungevity Short Hills 2012, LLC, a Delaware limited liability company.

"Sungevity Short Hills Collateral" means all of the Credit Parties right, title and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located: (a) all personal property of Sungevity Short Hills and (b) the limited liability company interests of any type or nature held by a Borrower (including all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed, if any, in respect of or in exchange for any or all of such equity interests) with respect to each of (i) Sungevity Short Hills, (ii) Sungevity Cardinal LLC, a Delaware limited liability company, (iii) Sungevity Gotham, LLC, a Delaware limited liability company, (iv) Sungevity Greenwich, LLC, a Delaware limited liability company, (v) Sungevity Financial Services, LLC, a Delaware limited liability company, and (vi) Sungevity Arch, LLC, a Delaware limited liability company, in favor of Sungevity Short Hills Lender in connection with the Sungevity Short Hills Facility (such limited liability company interests being referred to as the "Pledged Interests"), and all general intangibles evidencing, relating to or arising from the Pledged Interests, all collateral records, collateral support and Supporting Obligations relating to any of the foregoing, all cash and non-cash proceeds (including insurance proceeds) of the foregoing, all products, rents and profits thereof and all additions and accessions thereto, substitutions therefor, and replacements thereof (collectively referred to as the "Pledged Collateral"; which for the sake of clarity, does not include any of the Credit Parties rights to receive payment for services provided to such entities or other distributions payable from such entities to the Credit Parties to the extent such other distributions are permitted pursuant to the provisions of the Sungevity Short Hills Facility).

"Sungevity Short Hills Facility" means the debt financing arrangements with Atalaya and its affiliates pursuant to the Atalaya Credit Agreement.

"Sungevity Short Hills Lender" means Atalaya, each other lender from time to time party to the Sungevity Short Hills Facility and their respective successors and assigns.

"Sungevity Short Hills Loan" means loans and advances in incurred from the Sungevity Short Hills Lender pursuant to the Sungevity Short Hills Facility.

"Superpriority Claim" means a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all

administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject only to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

"Tax Equity Fund" means any tax equity funds, Subsidiaries, or other partnerships or similar entities which will receive incentives from utilities pursuant to Solar Incentive Programs which, in each case, did not receive an equity investment from Parent of more than $1,000,000.00 in the aggregate.

"Taxes" means  any and all present or future taxes, duties, levies, fees, imposts, deductions, charges or withholdings imposed by the U.S. Internal Revenue Service or any other taxing authority (whether domestic or foreign and including any federal, state, U.S. possession, county, local, provincial or foreign government or any subdivision or taxing agency thereof), whether computed on a separate, consolidated, unitary, combined or other basis, including interest, fines, penalties or additions to tax, with respect to the foregoing.

"Term Commitments" means the Initial Term Commitment and the Delayed Draw Term Commitments.

"Term Loan Interest Rate" means 15%.

"Term Loan Maturity Date" means the earlier of (i) the date which is 45 days following the Petition Date, (ii) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code or otherwise (including the Bankruptcy Sale); (iii) the effective date of a plan of reorganization or liquidation in the Cases; (iv) the date of filing or support by the Borrower of a plan of reorganization that does not provide for indefeasible payment in full in cash of all obligations owing hereunder or (v) the date of termination of the Term Commitments and the acceleration of any outstanding extensions of credit under the Term Loans in accordance with the terms of this Agreement.

"Trademark License" means any written agreement granting any right to use any Trademark or Trademark registration, now owned or hereafter acquired by any Credit Party or in which any Credit Party now holds or hereafter acquires any interest.

"Trademarks" means all trademarks (registered, common law or otherwise) and any applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof.

"Transfer" means a sale, lease, transfer or other disposition of assets.

"UCC" means the Uniform Commercial Code as the same is, from time to time, in effect in the State of New York; provided, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Agent's Lien on any Collateral is governed by the Uniform Commercial Code as the same is, from time to time, in effect in a jurisdiction other than the State of New York, then the term "UCC" shall mean the Uniform Commercial Code as in effect, from time to time, in such other

jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"U.S. Tax Compliance Certificate" has the meaning given to it in Section 12.20(f)(ii)(B)(3).

"U.S. Trustee" means the United States Trustee for the District of Delaware.

"Work Fee" means $250,000.

Unless otherwise specified, all references in this Agreement or any Annex or Schedule hereto to a "Section," "subsection," "Exhibit," "Annex," or "Schedule" shall refer to the corresponding Section, subsection, Exhibit, Annex, or Schedule in or to this Agreement. Unless otherwise specifically provided herein, any accounting term used in this Agreement or the other Loan Documents shall have the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed in accordance with GAAP, consistently applied. Unless otherwise defined herein or in the other Loan Documents, terms that are used herein or in the other Loan Documents and defined in the UCC shall have the meanings given to them in the UCC.

## SECTION 2    THE LOAN

2.1    [Reserved].

2.2    Term Loan.

(a)    (i)    Initial Term Loan. Subject to the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in Sections 4.1 and 4.2), each Lender will severally (and not jointly) make a loan in an amount not to exceed its respective Initial Term Commitment, and Borrower agrees to draw, $5,000,000 (the "Initial Term Loan") on the Closing Date.

(ii)    Delayed Draw Term Loan. Subject to the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in Section 4.2), each Lender will severally (and not jointly) make loans (each such loan, a "Delayed Draw Term Loan") after the Closing Date in an aggregate amount (together with all Delayed Draw Term Loans previously made by such Lender, but excluding any interest capitalized pursuant to Section 2.2(c)) not to exceed its respective Delayed Draw Term Commitment; provided that there shall not be more than one Delayed Draw Term Loan once per calendar week.  Each Delayed Draw Term Loan shall be made in an aggregate minimum amount of $100,000 and integral multiples of $100,000 in excess of that amount.

(b)    Advance Request. The Lenders shall fund the Loan in the manner requested by the Advance Request, which shall be delivered before noon New York time three (3) Business Days prior to the date of the requested Loan (each such date, including the Closing Date, an "Advance Date") in accordance with the terms and conditions of this Agreement, provided that each of the conditions precedent to the Loan are satisfied.

(c)    Interest. The outstanding principal balance of the Loans shall bear interest thereon from the Closing Date at the Term Loan Interest Rate based on a year consisting of 360 days, with interest based on the actual number of days elapsed.  Interest will be paid-in-kind and added to the principal amount outstanding hereunder on the first calendar day of each January, April, July and October (or if such day is not a Business Day, the next succeeding Business Day); provided, however, that any increase in the principal amount under this Section 2.2(c) shall not decrease any of the Lenders' Delayed Draw Term Commitments.  All unpaid interest on the Loan will be paid on the Term Loan Maturity Date.

(d)    Payment. The entire Term Loan principal balance and all accrued but unpaid interest hereunder, shall be due and payable on the Term Loan Maturity Date. Borrower shall make all payments under this Agreement without setoff, recoupment or deduction and regardless of any counterclaim or defense. All payments by Borrower of principal, interest, fees and other Secured Obligations shall be made in dollars in same day funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition, and delivered to Agent not later than 2:00 p.m. (New York City time) on the date due at the Principal Office of Agent for the account of Agent or the Lenders, as applicable; for purposes of computing interest and fees, funds received by Agent after that time on such due date shall be deemed to have been paid by Borrower on the next succeeding Business Day.

2.3    Maximum Interest. Notwithstanding any provision in this Agreement or any other Loan Document, it is the parties' intent not to contract for, charge or receive interest at a rate that is greater than the maximum rate permissible by law that a court of competent jurisdiction shall deem applicable hereto (which under the laws of the State of New York shall be deemed to be the laws relating to permissible rates of interest on commercial loans) (the "Maximum Rate"). If a court of competent jurisdiction shall finally determine that Borrower has actually paid to the Lenders an amount of interest in excess of the amount that would have been payable if all of the Secured Obligations had at all times borne interest at the Maximum Rate, then such excess interest actually paid by Borrower shall be applied as follows: first, to the payment of the Secured Obligations consisting of the outstanding principal; second, after all principal is repaid, to the payment of the Lenders' accrued interest, costs, expenses, professional fees and any other Secured Obligations; and third, after all Secured Obligations are repaid, the excess (if any) shall be refunded to Borrower.

2.4    Default Interest. Immediately upon the occurance and during the continuance of an Event of Default, the outstanding principal amount of the Secured Obligations and any overdue amounts shall bear interest or earn fees at a rate equal to four percent (4%) plus the rate otherwise applicable thereto and such interest shall be payable on demand.

2.5    Voluntary Prepayment and Termination. At its option and at any time, upon at least three (3) Business Days prior written notice to Agent, Borrower may prepay any of the outstanding Loans in a minimum amount of $100,000 and integral multiples of $100,000; provided that all accrued and unpaid interest thereon shall be paid-in-kind.

2.6    [Reserved].

2.7    Notes. If so requested by any Lender by written notice to Borrower, Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of any Lender pursuant to Section 12.13) (promptly after Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Loans.

2.8    Prepayment Treatment. Each payment (including prepayment) on account of any fee and any reduction of the Loans shall first be applied to any fees, expenses and enforcement costs, next to any accrued but unpaid interest then due and owing by the Borrower hereunder, and then to outstanding principal then due and owing or otherwise to be prepaid hereunder, pro rata according to the Term Loans of the relevant Lender.

2.9    Fees.

(a)    The Borrower agrees to pay the Facility Charge and the Work Fee to the Lenders on the Closing Date.

(b)    The Borrower agrees to pay a commitment fee in the amount of 2.00% per annum for the undrawn portion of its Delayed Draw Term Commitments, payable monthly in arrears, which fee shall be deemed paid in cash from the next succeeding Delayed Draw Term Loan. The commitment fee shall accrue on the average daily unused amount of the Delayed Draw Term Commitments from the period from and including the Closing Date to the earlier of (i) the Term Loan Maturity Date and (ii) the funding of all Delayed Draw Term Commitments.

(c)    The Borrower shall pay to the Agent the fees set forth in the Agent's Fee Letter.

2.10    Increased Costs.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or other Recipient, the Borrower will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such

Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)  Capital Requirements. If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Term Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)  Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to the Borrower, shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)  Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

2.11    In connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by Agent, in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, each Borrower and each other Credit Party hereby gives Agent (at the direction of the Required Lenders) the power and right, without assent by such Credit Party, to "credit bid" the full amount of all Secured Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

## SECTION 3  <u>SECURITY INTEREST</u>

3.1    As security for the prompt, complete and indefeasible payment when due (whether on the payment dates or otherwise) of all the Secured Obligations (excluding, for the avoidance of doubt, Avoidance Actions, but including the proceeds of any Avoidance Actions),

each Borrower and Subsidiary Guarantor grants to Agent (on behalf of the itself and the Lenders) a security interest in all of such Borrower or Subsidiary Guarantors' right, title and interest in and to all of its personal property, in each case whether now owned or existing or hereafter acquired, possessed or arising, whether tangible or intangible, wherever located (all of which collectively shall hereinafter be referred to as the "Collateral") including, without limitation:

(i)      all Accounts and Receivables;

(ii)     all Chattel Paper;

(iii)    all cash and all Deposit Accounts, together with all amounts on deposit from time to time in such Deposit Accounts;

(iv)     all Documents;

(v)      all General Intangibles, including Payment Intangibles and all Intellectual Property;

(vi)     all Goods, including Inventory, Equipment, Farm Products and Fixtures;

(vii)    all Instruments;

(viii)   all Investment Property;

(ix)     all Letter-of-Credit Rights and other Supporting Obligations;

(x)      all Records;

(xi)     all Commercial Tort Claims;

(xii)    all books and records relating to any of the foregoing; and

(xiii)   all Proceeds and Accessions with respect to any of the foregoing Collateral.

Each category of Collateral set forth above shall have the meaning set forth in the UCC (to the extent such term is defined in the UCC), it being the intention of the Credit Parties that the description of the Collateral set forth above be construed to include the broadest possible range of assets.

3.2      Notwithstanding the grant of the security interest set forth in Section 3.1, above, the Collateral shall not include the Excluded Collateral.

## SECTION 4    CONDITIONS PRECEDENT TO LOAN

The effectiveness of this Agreement and the obligations of any Lender to make the Loans hereunder are subject to the satisfaction by the Credit Parties of the following conditions:

4.1     Initial Term Loans.  On or prior to the Closing Date:

(a)     the Credit Parties shall have delivered to Agent and Lenders executed originals of the Loan Documents and all other documents and instruments reasonably required by Agent or the Lenders to effectuate the transactions contemplated hereby or to create and perfect the Liens of Agent with respect to all Collateral, in all cases in form and substance reasonably acceptable to Agent and the Lenders;

(b)     the Credit Parties shall have delivered to Agent and Lenders certified copies of resolutions of each Credit Party's (as applicable) board of directors evidencing approval of the Loan Documents, the Loan and other transactions evidenced by the Loan Documents;

(c)     the Credit Parties shall have delivered to Agent and Lenders certified copies of the constitutional document and the bylaws (or applicable equivalent), as amended through the Closing Date, of each Credit Party;

(d)     the Credit Parties shall have delivered to Agent and Lenders a certificate of good standing within thirty (30) days of the Closing Date for each Credit Party from its respective jurisdiction of organization and similar certificates from all other jurisdictions in which it does business and where the failure to be qualified would have a Material Adverse Effect;

(e)     the Lenders shall have received the Facility Charge and the Work Fee, the Agent shall have received the fees payable to it on the Closing Date pursuant to the Agent's Fee Letter, and the Agent and Lenders shall have received reimbursement of Agent's and the Lenders' current expenses reimbursable pursuant to this Agreement, which amounts may be deducted from the Loan;

(f)     the Credit Parties shall have delivered to Agent and Lenders the Budget, which shall be in form and substance acceptable to each of the Lenders;

(g)     [reserved];

(h)     the Interim Order Entry Date shall have occurred prior to the Closing Date and not later than three Business Days following the Petition Date, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the Required Lenders in their sole discretion and shall not be subject to a stay, and the Agent and Lenders shall have received a signed copy of the Interim Order entered by the Bankruptcy Court;

(i)     the Petition Date shall have occurred and each Credit Party shall be a debtor and debtor-in-possession in the Cases.  The "first day orders" sought by the Borrower shall be satisfactory in form and substance to the Agent and the Required Lenders in their sole discretion;

(j)     all necessary governmental and third party consents and approvals necessary in connection with the Secured Obligations and the transactions contemplated hereby shall have been obtained;

(k)     the Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the PATRIOT Act; and

(l)     a chief restructuring officer acceptable to the Lenders shall have been appointed.

4.2     All Loans. On each Advance Date:

(a)     the Credit Parties shall have delivered to Agent an Advance Request for the applicable Loan, duly executed by Parent's Authorized Officer;

(b)     the representations and warranties set forth in this Agreement and in Section 5 shall be true and correct in all material respects (other than any representation or warranty qualified by "materiality" or "Material Adverse Effect", in which case, such representation or warranty shall be true and correct) on and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date;

(c)     [reserved];

(d)     at the time of and immediately after such Loan no Event of Default shall have occurred and be continuing;

(e)     there exists no unstayed action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that could reasonably be expected to have a Material Adverse Effect;

(f)     the Cases of any of the Debtors shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(g)     no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases; and

(h)     the use of proceeds of such Loan shall be in accordance with Section 5.17.

Each Advance Request shall be deemed to constitute a representation and warranty by Borrower on the relevant Advance Date as to the matters specified in paragraphs (b) through (h) of this Section 4.2 and as to the matters set forth in the Advance Request.

## SECTION 5   <u>REPRESENTATIONS AND WARRANTIES OF THE CREDIT PARTIES</u>

Each Credit Party represents and warrants that:

5.1     Corporate Status. Parent is a corporation duly organized, legally existing and in good standing under the laws of the State of Delaware, and is duly qualified as a foreign corporation in all jurisdictions in which the nature of its business or location of its properties require such qualifications and where the failure to be qualified could reasonably be expected to have a Material Adverse Effect. Parent's present name, former names (if any), locations, place of formation, tax identification number, organizational identification number and other information are correctly set forth in Exhibit C, as may be updated by the Credit Parties in a written notice (including any Compliance Certificate) provided to Agent after the Closing Date. Sungevity Development is a limited liability company duly organized, legally existing and in good standing under the laws of the State of Delaware, and is duly qualified as a foreign limited liability company in all jurisdictions in which the nature of its business or location of its properties require such qualifications and where the failure to be qualified could reasonably be expected to have a Material Adverse Effect. Sungevity Development's present name, former names (if any), locations, place of formation, tax identification number, organizational identification number and other information are correctly set forth in Exhibit C, as may be updated by the Credit Parties in a written notice (including any Compliance Certificate) provided to Agent after the Closing Date. Each Subsidiary Guarantor is a corporation or other entity duly organized, formed or incorporated, legally existing and in good standing under the laws of its jurisdiction of incorporation, organization or formation, and is duly qualified as a foreign corporation and, where applicable, is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.2     Collateral. Each Credit Party owns the Collateral (including the Intellectual Property), free of all Liens, except for Permitted Liens. Subject to the entry of the Orders and the terms hereof, each Credit Party has the power and authority to grant to Agent a Lien in the Collateral as security for the Secured Obligations.

5.3     Consents. Subject to the entry of the Orders and the terms hereof, each Credit Party's execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party (i) have been duly authorized by all necessary corporate action of such Credit Party, (ii) will not result in the creation or imposition of any Lien upon the Collateral, other than Permitted Liens and the Liens created by this Agreement and the other Loan Documents, (iii) do not violate any provisions of such Credit Party's Certificate or Articles of Incorporation (as applicable), bylaws, or any, law, regulation, order, injunction, judgment, decree or writ to which such Credit Party is subject and (iv) except as described on Schedule 5.3, do not violate any contract or agreement or require the consent or approval of any other Person which has not already been obtained.

5.4     Material Adverse Effect. Since the Closing Date, no event that has had or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing. No Credit Party is aware of any event likely to occur that is reasonably expected to result in a Material Adverse Effect.

5.5     Actions Before Governmental Authorities. Other than the Cases, there are no actions, suits or proceedings at law or in equity or by or before any governmental authority now

pending or, to the knowledge of any Credit Party, threatened against or affecting Parent or any Subsidiary or their respective property that are reasonably likely to result in damages of $500,000.00 or more in the aggregate or in a Material Adverse Effect.

5.6     Laws. Subject to the entry of the Orders and the terms hereof, neither Parent nor any Subsidiary is in violation of any law, rule or regulation, or in default with respect to any judgment, writ, injunction or decree of any governmental authority, where such violation or default is reasonably expected to result in a Material Adverse Effect. Neither Parent nor any Subsidiary is in default in any manner under any provision of any agreement or instrument evidencing Indebtedness, or any other agreement to which it is a party or by which it is bound, in each case the default of which could reasonably be expected to have a Material Adverse Effect.

5.7     Information Correct and Current. No information, report, Advance Request, financial statement, exhibit or schedule furnished, by or on behalf of Parent or any other Credit Party to Agent or Lenders in connection with any Loan Document or included therein or delivered pursuant thereto contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading at the time such statement was made or deemed made (it being recognized by Agent and the Lenders that the projections and forecasts provided by Parent in good faith and based upon reasonable assumptions are not viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ from the projected or forecasted results). Additionally, any and all financial or business projections provided by Parent to Agent or the Lenders, whether prior to or after the Closing Date, shall be (i) provided in good faith and based on the most current data and information available to Parent, and (ii) the most current of such projections provided to Parent's Board of Directors.

5.8     Tax Matters. Except as described on Schedule 5.8 and except those being contested in good faith by appropriate proceedings with adequate reserves under GAAP, (a) Parent and each Subsidiary has filed all federal, state, local and non-U.S. Tax returns that it is required to file (including after giving effect to any timely filed extensions), (b) Parent and each Subsidiary has duly paid or fully reserved for all Taxes or installments thereof (including any interest or penalties) as and when due, which have or may become due pursuant to such returns, (c) Parent and each Subsidiary has paid or fully reserved for any Tax assessment received by such Person for the three (3) years preceding the Closing Date, if any (including any Taxes being contested in good faith and by appropriate proceedings) and (d) Parent and each Subsidiary has not "participated" in a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4.

5.9     Intellectual Property Claims. Each Credit Party is the sole owner of, or otherwise has the right to use, the Intellectual Property material to such Credit Party's business. Except as described on Schedule 5.9 to the best of each Credit Party's knowledge after due inquiry, (i) each of the material Copyrights, Trademarks and Patents is valid and enforceable, (ii) no material part of the Intellectual Property has been judged invalid or unenforceable, in whole or in part, and (iii) no claim has been made to any Credit Party that any material part of the Intellectual Property violates the rights of any third party. Exhibit D is a true, correct and complete list of each of Credit Party's registered Patents, registered Trademarks, registered Copyrights, domain names

and material agreements under which such Credit Party licenses Intellectual Property from third parties (other than shrink-wrap, generally commercially available, and open source software licenses), together with application or registration numbers, as applicable, owned by such Credit Party or any Subsidiary, in each case as of the Closing Date. No Credit Party is in material breach of, nor has any Credit Party failed to perform any material obligations under, any of the foregoing contracts, licenses or agreements and, to each Credit Party's knowledge after due inquiry, no third party to any such contract, license or agreement is in material breach thereof or has failed to perform any material obligations thereunder.

5.10    Intellectual Property. Except as described on Schedule 5.10, each Credit Party has, or in the case of any proposed business, will have, all material rights with respect to Intellectual Property necessary in the operation or conduct of each Credit Party's business as currently conducted and proposed to be conducted by such Credit Party. Without limiting the generality of the foregoing, and in the case of Licenses, except for restrictions that are unenforceable under Division 9 of the UCC, each Credit Party has the right, to the extent required to operate such Credit Party's business and is material to its business, each Credit Party owns or has the right to use, pursuant to valid licenses, all material software development tools, material library functions, compilers and all other material third-party software and other items that are used in the design, development, promotion, sale, license, manufacture, import, export, use or distribution of Borrower Products.

5.11    Borrower Products. Except as described on Schedule 5.11, no Intellectual Property owned by any Credit Party or Borrower Product has been or is subject to any actual or, to the knowledge of each Credit Party, threatened litigation, proceeding (including any adverse proceeding in the United States Patent and Trademark Office or any corresponding foreign office or agency) or outstanding decree, order, judgment, settlement agreement or stipulation that restricts in any manner any Credit Party's use, transfer or licensing thereof or that may affect the validity, use or enforceability thereof. There is no decree, order, judgment, agreement, stipulation, arbitral award or other provision entered into in connection with any litigation or proceeding that obligates any Credit Party to grant licenses or ownership interest in any future Intellectual Property related to the operation or conduct of the business of any Credit Party or Borrower Products. No Credit Party has received any written notice or claim, or, to the knowledge of any Credit Party, oral notice or claim, challenging or questioning any Credit Party's ownership in any Intellectual Property (or written notice of any claim challenging or questioning the ownership in any licensed Intellectual Property of the owner thereof) or suggesting that any third party has any claim of legal or beneficial ownership with respect thereto nor, to any Credit Party's knowledge, is there a reasonable basis for any such claim. Neither any Credit Party's use of its Intellectual Property nor the production and sale of Borrower Products infringes the Intellectual Property or other rights of others.

5.12    Financial Accounts. Exhibit E, as may be updated by the Parent in a written notice pursuant to Section 7.1(j), is a true, correct and complete list of (a) all banks and other financial institutions at which Parent or any Subsidiary maintains Deposit Accounts and (b) all institutions at which Parent or any Subsidiary maintains an account holding Investment Property, and such exhibit correctly identifies the name, address and telephone number of each bank or other institution, the name in which the account is held, a description of the purpose of the account, the

complete account number therefore, the balance as of the Closing Date and whether such account is pledged to, or otherwise restricted by, any Person other than Agent.

5.13    Employee Loans. Other than as set forth on Schedule 5.13, no Credit Party has any outstanding loans to any employee, officer or director of such Credit Party nor has any Credit Party guaranteed the payment of any loan made to an employee, officer or director of any Credit Party by a third party.

5.14    Capitalization and Subsidiaries. Each Credit Party's capitalization as of the Closing Date is set forth on Schedule 5.14 annexed hereto. No Credit Party owns any stock, partnership interest or other securities of any Person, except for Permitted Investments. Attached as Schedule 5.14, as may be updated by Parent in a written notice provided after the Closing Date, is a true, correct and complete list of each Subsidiary.

5.15    [Reserved].

5.16    Binding Obligation.  Subject to the entry of the Orders and subject to the terms hereof, each Loan Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

5.17    Use of Proceeds. The Borrower shall use the proceeds of the Loans in accordance with the Budget and the Orders entered in connection with the Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Order):

        (a)    to pay certain costs, premiums, fees and expenses related to the Cases (including, without limitation, the payments set forth in Section 4.1(e));

        (b)    to make permitted Adequate Protection Payments; and

        (c)    to fund working capital and other needs of the Debtors in accordance with the Budget.

5.18    Financial Information. (a) On and as of the Closing Date, the Budget, copies of which have heretofore been furnished to the Lenders and (b) following the Closing Date, the Budget delivered pursuant to Section 7.01(l), in each case, are based on good faith estimates and assumptions made at such time by the persons who prepared it.

5.19    No Defaults. Subject to the entry of the Orders and subject to the terms thereof, no Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document, except for any Default or Event of Default arising from a default or event of default that is continuing under the Prepetition Hercules Loan Agreement, Prepetition Subordinated Indebtedness or the Atalaya Credit Agreement as a result of the filing of the Cases.

5.20    Cases. The Cases were commenced on the Petition Date in accordance with applicable Laws and proper notice thereof, and notice of the hearing for the approval of the Interim Order has been given as identified in the certificate of service filed with the Bankruptcy Court.

5.21    Orders. The Interim Order and, after it has been entered, the Final Order, and the transactions contemplated by this Agreement and the other Loan Documents are in full force and effect, and have not, in whole or in part, been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any pending or threatened challenge or proceeding in any jurisdiction, and the Borrower is in compliance with each Order.

5.22    Security.  (a)  Subject to the entry of the Orders, this Agreement is effective to create in favor of the Agent (for the benefit of itself and the Lenders) a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  To the extent not previously delivered to the agent for the Prepetition Hercules Loan Agreement, in the case of the (i) pledged equity interests, (ii) all present and future payments, proceeds, dividends, distributions, instruments, compensation, property, assets, interests and rights distributable on account of such equity interests, (iii) all monies due or to become due and payable of and to the holder(s) on account of such equity interests or otherwise paid, issued or distributed from time to time in respect of or in exchange therefor, (iv) any certificate, instrument or other document evidencing or representing any such equity interests (including all proceeds of dissolution or liquidation), and (v) any and all proceeds of the foregoing (the foregoing hereinafter collectively called the "Pledged Collateral"), when certificates or promissory notes, as applicable, representing such Pledged Collateral are delivered to the Agent, and in the case of the other Collateral described in this Agreement, when financing statements are filed in the applicable jurisdiction, subject to the entry of the Orders, the Agent (for the benefit of itself and the Lenders) shall have a perfected Lien on, and security interest in, all right, title and interest of the Credit Parties in such Collateral and, subject to Section 9-315 of the UCC, the proceeds thereof, as security for the Secured Obligations to the extent perfection can be obtained by filing UCC financing statements, in each case with the priority set forth in the Orders.

(b)    Subject to the entry of the Orders, the Agent (for the benefit of itself and the Lenders) will have upon entry of the Interim Order, a valid Lien on all of the Credit Parties' right, title and interest in and to the Collateral security interest in which is granted hereunder and the proceeds thereof, and subject to the entry of the Orders, the Agent (for the benefit of itself and the Lenders) will have, upon entry of the Interim Order, a perfected Lien on, and security interest in, all right, title and interest of the Credit Parties in such Collateral and, to the extent applicable, subject to Section 9-315 of the UCC, the proceeds thereof, in each case prior and superior in right to any other person, subject to the Permitted Liens having priority under applicable Law and the Orders.

5.23    ERISA. Except as would not reasonably be expected to result in a material liability to a Credit Party, (a) each Plan is in compliance with ERISA, the Code and any Requirement of Law; (b) neither an ERISA Event nor an "accumulated funding deficiency" (within the meaning of §412 or §430 of the Code or §302 of ERISA) has occurred (or is reasonably likely to occur) with respect to any Plan; (c) no Single Employer Plan has terminated,

and no Lien has been incurred in favor of the PBGC or a Plan. Based on the assumptions used to fund each Single Employer Plan, the present value of all accrued benefits under each such Plan did not materially exceed the value of the assets of such Plan allocable to such accrued benefit as of the last annual valuation date prior to the date on which this representation is made; (c) neither any Credit Party nor any ERISA Affiliate has incurred or would reasonably be expected to incur any Withdrawal Liability exceeding $50,000, in connection with any Multiemployer Plan, including in the event that such Credit Party or ERISA Affiliate were to completely withdraw from such Multiemployer Plan; and (d) no such Multiemployer Plan is (or is reasonably expected to be) terminated, or insolvent (within the meaning of §4245 of ERISA).

5.24    Investment Company Act. None of the Credit Parties are required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

5.25    PATRIOT Act; OFAC and Other Regulations.

(a)    No Credit Party, any of its Subsidiaries or, to the knowledge of each Credit Party, any of the Affiliates or respective officers, directors, brokers or agents of such Credit Party, Subsidiary or Affiliate:

(i)    has violated any Anti-terrorism Laws; or

(ii)    has engaged in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

(b)    No Credit Party, any of its Subsidiaries or, to the knowledge of each Credit Party, any of the Affiliates or respective officers, directors, brokers or agents of such Credit Party, Subsidiary or Affiliate that is acting or benefiting in any capacity in connection with the Loans is a Blocked Person.

(c)    No Credit Party, any of its Subsidiaries or, to the knowledge of each Credit Party, any of the Affiliates or respective officers, directors, brokers or agents of such Credit Party, Subsidiary or Affiliate acting or benefiting in any capacity in connection with the Loans:

(i)    conducts any business or engages in making or receiving any contribution of goods, services or money to or for the benefit of any Blocked Person;

(ii)    deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-terrorism Law; or

(iii)    engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-terrorism Law.

5.26    Federal Reserve Board Regulations. The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying "margin stock" within the meaning

29

of Regulation U of the Board of Governors of the Federal Reserve System of the United States (the "Board") and no part of the Loan Proceeds will be used for any purpose which entails a violation of Regulations U, T or X of the Board.

## SECTION 6  INSURANCE: INDEMNIFICATION

6.1     Coverage. Each Credit Party shall cause to be carried and maintained commercial general liability insurance, on an occurrence form, against risks customarily insured against in each Credit Party's line of business. Such risks shall include the risks of bodily injury, including death, property damage, personal injury, advertising injury, and contractual liability per the terms of the indemnification agreement found in Section 6.3. Each Credit Party must maintain a minimum of $2,000,000.00 of commercial general liability insurance for each occurrence. Each Credit Party has and agrees to maintain a minimum of $2,000,000.00 of directors' and officers' insurance for each occurrence and $5,000,000.00 in the aggregate. So long as there are any Secured Obligations outstanding, each Credit Party shall also cause to be carried and maintained insurance upon the Collateral, insuring against all risks of physical loss or damage howsoever caused, in an amount not less than the full replacement cost of the Collateral, provided that such insurance may be subject to standard exceptions and deductibles.

6.2     Certificates. Each Credit Party shall deliver to Agent certificates of insurance that evidence each Credit Party's compliance with its insurance obligations in Section 6.1 and the obligations contained in this Section 6.2. Each Credit Party's insurance certificate shall state Agent is an additional insured for commercial general liability, a loss payee for all risk property damage insurance, subject to the insurer's approval, and a loss payee for property insurance and additional insured for liability insurance for any future insurance that such Credit Party may acquire from such insurer. Attached to the certificates of insurance will be additional insured endorsements for liability and lender's loss payable endorsements for all risk property damage insurance. All certificates of insurance will provide for a minimum of twenty (20) days advance written notice to Agent of cancellation or any other change adverse to Agent's interests (other than as a result of non-payment, in which case such certificates of insurance will provide for a minimum of ten (10) days advance written notice to Agent of cancellation). Any failure of Agent to review such insurance certificates for compliance is not a waiver of any of Agent's rights, all of which are reserved, and the Borrowers and Lenders acknowledge that the Agent shall have no duty to review such certificates.

6.3     Indemnity. Each Credit Party, jointly and severally, agrees to indemnify and hold Agent, the Lenders and their officers, directors, employees, agents, in-house attorneys, representatives and shareholders (each, an "Indemnified Person") harmless from and against any and all claims, costs, expenses, damages, obligations, losses, penalties, actions, judgments, suits, disbursements  and liabilities of any kind or nature whatsoever (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort), including reasonable attorneys' fees and disbursements and other costs of investigation or defense (including those incurred upon any appeal) (collectively, "Liabilities"), that may be instituted, awarded or asserted against or incurred by such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents or the administration of such credit, or in connection with or arising out of the transactions contemplated hereunder and thereunder, or any actions or failures to act in

connection therewith, or arising out of the disposition or utilization of the Collateral, excluding in all cases Liabilities to the extent resulting solely from any Indemnified Person's gross negligence or willful misconduct (as determined by a court of competent jurisdiction by final and nonappealable judgment or otherwise expressly agreed to by such Indemnified Person). Each Credit Party agrees to pay, and to save Agent and the Lenders harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all excise, sales or other similar Taxes (excluding Taxes imposed on or measured by the net income of Agent or the Lenders) that may be payable or determined to be payable with respect to any of the Collateral or this Agreement. In no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).  Without prejudice to the survival of any other agreement of a Credit Party hereunder or under any other Loan Document, the provisions of this Section 6.3 shall survive the payment in full of principal, interest and all other amounts payable hereunder and the termination of this Agreement and the other Loan Documents.

## SECTION 7   COVENANTS OF CREDIT PARTIES

Each Credit Party agrees as follows:

7.1     Financial Reports. Parent, on behalf of itself and each other Credit Party, shall furnish to Agent the financial statements and reports listed hereinafter (the "Financial Statements"):

(a)     as soon as practicable (and in any event within 30 days) after the end of each month, unaudited interim and year-to-date financial statements as of the end of such month (prepared on a consolidated basis), including balance sheet and related statements of income and cash flows accompanied by a report detailing any material contingencies or any other occurrence that would reasonably be expected to have a Material Adverse Effect, all certified by Parent's Authorized Officer to the effect that they have been prepared in accordance with GAAP, except (i) for the absence of footnotes, (ii) that they are subject to normal year-end adjustments, and (iii) they do not contain certain non-cash items that are customarily included in quarterly and annual financial statements;

(b)     as soon as practicable (and in any event within 45 days) after the end of each calendar quarter, unaudited interim and year-to-date financial statements as of the end of such calendar quarter (prepared on a consolidated basis), including balance sheet and related statements of income and cash flows accompanied by a report detailing any material contingencies or any other occurrence that would reasonably be expected to have a Material Adverse Effect, certified by Parent's Authorized Officer to the effect that they have been prepared in accordance with GAAP, except (i) for the absence of footnotes, and (ii) that they are subject to normal year-end adjustments; as well as the most recent capitalization table for Parent;

(c)     [reserved];

(d)     as soon as practicable (and in any event within 30 days) after the end of each month, a Compliance Certificate in the form of Exhibit F;

(e)     [reserved];

(f)     promptly upon receipt of notice thereof, a report of any legal actions pending or threatened in writing against a Borrower or any Subsidiary Guarantor that could reasonably be expected to result in damages or costs (other than attorney's costs) to such Borrower or any Subsidiary Guarantor of Two Hundred and Fifty Thousand Dollars ($250,000) or more;

(g)     as soon as practicable (and in any event by noon Pacific Time on the next Business Day), a report detailing (i) the cash balances of the Parent and its Subsidiaries as of the end of the prior Business Day, (ii) the number of installations started and completed on each day since the prior report delivered pursuant to this clause (g), (iii) the number of new orders signed on each day since the prior report delivered pursuant to this clause (g), (iv) the average gross profit (excluding referral fee) for installations completed on each day since the prior report delivered pursuant to this clause (g), (v) collections on each day since the prior report delivered pursuant to this clause (g) and (vi) compliance with Section 7.33 and, on each Business Day following a date on which Section 7.34 was required to be tested, compliance with Section 7.34;

(h)     at the same time and in the same manner as it gives to its directors, copies of all notices, minutes, consents and other materials that Parent provides to its directors in connection with meetings of the Board of Directors, and within 30 days after each such meeting, minutes of such meeting; provided that Parent shall not be required to deliver (i) privileged information, (ii) information relating to any conflict of interest policy, and (iii) compensation information;

(i)     at the same time and in the same manner as it provides to or receives from any lender or agent under the Prepetition Hercules Loan Agreement or any of the Prepetition Subordinated Indebtedness, copies of all default or other notices, consents, waivers, and amendments, provided to or received from any agent or lender in connection with the Prepetition Hercules Loan Agreement or any of the Prepetition Subordinated Indebtedness;

(j)     promptly upon the execution thereof, copies of any amendment to the certificate of incorporation, bylaws, certificate of formation, operating agreement or other organizational documents of any Credit Party;

(k)     any other documents or materials reasonably requested by the Agent or any Lender;

(l)     the Budget shall be updated, modified or supplemented no more frequently than monthly by the Borrower, and each such updated, modified or supplemented budget shall be approved in writing by, and shall be in form and substance reasonably satisfactory to, the Required Lenders in their discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed to be a Budget; provided, however, that in the event the Required Lenders and the Borrower, cannot agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default once the period covered by the prior Budget has terminated.  Each Budget delivered to the Agent shall be accompanied by such supporting documentation as reasonably requested by the Lenders.  Each Budget shall be prepared in good faith based upon assumptions which the Borrower believes to be reasonable;

(m)     the Borrower shall deliver to the Agent on or before 11:59 p.m. Pacific time on Thursday of each week a compliance certificate, which shall include such detail as is reasonably satisfactory to the Lenders, signed by an Authorized Officer of the Borrower certifying that (i) the Credit Parties are in compliance with the covenants contained in Section 7.26, (ii) no Default or Event of Default has occurred (except for any Default or Event of Default arising from a default or event of default that is continuing under the Prepetition Hercules Loan Agreement, Prepetition Subordinated Indebtedness or the Atalaya Credit Agreement as a result of the filing of the Cases) or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (iii) attaching a Budget Variance Report;

(n)     upon request, from time to time, all proceedings, motions and other documents filed with the Bankruptcy Court on behalf of the Debtors in the Cases and all such material proceedings, motions and other documents shall include counsel for the Agent and counsel for each Lender on any "Special Notice List" or other similar list of parties to be served with papers in the Cases; and

(o)     (i) as soon as practicable in advance of filing with the Bankruptcy Court or delivering to the Committee appointed in a Case, if any, or to the U.S. Trustee, as the case may be, the Final Order, all other material proposed orders and pleadings related to (x) the Cases (all of which must be in form and substance reasonably satisfactory to the Agent and the Lenders) and (y) the Term Loan and/or any sale contemplated in accordance with Section 7.26 hereof and/or any disclosure statement related thereto (all of which must be in form and substance satisfactory to the Agent and the Lenders), and (ii) substantially simultaneously with the filing with the Bankruptcy Court or delivering to the Committee appointed in any Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Parent or its Subsidiaries or the Cases that may be filed with the Bankruptcy Court or delivered to the Committee appointed in any Case, if any, or to the U.S. Trustee.

Documents required to be delivered pursuant to the terms hereof (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which Parent posts or files such documents, or provides a link thereto, on Parent's website on the Internet at Parent's website address, or are available at www.sec.gov (or any successor site maintained by the SEC for similar purposes) or on PACER; provided, however, Parent shall promptly notify Agent and the Lenders in writing (which may be by electronic mail) of the posting of any such documents.

No Credit Party (without the consent of the Required Lenders such consent not to be reasonably withheld) shall make any change in its (a) accounting policies or reporting practices, except as required by GAAP or (b) fiscal years or fiscal quarters. The fiscal year of each Credit Party shall end on December 31.

7.2     Management Rights. Parent, on behalf of each other Credit Party, shall permit any representative that Agent or any Lender authorizes, including its attorneys and accountants, to inspect the Collateral and examine and make copies and abstracts of the books of account and

records of each Credit Party at reasonable times and upon reasonable notice during normal business hours; provided, however, that so long as no Event of Default has occurred and is continuing, such examinations shall be limited to no more than two (2) per fiscal year. In addition, any such representative shall have the right to meet with management and officers of Parent to discuss such books of account and records. In addition, Agent or any Lender shall be entitled at reasonable times and intervals to consult with and advise the management and officers of Parent concerning significant business issues affecting any Credit Party. Such consultations shall not unreasonably interfere with any Credit Party's business operations. The parties intend that the rights granted Agent and any Lender shall constitute "management rights" within the meaning of 29 C.F.R Section 2510.3-101(d)(3)(ii), but that any advice, recommendations or participation by Agent or any Lender with respect to any business issues shall not be deemed to give Agent or any Lender, nor be deemed an exercise by Agent or any Lender of, control over any Credit Party's management or policies.

7.3     Further Assurances. Upon the request of Agent (at the direction of the Required Lenders), each Credit Party shall from time to time execute, deliver and file, alone or with Agent, any financing statements, security agreements, collateral assignments, notices, control agreements, or other documents to grant a security interest in, perfect or give the highest priority to Agent's Lien on the Collateral. Each Credit Party shall from time to time procure any instruments or documents as may be requested by Agent (at the direction of the Required Lenders), and take all further action that may be necessary or desirable, or that Agent may reasonably request (at the direction of the Required Lenders), to perfect and protect the Liens granted hereby and thereby. In addition, and for such purposes only, each Credit Party hereby authorizes Agent to execute and deliver on behalf of such Credit Party and to file such financing statements, collateral assignments, notices, control agreements, security agreements and other documents without the signature of such Credit Party either in Agent's name or in the name of Agent as agent and attorney-in-fact for such Credit Party; provided that prior to the occurrence of any Event of Default, Agent shall provide prior written notice of such additional documents to the applicable Credit Party and shall provide copies of such documents as soon as possible. Each Credit Party shall protect and defend such Credit Party's title to the Collateral and Agent's Lien thereon against all Persons claiming any interest adverse to such Credit Party or Agent other than Permitted Liens.

7.4     Indebtedness. No Credit Party shall create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness, or permit any Subsidiary so to do, other than Permitted Indebtedness, or prepay any Indebtedness or take any actions which impose on any Credit Party an obligation to prepay any Indebtedness, except for the conversion of Indebtedness into equity securities and the payment of cash in lieu of fractional shares in connection with such conversion.

7.5     Collateral. Each Credit Party shall at all times keep the Collateral, the Intellectual Property and all other property and assets used in each Credit Party's business or in which such Credit Party now or hereafter holds any interest free and clear from any Liens whatsoever (except for Permitted Liens), and shall give Agent prompt written notice of any Liens thereon (other than Permitted Liens), provided however, that the Collateral and such other property and assets may be subject to Permitted Liens except that there shall be no Liens whatsoever on Intellectual Property (other than licenses permitted under this Agreement). Each Credit Party

shall cause its Subsidiaries to protect and defend such Subsidiary's title to its assets from and against all Persons claiming any interest adverse to such Subsidiary, and each Credit Party shall cause its Subsidiaries at all times to keep such Subsidiary's property and assets free and clear from any legal process or Liens whatsoever (except for Permitted Liens, provided however, that there shall be no Liens whatsoever on Intellectual Property), and shall give Agent prompt written notice of any Liens (other than Permitted Liens). No Credit Party shall agree with any Person other than Agent or any Lender (or pursuant to the Prepetition Hercules Loan Agreement or any of the Prepetition Subordinated Indebtedness Documentation) not to encumber such Credit Party's property.

7.6    Investments. No Credit Party shall directly or indirectly acquire or own, or make any Investment in or to any Person, or permit any of its Subsidiaries so to do, other than Permitted Investments.

7.7    Distributions. No Credit Party shall, and no Credit Party shall allow any Subsidiary to, (a) repurchase or redeem any class of stock or other equity interest other than pursuant to employee, director or consultant repurchase plans or other similar agreements, provided, however, in each case the repurchase or redemption price does not exceed the original consideration paid for such stock or equity interest, or (b) declare or pay any cash dividend or make a cash distribution on any class of stock or other equity interest, except that a Subsidiary that is not a Credit Party may pay dividends or make distributions to a Credit Party or to other Subsidiaries and a Subsidiary that is a Credit Party may pay dividends or make distributions to another Credit Party, or (c) lend money to any employees, officers or directors or guarantee the payment of any such loans granted by a third party or (d) waive, release or forgive any Indebtedness owed by any employees, officers or directors.

7.8    Transfers. Except for Permitted Transfers, neither a Credit Party nor any Subsidiary shall voluntarily or involuntarily transfer, sell, lease, license, lend or in any other manner convey any equitable, beneficial or legal interest in any material portion of its assets.

7.9    Mergers or Acquisitions. No Credit Party shall (a) merge or consolidate, or permit any of its Subsidiaries to merge or consolidate, with or into any other business organization (other than mergers or consolidations of (i) a Subsidiary which is not a Credit Party into another Subsidiary or into another Credit Party or (ii) a Credit Party into another Credit Party), or (b) acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the capital stock or property of another Person.

7.10    Taxes. Each Credit Party and their respective Subsidiaries shall pay when due (taking into account all available extensions) all Taxes, fees or other charges of any nature whatsoever (together with any related interest or penalties) now or hereafter imposed or assessed against any Credit Party, any Subsidiary, Agent, any Lender or the Collateral or upon any Credit Party's or such Subsidiary's ownership, possession, use, operation or disposition thereof or upon any Credit Party's rents, receipts or earnings arising therefrom. Each Credit Party and their respective Subsidiaries shall file on or before the due date therefor (taking into account all applicable extensions) all personal property Tax returns in respect of the Collateral. Notwithstanding the foregoing, any Credit Party or Subsidiary may contest, in good faith and by

appropriate proceedings, Taxes for which such Credit Party maintains adequate reserves therefor in accordance with GAAP.

7.11    Corporate Changes. No Credit Party shall change its corporate name, legal form or jurisdiction of formation without twenty (20) days' prior written notice to Agent. Parent shall not suffer a Change in Control. No Credit Party shall relocate its chief executive office or its principal place of business unless: (i) it has provided prior written notice to Agent; and (ii) such relocation shall be within the continental United States. No Credit Party shall relocate any item of Collateral (other than (x) sales of Inventory in the ordinary course of business, (y) [reserved], and (z) relocations of Collateral from a location described on Exhibit C to another location described on Exhibit C) unless (i) it has provided prompt written notice to Agent, (ii) such relocation is within the continental United States and, (iii) if such relocation is to a third party bailee, it has delivered a bailee agreement in form and substance reasonably acceptable to the Required Lenders.  Each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business; provided, neither Parent (other than with respect to existence) nor any of its Subsidiaries shall be required to preserve any such existence, right or franchise, licenses and permits if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to any Lender.

7.12    Deposit Accounts. No Credit Party shall maintain any Deposit Accounts, or accounts holding Investment Property, except with respect to which Agent has a perfected first priority security interest (subject, in each case, to control agreements with respect thereto entered into prior to the Petition Date between the applicable Credit Party, the applicable account bank and Hercules).

7.13    Parent shall notify Agent and the Lenders of each Subsidiary formed subsequent to the Closing Date and, within 15 days of formation of any Subsidiary other than an Excluded Subsidiary, shall cause any such Subsidiary that is a Domestic Subsidiary to execute and deliver to Agent a Joinder Agreement.

7.14    [Reserved].

7.15    Notification of Event of Default. Parent shall notify Agent and the Lenders immediately of the occurrence of any Event of Default.

7.16    [Reserved].

7.17    Compromise of Agreements. With respect to Accounts with a combined value in excess of twenty-five percent (25%) of all Borrowers' Accounts then outstanding, neither Borrower shall (a) grant any material extension of the time of payment thereof, (b) to any material extent, compromise, compound or settle the same for less than the full amount thereof, (c) release, wholly or partly, any Person liable for the payment thereof, or (d) allow any credit or discount whatsoever thereon other than trade discounts granted by any Borrower in the ordinary

course of business of such Borrower, unless, in each case, such actions are consistent with past practices.

7.18    Anti-Terrorism Laws. None of the Credit Parties shall violate any Anti- Terrorism Laws; conduct any business or engage in making or receiving any contribution of goods, services or money to or for the benefit of any Blocked Person; deal in, or otherwise engage in any transaction related to, any property or interests in property blocked pursuant to any Anti-terrorism Law; or engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

7.19    Federal Reserve Board Regulations. None of the Credit Parties shall engage in the business of extending credit for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation U of the Federal Reserve Board or use any part of the Loan Proceeds for any purpose which entails a violation of Regulations U, T or X of the Federal Reserve Board.

7.20    Prepetition Loan Documents.  No Credit Party shall amend, supplement, restate, otherwise modify the Prepetition Loan Documentation or enter into any new Prepetition Loan Documentation without the prior written consent of the Agent (given at the direction of the Required Lenders), except as permitted under the Intercreditor Agreement.

7.21    Affiliate Transactions. No Credit Party shall enter into or be a party to any transaction including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate unless such transaction is:

(a)    otherwise permitted by the terms of this Agreement;

(b)    in the ordinary course of business of the Borrower or the relevant Subsidiary, as the case may be; and

(c)    on fair and reasonable terms no less favorable to the Borrower or the relevant Subsidiary, as the case may be, than those that would have been obtained in a comparable transaction on an arm's length basis from an unrelated Person.

7.22    Debtor-in-Possession Obligations.  Comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and any order of the Bankruptcy Court.

7.23    Milestones.[1] Credit Parties shall achieve each of the following milestones (as the same may be extended from time to time with the consent of the Agent (given at the direction of the Required Lenders, the "Milestones"):

(a)    file the Bankruptcy Sale Motion on the Petition Date;

_____

[1] NTD: to be conformed on an ongoing basis to agreed Milestones in DIP Order.

(b)    obtain entry of the Interim Order shall by the Bankruptcy Court on or before the date that is 3 Business Days after the Petition Date;

(c)    obtain entry of the Bidding Procedures Order (such date, the "Bidding Procedures Order Date") by the Bankruptcy Court on or before the date that is 15 days after the Petition Date;

(d)    the Final Order shall have been entered by the Bankruptcy Court on or before the date that is 30 days after the Petition Date;

(e)    the bid deadline set forth in the Bidding Procedures Order shall occur on or before the date that is 10 days after the Bidding Procedures Order Date;

(f)    if qualifying bids are received in accordance with the Bidding Procedures Order, the Credit Parties shall hold an auction with respect to the Bankruptcy Sale on or before the date that is 11 days after the Bidding Procedures Order Date;

(g)    the Credit Parties shall obtain entry of court orders of the Bankruptcy Court authorizing the Bankruptcy Sale to the successful bidder in accordance with the Bidding Procedures Order, in each case in form and substance reasonably acceptable to the Required Lenders on or before the date that is 12 days after the Bidding Procedures Order Date.

7.24    [Reserved].

7.25    First Day Orders.  The Credit Parties shall cause all proposed "first day orders" submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects.

7.26    Budget Compliance and Variances.

(a)    The Credit Parties and their Subsidiaries will use the proceeds of the Loans solely to make disbursements for expenditures provided for in accordance with Section 5.17 and this Section 7.26.  The Credit Parties and their Subsidiaries shall not pay any expenses (other than *de minimis* amounts) or other disbursements (other than *de minimis* disbursements) other than the type of expenses and disbursements set forth in the Budget.

(b)    Beginning on the Wednesday after the Petition Date and on each Wednesday thereafter, Parent and the Borrower will not permit (i) the Actual Net Cash Flows (without giving effect to borrowings and repayments under this Agreement) for the Cumulative Period to be less than 10% of the Budgeted Net Cash Flows (without giving effect to borrowings and repayments under this Agreement) for the Cumulative Period, (ii) the Actual Operating Net Cash Flows (without giving effect to borrowings and repayments under this Agreement) for the Cumulative Period to be less than 10% of the Budgeted Operating Net Cash Flows (without giving effect to borrowings and repayments under this Agreement) for the Cumulative Period, and (iii) any Actual Line Item Disbursement Amount for the Cumulative Period to exceed 10% of the Budgeted Line Item Disbursement Amount for the applicable line item for the Cumulative Period.

7.27 Adequate Protection Payments. Credit Parties will make adequate protection payments payable in cash on the dates and to the extent required by the Orders (such interest and payments, collectively, the "Adequate Protection Payments").

7.28 Consultants. The Credit Parties shall provide the Agent and the Lenders with reasonable access to any consultant, turnaround management, broker or financial advisory firm retained by Parent or its Subsidiaries in any of the Cases and, if requested, copies of all retention agreements for each such consultant.

7.29 Challenges. Notwithstanding anything herein to the contrary no portion or proceeds of the Term Loan or the Collateral, and no disbursements set forth in the Budget, shall be used for the payments or purposes which would violate the terms of Paragraph 35 of the Interim Order except as otherwise permitted pursuant to the terms of an applicable Order.

7.30 Filing of Motions and Applications. Without the prior written consent of the Agent (at the direction of the Required Lenders), the Credit Parties shall not apply to the Bankruptcy Court for, or join in or support any motion or application seeking, authority to (a) take any action that is prohibited by the terms of any of the Loan Documents or the Orders, (b) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Orders, or (c) permit any Indebtedness or Claim to be pari passu with or senior to any of the Term Loans, except as expressly stated in the Orders.

7.31 Superpriority Claim. No Credit Party shall incur, create, assume, suffer to exist or permit any other Superpriority Claim which is pari passu with or senior to the claims of the Agent and the Lenders against the Borrower or any of its Subsidiaries, except for the Carve Out and as otherwise expressly stated in the Orders.

7.32 Use of Proceeds. No Credit Party shall use any proceeds of the Loans for a purpose that is prohibited by this Agreement or the Orders.

7.33 Weekly Orders. The Credit Parties shall have, weekly, as of each Friday after the date hereof, signed orders for a minimum of the number of PV Systems set forth below for such date:

| Date | Orders signed during the previous seven (7) days |
|---|---|
| March 17 | 40 |
| March 24 | 40 |
| March 31 | 40 |
| Thereafter | 50 |

7.34 Daily Installations. The Credit Parties shall have, on each day,

(a) on average over the previous seven (7) days, initiated the installation of a minimum of the number of PV Systems set forth below for such date:

| Date | Average number of installations initiated over the previous seven (7) days |
|---|---|
| March 15 | 33 |
| March 16 | 43 |
| March 17 | 53 |
| March 18 | 55 |
| March 19 | 55 |
| March 20 - March 25 | 65 |
| March 26 - April 1 | 70 |
| April 2 - April 8 | 95 |
| April 9 and thereafter | 115 |

(b)     on average over the previous seven (7) days, completed the installation of a minimum of the number of PV Systems set forth below for such date:

| Date | Average number of installations completed over the previous seven (7) days |
|---|---|
| March 15 | 28 |
| March 16 | 38 |
| March 17 | 48 |
| March 18 | 50 |
| March 19 | 50 |
| March 20 - March 25 | 60 |
| March 26 - April 1 | 65 |
| April 2 - April 8 | 90 |
| April 9 and thereafter | 110 |

(c)     on average over the previous seven (7) days, a minimum of the average gross profits (before referral fees) for installations set forth below for such date:

| Date | Average gross profits over the previous seven (7) days |
|---|---|
| March 15 | $6,500 |
| March 16 | $6,500 |
| March 17 | $7,000 |
| March 18 | $7,000 |
| March 19 | $7,000 |
| March 20 - March 25 | $7,000 |
| March 26 - April 8 | $8,500 |
| April 9 and thereafter | $10,000 |

(d)     on average over the previous seven (7) days, a minimum of the collections set forth below for such date:

| Date | Average collections over the previous seven (7) days |
|---|---|
| March 15 | $150,000 |
| March 16 | $200,000 |
| March 17 | $950,000 |
| March 18 | $950,000 |
| March 19 | $950,000 |
| March 20 - March 25 | $1,040,000 |
| March 26 - April 1 | $1,040,000 |
| April 2 - April 8 | $1,040,000 |
| April 9 and thereafter | $1,040,000 |

7.35    Modifications to Orders.    No Credit Party shall seek or consent to any amendment, supplement or any other modification of any of the terms of the Orders after such orders are entered by the Bankruptcy Court without the prior written consent of the Agent and the Required Lenders.

## SECTION 8   [RESERVED]

## SECTION 9   EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall be an Event of Default:

9.1     Payments. Except to the extent the holder thereof would be stayed from exercising remedies as a result of the Cases, the Credit Parties fail to pay any amounts due under this Agreement or any of the other Loan Documents on the due date; or

9.2     Covenants. Any Credit Party breaches or defaults in the performance of any covenant or Secured Obligation under this Agreement, or any of the other Loan Documents or any other agreement among any Credit Party, Agent and the Lenders, and (a) with respect to a default under any covenant under this Agreement (other than as set forth in Section 9.2(b)), any other Loan Document or any other agreement among any Credit Party, Agent and the Lenders, such default continues for more than fifteen (15) Business Days after the earlier of the date on which (i) Agent (acting upon the request of the Required Lenders) has given notice of such default to such Credit Party and (ii) such Credit Party has actual knowledge of such default or (b) with respect to a default under any of Sections 6, 7.4 through and including 7.9, 7.11 through and including 7.15, 7.17 through and including 7.21, 7.23, 7.24, 7.26, 7.27, 7.29, 7.32, 7.33 and 7.34, the occurrence of such default; or

9.3     Material Adverse Effect. A circumstance has occurred that has had a Material Adverse Effect. Agent shall (acting upon the request of the Required Lenders) provide written notice to Parent stating its belief that a Material Adverse Effect has occurred. Agent shall (acting upon the request of the Required Lenders) provide three (3) Business Days written notice to

Parent before exercising any right or remedy or causing a Default or an Event of Default to occur with respect to this Section 9.3, whereby during such time, the Lenders shall make themselves available to discuss in good faith any proposed solution to such Material Adverse Effect, and Parent may take such action otherwise permitted under the Loan Documents (i) as required so that the event or circumstance that is the basis for such Material Adverse Effect no longer exists (to the extent curable), (ii) to show evidence that no Material Adverse Effect has occurred or (iii) to provide a plan detailing how it will mitigate the effect of such event or circumstance that, based on such plan, in the foreseeable future will provide Parent the ability to overcome such Material Adverse Effect, which, in each case, at such time such evidence is shown and plans are provided, the Lenders shall promptly re-determine in good faith whether an Event of Default still exists with respect to this Section 9.3. If not, any proposed or expected violation of this Section 9.3 will immediately be deemed to be waived and cured, without any further action. Further, no Event of Default shall be triggered under this Section 9.3 if the circumstance arises out of: (i) war, act of terrorism, civil unrest or similar event; or (ii) any adverse change, effect or circumstance resulting from an action required or permitted by this Agreement; or

9.4    Representations. Any representation or warranty made by any Credit Party in any Loan Document shall have been false or misleading in any material respect when furnished; or

9.5    ERISA Events.  The occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a liability of any Credit Party in an aggregate amount exceeding $1,000,000; or

9.6    Attachments; Judgments. Any portion of any Credit Party's assets are attached or seized, or a levy is filed against any such assets, or a final judgment or judgments is/are entered for the payment of money, individually or in the aggregate, of at least $1,000,000.00 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than five (5) days prior to the date of any proposed sale thereunder), or any Credit Party is enjoined or in any way prevented by court order from conducting any part of its business; or

9.7    Other Obligations. Except to the extent the counterparty thereto would be stayed from exercising remedies as a result of the Cases, the occurrence of any default under any agreement or obligation of any Credit Party involving any Indebtedness in excess of $1,000,000.00 in the aggregate which permits the holder of such Indebtedness to accelerate such Indebtedness or exercise any remedies with respect thereto; or

9.8    Invalidity of Loan Documents. Any provision of any Loan Document, at any time after its execution and delivery and for any reason, ceases to be in full force and effect; or Parent or any Credit Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or Parent or any Credit Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Loan Document; or (ii) any Lien purported to be created under any Loan Document shall cease to be, or shall be asserted by

Parent or any Credit Party or any other Person not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Loan Document; or

9.9     [reserved]; or

9.10    The existence of any claim by the PBGC or any Employee Benefit Plan in connection with one or more Employee Benefit Plan that purports to assert or otherwise seeks to impose any Lien on the Collateral having a priority senior to or pari passu with the Liens and the security interests granted herein; or

9.11    Any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code without the consent of the Required Lenders; or

9.12    A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Debtors; or

9.13    An order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Credit Parties; or

9.14    [reserved]; or

9.15    The existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of the Term Loans and the Carve Out or as otherwise permitted under the applicable Loan Documents or permitted under the Orders, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Agent and the Lenders under the Term Loans, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than claims in respect of the Carve Out) or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Orders then in effect (but only in the event specifically consented to by the Agent (at the direction of the Required Lenders)), whichever is in effect; or

9.16    The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $250,000 in the aggregate (excluding purchase money financings and equipment financings) or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole); or

9.17    An order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order, in each case without the prior written consent of Agent (acting

upon the request of the Required Lenders) and, with respect to any material change that is adverse to the Required Lenders; or

9.18    The Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of Agent (acting upon the request of the Required Lenders) and, with respect to any material change, the Required Lenders; or

9.19    Any of the Credit Parties shall fail to comply with the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) in any material respect;

9.20    An order in the Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the commencement of other actions that are materially adverse to Agent, the Lenders or their respective rights and remedies under the Term Loans in any of the Cases or inconsistent with any of the Loan Documents or the Asset Purchase Agreement; or

9.21    If the Final Order does not include a waiver, in form and substance satisfactory to the Required Lenders, of the right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code; or

9.22    the consummation of any sale of all or substantially all assets of the Credit Parties pursuant to Section 363 of the Bankruptcy Code, other than the Bankruptcy Sale; or

9.23    Any Credit Party or any Subsidiary thereof shall take any action in support of any matter set forth in Sections 9.10 through 9.22 hereof, or any other Person shall do so and such application is not contested in good faith by the Credit Parties and the relief requested is granted in an order that is not stayed pending appeal; or

9.24    Any Credit Party or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Term Loans or any other rights granted to the Agent and the Lenders in the Orders or this Agreement or (ii) any relief under Sections 506(c) or 552(b) of the Bankruptcy Code with respect to any Collateral; or

9.25    Any Credit Party shall challenge, support or encourage a challenge of any payments made to the Agent or any Lender with respect to the Term Loans, other than to challenge the occurrence of a Default or Event of Default; or

9.26    Without the consent of the Agent (acting upon the request of the Required Lenders), the filing of any motion by the Credit Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any prepetition agent or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date); or

9.27    Without the Agent's consent (acting upon the request of the Required Lenders), the entry of any order by the Bankruptcy Court granting, or the filing by any Credit Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral in a manner inconsistent with the Budget without the Agent's consent (acting upon the request of the Required Lenders) or to obtain any financing under Section 364 of the Bankruptcy Code other than the Term Loans unless such motion or order contemplates payment in full in cash of the Term Loans immediately upon consummation of the transactions contemplated thereby; or

9.28    Any Credit Party or any person on behalf of any Credit Party shall file any motion seeking authority to consummate a sale of assets of the Credit Parties or the Collateral to the extent having a value in excess of $250,000 outside the ordinary course of business and not otherwise permitted hereunder; or

9.29    If any Credit Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of Credit Parties and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; provided, that the Credit Parties shall have five Business Days after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court order; or

9.30    Any Credit Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Indebtedness or payables other than payments (i) in respect of accrued payroll and related expenses as of the commencement of the Cases, (ii) in respect of certain creditors and (iii) permitted under this Agreement, in each case, to the extent authorized by one or more "first or second day orders" (or other orders with the consent of the Agent (acting upon the request of the Required Lenders)) and consistent with the Budget; or

9.31    If, unless otherwise approved by the Agent (acting upon the request of the Required Lenders), an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Cases and such order shall not be reversed or vacated within 10 days; or

9.32    Without the Required Lenders' consent, any Credit Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (a) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to the Agent's liens and security interests or; (b) to modify or affect any of the rights of the Agent, or the Lenders under the Orders, the Loan Documents by any plan of reorganization confirmed in the Cases or subsequent order entered in the Cases; or

9.33    A Debtor Professional Fee Report is received by the Agent and Lenders that reflects an estimate of the aggregate amount of Professional Fees of the Debtor, incurred through the Cumulative Period, that is in excess of $2,192,500 (but in any event excluding from the calculation any success fees due to or invoiced by any Professional Person), provided, however,

that no Event of Default shall exist until the Agent (acting upon the request of the Required Lenders) shall have given notice of such default to the Borrower; provided, further, that if the Agent has not given notice within twenty-four (24) hours following receipt of such Debtor Professional Fee Report, such default shall be deemed waived until receipt of the subsequent Debtor Professional Fee Report.

## SECTION 10
## REMEDIES

10.1    General. Upon and during the continuance of any one or more Events of Default, (1) the Agent, at the request of the Required Lenders, may by notice to the Borrower, without further notice, motion, or application to, order of, or hearing before the Bankruptcy Court, take any or all of the following actions, at the same or different times including, without limitation: (i) terminate forthwith the Term Commitments and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable in cash, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Credit Parties accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by each Credit Party, anything contained herein or in any other Loan Document to the contrary notwithstanding; and (2) after giving three (3) Business Days' prior written notice (the "Remedies Notice Period") to the Borrower, the automatic stay of Section 362 of the Bankruptcy Code shall be terminated without order of the Bankruptcy Court, without the need for filing any motion or relief from the automatic stay or any other pleading, for the purpose of permitting the Lenders to do any of the following: (i) directing the Agent to foreclose on the Collateral, (ii) enforcing all of their rights under any guaranty and (iii) exercising all other rights and remedies provided for in the Loan Documents, the Order and applicable law or in equity.   In any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Agent or the Lenders, as set forth in this Agreement, the applicable Order or other Loan Documents.

10.2    Collection; Foreclosure. Upon the occurrence and during the continuance of any Event of Default, Agent may (at the direction of the Required Lenders), at any time or from time to time, apply, collect, liquidate, sell in one or more sales, lease or otherwise dispose of, any or all of the Collateral, in its then condition or following any commercially reasonable preparation or processing, in such order as Agent (acting at the direction of the Required Lenders) may elect. Any such sale may be made either at public or private sale at its place of business or elsewhere. Each Credit Party agrees that any such public or private sale may occur upon ten (10) calendar days' prior written notice to such Credit Party. Agent may require any Credit Party to assemble the Collateral and make it available to Agent at a place designated by Agent that is reasonably convenient to Agent and such Credit Party.   Agent (acting at the direction of the Required Lenders) shall be deemed to have acted reasonably in the custody, preservation and disposition of any of the Collateral if it complies with the obligations of a secured party under the UCC.  If the sale or other disposition of the Collateral fails to satisfy all of the Borrower's obligations to

the Lenders and the Agent, the Borrower shall remain liable to the Lenders and the Agent for any deficiency.

10.3    During the continuance of an Event of Default, all payments or proceeds received by Agent in respect of any of the Secured Obligations shall be applied in the following order of priority:

First, to Agent and then the Lenders in an amount sufficient to pay in full Agent's fees, costs and professionals' and advisors' fees and expenses and any other amounts owed to the Agent under this Agreement (including, without limitation, amounts owed under Section 12.11), and then the Lenders' costs and professionals' and advisors' fees and expenses as described in Section 12.11;

Second, to the Lenders in an amount equal to the then unpaid amount of the Secured Obligations (including principal, interest, and the Default Rate interest); and

Finally, after the full, final, and indefeasible payment in Cash of all of the Secured Obligations, in accordance with the Intercreditor Agreement.

10.4    No Waiver. Agent shall be under no obligation to marshal any of the Collateral for the benefit of any Credit Party or any other Person, and each Credit Party expressly waives all rights, if any, to require Agent to marshal any Collateral.

10.5    Cumulative Remedies. The rights, powers and remedies of Agent hereunder shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative. The exercise of any one or more of the rights, powers and remedies provided herein shall not be construed as a waiver of or election of remedies with respect to any other rights, powers and remedies of Agent.

## SECTION 11
## AGENCY PROVISIONS

11.1    Appointment and Authority.

(a)    Each of the Lenders hereby irrevocably appoints Wilmington Trust, National Association to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Agent and the Lenders, and neither the Borrower nor any other Credit Party shall have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. Any direction or request given to the Agent by any Lender may be given via email unless otherwise required by the Agent.

(b)    Each of the Lenders hereby acknowledges and agrees that the Agent act as its attorney-in-fact and may enter into the Intercreditor Agreement, in the form attached hereto as Exhibit H, as well as any amendments, supplements or other modifications thereto (consented to by the Required Lenders), and any other Loan Document, each on behalf of the Lenders.

11.2    Exculpatory Provisions.

(a)    The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether an Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Insolvency Proceeding;

(iii)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity; and

(iv)    shall in no event be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

(b)    The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request or direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment. The Agent shall be deemed not to have knowledge of any Event of Default unless and until notice describing such Event of Default is given to the Agent in writing by the Borrower or a Lender.

(c)    The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the

performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Section 4 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

(d)     Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement, or any other Loan Document, to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Agent, it is understood that in all cases the Agent shall be fully justified in failing or refusing to take any such action if it shall not have received written instruction, advice or concurrence from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in any other Loan Document) in respect of such action. The Agent shall have no liability for any failure or delay in taking any actions contemplated above as a result of a failure or delay on the part of the Required Lenders to provide such instruction, advice or concurrence. This provision is intended solely for the benefit of the Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

(e)     Except for any action expressly required of the Agent hereunder or other Loan Document to which it is a party, it shall in all cases be fully justified in failing or refusing to act unless it shall receive further assurances to its reasonable satisfaction from the Lenders of their indemnification obligations under Section 11.9 against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  No provision of this Agreement or any Loan Document shall require the Agent to take any action that it reasonably believes to be contrary to applicable law or to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties thereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

11.3     Reliance by Agent. The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Agent may consult with legal counsel (who may be counsel for the Borrower or any

Lender), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

11.4     Delegation of Duties. The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives (their "Related Parties"). The exculpatory provisions of this Section 11 shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent. The Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

11.5     Resignation of Agent.

(a)     The Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)     With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security as bailee until such time as a successor Agent is appointed) and (ii) except for any indemnity. expense reimbursement or fee payments (including, without limitation, amounts owed under Sections 6.3 or 12.11) owed to the retiring Agent, all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent (other than any rights to indemnity, expense reimbursement payments owed to the retiring Agent), and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Section 11 and Sections 6.3 and 12.11 shall continue in effect for the benefit of such retiring Agent, its sub-

agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

11.6    Non-Reliance on Agent and Other Lenders. Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

11.7    Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Insolvency Proceeding relative to any Credit Party, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable or as required by applicable law in order to have the claims of the Lenders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agent and their respective agents and counsel and all other amounts due the Lenders and the Agent under this Agreement and the other Loan Documents) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under this Agreement and the other Loan Documents.

11.8    Collateral and Guaranty Matters.

(a)    The Lenders irrevocably authorize the Agent, at the direction of the Required Lenders,

(i)    to release any Lien on any property granted to or held by the Agent under any Loan Document (x) upon payment in full of all Obligations (other than contingent indemnification obligations), (y) that is sold or otherwise disposed of or to be sold or otherwise

disposed of as part of or in connection with any sale or other disposition permitted under the Loan Documents; or

        (ii)    to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

        (b)    The Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, nor shall the Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

        11.9    To the extent that the Credit Parties for any reason fail to indefeasibly pay any amount required under Sections 6.3 or 12.11 to be paid by them to the Agent (or any sub-agent thereof) or any related party entitled thereto of the Agent, each Lender severally agrees to pay to the Agent (or any such sub-agent) or such related party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Term Commitments at such time or, if the Term Commitments have been terminated, based on each Lender's share of the outstanding Loans at the time the Term Commitments are terminated) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided that the unreimbursed expense or indemnified loss, claim, damage, Liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub agent) in its capacity as such, or against any related party thereof acting for the Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this Section 11.9 shall survive the payment in full of the Secured Obligations and the termination of this Agreement.

## SECTION 12
## MISCELLANEOUS

        12.1    Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

        12.2    Notice. Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, service of process or other communication (including the delivery of Financial Statements) that is required, contemplated, or permitted under the Loan Documents or with respect to the subject matter hereof shall be in writing, and shall be deemed to have been validly served, given, delivered, and received upon the earlier of: (i) the day of transmission by facsimile or hand delivery or delivery by an overnight express service or overnight mail delivery service; or (ii) the third calendar day after deposit in the United States mails, with proper first class postage prepaid, in each case addressed to the party to be notified as follows:

        (a)    If to Agent:

Wilmington Trust, National Association
50 South Sixth Street, Suite 1290
Minneapolis, MN  55402
Attention: Jeffery Rose
Facsimile: 612-217-5651
Telephone: 612-217-5630
Email: jrose@wilmingtontrust.com

With a copy to:

Alston & Bird LLP
101 South Tryon Street, Suite 4000
Charlotte, NC 28280
Attention: Jason Solomon
Email: jason.solomon@alston.com

With a copy to:

Kirkland & Ellis LLP
333 Hope Street
Los Angeles, CA 90071
Attention: David Nemecek
Email: david.nemecek@kirkland.com

(b)     If to Credit Parties:

SUNGEVITY, INC.
66 Franklin Street, Suite 310
Oakland, CA 94607
Attention:
Email:

With a copy to:

SUNGEVITY, INC.
66 Franklin Street, Suite 310
Oakland, CA 94607
Attention: Elizabeth Rushforth, General Counsel
Email: legal@sungevity.com

With a copy (which does not constitute notice):

Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105
Attention: Dario D. Avram
Email: DarioAvram@mofo.com

or to such other address as each party may designate for itself by like notice.

12.3    Entire Agreement; Amendments.

(a)    This Agreement and the other Loan Documents constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term sheets, non-disclosure or confidentiality agreements, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof.

(b)    None of this Agreement, any other Loan Document (other than any fee letter, or any landlord or bailee agreement), or any terms hereof or thereof may be amended, waived, supplemented or modified except in accordance with the provisions of this Section 12.3(b). No such amendment, waiver, supplement (including any additional Loan Document) or other modification with respect to any Loan Document and no such consent with respect to any departure by any Credit Party from any such Loan Document, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by the Agent with the consent or at the direction of the Required Lenders) and the Borrower, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver, supplement (including any additional Loan Document) or other modification and no such consent with respect to any departure by any Credit Party from any such Loan Document, shall do any of the following, unless in writing and signed by all the Lenders directly and adversely affected thereby (or by the Agent with the consent of all the Lenders directly and adversely affected thereby, but without requiring the consent of the Required Lenders):

(i)    increase or extend the Term Commitment of such Lender; provided that only the Lender or Lenders subject to such increase shall be deemed directly adversely affected thereby;

(ii)    postpone or delay any date fixed for, or reduce or waive, any scheduled installment of principal or any payment of interest, fees or other amounts (other than principal) due to such Lender hereunder or under any other Loan Document;

(iii)    reduce the principal of, or the rate of interest specified herein (it being agreed that waiver of the default interest margin shall only require the consent of the Required Lenders) or the amount of interest payable in cash specified herein on any Loan, or of any fees or other amounts payable hereunder or under any other Loan Document, in each case due to such Lender;

(iv)    change or have the effect of changing the priority or pro rata treatment of any payments (including voluntary and mandatory prepayments), Liens, proceeds of Collateral or reductions in Term Commitments (including as a result in whole or in part of allowing the issuance or incurrence, pursuant to this Agreement or otherwise, of new loans or other Indebtedness having any priority over any of the Secured Obligations in respect of payments, Liens, Collateral or proceeds of Collateral, in exchange for any Secured Obligations or otherwise);

(v)    change the percentage of the Term Commitments or of the aggregate unpaid principal amount of the Loans which shall be required for the Lenders or any of them to take any action hereunder;

(vi)    amend or otherwise modify this Section 12.3(b), Section 12.7, the definition of Required Lenders or any provision hereunder or under any other Loan Agreement providing for consent or other action by all Lenders or all affected Lenders;

(vii)    discharge any Credit Party from its respective payment Obligations under the Loan Documents, or release all or substantially all of the Collateral, except as otherwise may be provided in this Agreement or the other Loan Documents; or (viii) eliminate or reduce the voting rights of any Lender under this Section 12.3(b) without the written consent of such Lender;

(c)    it being agreed that (X) all Lenders shall be deemed to be directly and adversely affected by an amendment, waiver or supplement described in the preceding clauses (iv), (v), (vi), and (vii) and (Y) notwithstanding the preceding clause (X), only those Lenders that have not been provided a reasonable opportunity, as determined in the good faith judgment of the Required Lenders, to receive the most-favorable treatment under or in connection with the applicable amendment, waiver or supplement described in the preceding clause (iv) (other than the right to receive customary administrative agency, arranging, underwriting and other similar fees) that is provided to any other Person, including the opportunity to participate on a pro rata basis on the same terms in any new loans or other Indebtedness permitted to be issued as a result of such amendment, waiver or supplement, shall be deemed to be directly and adversely affected by such amendment, waiver or supplement.

12.4    No Strict Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

12.5    No Waiver. The powers conferred upon the Agent by this Agreement are solely to protect its rights hereunder and under the other Loan Documents and its interest in the Collateral and shall not impose any duty upon the Agent to exercise any such powers. No omission or delay by the Agent at any time to enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by each Credit Party at any time designated, shall be a waiver of any such right or remedy to which the Agent is entitled, nor shall it in any way affect the right of the Agent to enforce such provisions thereafter.

12.6    Survival. All agreements, representations and warranties contained in this Agreement and the other Loan Documents or in any document delivered pursuant hereto or thereto shall be for the benefit of the Agent, the Lenders and each Credit Party, as applicable, and shall survive the execution and delivery of this Agreement and the expiration or other termination of this Agreement.

12.7    Successors and Assigns. The provisions of this Agreement and the other Loan Documents shall inure to the benefit of and be binding on each Credit Party and its permitted assigns (if any). No Credit Party shall assign its obligations under this Agreement or any of the other Loan Documents without Agent's express prior written consent (at the direction of all Lenders), and any such attempted assignment shall be void and of no effect. Agent and any Lender may assign, transfer, or endorse its rights hereunder and under the other Loan Documents as set forth in Section 12.13.

12.8    Governing Law. This Agreement and the other Loan Documents have been negotiated and delivered to the Agent in the State of New York, and shall have been accepted by Lender in the State of New York. Payment to the Agent by Credit Parties of the Secured Obligations is due in the State of New York. This Agreement and the other Loan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

12.9    Consent to Jurisdiction and Venue. All judicial proceedings (to the extent that the reference requirement of Section 12.10 is not applicable) arising in or under or related to this Agreement or any of the other Loan Documents may be brought in any state or federal court located in the State of New York, located in the City of New York, Borough of Manhattan, or of the United States of America sitting in the Southern District of New York. By execution and delivery of this Agreement, each party hereto generally and unconditionally: (a) consents to nonexclusive personal jurisdiction in the State of New York; (b) waives any objection as to jurisdiction or venue in the State of New York; (c) agrees not to assert any defense based on lack of jurisdiction or venue in the aforesaid courts; and (d) irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement or the other Loan Documents. Service of process on any party hereto in any action arising out of or relating to this Agreement shall be effective if given in accordance with the requirements for notice set forth in Section 12.2, and shall be deemed effective and received as set forth in Section 12.2. Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of either party to bring proceedings in the courts of any other jurisdiction.

12.10    Mutual Waiver of Jury Trial / Judicial Reference.  Because disputes arising in connection with complex financial transactions are most quickly and economically resolved by an experienced and expert Person and the parties wish applicable state and federal laws to apply (rather than arbitration rules), the parties desire that their disputes be resolved by a judge applying such applicable laws. EACH OF THE CREDIT PARTIES, AGENT AND EACH LENDER SPECIFICALLY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, CROSS-CLAIM, COUNTERCLAIM, THIRD PARTY CLAIM OR ANY OTHER CLAIM (COLLECTIVELY, "CLAIMS") ASSERTED BY ANY CREDIT PARTY AGAINST AGENT, EACH LENDER OR THEIR RESPECTIVE ASSIGNEE OR BY AGENT, EACH LENDER OR THEIR RESPECTIVE ASSIGNEE AGAINST ANY CREDIT PARTY. This waiver extends to all such Claims, including Claims that involve Persons other than Agent, Credit Parties and any Lender; Claims that arise out of or are in any way connected to the relationship among any Credit Party, Agent and any Lender; and any Claims for damages, breach of contract, tort, specific performance, or any equitable or legal relief of any kind, arising out of this Agreement, any other Loan Document.

12.11  Professional Fees. Credit Parties promise to pay the fees and expenses of the Agent and each Lender necessary to finalize the loan documentation and close the Loans, including but not limited to reasonable attorneys' fees, UCC searches, filing costs, and other miscellaneous expenses. In addition, Credit Parties promise to pay any and all reasonable attorneys' and other professionals' fees and expenses (including fees and expenses of in-house counsel) incurred by Agent and the Lenders after the Closing Date in connection with or related to: (a) the Loan; (b) the administration, collection, or enforcement of the Loan; (c) the amendment or modification of the Loan Documents; (d) any waiver, consent, release, or termination under the Loan Documents; (e) the protection, preservation, audit, field exam, sale, lease, liquidation, or disposition of Collateral or the exercise of remedies with respect to the Collateral; (f) any legal, litigation, administrative, arbitration, or out of court proceeding in connection with or related to any Credit Party or the Collateral, and any appeal or review thereof; and (g) any bankruptcy, restructuring, reorganization, assignment for the benefit of creditors, workout, foreclosure, or other action related to any Credit Party, the Collateral, the Loan Documents, including representing Agent or the Lenders in any adversary proceeding or contested matter commenced or continued by or on behalf of any Credit Party's estate, and any appeal or review thereof.  For the avoidance of doubt, the Borrower shall reimburse Agent, the Lenders and their respective Affiliates for all reasonable and documented legal, accounting, appraisal, consulting, and other fees, costs and expenses incurred in connection with the negotiation, preparation and administration of the Loan Documents, the Interim Order and the Final Order and incurred in connection with:

(a)  amendment, modification or waiver of, consent with respect to, or termination of, any of the Loan Documents or advice in connection with the syndication and administration of the Loans made pursuant hereto or its rights hereunder or thereunder;

(b)  any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, any Lender, the Borrower or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case or proceeding commenced by or against any Borrower or any other Person that may be obligated to Agent by virtue of the Loan Documents; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Loans during the pendency of one or more Events of Default; provided that no Person shall be entitled to reimbursement under this clause (b) in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct (as determined by a final non-appealable judgment);

(c)  any attempt to enforce or prosecute any rights or remedies of Agent against any or all of the Debtors or any other Person that may be obligated to the Agent or any Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(d) any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(e) the obtaining of approval of the Loan Documents by the Bankruptcy Court;

(f) the preparation and review of pleadings, documents and reports related to the Cases, attendance at meetings, court hearings or conferences related to the Cases, and general monitoring of the Cases;

(g) efforts to (i) monitor the Loans or any of the other Secured Obligations, (ii) evaluate, observe or assess any of the Debtors or their respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral;

(h) any lien searches or request for information listing financing statements or liens filed or searches conducted to confirm receipt and due filing of financing statements and security interests in all or a portion of the Collateral; and

(i) including, as to each of clauses (a) through (h) above, all reasonable attorneys' and other professional and service providers' fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all reasonable expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 12.11, all of which shall be payable, on demand, by Borrower to the Agent.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: reasonable fees, costs and expenses of accountants, sales consultants, financial advisors, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; air express charges; and reasonable expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.

All amounts reimbursable by Borrower under this Section 12.11 shall constitute Secured Obligations secured by the Collateral and shall be payable on demand therefor by the Agent to Borrower.

12.12 Confidentiality. Agent and each Lender acknowledge that certain items of Collateral and information provided to it by the Credit Parties are confidential and proprietary information of the Credit Parties, if and to the extent (x) any Credit Party notifies Lender that such information is confidential, or (y) such information should reasonably be understood to be confidential (the "Confidential Information").  Accordingly, the Agent and each Lender agree that any Confidential Information it may obtain in the course of acquiring, administering, or perfecting the Agent's security interest in the Collateral shall not be disclosed to any other Person or entity in any manner whatsoever, in whole or in part, without the prior written consent of the applicable Credit Party, except that the Agent and each Lender may disclose any such information: (a) to its own directors, officers, employees, accountants, counsel and other professional advisors and to its Affiliates if the Agent or such Lender in their sole discretion

determines that any such party should have access to such information in connection with such party's responsibilities in connection with the Loans or this Agreement and, provided that such recipient of such Confidential Information either (i) agrees to be bound by the confidentiality provisions of this paragraph or (ii) is otherwise subject to confidentiality restrictions that reasonably protect against the disclosure of Confidential Information; (b) if such information is generally available to the public; (c) if required or appropriate in any report, statement or testimony submitted to any governmental authority having or claiming to have jurisdiction; (d) if required or appropriate in response to any summons or subpoena or in connection with any litigation, to the extent permitted or deemed advisable by Agent's or such Lender's counsel; (e)to comply with any applicable legal requirement or law applicable to Agent or such Lender; (f) to the extent reasonably necessary in connection with the exercise of any right or remedy under any Loan Document, including the Agent's sale, lease, or other disposition of Collateral after default; (g) to any participant or assignee of the Agent or such Lender or any prospective participant or assignee; provided, that such participant or assignee or prospective participant or assignee agrees in writing to be bound by this Section prior to disclosure; or (h) otherwise with the prior consent of the applicable Credit Party; provided, that any disclosure made in violation of this Agreement shall not affect the obligations of the Credit Parties or any of its affiliates or any guarantor under this Agreement or the other Loan Documents; provided, however, that with respect to disclosure of Confidential Information pursuant to clauses (c), (d) and (e) above, the Agent and each Lender shall each use commercially reasonable efforts to notify the Credit Parties in advance of making any such disclosure.

12.13   Assignment of Rights. Parent and each other Credit Party hereby agree that each Lender may sell and assign all or part of its interest hereunder and under the Loan Documents to (a) any of its affiliates resident in the United States at any time or (b) any other Person or entity (an "Assignee") with the prior written consent of Parent; provided however, that if an Event of Default has occurred and is continuing, each Lender may sell or assign any or all of its interests hereunder and under the other Loan Documents without the prior written consent of Parent. After such assignment the term "Lender" as used in the Loan Documents shall mean and include such Assignee, and such Assignee shall be vested with all rights, powers and remedies of a Lender hereunder with respect to the interest so assigned; but with respect to any such interest not so transferred, the transferring Lender shall retain all rights, powers and remedies hereby given. No such assignment by a Lender shall relieve any Credit Party of any of its obligations hereunder. Each Lender agrees that in the event of any transfer by it of a Note, it will endorse thereon a notation as to the portion of the principal of a Note, which shall have been paid at the time of such transfer and as to the date to which interest shall have been last paid thereon. Each Lender shall notify the Agent in writing of any sale, transfer or assignment on any part of its interest hereunder and under the Loan Documents. Any Assignee shall provide to the Agent such information as the Agent may request.   No transfer or assignment by any Lender shall be effective unless (i) the Assignee and such Lender shall have provided the Agent with an assignment and acceptance agreement in such form as the Agent may reasonably request and (ii) the Agent has received a recording and processing fee of $3,500.  The Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Agent's Principal Office a copy of each such assignment and acceptance agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and of the principal amounts of the Loans and Term Loans (and interest thereon) owing to each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent

59

manifest error, and the Borrower, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. Upon its receipt of such assignment and acceptance agreement executed by the parties to such assignment, the Agent shall record the information contained therein in the Register.

12.14   [Reserved].

12.15   Counterparts. This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so delivered shall be deemed an original, but all of which counterparts shall constitute but one and the same instrument.

12.16   No Third Party Beneficiaries. No provisions of the Loan Documents are intended, nor will be interpreted, to provide or create any third-party beneficiary rights or any other rights of any kind in any Person other than Agent, the Lenders and the Credit Parties unless specifically provided otherwise herein, and, except as otherwise so provided, all provisions of the Loan Documents will be personal and solely among Agent, the Lenders and the Credit Parties.

12.17   Experienced and Sophisticated Parties. The Agent and the Lenders, on the one hand, and the Borrower and the other Credit Parties, on the other hand, by reason of their own respective business and financial experience and that of their professional advisers, hereby represent with respect to themselves and acknowledge with respect to the other party that each such party has the capacity to protect its own interests in connection with this Agreement and the transaction contemplated hereby.

12.18   Publicity. Other than with respect to or in connection with the Cases, none of the parties hereto nor any of its respective member businesses and affiliates shall, without the other parties' prior written consent (which shall not be unreasonably withheld or delayed), publicize or use (a) the other party's name (including a brief description of the relationship among the parties hereto), logo or hyperlink to such other parties' web site, separately or together, in written and oral presentations, advertising, promotional and marketing materials, client lists, public relations materials or on its web site (together, the " Publicity Materials"); (b) the names of officers of such other parties in the Publicity Materials; and (c) such other parties' name, trademarks, servicemarks in any news or press release concerning such party; provided however, notwithstanding anything to the contrary herein, no such consent shall be required (i) to the extent necessary to comply with the requests of any regulators, legal requirements or laws applicable to such party, pursuant to any listing agreement with any national securities exchange (so long as such party provides prior notice to the other party hereto to the extent reasonably practicable) and (ii) to comply with Section 12.12.

12.19   Guaranty; Waivers.

(a)   Guaranty. Each Subsidiary Guarantor unconditionally and irrevocably guarantees to Agent and the Lenders the full and prompt payment when due (whether at stated

maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Secured Obligations (the "Guaranteed Obligations"). The Guaranteed Obligations include interest that, but for a proceeding under any Insolvency Proceeding, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Parent or any other Subsidiary Guarantor for such interest in any such proceeding.

(b)    Separate Obligation. Each Subsidiary Guarantor acknowledges and agrees that: (i) the Guaranteed Obligations are separate and distinct from any Indebtedness arising under or in connection with any other document, including under any provision of this Agreement other than this Section 12.19, executed at any time by such Subsidiary Guarantor in favor of the Agent or any Lender; and (ii) such Subsidiary Guarantor shall pay and perform all of the Guaranteed Obligations as required under this Section 12.19, and the Agent or any Lender may enforce any and all of their respective rights and remedies hereunder, without regard to any other document, including any provision of this Agreement other than this Section 12.19, at any time executed by such Subsidiary Guarantor in favor of the Agent and, irrespective of whether any such other document, or any provision thereof or hereof, shall for any reason become unenforceable or any of the Indebtedness thereunder shall have been discharged, whether by performance, avoidance or otherwise. Each Subsidiary Guarantor acknowledges that, in providing benefits to Borrower, the Agent and each Lender is relying upon the enforceability of this Section 12.19 and the Guaranteed Obligations as separate and distinct Indebtedness of such Subsidiary Guarantor, and each Subsidiary Guarantor agrees that the Agent and such Lender would be denied the full benefit of its bargain if at any time this Section 12.19 or the Guaranteed Obligations were treated any differently. The fact that the guaranty is set forth in this Agreement rather than in a separate guaranty document is for the convenience of Borrower and Subsidiary Guarantors and shall in no way impair or adversely affect the rights or benefits of the Agent or any Lender under this Section 12.19. Each Subsidiary Guarantor agrees to execute and deliver a separate document, immediately upon request at any time of the Agent or any Lender, evidencing such Subsidiary Guarantor's obligations under this Section 12.19. Upon the occurrence of any Event of Default, a separate action or actions may be brought against such Subsidiary Guarantor, whether or not Borrower, any other Subsidiary Guarantor or any other Person is joined therein or a separate action or actions are brought against Borrower, any such other Subsidiary Guarantor or any such other Person.

(c)    Limitation of Guaranty. To the extent that any court of competent jurisdiction shall impose by final judgment under applicable Laws (including sections 544 and 548 of the Bankruptcy Code) any limitations on the amount of any Subsidiary Guarantor's liability with respect to the Guaranteed Obligations that the Agent can enforce on behalf of the Lenders under this Section 12.19, the Lenders by their acceptance hereof accept such limitation on the amount of such Subsidiary Guarantor's liability hereunder to the extent needed to make this Section 12.19 fully enforceable and nonavoidable.

(d)    Liability of Subsidiary Guarantors. The liability of any Subsidiary Guarantor under this Section 12.19 shall be irrevocable, absolute, independent and unconditional, and shall not be affected by any circumstance that might constitute a discharge of a surety or guarantor other than the indefeasible payment and performance in full of all Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Subsidiary Guarantor agrees as follows:

(i)     such Subsidiary Guarantor's liability hereunder shall be the immediate, direct, and primary obligation of such Subsidiary Guarantor and shall not be contingent upon Agent's exercise or enforcement of any remedy it may have against Borrower or any other Person, or against any Collateral or other security for any Guaranteed Obligations;

(ii)     this Guaranty is a guaranty of payment when due and not merely of collectability;

(iii)     Agent may enforce this Section 12.19 upon the occurrence of an Event of Default notwithstanding the existence of any dispute among Agent, on the one hand, and Borrower or any other Person, on the other hand, with respect to the existence of such Event of Default;

(iv)     such Subsidiary Guarantor's payment of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge such Subsidiary Guarantor's liability for any portion of the Guaranteed Obligations remaining unsatisfied; and

(v)     such Subsidiary Guarantor's liability with respect to the Guaranteed Obligations shall remain in full force and effect without regard to, and shall not be impaired or affected by, nor shall such Subsidiary Guarantor be exonerated or discharged by, any of the following events:

(A)     any proceeding under any Insolvency Proceeding;

(B)     any limitation, discharge, or cessation of the liability of Borrower or any other Person for any Guaranteed Obligations due to any statute, regulation or rule of law, or any invalidity or unenforceability in whole or in part of any of the Guaranteed Obligations or the Loan Documents;

(C)     any merger, acquisition, consolidation or change in structure of Borrower or any Subsidiary Guarantor or any other guarantor or Person, or any sale, lease, transfer or other disposition of any or all of the assets or shares of Borrower or any other Person;

(D)     any assignment or other transfer, in whole or in part, of the Agent's or any Lender's interests in and rights under this Agreement (including this Section 12.19) or the other Loan Documents;

(E)     any claim, defense, counterclaim or setoff, other than that of prior performance, that Borrower, such Subsidiary Guarantor, any other Guarantor or any other Person may have or assert, including any defense of incapacity or lack of corporate or other authority to execute any of the Loan Documents;

(F)     the amendment, modification, renewal, extension, cancellation or surrender of any Loan Document or any Guaranteed Obligations;

(G)     the Agent's or any Lender's exercise or non-exercise of any power, right or remedy with respect to any Guaranteed Obligations or any Collateral;

(H)     the Agent's or any Lenders' vote, claim, distribution, election, acceptance, action or inaction in any proceeding under any Bankruptcy Law; or

(I)     any other guaranty, whether by such Subsidiary Guarantor or any other Person, of all or any part of the Guaranteed Obligations or any other indebtedness, obligations or liabilities of Borrower to the Lenders or the Agent.

(e)     Consents of Subsidiary Guarantors. Each Subsidiary Guarantor hereby unconditionally consents and agrees that, without notice to or further assent from such Subsidiary Guarantor:

(i)     the principal amount of the Guaranteed Obligations may be increased or decreased and additional indebtedness or obligations of Borrower under the Loan Documents may be incurred and the time, manner, place or terms of any payment under any Loan Document may be extended or changed, by one or more amendments, modifications, renewals or extensions of any Loan Document or otherwise;

(ii)     the time for Borrower's (or any other Person's) performance of or compliance with any term, covenant or agreement on its part to be performed or observed under any Loan Document may be extended, or such performance or compliance waived, or failure in or departure from such performance or compliance consented to, all in such manner and upon such terms as the Agent or the Lenders (as applicable under the relevant Loan Documents) may deem proper;

(iii)     the Agent or any Lender may request and accept other guaranties and may take and hold security as Collateral for the Guaranteed Obligations, and may, from time to time, in whole or in part, exchange, sell, surrender, release, subordinate, modify, waive, rescind, compromise or extend such other guaranties or security and may permit or consent to any such action or the result of any such action, and may apply such security and direct the order or manner of sale thereof; and

(iv)     the Agent or any Lender may exercise, or waive or otherwise refrain from exercising, any other right, remedy, power or privilege even if the exercise thereof affects or eliminates any right of subrogation or any other right of such Subsidiary Guarantor against Borrower.

(f)     Subsidiary Guarantor's Waivers. Each Subsidiary Guarantor waives and agrees not to assert:

(i)     any right to require the Agent or any Lender to proceed against Borrower, any other Guarantor or any other Person, or to pursue any other right, remedy, power or privilege of the Agent or any Lender whatsoever;

(ii)     the defense of the statute of limitations in any action hereunder or for the collection or performance of the Guaranteed Obligations;

(iii)     any defense arising by reason of any lack of corporate or other authority or any other defense of Borrower, such Guarantor or any other Person;

(iv)    any defense based upon the Agent's or any Lender's errors or omissions in the administration of the Guaranteed Obligations;

(v)    any rights to set offs and counterclaims;

(vi)    any and all notice of the acceptance of this guaranty, and any and all notice of the creation, renewal, modification, extension or accrual of the Guaranteed Obligations, or the reliance by the Agent or any Lender upon this Guaranty, or the exercise of any right, power or privilege hereunder. The Guaranteed Obligations shall conclusively be deemed to have been created, contracted, incurred and permitted to exist in reliance upon this Guaranty. Each Subsidiary Guarantor waives promptness, diligence, presentment, protest, demand for payment, notice of default, dishonor or nonpayment and all other notices to or upon Borrower, each Guarantor or any other Person with respect to the Guaranteed Obligations.

(g)    Financial Condition of Borrower. No Subsidiary Guarantor shall have any right to require the Agent or any Lender to obtain or disclose any information with respect to: the financial condition or character of Borrower or the ability of Borrower to pay and perform the Guaranteed Obligations; the Guaranteed Obligations; any Collateral or other security for any or all of the Guaranteed Obligations; the existence or nonexistence of any other guarantees of all or any part of the Guaranteed Obligations; any action or inaction on the part of the Agent, any Lender or any other Person; or any other matter, fact or occurrence whatsoever. Each Subsidiary Guarantor hereby acknowledges that it has undertaken its own independent investigation of the financial condition of Borrower and all other matters pertaining to this Guaranty and further acknowledges that it is not relying in any manner upon any representation or statement of the Agent with respect thereto.

(h)    Subrogation. Until the Guaranteed Obligations shall be satisfied in full and the Term Commitment shall be terminated, each Subsidiary Guarantor shall not have, and shall not directly or indirectly exercise: (i) any rights that it may acquire by way of subrogation under this Section 12.19, by any payment hereunder or otherwise; (ii) any rights of contribution, indemnification, reimbursement or similar suretyship claims arising out of this Section 12.19; or (iii) any other right that it might otherwise have or acquire (in any way whatsoever) that could entitle it at any time to share or participate in any right, remedy or security of the Agent or any Lender as against any Borrower or other Subsidiary Guarantors or any other Person, whether in connection with this Section 12.19, any of the other Loan Documents or otherwise. If any amount shall be paid to any Subsidiary Guarantor on account of the foregoing rights at any time when all the Guaranteed Obligations shall not have been paid in full, such amount shall be held in trust for the benefit of the Lenders and the Agent and shall forthwith be paid to the Lenders or the Agent to be credited and applied to the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Loan Documents.

(i)    Subordination. All payments on account of all indebtedness, liabilities and other obligations of Borrower to any Subsidiary Guarantor, whether now existing or hereafter arising, and whether due or to become due, absolute or contingent, liquidated or unliquidated, determined or undetermined (the "Subsidiary Guarantor Subordinated Indebtedness") shall be subject, subordinate and junior in right of payment and exercise of remedies, to the extent and in the manner set forth herein, to the prior payment in full in cash or cash equivalents of the

Guaranteed Obligations. As long as any of the Guaranteed Obligations (other than unasserted contingent indemnification obligations) shall remain outstanding and unpaid, each Subsidiary Guarantor shall not accept or receive any payment or distribution by or on behalf of Borrower or any other Subsidiary Guarantor, directly or indirectly, or assets of Borrower or any other Subsidiary Guarantor, of any kind or character, whether in cash, property or securities, including on account of the purchase, redemption or other acquisition of Subsidiary Guarantor Subordinated Indebtedness, as a result of any collection, sale or other disposition of Collateral, or by setoff, exchange or in any other manner, for or on account of the Subsidiary Guarantor Subordinated Indebtedness ("Subsidiary Guarantor Subordinated Indebtedness Payments"), except that, so long as an Event of Default does not then exist, any Subsidiary Guarantor shall be entitled to accept and receive payments on its Subsidiary Guarantor Subordinated Indebtedness, in accordance with past business practices of such Subsidiary Guarantor and Borrower (or any other applicable Subsidiary Guarantor) and not in contravention of any Law or the terms of the Loan Documents.

If any Subsidiary Guarantor Subordinated Indebtedness Payments shall be received in contravention of this Section 12.19, such Subsidiary Guarantor Subordinated Indebtedness Payments shall be held in trust for the benefit of the Lenders and the Agent and shall be paid over or delivered the Lenders and the Agent for application to the payment in full in cash or cash equivalents of all Guaranteed Obligations remaining unpaid to the extent necessary to give effect to this Section 12.19 after giving effect to any concurrent payments or distributions to the Lenders in respect of the Guaranteed Obligations.

(j)    Continuing Guaranty. This Guaranty is a continuing guaranty and agreement of subordination and shall continue in effect and be binding upon each Subsidiary Guarantor until termination of the Aggregate Commitments and payment and performance in full of the Guaranteed Obligations, including Guaranteed Obligations which may exist continuously or which may arise from time to time under successive transactions, and each Subsidiary Guarantor expressly acknowledges that this guaranty shall remain in full force and effect notwithstanding that there may be periods in which no Guaranteed Obligations exist. This Guaranty shall continue in effect and be binding upon each Subsidiary Guarantor until actual receipt by the Agent and each Lender of written notice from such Subsidiary Guarantor of its intention to discontinue this Guaranty as to future transactions (which notice shall not be effective until noon on the day that is five Business Days following such receipt); provided that no revocation or termination of this guaranty shall affect in any way any rights of the Agent or the Lenders hereunder with respect to any Guaranteed Obligations arising or outstanding on the date of receipt of such notice, including any subsequent continuation, extension, or renewal thereof, or change in the terms or conditions thereof, or any Guaranteed Obligations made or created after such date to the extent made or created pursuant to a legally binding commitment of the Agent or the Lenders in existence as of the date of such revocation (collectively, "Existing Guaranteed Obligations"), and the sole effect of such notice shall be to exclude from this Guaranty Guaranteed Obligations thereafter arising which are unconnected to any Existing Guaranteed Obligations.

(k)    Reinstatement. This Guaranty shall continue to be effective or shall be reinstated and revived, as the case may be, if, for any reason, any payment of the Guaranteed Obligations by or on behalf of Borrower (or receipt of any proceeds of collateral) shall be

rescinded, invalidated, declared to be fraudulent or preferential, set aside, voided or otherwise required to be repaid to Borrower, its estate, trustee, receiver or any other Person (including under any Bankruptcy Law), or must otherwise be restored by the Agent, whether as a result of proceedings under any bankruptcy law or otherwise. All losses, damages, costs and expenses that the Agent or any Lender may suffer or incur as a result of any voided or otherwise set aside payments shall be specifically covered by the indemnity in favor of the Agent and the Lenders contained in Section 6.3.

(l)     Substantial Benefits. The Loans provided to or for the benefit of Borrower hereunder by the Lenders have been and are to be contemporaneously used for the benefit of Borrower and each Subsidiary Guarantor and their respective Subsidiaries. It is the position, intent and expectation of the parties that Borrower and each Subsidiary Guarantor have derived and will derive significant and substantial benefits from the Loans to be made available by the Lenders under the Loan Documents. Each Subsidiary Guarantor has received at least "reasonably equivalent value" (as such phrase is used in Section 548 of the Bankruptcy Code and in comparable provisions of other applicable Laws) and more than sufficient consideration to support its obligations hereunder in respect of the Guaranteed Obligations. Immediately prior to and after and giving effect to the incurrence of each Subsidiary Guarantor's obligations under this Guaranty, such Subsidiary Guarantor will be solvent and will not be subject to any Insolvency Proceedings nor meet the conditions to be subject to any Insolvency Proceedings.

(m)     KNOWING AND EXPLICIT WAIVERS. EACH SUBSIDIARY GUARANTOR ACKNOWLEDGES THAT IT EITHER HAS OBTAINED THE ADVICE OF LEGAL COUNSEL OR HAS HAD THE OPPORTUNITY TO OBTAIN SUCH ADVICE IN CONNECTION WITH THE TERMS AND PROVISIONS OF THIS Section 12.19. EACH SUBSIDIARY GUARANTOR ACKNOWLEDGES AND AGREES THAT EACH OF THE WAIVERS AND CONSENTS SET FORTH HEREIN IS MADE WITH FULL KNOWLEDGE OF ITS SIGNIFICANCE AND CONSEQUENCES, THAT ALL SUCH WAIVERS AND CONSENTS HEREIN ARE EXPLICIT AND KNOWING AND THAT EACH SUBSIDIARY GUARANTOR EXPECTS SUCH WAIVERS AND CONSENTS TO BE FULLY ENFORCEABLE.

(n)     Any payment on account of an amount that is payable hereunder or under any other Loan Document must be made in United States Dollars.

(o)     Each Subsidiary Guarantor that is organized outside of the United States shall, at the request of the Agent (acting at the request of the Required Lenders), appoint a process agent reasonably acceptable to the Agent and the Required Lenders as its process agent for the purpose of accepting service of any process in the United States. Each such Subsidiary Guarantor agrees that such service upon receipt by Corporation Service Company or other designated process agent (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by applicable law, be taken and held to be valid personal service upon and personal delivery to it.

(p)     Each Subsidiary Guarantor agrees with the Agent and each Lender that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify the Agent or such Lender, as applicable,

immediately on demand against any cost, loss or liability it incurs as a result of a Subsidiary Guarantor not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Loan Document on the date when it would have been due. The amount payable by a Subsidiary Guarantor under this indemnity will not exceed the amount it would have had to pay under this Section 12.19(p) if the amount claimed had been recoverable on the basis of a guarantee.

12.20   Gross-up.

(a)      For purposes of this Section 12.20, the term "applicable law" includes FATCA.

(b)      Payments Free of Taxes. Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)      Payment of Other Taxes by the Borrower. The Borrower shall timely pay to the relevant governmental authority in accordance with applicable law, or at the option of the Agent or any Lender timely reimburse it for the payment of, any Other Taxes.

(d)      Indemnification by the Borrower. The Borrower shall jointly and severally indemnify each recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such recipient or required to be withheld or deducted from a payment to such recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to the Borrower by the Lenders (with a copy to the Agent), or by the Agent on its own behalf or on behalf of the Lenders, shall be conclusive absent manifest error.

(e)      Indemnification by the Lenders. Each Lender shall severally indemnify the Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability

delivered to any Lender by the Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lenders from any other source against any amount due to the Agent under this paragraph (e).

(f)     As soon as practicable after any payment of Taxes by the Borrower to a governmental authority pursuant to this Section 12.20, the Borrower shall deliver to the affected Lender the original or a certified copy of a receipt issued by such governmental authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Lender.

(i)     Status of Lenders. (1) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and Agent, at the time or times reasonably requested by the Borrower or Agent, such properly completed and executed documentation reasonably requested by the Borrower or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, each Lender, upon the reasonable request by the Borrower or Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or Agent as will enable the Borrower or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 12.20(g) (ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in any Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower,

(A)     any Lender that is a U.S. person shall deliver to the Borrower and Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), whichever of the following is applicable:

(1)     in the case of a foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty

and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit J-l to the effect that such foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E; or

(4)     to the extent a foreign Lender is a partnership and one or more direct or indirect partners of such foreign Lender are claiming the portfolio interest exemption, such foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-2 on behalf of each such direct and indirect partner;

(C)     any foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or Agent as may be necessary for the Borrower or Agent to comply with their obligations under FATCA and to determine that such Lender has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower or Agent in writing thereof.

(g)     Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes, or a credit against a Tax liability in lieu of a refund, as to which it has been indemnified pursuant to this Section 12.20 (including by the payment of additional amounts pursuant to this Section 12.20), it shall pay to the indemnifying party an amount equal to such refund or the economic benefit of a credit (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund or the economic benefit of a credit), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant governmental authority with respect to such refund or the economic benefit of a credit). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant governmental authority) in the event that such indemnified party is required to repay such refund or the economic benefit of a credit to such governmental authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund or the economic benefit of a credit had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Survival. Each party's obligations under this Section 12.20 shall survive any assignment of rights by, or the replacement of, the Agent or any Lender and the repayment, satisfaction or discharge of all obligations under any Loan Document.

12.21   Joint and Several Liability.  For the avoidance of doubt, for the purposes of this Section 12.21, Parent and Sungevity Development shall each be referred to as a "Borrower".

(a)     Each Borrower has determined and represents to the Lenders that it is a legitimate business purpose and in its best interests to induce the Lenders to extend credit pursuant to this Agreement. Each Borrower acknowledges and represents that its business is related to the business of every other Borrower hereunder, and all commitments, advances and other credit extensions under this Agreement will individually and collectively benefit each Borrower hereunder.

(b)     Each Borrower has determined and represents to the Lenders that it has, and after giving effect to the transactions contemplated by this Agreement will have, assets having a fair market value in excess of its liabilities, after giving effect to any available rights of contribution or subrogation, and each Borrower has, and will have, access to adequate capital for the conduct of its business and the ability to pay its debts as they mature.

(c)        Each Borrower agrees that it is jointly and severally and unconditionally liable to the Lenders for, and will pay to the Lenders when due, the full amount of all existing and future indebtedness arising in connection with any credit facility extended under this Agreement, and all modifications, extensions and renewals thereto, including without limitation all principal and interest, and all fees, costs and expenses chargeable to each Borrower individually or collectively in connection with any credit facility hereunder and all advances disbursed to any Borrower under any credit facility. These obligations shall be in addition to any other obligations of under any other agreement with the Lenders entered into before or after the date of this Agreement, unless such other agreement is expressly modified or revoked in writing, and this Agreement shall not affect or invalidate the terms of any such other agreement, unless otherwise expressly provided herein.

(d)        The liability of a Borrower for indebtedness hereunder shall be reinstated and revived and the rights of the Agent and the Lenders shall continue if and to the extent that for any reason any amount at any time paid on account of any credit facility under this Agreement by any Borrower or any other Person or entity is rescinded or must otherwise be restored by the Lenders, whether as a result of any proceedings in Bankruptcy or reorganization or otherwise, all as though such amount had not been paid.

(e)        Borrower authorizes the Agent, without notice to or demand on such Borrower, and without affecting such Borrower's liability for indebtedness incurred under any credit facility extended under this Agreement, from time to time to: (i) upon the occurrence and during the continuance of any Event of Default, alter, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of, the indebtedness of any other Borrower to the Lenders on account of any such facilities; (ii) take and hold security from any other Borrower for the payment of indebtedness incurred under any credit facility extended under this Agreement, and exchange, enforce, waive, subordinate or release any such security; (iii) upon the occurrence and during the continuance of any Event of Default, apply such security and direct the order or manner of sale thereof, including without limitation, a non-judicial sale permitted by the terms of the controlling security agreement, mortgage, or deed of trust, as the Agent in its discretion may determine; and (iv) release or substitute any one or more of the endorsers or any guarantors of any credit facility hereunder, or any other party obligated thereon.

(f)        Each Borrower represents and warrants to the Lenders that it has established adequate means of obtaining from every other Borrower on a continuing basis financial and other information relating to the financial condition of every other Borrower, and each Borrower agrees to keep adequately informed by such means of any facts, events or circumstances which might in any way affect its risks hereunder. Each Borrower further agrees that no Lender nor the Agent shall have an obligation to disclose to it any information or material about any other Borrower which is acquired by such Lender or the Agent in any manner.

(g)        Each Borrower waives any right to require the Agent to: (i) proceed against any other Borrower or any other Person; (ii) proceed against or exhaust any security held from any other Borrower or any other Person; (iii) pursue any other remedy in the Agent's power; (iv) apply payments received by the Agent or any Lender from any other Borrower to any credit facility extended under this Agreement; or (v) make any presentments or demands for

performance, or give any notices of nonperformance, protests, notices of protest or notices of dishonor in connection with any credit facility extended under this Agreement.

(h)     Each Borrower waives to the extent permitted by applicable law any defense to its liability for repaying any credit facility extended under this Agreement based upon or arising by reason of: (i) any disability or other defense of any other Borrower or any other Person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the liability of any other Borrower for the credit facility extended under this Agreement; (iii) any lack of authority of any officer, director, partner, agent or other Person acting or purporting to act on behalf of any other Borrower or any defect in the formation of any other Borrower; (iv) the application by any other Borrower of the proceeds of any credit facility extended under this Agreement for purposes other than the purposes intended or understood by the Lenders or each other Borrower; (v) any act or omission by the Agent or any Lender which directly or indirectly results in or aids the discharge of any other Borrower by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of the Agent or any Lender against any other Borrower; (vi) any impairment of the value of any interest in any security for any credit facility extended under this Agreement, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; or (vii) any modification of the indebtedness of any other Borrower for any credit facility extended under this Agreement, including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the indebtedness of any Borrower for any credit facility extended under this Agreement, including increase or decrease of the rate of interest thereon.

(i)     Until each credit facility extended under this Agreement and all indebtedness arising under or in connection with this Agreement shall have been paid in full, no Borrower shall have any right of subrogation. Each Borrower waives all rights and defenses it may have arising out of any election of remedies by the Agent or any Lender, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for each credit facility extended under this Agreement, destroys its rights of subrogation or its rights to proceed against any other Borrower for reimbursement. Until all indebtedness of each Borrower to the Lenders arising under or in connection with this Agreement shall have been paid in full, each Borrower waives any right to enforce any remedy which the Agent or any Lender now has or may hereafter have against any other Borrower or any other Person, and waives any benefit of, or any right to participate in, any security now or hereafter held by the Agent.

(j)     If any of the waivers or other provisions hereof is determined to be contrary to applicable law or public policy, such waiver shall be effective only to the extent permitted by law.

(k)     It is the position of the Borrower that each Borrower benefits from each credit facility that has been made available by the Lenders under this Agreement and from each extension of credit hereunder, regardless of whether such credit is disbursed to a joint account of Borrower or to or for the account of any Borrower.

12.22 Intercreditor Agreement. So long as the Hercules Loan Agreement remains outstanding, the Agent's and Lenders' rights under this Agreement are subject to the terms and conditions of the Intercreditor Agreement.

(SIGNATURES TO FOLLOW)

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Debtor-in-Possession Loan and Security Agreement as of the day and year first above written.

**BORROWERS:**

**SUNGEVITY, INC.**

By:    _____
        Andrew Birch
        Chief Executive Officer

**SUNGEVITY DEVELOPMENT, LLC**

By:    _____
        Andrew Birch
        Chief Executive Officer

**SUBSIDIARY GUARANTORS:**

**SUNGEVITY SD, LLC**

By:    _____
        Andrew Birch
        Chief Executive Officer

**SUNGEVITY INTERNATIONAL HOLDINGS LLC**

By:    _____
        Andrew Birch
        Chief Executive Officer

AGENT:
WILMINGTON TRUST, NATIONAL
ASSOCIATION


By:    _____

LENDERS:
LSHC SOLAR HOLDINGS LLC


By:    _____

Table of Exhibits and Schedules

| Exhibit A: | Advance Request<br>Attachment to Advance Request |
| Exhibit B | Interim Order |
| Exhibit B-l: | Promissory Note |
| Exhibit C: | Name, Locations, and Other Information for Borrower |
| Exhibit D: | Credit Parties Patents, Trademarks, Copyrights and Licenses |
| Exhibit E: | Credit Parties Deposit Accounts and Investment Accounts |
| Exhibit F: | Compliance Certificate |
| Exhibit G: | Joinder Agreement |
| Exhibit H | Intercreditor Agreement |
| Exhibit J-1 | U.S. Tax Compliance Certificate |
| Exhibit J-2 | U.S. Tax Compliance Certificate for Partnerships |
| | |
| Schedule 1.1 | Commitments |
| Schedule 1.2 | Principal Office of Agent |
| Schedule 1A | Existing Permitted Indebtedness |
| Schedule IB | Existing Permitted Investments |
| Schedule 1C | Existing Permitted Liens |
| Schedule 5.3 | Consents |
| Schedule 5.8 | Tax Matters |
| Schedule 5.9 | Intellectual Property Claims |
| Schedule 5.10 | Intellectual Property |
| Schedule 5.11 | Borrower Products |
| Schedule 5.13 | Existing Employee Loans |
| Schedule 5.14 | Capitalization |

**EXHIBIT A**

**ADVANCE REQUEST**

To:      Agent:                                                           Date:              , 20

Wilmington Trust, National Association (the "Agent")
50 South Sixth St, Suite 1290
Minneapolis, MN 55402
Facsimile: 612-217-5651
Attn: Jeffery Rose

Sungevity, Inc., a Delaware corporation ("Parent"), and Sungevity Development, LLC, a Delaware limited liability company ("Sungevity Development" and together with Parent, collectively, "Borrower"), hereby request from Wilmington Trust, National Association ("Agent") on behalf of Lenders a Loan in the amount of _____ Dollars ($_____) (the "Loan Amount") on_____,____ (the "Advance Date") pursuant to the Debtor-In-Possession Loan and Security Agreement among Borrower, the other Credit Parties party thereto, Agent and Lenders (as amended, restated, or modified from time to time, the "Agreement"). Capitalized words and other terms used but not otherwise defined herein are used with the same meanings as defined in the Agreement.

Please:

[Deduct from the Loan Amount and pay to the Lenders the accrued and unpaid commitment fee contemplated by Section 2.9(b) of the Agreement (the "Fees") in the amount of [$_____].][1]

Wire the Loan Amount [less the Fees] to [Parent's][Sungevity Development's] account      _____

Bank:            _____
Address:        _____
                _____
ABA Number:     _____
Account Number: _____
Account Name:   _____

Borrower represents that the conditions precedent to the Loan set forth in the Agreement are satisfied and shall be satisfied upon the making of such Loan, including but not limited to: (i) that the representations and warranties set forth in the Agreement are and shall be true and correct in all material respects (other than any representation or warranty qualified by "materiality" or "Material Adverse Effect", in which case, such representation or warranty shall be true and correct) on and as of the Closing Date, except to the extent such representations

---

[1] Include if a Delayed Draw Term Loan.

and warranties expressly relate to an earlier date; (ii) that each Credit Party is in compliance with all the terms and provisions set forth in each Loan Document on its part to be observed or performed; (iii) at the time of and immediately after such Loan, no Event of Default shall have occurred and be continuing, except for any Default or Event of Default that is continuing under the Prepetition Hercules Loan Agreement, Prepetition Subordinated Indebtedness and the Atalaya Credit Agreement as a result of the filing of the Cases; (iv) there exists no unstayed action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that could reasonably be expected to have a Material Adverse Effect, (v) the Cases of any of the Debtors shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (vi) no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases; and (vii) the use of proceeds of such Loan shall be in accordance with Section 5.17 of the Agreement. Borrower understands and acknowledges that Lenders have the right to review the financial information supporting this representation and, based upon such review in its sole discretion, Lender may decline to fund the requested Loan.

Borrower hereby represents that Borrower's corporate or limited liability company status, as applicable, and locations have not changed since the date of the Agreement or, if the Attachment to this Advance Request is completed, are as set forth in the Attachment to this Advance Request.

Borrower agrees to notify Agent promptly before the funding of the Loan if any of the matters which have been represented above shall not be true and correct on the Borrowing Date and if Agent has received no such notice before the Advance Date then the statements set forth above shall be deemed to have been made and shall be deemed to be true and correct as of the Advance Date.

Executed as of [          ], 20 [ ].

BORROWER:

SUNGEVITY, INC.

SIGNATURE: _____

TITLE: _____
PRINT NAME: _____

SUNGEVITY DEVELOPMENT, LLC

SIGNATURE: _____

TITLE: _____
PRINT NAME: _____

MANAGER:

[_____]

SIGNATURE:  _____

TITLE: _____

PRINT NAME:  _____

**ATTACHMENT TO ADVANCE REQUEST**

Dated: _____

Borrower hereby represents and warrants to Agent that Borrower's current name and organizational status is as follows:

| | |
|---|---|
| Name: | Sungevity, Inc. |
| Type of organization: | Corporation |
| State of organization: | Delaware |
| Organization file number: | 4231064 |
| Name: | Sungevity Development, LLC |
| Type of organization: | Limited Liability Company |
| State of organization: | Delaware |
| Organization file number: | 4771828 |

Borrower hereby represents and warrants to Agent that the street addresses, cities, states and postal codes of its current locations are as follows:

**EXHIBIT B-1**

**SECURED TERM PROMISSORY NOTE**

$[●]                                                    Advance Date: _____, 20__

Maturity Date: [___], 2017

FOR VALUE RECEIVED, SUNGEVITY, INC., a Delaware corporation ("Parent"), SUNGEVITY DEVELOPMENT, LLC, a Delaware limited liability, and each of Parent's Subsidiaries who have delivered a Joinder Agreement (collectively, the "Borrower") hereby promises to pay to the order of the holder of this Note (the "Lender") at [_____] or such other place of payment as the holder of this Secured Term Promissory Note (this "Promissory Note") may specify from time to time in writing, in lawful money of the United States of America, the principal amount of $[●] or such other principal amount as Lender has advanced to Borrower, together with an interest rate equal to 15% per annum based upon a year consisting of 360 days, with interest computed daily based on the actual number of days in each month.  Interest will be paid-in-kind and added to the principal amount outstanding hereunder on the first calendar day of each January, April, July and October (or if such day is not a Business Day, the next succeeding Business Day).

This Promissory Note is the Note referred to in, and is executed and delivered in connection with, that certain Loan and Security Agreement dated March [●], 2017, by and among Borrower, Agent, and the several banks and other financial institutions or entities from time to time party thereto as lender (as the same may from time to time be amended, modified or supplemented in accordance with its terms, the "Loan Agreement"), and is entitled to the benefit and security of the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement), to which reference is made for a statement of all of the terms and conditions thereof. All payments shall be made in accordance with the Loan Agreement. All terms defined in the Loan Agreement shall have the same definitions when used herein, unless otherwise defined herein. An Event of Default under the Loan Agreement shall constitute a default under this Promissory Note.

Borrower waives presentment and demand for payment, notice of dishonor, protest and notice of protest under the UCC or any applicable law. Borrower agrees to make all payments under this Promissory Note without setoff, recoupment or deduction and regardless of any counterclaim or defense. This Promissory Note has been negotiated and delivered to Lender and is payable in the State of New York. This Promissory Note shall be governed by and construed and enforced in accordance with, the laws of the State of New York, excluding any conflicts of law rules or principles that would cause the application of the laws of any other jurisdiction.

[SIGNATURES CONTINUE ON NEXT PAGE]

BORROWER FOR ITSELF AND
ON BEHALF OF ITS SUBSIDIARIES:

SUNGEVITY, INC.

By: _____
Title: _____

SUNGEVITY DEVELOPMENT, LLC

By:_____
Title: _____

**EXHIBIT C**

**NAME, LOCATIONS, AND OTHER INFORMATION FOR BORROWER**

1.      Parent represents and warrants to Agent and Lenders that Parent's current name and organizational status as of the Closing Date is as follows:

| | |
|---|---|
| Name: | SUNGEVITY, INC. |
| Type of organization: | Corporation |
| State of organization: | Delaware |
| Organization file number: | 4231064 |
| Federal employer tax identification number: | 01-0904328 |

2.      Parent represents and warrants to Agent and Lenders that for five (5) years prior to the Closing Date, Parent did not do business under any other name or organization or form.

3.      Parent represents and warrants to Agent and Lenders that its chief executive office is located at 66 Franklin Street, Suite 310, Oakland, CA 94607, USA.

4.      Sungevity Development represents and warrants to Agent and Lenders that Sungevity Development's current name and organizational status as of the Closing Date is as follows:

| | |
|---|---|
| Name: | SUNGEVITY DEVELOPMENT, LLC |
| Type of organization: | Limited Liability Company |
| State of organization: | Delaware |
| Organization file number: | 4771828 |
| Federal employer tax identification number: | 80-0570323 |

5.      Sungevity Development represents and warrants to Agent and Lenders that for five (5) years prior to the Closing Date, Sungevity Development did not do business under any other name or organization or form.

6.      Sungevity Development represents and warrants to Agent and Lenders that its chief executive office is located at 66 Franklin Street, Suite 310, Oakland, CA 94607, USA.

7.    Sungevity International Holdings LLC represents and warrants to Agent and Lenders that Sungevity International Holdings LLC's current name and organizational status as of the Closing Date is as follows:

| | |
|---|---|
| Name: | SUNGEVITY INTERNATIONAL HOLDINGS LLC |
| Type of organization: | Limited Liability Company |
| State of organization: | Delaware |
| Organization file number: | 5515646 |
| Federal employer tax identification number: | 46-5475598 |

8.    Sungevity International Holdings LLC represents and warrants to Agent and Lenders that for five (5) years prior to the Closing Date, Sungevity International Holdings LLC did not do business under any other name or organization or form.

9.    Sungevity International Holdings LLC represents and warrants to Agent and Lenders that its chief executive office is located at 66 Franklin Street, Suite 310, Oakland, CA 94607, USA.

10.    Sungevity SD, LLC represents and warrants to Agent and Lenders that Sungevity SD, LLC's current name and organizational status as of the Closing Date is as follows:

| | |
|---|---|
| Name: | SUNGEVITY SD, LLC |
| Type of organization: | Limited Liability Company |
| State of organization: | Delaware |
| Organization file number: | 4906412 |
| Federal employer tax identification number: | 27-4154847 |

11.    Sungevity SD, LLC represents and warrants to Agent and Lenders that for five (5) years prior to the Closing Date, Sungevity SD, LLC did not do business under any other name or organization or form.

12.    Sungevity SD, LLC represents and warrants to Agent and Lenders that its chief executive office is located at 66 Franklin Street, Suite 310, Oakland, CA 94607, USA.

# EXHIBIT D

## CREDIT PARTIES PATENTS, TRADEMARKS, COPYRIGHTS AND LICENSES

### PATENTS

*Patent Title:* Methods and Systems for Provisioning Energy Systems

| Country | Application Number | Filing Date | Patent Number | Issue Date |
|---|---|---|---|---|
| Australia | 20080309133 | 06-Oct-2008 | 2008309133 | 15-May-2014 |
| Australia | 2014202326 | 06-Oct-2008 | 2014202326 | 24-Nov-2016 |
| Brazil | PI0818510-7 | 06-Oct-2008 | | |
| Canada | 2,701,645 | 06-Oct-2008 | | |
| China (People's Republic) | 200880116571 | 06-Oct-2008 | CN 101918767 B | 07-Aug-2013 |
| European Patent Convention | 16157956.0 | 06-Oct-2008 | | |
| India | 2326/DELNP/2010 | 06-Oct-2008 | | |
| Korea, Republic of | 20107008197 | 06-Oct-2008 | | |
| Mexico | MX/a/2010/003682 | 06-Oct-2008 | 321609 | 03-Jul-2014 |
| Mexico | MX/a/2014/008214 | 06-Oct-2008 | 335847 | 18-Dec-2015 |
| Philippines | 1-2010-500721 | 06-Oct-2008 | | |
| South Africa | 2010/02431 | 06-Oct-2008 | 2010/02431 | 29-May-2013 |
| United States of America | 12/364,506 | 02-Feb-2009 | 8,417,061 | 09-Apr-2013 |
| United States of America | 12/681,375 | 06-Oct-2008 | 9,279,602 | 08-Mar-2016 |
| United States of America | 13/847,766 | 20-Mar-2013 | | |

**Priorities**

| Country | Application # | Filing Date |
|---|---|---|
| United States of America | 60/977,592 | 04-Oct-2007 |
| United States of America | 61/025,431 | 01-Feb-2008 |
| United States of America | 61/047,086 | 22-Apr-2008 |

***Patent Title:*** Rapid 3D Modeling

| Country | Application Number | Filing Date | Patent Number | Issue Date |
|---|---|---|---|---|
| Australia | 2011312140 | 07-Oct-2011 | 2011312140 | 11-Feb-2016 |
| Brazil | 1120130083506 | 07-Oct-2011 | | |
| Canada | 2,813,742 | 07-Oct-2011 | | |
| European Patent Convention | 11831734.6 | 07-Oct-2011 | | |
| India | 3134/DELNLP/2013 | 07-Oct-2011 | | |
| Japan | 2013-533001 | 07-Oct-2011 | JP 6057298B | 11-Jan-2017 |
| Japan | 2016-131909 | 01-Jul-2016 | | |
| Korea, Republic of | 2013-7011059 | 07-Oct-2011 | | |
| Mexico | MX/a/2013/003853 | 07-Oct-2011 | 324688 | 22-Oct-2014 |
| Philippines | 1-2013-500647 | 04-Apr-2013 | 12013500647 | 24-Aug-2016 |
| Singapore | 201302557 | 07-Oct-2011 | 189284 | 24-Aug-2016 |
| South Africa | 2013/02469 | 07-Oct-2011 | 2013/02469 | 25-Jun-2014 |
| United States of America | 13/878,106 | 07-Oct-2011 | | |

#### Priorities

| Country | Application # | Filing Date |
|---|---|---|
| United States of America | 61/391,069 | 07-Oct-2010 |

***Patent Title:*** Designing and Installation Quoting for Solar Energy Systems

| Country | Application Number | Filing Date | Patent Number | Issue Date |
|---|---|---|---|---|
| European Patent Convention | 14840127.6 | 28-Aug-2014 | | |
| United States of America | 14/471,181 | 28-Aug-2014 | | |
| China | 2014-80059626 | 28-Aug-2014 | | |

**Priorities**

| Country | Application # | Filing Date |
|---|---|---|
| United States of America | 61/871,419 | 29-Aug-2013 |

# TRADEMARKS

| Mark Listed Owner | App Filing Date / Reg Date | App/SN & Reg No. | |
|---|---|---|---|
| SUNGEVITY | Sungevity, Inc. | 10/11/2006 / 01/01/2008 | 77/018,402 / 3,362,939 |
| SUNSHINE ONLINE | Sungevity, Inc. | 11/27/2007 / 02/22/2011 | 77/338,221 / 3,923,517 |
| SUNGEVITY | Sungevity, Inc. | 10/9/2008 / 05/18/2010 | 77/589,921 / 3,790,936 |
| SUNGEVITY | Sungevity, Inc. | 10/9/2008 / 9/01/2009 | 77/977,381 / 3,676,476 |
| LEASE IS MORE | Sungevity, Inc. | 3/1/2010 / 10/12/2010 | 77/947,404 / 3,860,078 |
| MAKE YOUR HOME A HYBRID | Sungevity, Inc. | 10/14/2016 / | 87/203,818 / |
|  | Sungevity, Inc. | 11/10/2008 / 05/18/2010 | 77/979,324 / 3,790,256 |
|  | Sungevity, Inc. | 6/7/2010 / 01/11/2011 | 85/056,786 / 3,904,398 |
| SUNGEVITY | Sungevity, Inc. | 11/17/2010 / 06/28/2011 | 85/179,313 / 3,985,389 |
| IQUOTE | Sungevity, Inc. | 1/13/2011 / 08/02/2011 | 85/217,204 / 4,007,809 |
| SOLAR HOME SPECIALISTS | Sungevity, Inc. | 5/17/2010 / 05/01/2012 | 85/040,743 / 4,133,831 |
| THE LIFE AND TIMES OF SOLAR PEOPLE | Sungevity, Inc. | 10/26/2011 / 06/26/2012 | 85/457,973 / 4,164,299 |
| GENERATE POSITIVE | Sungevity, Inc. | 6/4/2012 / 05/14/2013 | 85/642,399 / 4,336,239 |

## SUNGEVITY FOREIGN APPLICATIONS & REGISTRATIONS

| Jurisdiction | Mark | App Filing Date / Reg Date | App/SN & Reg No. |
|---|---|---|---|
| EU (CTM) | SUNGEVITY | 11/30/2011 06/22/2012 | 010459171 010459171 |
| EU (CTM) |  | 11/30/2011 07/10/2012 | 010459188 010459188 |
| EU (CTM) | IQUOTE | 11/30/2011 04/27/2012 | 010459204 010459204 |

13

| EU (CTM) | SUNGEVITY SOLAR HOME SPECIALISTS | 11/30/2011<br>04/27/2012 | 010459196<br>010459196 |
| Australia | SUNGEVITY | 4/20/2012<br>04/20/2012 | 1487159<br>1487159 |
| Australia | GENERATE POSITIVE | 4/24/2014<br>4/24/2014 | 1619085<br>1619085 |
| International Register | GENERATE POSITIVE | 5/1/2014<br>5/1/2014 | 1210253<br>1210253 |
| EU (CTM) | GENERATE POSITIVE | 5/1/2014<br>6/11/2015 | 1210253<br>1210253 |
| EU (CTM) | ZONLINE | 9/12/2011<br>12/12/2011 | 01232303<br>0907780 |
| Australia |  | 4/24/2014<br>4/24/2014 | 1619087<br>1619087 |

**SUNGEVITY COMMON LAW MARKS**

| Mark | Goods/Services |
|---|---|
|  | Bags (018)<br>Apparel, namely, shirts and jackets in (025) |
| **MY SUNGEVITY** | Installation of solar installations; installation of renewable energy systems for solar energy collection and dispersion (037)<br><br>Leasing of renewable energy equipment for use in converting renewable resources into power (040)<br><br>Technical planning of solar installations; environmental consulting in the field of environmental engineering (042) |
| **SAVE MONEY.**<br>**SAVE TIME.** | Installation of solar installations; installation of renewable energy systems for solar energy collection and dispersion (037)<br><br>Leasing of renewable energy equipment for use in converting renewable resources into power (040)<br><br>Technical planning of solar installations; environmental consulting in the field of environmental engineering (042) |
| **Solar IQUOTE** | Providing information on the cost savings resulting from converting from non-renewable energy to renewable energy; providing rate quotes for leasing of renewable energy equipment for use in converting renewable resources into power, providing rate quotes for leasing of renewable energy equipment, and providing rate quotes for cash sales, installation and maintenance of renewable energy generation equipment (036)<br><br>Leasing of renewable energy equipment for use in converting renewable resources into power (040)<br><br>Technical environmental consulting in the field of environmental engineering; providing a website featuring non-downloadable software featuring rate quotes for leasing of renewable energy equipment for use in converting renewable resources into power, rate quotes for leasing of renewable energy equipment, and rate quotes for cash sales, installation and maintenance of renewable energy generation equipment and of renewable energy generation equipment (042) |
| **1.866.SUN.4ALL** | Installation and maintenance of renewable energy generation equipment (037)<br><br>Leasing of renewable energy equipment for use in converting renewable resources into power; leasing of renewable energy equipment (040)<br><br>On-line journals, namely, blogs and microblogs featuring information regarding renewable energy, commercial solar energy, energy efficiency, green living, home solar, legislation, science and solar industry news (041)<br><br>Environmental consulting in the field of environmental engineering; environmental engineering services; technical planning of solar installations (042) |

| | |
|---|---|
| **Instant IQUOTE** | Providing information on the cost savings resulting from converting from non-renewable energy to renewable energy; providing rate quotes for leasing of renewable energy equipment for use in converting renewable resources into power, providing rate quotes for leasing of renewable energy equipment, and providing rate quotes for cash sales, installation and maintenance of renewable energy generation equipment and of renewable energy generation equipment (036)<br><br>Leasing of renewable energy equipment for use in converting renewable resources into power (040)<br><br>Technical environmental consulting in the field of environmental engineering; providing a website featuring non-downloadable software featuring rate quotes for leasing of renewable energy equipment for use in converting renewable resources into power, rate quotes for leasing of renewable energy equipment, and rate quotes for cash sales, installation and maintenance of renewable energy generation equipment and of renewable energy generation equipment (042) |

Copyrights: None

Domains:
rooftoprevolutionbook.com
sfun.biz
solaronthewhitehouse.com
sungevity.net
generatepositive.com
generatepositive.net
generatepositive.org
getsungevity.com
gosungevity.com
mysolaranswers.com
solarsfun.com
sungevitydesign.com
sungevitypartner.com
sungevity.com
sungevity.org
sungevity.nl
sungevity.de
sungevity.be
login.sungevity.nl
eon.sungevity.nl
login.sungevity.de
engie.sungevity.be
login.sungevity.be
monitoring.sungevity.nl

**Material Licenses**

Monitoring and Software Licensing Agreement, dated as of October 13, 2010, between Locus Energy, LLC and Sungevity, Inc.

Microsoft Business and Services Agreement, dated September 30, 2014, between Microsoft Corporation and Sungevity, Inc.

Five9 Master Services Agreement, dated   March 30, 2015, between Five9, Inc. and Sungevity, Inc.
          NOTE: Sungevity sent a notice of termination that will be effective on March 30, 2017.

Agosto Services and License Agreement, dated December 10, 2024, between Agosto Inc. and Sungevity, Inc.

End-User Web Services Subscription Agreement, dated January 31, 2016, between Drawloop Technologies, Inc. and Sungevity, Inc.

Subscription Services Agreement, dated July 13, 2016, between Genability, Inc. and Sungevity, Inc.

Master Agreement, dated September 1, 2011, between Level Three Solutions and Sungevity, Inc.

Hosted Services Agreement, dated March 14, 2016, between Utility API, Inc. and Sungevity, Inc.

Subscription and Services Agreement, dated December 29, 2015, between Xactly Corporation and Sungevity, Inc.

Informatica Cloud Subscription Agreement, between Informatica Corporation and Sungevity, Inc.

# EXHIBIT E

## CREDIT PARTIES' DEPOSIT AND INVESTMENT ACCOUNTS

Secured Lenders:    Hercules Capital, Inc., MMA Energy Capital, LLC, MHA Trust, LLC, Bridge Loan Agent

Excluded Accounts:    "Excluded Deposit Account" means (i) any deposit or other bank account maintained by a Credit Party solely for the purpose of maintaining cash collateral for letters of credit permitted under clause (vii)(A) and (B) of the definition of Permitted Indebtedness and set forth on Schedule A, (ii) deposit accounts established solely as payroll and other zero balance accounts, (iii) accounts established to hold funds for flexible spending purposes of employees of Borrower, (iv) Credit Card Accounts and (v) other deposit accounts, so long as at any time the balance in any such account does not exceed $10,000 and the aggregate balance in all such other deposit accounts does not exceed $100,000.

| Institution Name and Address | Account Number and Description | Name of Account Owner | Account Name | Account Balance as of [1 Business Day prior to Closing Date][2] | Account Subject to Pledge or Control Agreement |
|---|---|---|---|---|---|
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | CD#-0103015301  - Cash Collateral for LCs | Sungevity, Inc. | Sungevity Inc. Certificate of Deposit | | Excluded Account – For letters of credit. |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101157238  (Operating Account) | Sungevity, Inc. | Sungevity Inc. | | Yes - Secured Lenders |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101155380  (Money Market and Collateral Account for Bridge Bank Credit Card) | Sungevity, Inc. | Sungevity Inc. | | Excluded Account |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101155398  (Operating Account) | Sungevity Development, LLC | Sungevity Development LLC | | Yes-Secured Lender |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 102121092 (Operating Account) | Sungevity Development, LLC | Sungevity Development, LLC Account #2 | | Yes - Secured Lenders |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 102960531 (Operating Account) | Sungevity Development, LLC | Sungevity Development, LLC Account #3 | | Yes-Secured Lenders |

---

[2] NTD: To be inserted prior to closing

| | | | | | |
|---|---|---|---|---|---|
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101155406 (Operating Account) | Sungevity Financial Services, LLC | Sungevity Financial Services LLC | | Yes. Atalaya Capital Management |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101155414 (Operating Account) | Sungevity USB Residential 2010, LLC | Sungevity USB Residential 2010 LLC | | None |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101155422 (Operating Account) | Sungevity USB Residential Lessee 2010 LLC | Sungevity USB Residential 2010 LLC | | None |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101156107 (Operating Account) | Sungevity USB Residential Lessee 2010 LLC | Sungevity USB Residential 2010 LLC | | None |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101159135 (Operating Account) | Sungevity ARCH LLC | Sungevity ARCH LLC | | Yes. Atalaya Capital Management |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101158830 (Operating Account) | Sungevity SD, LLC | Sungevity SD LLC | | Yes – Secured Lenders |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101970192 (Operating Account) | Sungevity Gotham, LLC | Sungevity Gotham LLC | | Yes. Atalaya Capital Management |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101343812 (Operating Account) | Sungevity Citi Lessor, LLC | Sungevity Citi Lessor, LLC | | Yes. Atalaya Capital Management |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 102415858 (Operating Account) | Sungevity Greenwich Lessor, LLC | Sungevity Greenwich Lessor, LLC General Checking | | Yes. To Rabo Tax Equity Partner Security Agreement |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 102988672 (Operating Account) | Sungevity Greenwich Lessor, LLC | Sungevity Greenwich Lessor LLC Operating A/C- Lessee | | Yes. To Rabo Tax Equity Partner Security Agreement |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101934958 (Operating Account) | Sungevity Greenwich, LLC | Sungevity Greenwich LLC | | Yes. Atalaya Capital Management |
| Bridge Bank, 55 | 101630218 (Operating | Sungevity, Inc. | Sungevity Inc. | | Yes- Secured |

18

| | | | | | |
|---|---|---|---|---|---|
| Almaden Blvd, Suite 100, San Jose, CA 95113 | Account) | | BP | | Lenders |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 102676657 (Operating Account) | Sungevity Cardinal LLC | Sungevity Cardinal LLC | | Yes. Atalaya Capital Management |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 102707924 (Operating Account) | Sungevity Short Hills 2012, LLC | Sungevity Short Hills 2012 LLC | | Yes. Atalaya Capital Management |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101589257 (Operating Account) | Sungevity, Inc. | Sungevity Inc. Commercial Account | | Yes- Secured Lenders |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 101363042 (Operating Account) | Sungevity, Inc. | Sungevity Inc. | | Yes- Secured Lenders |
| Bridge Bank, 55 Almaden Blvd, Suite 100, San Jose, CA 95113 | 102214004 (Operating Account) | Sungevity, Inc. | Sungevity Inc. Investor Funding | | No. Excluded Account |
| US Bank Account | 152313149055 (Operating Account) | Sungevity USB Residential 2011, LLC | Sungevity USB Residential Lessee 2011LLC, C/O Sungevity Inc. | | None. |
| US Bank Account | 152313149071 (Operating Account) | Sungevity USB Residential Lessee 2011, LLC | Sungevity USB Residential Lessee 2011LLC, C/O Sungevity Inc. | | None. |
| US Bank Account | 152313149808 (Operating Account) | Sungevity USB Residential Lessee 2011, LLC | Sungevity USB Residential Lessee 2011LLC, Disbursement Account C/O Sungevity Inc. | | None. |

19

| US Bank Account | 152313149352 (Operating Account) | Sungevity USB Residential Lessee 2011, LLC | Sungevity SB Residential Lessee 2011LLC, Treasury Grant Account C/O Sungevity Inc. | | None. |
|---|---|---|---|---|---|
| US Bank Account | 152313870577 (Operating Account) | Sungevity USB Residential 2012, LLC | Sungevity USB Residential 2012 LLC C/O Sungevity Inc. Operating Account | | None. |
| US Bank Account | 152313870585 (Operating Account) | Sungevity USB Residential Lessee 2012, LLC | Sungevity USB Residential Lessee 2012 LLC C/O Sungevity Inc. Operating Account | | None. |
| US Bank Account | 152313870643 (Operating Account) | Sungevity USB Residential Lessee 2012, LLC | Sungevity USB Residential Lessee 2012 LLC Collections | | None. |
| JP Morgan Operating Account | 528217321 (Operating Account) | Sungevity Short Hills 2012, LLC | JPM as E/A for Sungevity Short Hills 2012, LLC/Operating Account Sungevity Short Hills 2012 LLC | | Yes. – Atalaya Capital Management |
| JP Morgan Tax Equity Reserve Account | 528217313 (reserve account for put reserve payments to be made under tax equity docs) | Sungevity Short Hills 2012, LLC | JPM as E/A for Sungevity Short Hills 2012, LLC/Tax Equity Put Reserve, LLC/Sungevity Short Hills 2012 LLC | | Yes. – Atalaya Capital Management |
| JP Morgan Interest Reserve Account | 528217347 (interest reserve account for Atalaya interest payments) | Sungevity Short Hills 2012, LLC | JPM as E/A for Sungevity Short Hills 2012, LLC/Interest | | Yes. – Atalaya Capital Management |

| | | | Reserve LLC Sungevity Short Hills 2012 LLC | | |
|---|---|---|---|---|---|
| Bridge Bank | 0101235232 (ZBA Account to 7238) | Sungevity, Inc. | Sungevity Inc. Payroll | | No. Excluded Account |
| Bridge Bank | 0101235232 (ZBA Account to 7238) | Sungevity, Inc. | Sungevity Inc. AR | | No. Excluded Account |
| Bridge Bank | 0102022860 (ZBA Account to 7238) | Sungevity, Inc. | Sungevity Inc. AP | | No. Excluded Account |
| Bridge Bank | 0102641628 (ZBA Account to 7238) | Sungevity, Inc. | Sungevity FSA | | No. Excluded Account |
| ABNAMRO | 20017112FTSBGB2LGBP | Sungevity UK Ltd | ABN AMRO UK GBP | | No. |
| ABNAMRO | 20017128FTSBGB2LEUR | Sungevity UK Ltd | ABN AMRO UK EUR | | No |
| ABNAMRO | 3000016244FTSBDEFAEUR | Sungevity Netherlands B.V. | ABN AMRO Duitsland | | No |
| ABNAMRO | 441407595ABNANL2AEUR | Sungevity Netherlands B.V. | ABN AMRO 44.14.07.595 doneer de zon | | No |
| ABNAMRO | 465901239ABNANL2AEUR | Sungevity Netherlands B.V. | BANKREKENING | | No |
| ABNAMRO | 563396865ABNANL2AEUR | Sungevity Netherlands B.V. | ABN AMRO 56.33.96.865 inzake NUON | | No |
| ABNAMRO | 719400125841ABNABEL2AEUR | Sungevity Belgium BVBA | ABN AMRO BE88719400125841 | | No |
| ABNAMRO | 995020574ABNANL2AEUR | Sungevity Netherlands B.V. | ABN AMRO 9950.20.574 (g-rekening) | | No |
| ABNAMRO | 547083513ABNANL2AEUR | Sungevity Netherlands B.V | ABN AMRO 5470.83.513 (bankgarantie) | | Yes in connection with , bank guarantee deposit, expiring in May |

**EXHIBIT F**

**COMPLIANCE CERTIFICATE**

Wilmington Trust, National Association, as agent (the "Agent")
50 South Sixth Street
Suite 1290
Minneapolis, MN 55402

Reference is made to that certain Debtor-In-Possession Loan and Security Agreement dated as of March [●], 2017 and all ancillary documents entered into in connection with such Debtor-In-Possession Loan and Security Agreement all as may be amended from time to time, (hereinafter referred to collectively as the "Loan Agreement") by and among the several banks and other financial institutions or entities from time to time party thereto (collectively, the "Lenders") and Wilmington Trust, National Association, as agent for the Lenders (the "Agent"), Sungevity, Inc. (the "Company"), Sungevity Development, LLC ("Sungevity Development", and collectively with the Company, "Borrower") and each of the Subsidiary Guarantors party thereto, collectively, as Credit Parties. All capitalized terms not defined herein shall have the same meaning as defined in the Loan Agreement.

The undersigned is an Officer of the Company, knowledgeable of all Company financial matters, and is authorized to provide certification of information regarding the Company. The undersigned hereby certifies that in accordance with the terms and conditions of the Loan Agreement, the Company is in compliance for the applicable period with all covenants, conditions and terms and hereby reaffirms that all representations and warranties contained therein are true and correct in all material respects (other than any representation or warranty qualified by "materiality" or "Material Adverse Effect", in which case, such representation or warranty shall be true and correct) on and as of the date of this Compliance Certificate with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date. Attached are the required documents supporting the above certification. The undersigned further certifies that these are prepared in accordance with GAAP (except for the absence of footnotes with respect to unaudited financial statement and subject to normal year end adjustments) and are consistent from one period to the next except as explained below.

| REPORTING REQUIREMENT | REQUIRED | CHECK IF ATTACHED |
|---|---|---|
| Interim Financial Statements | Monthly within 30 days | |
| Interim Financial Statements | Quarterly within 45 days | |

Very Truly Yours,

SUNGEVITY, INC.

By: _____
Name: _____
Its: _____

**EXHIBIT G**

**FORM OF JOINDER AGREEMENT**

This Joinder Agreement (the "Joinder Agreement") is made and dated as of [●], 20[●], and is entered into by and between a corporation ("Subsidiary"), and WILMINGTON TRUST, NATIONAL ASSOCIATION, a national banking association, as agent (the "Agent").

**RECITALS**

A.    Subsidiary's Affiliate, Sungevity, Inc., a Delaware corporation ("Company"), has entered into that certain Debtor-In-Possession Loan and Security Agreement dated March [●], 2017, with the several banks and other financial institutions or entities from time to time party thereto as lenders (collectively, the "Lenders") and the Agent, as such agreement may be amended, restated or modified from time to time (the "Loan Agreement"), together with the other agreements executed and delivered in connection therewith;

B.    Subsidiary acknowledges and agrees that it will benefit both directly and indirectly from Company's execution of the Loan Agreement and the other agreements executed and delivered in connection therewith;

**AGREEMENT**

NOW THEREFORE, Subsidiary and Agent agree as follows:

1.    The recitals set forth above are incorporated into and made part of this Joinder Agreement. Capitalized terms not defined herein shall have the meaning provided in the Loan Agreement.

2.    By signing this Joinder Agreement, Subsidiary shall be bound by the terms and conditions of the Loan Agreement the same as if it were the Borrower (as defined in the Loan Agreement) under the Loan Agreement, mutatis mutandis. In particular, Subsidiary hereby acknowledges and agrees that it (i) hereby grants a security interest to Lender in the Collateral on the terms set forth in Section 3.1 of the Loan Agreement as if it were the Borrower thereunder, (ii) makes the representations set forth in Section 5 of the Loan Agreement as if it were the Borrower thereunder, (iii) agrees to be bound by the covenants and agreements set forth in Sections 6, 7 and 12 of the Loan Agreement as if it were the Borrower thereunder and (iv) hereby guarantees the Guaranteed Obligations pursuant to Section 12.19 of the Loan Agreement. Notwithstanding the foregoing, and except as set forth herein, (x) Subsidiary hereby agrees that neither Agent nor Lender shall have any duties, responsibilities or obligations to Subsidiary arising under or related to the Loan Agreement or the other agreements executed and delivered in connection therewith, (y) Lender and Agent agree that if a Subsidiary is covered by Company's insurance, Subsidiary shall not be required to maintain separate insurance or comply with the provisions of Sections 6.1 and 6.2 of the Loan Agreement, and (z) Lender and Agent agree that as long as Company satisfies the requirements of Section 7.1 of the Loan Agreement, Subsidiary shall not have to provide Agent separate Financial Statements. Rather, to the extent that Agent or Lender has any duties, responsibilities or obligations arising under or related to the Loan Agreement or the other agreements executed and delivered in connection therewith, those duties,

responsibilities or obligations shall flow only to Company and not to Subsidiary or any other Person or entity. By way of example (and not an exclusive list): (a) Agent or Lender's providing notice to Company in accordance with the Loan Agreement or as otherwise agreed among Company, Agent and Lender shall be deemed provided to Subsidiary; (b) a Lender's providing a Loan to Company shall be deemed a Loan to Subsidiary; and (c) Subsidiary shall have no right to request a Loan or make any other demand on Lender.

3.      Subsidiary agrees not to certificate its equity securities without Agent's prior written consent, which consent may be conditioned on the delivery of such equity securities to Agent in order to perfect Agent's security interest in such equity securities.

4.      Subsidiary acknowledges that it benefits, both directly and indirectly, from the Loan Agreement, and hereby waives, for itself and on behalf on any and all successors in interest (including without limitation any assignee for the benefit of creditors, receiver, bankruptcy trustee or itself as debtor-in- possession under any bankruptcy proceeding) to the fullest extent provided by law, any and all claims, rights or defenses to the enforcement of this Joinder Agreement on the basis that (a) it failed to receive adequate consideration for the execution and delivery of this Joinder Agreement or (b) its obligations under this Joinder Agreement are avoidable as a fraudulent conveyance.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

SUBSIDIARY:

By: _____

Name: _____
Title: _____

Address: _____
_____
_____

Telephone:_____
Facsimile: _____

AGENT:

WILMINGTON TRUST, NATIONAL ASSOCIATION

By:_____

Name: _____
Title: _____

Address:  50 South Sixth Street
          Suite 1290
          Minneapolis, MN 55402
          Facsimile: 612-217-5651
          Telephone: 612-217-5630

**EXHIBIT H**

**INTERCREDITOR AGREEMENT**

**(See Attached)**

**SUBORDINATION AND INTERCREDITOR AGREEMENT**

DATED AS OF MARCH [__], 2017

AMONG

**HERCULES CAPITAL, INC.,**
AS INITIAL SENIOR CREDITOR,

and

**THE SEVERAL BANKS AND FINANCIAL INSTITUTIONS AND SIGNATORIES HERETO**,
AS THE INITIAL SUBORDINATED LENDERS, AND

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
AS INITIAL SUBORDINATED LENDER AGENT,

concerning

**SUNGEVITY, INC.**

and

the other Company Parties referenced herein

## SUBORDINATION AND INTERCREDITOR AGREEMENT

This SUBORDINATION AND INTERCREDITOR AGREEMENT, dated as of March [__], 2017 (this "*Agreement*"), is between: (a) HERCULES CAPITAL, INC., a Maryland corporation (f/k/a Hercules Technology Growth Capital, Inc.) as agent and lender party to the Initial Senior Loan Agreement (in such capacity, the "*Initial Senior Creditor*"); (b) the several banks and other financial institutions or entities from time to time parties to this Agreement (each, an "*Initial Subordinated Lender*" and, collectively, the "*Initial Subordinated Lenders*") and WILMINGTON TRUST, NATIONAL ASSOCIATION, a national banking association, in its capacity as administrative agent for the Initial Subordinated Lenders (in such capacity, the "*Initial Subordinated Lender Agent*"); (c) SUNGEVITY, INC., a Delaware corporation ("*Company*"); (d) SUNGEVITY DEVELOPMENT, LLC, a Delaware limited liability company ("*Development*"); and (e) the Company Parties (as hereinafter defined).

### RECITALS

WHEREAS, the Company and Development entered into that certain Loan and Security Agreement, dated as of March 31, 2015 (as the same may be amended, supplemented and/or otherwise modified from time to time, the "*Initial Senior Loan Agreement*"), among Company and Development, as borrowers, the subsidiaries of Company from time to time party thereto as guarantors ("*Subsidiary Guarantors*"), the lenders party thereto and Initial Senior Creditor;

WHEREAS, on March 13, 2017 (the "*Petition Date*"), the Company Parties (in such capacity, each a "*Debtor*" and, collectively, the "*Debtors*") filed voluntary petitions with the Bankruptcy Court initiating cases pending under Chapter 11 of the Bankruptcy Code (collectively, the "*Cases*" and each a "*Case*") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrower has requested that the Initial Subordinated Lenders make available to the Company Parties debtor-in-possession term loans in an aggregate principal amount of up to Twenty Million Dollars ($20,000,000) (each a "*DIP Term Loan*" and, collectively, the "*DIP Term Loans*") pursuant to a Debtor-In-Possession Loan and Security Agreement by and among the Initial Subordinated Lenders, the Initial Subordinated Lender Agent and the Company Parties dated as of the date hereof (the "*DIP Loan Agreement*");

WHEREAS, concurrently with the commencement of the Cases, the Company Parties have entered into an Asset Purchase Agreement dated as of the date hereof (the "*Asset Purchase Agreement*") with LSHC Solar Holdings LLC, a Delaware limited liability company ("*Acquisition Co*") pursuant to which Acquisition Co will acquire substantially all of the assets of the Company Parties, conditioned, among other things, to the approval of the Bankruptcy Court under Sections 363 and 365 of the Bankruptcy Code;

WHEREAS, Initial Senior Creditor is unwilling to consent to the DIP Term Loans and continue to extend, financial accommodations to the Company Parties unless and until the parties hereto enter into this Agreement;

NOW, THEREFORE, for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties hereto agree as follows:

ARTICLE I
CERTAIN DEFINED TERMS; CERTAIN RULES OF CONSTRUCTION

SECTION 1.01    CERTAIN DEFINED TERMS.

As used herein:

"*Acquisition Co*" has the meaning ascribed to such term in the Recitals.

"*Act*" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"*Affiliate*" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"*Agreement*" has the meaning ascribed thereto in the introductory paragraph hereto.

"*Asset*" means any interest (whether now existing or hereafter acquired or arising) of a Person in any kind of property or assets, whether real, personal, or mixed real and personal, or whether tangible or intangible.

"*Asset Purchase Agreement*" has the meaning ascribed to such term in the Recitals.

"*Bankruptcy Code*" means Title 11 of the United States Code (11 U.S.C. Sections 101 *et seq.*).

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required to close under the Laws of the State of New York.

"*Case*" or "*Cases*" has the meaning ascribed to such terms in the Recitals.

"*Cash and Cash Equivalents*" means all cash and any presently existing or hereafter arising deposit account balances, certificates of deposit or other financial instruments classified as cash equivalents under generally accepted accounting principles.

"*Cash Collateral*" means any Collateral consisting of Cash and Cash Equivalents, any security entitlement (as defined in the UCC) and any financial assets (as defined in the UCC).

"*Collateral*" has the meaning specified in the Initial Senior Loan Agreement.

"*Company*" has the meaning ascribed thereto in the introductory paragraph hereto.

49066/0031-14246842v2

"*Company Parties*" means, as of any date of determination, collectively, Company, Development, each Person that is a Subsidiary Guarantor on the date hereof, each Person that becomes a Subsidiary Guarantor after the date hereof and any other Person who has guaranteed or otherwise becomes obligated with respect to any Creditor Indebtedness, including by way of a third-party pledge or other similar agreement.

"*Control*" means (other than when used in the term "*Control Collateral*") the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  The terms "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Control Collateral*" means any Collateral consisting of a certificated security (as defined in the UCC), investment property (as defined in the UCC), a deposit account (as defined in the UCC) and any other Collateral as to which a Lien may be perfected through physical possession or control by the secured party or any agent therefor.

"*Creditor Documents*" means, collectively, the Initial Senior Creditor Documents and the Initial Subordinated Creditor Documents, but excludes this Agreement.

"*Creditor Indebtedness*" means any or all of, as the context requires, the Total Initial Senior Creditor Indebtedness (including the Initial Senior Creditor Indebtedness) or the Initial Subordinated Creditor Indebtedness.

"*Creditors*" means, collectively, Initial Senior Creditor and the Initial Subordinated Creditors.

"*DIP Loan Agreement*" has the meaning ascribed to such term in the Recitals.

"*Governmental Authority*" means the government of the United States or any other nation, or of any political subdivision thereof, whether federal, state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Indebtedness*" means, without duplication of amounts and at any time any determination thereof is to be made, the aggregate then outstanding amount of all obligations, indebtedness, and liabilities of any Person of every kind and character, including:  (a) all obligations, indebtedness, and liabilities arising under successive transactions renewing, increasing, extending, or continuing any indebtedness, changing the interest rate or other terms thereof, or creating new or additional indebtedness after prior indebtedness has been in whole or in part satisfied; and (b) all obligations, indebtedness, and liabilities, whether for principal, interest (including interest that, but for the filing of a petition under applicable Insolvency Laws with respect to such Person, would have accrued on any such obligations, indebtedness, or liabilities), reimbursement obligations (including reimbursement obligations with respect to letters of credit and guaranties), the notional amount of swap, hedge or other interest protection agreements, fees, costs, expenses, premiums, end of term fees, make-whole amounts or prepayment fees, yield

49066/0031-14246842v2

maintenance amounts, success fees, unused fine fees, charges, attorneys' fees, and indemnity obligations; in all cases, whether previously, now, or hereafter made, incurred, or created, whether voluntarily or involuntarily and however arising, whether now due or due in the future, whether absolute or contingent, whether liquidated or unliquidated, whether determined or undetermined, whether such Person may be liable individually or jointly with others, and whether recovery may be or hereafter become barred by any statute of limitations or become otherwise unenforceable for any reason whatsoever.

"*Initial Senior Creditor*" has the meaning ascribed thereto in the introductory paragraph hereto.

"*Initial Senior Creditor Documents*" means, collectively: (a) the Initial Senior Loan Agreement; and (b) all Loan Documents (as defined in the Initial Senior Loan Agreement).

"*Initial Senior Creditor Indebtedness*" means, at any time of determination, Indebtedness of the Company Parties owing to Initial Senior Creditor under the Initial Senior Creditor Documents in an amount not to exceed the Initial Senior Creditor Priority Amount.

"*Initial Senior Creditor Indebtedness Termination Date*" means the date on which the Initial Senior Creditor Priority Amount is reduced to $0.00.  Notwithstanding anything herein to the contrary, the Initial Senior Creditor Indebtedness shall be deemed to be Paid in Full upon the consummation of the acquisition contemplated by the Asset Purchase Agreement.  For the avoidance of doubt, nothing contained in this definition shall constitute or be deemed as Payment in Full of the Total Initial Senior Creditor Indebtedness, other than the Initial Senior Creditor Priority Amount.

"*Initial Senior Creditor Priority Amount*" means $15,000,000, which amount shall (i) include all obligations, indebtedness and liabilities incurred pursuant to the Initial Senior Creditor Documents (including, but not limited to, all principal, interest, reimbursement obligations, the notional amount of any swap, hedge or other interest protection agreements, fees, costs, expenses, premiums, end of term fees, make-whole amounts or prepayment fees, yield maintenance amounts, success fees, unused fine fees, charges, attorneys' fees and indemnification obligations), and (ii) be decreased by any payments received with respect to the Initial Senior Creditor Indebtedness  (including, but not limited to, all principal, interest, reimbursement obligations, the notional amount of any swap, hedge or other interest protection agreements, fees, costs, expenses, premiums, end of term fees, make-whole amounts or prepayment fees, yield maintenance amounts, success fees, unused fine fees, charges, attorneys' fees and indemnification obligations) received by the Initial Senior Creditor on or after the date hereof.

"*Initial Senior Default*" means a Default or an Event of Default (as such terms are defined in any of the Initial Senior Creditor Documents).

"*Initial Senior Loan Agreement*" has the meaning set forth in the Recitals

4

"*Initial Subordinated Creditors*" means the Initial Subordinated Lenders and the Initial Subordinated Lender Agent.

"*Initial Subordinated Creditor Documents*" means (a) the DIP Loan Agreement and (b) (b) all Loan Documents (as defined in the DIP Loan Agreement).

"*Initial Subordinated Creditor Indebtedness*" means, at any time of determination, Indebtedness of the Company Parties owing to an Initial Subordinated Creditor under any Initial Subordinated Creditor Documents.

"*Initial Subordinated Default*" means a Default or an Event of Default (as such terms are defined in any of the Initial Subordinated Creditor Documents).

"*Initial Subordinated Lender Agent*" has the meaning ascribed thereto in the introductory paragraph hereto.

"*Insolvency Laws*" means, collectively, (a) the Bankruptcy Code and (b) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws from time to time in effect and affecting the rights of creditors generally.

"*Laws*" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case, whether or not having the force of law.

"*Lien*" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"*Lien Enforcement Action*" means:  (a) any action by any Creditor to foreclose, enforce, collect, take possession of, sell or otherwise realize upon, or to exercise any other right or remedy with respect to, any Collateral, including any action by any Creditor to foreclose on the Lien of such Person in any Collateral or any action by any Creditor to take possession of, sell or otherwise realize (judicially or non-judicially) upon any Collateral (including by setoff or notification of account debtors); or (b) the commencement by any Creditor of any legal proceedings against a Company Party with respect to any Collateral to facilitate the actions described in clause (a) of this definition.  For the avoidance of doubt, the mere acceleration of any Creditor Indebtedness shall not be considered a "*Lien Enforcement Action*."

49066/0031-14246842v2

"*Paid in Full*" and "*Payment in Full*" means, with respect to any Creditor Indebtedness, the indefeasible payment in full of all such Creditor Indebtedness in cash (or otherwise to the written satisfaction of the holder thereof) (excluding any contingent indemnity obligations absent the assertion of a claim or the known existence of a claim reasonably likely to be asserted), and, in the event any such Creditor Indebtedness is paid over time or modified pursuant to Section 1129 of the Bankruptcy Code (or any similar provision of any other applicable Insolvency Law), shall further mean that the holder thereof shall have received the final payment due on account of such Creditor Indebtedness (excluding any contingent indemnity obligations absent the assertion of a claim or the known existence of a claim reasonably likely to be asserted).

"*Permitted Initial Subordinated Creditor Payments*" has the meaning ascribed thereto in **Section 2.02(a)**.

"*Permitted Non-Cash Payments*" means the payment of interest, default interest, fees or other charges in-kind, by adding to the principal balance of the Subordinated Creditor Indebtedness or otherwise on an accretion basis (but in no event made in cash) in accordance with the Initial Subordinated Creditor Documents.

"*Permitted Subordinated Creditor Payments*" means, as the context requires, either the Permitted Initial Subordinated Creditor Payments or the Permitted Subsequent Subordinated Creditor Payments.

"*Permitted Subsequent Subordinated Creditor Payments*" has the meaning ascribed thereto in **Section 2.02(a)**.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"*Petition Date*" has the meaning ascribed to such term in the Recitals.

"*Pro Rata*" means with respect to an Initial Subordinated Creditor means the ratio of (i) the principal amount of such Initial Subordinated Creditor's Initial Subordinated Creditor Indebtedness to (ii) the principal amount of all Initial Subordinated Creditor Indebtedness.

"*Recovery*" has the meaning ascribed thereto in **Section 2.11**.

"*Related Parties*" means, with respect to any Person, such Person's Affiliates and the partners, members, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"*Release Event*" means the entry of an order of a Bankruptcy Court with respect to the Cases that vacates the automatic stay and authorizes Senior Creditor to take any Lien Enforcement Action with respect to all or a material portion of the Collateral.

"*Senior Creditor*" means (a) prior to the Initial Senior Creditor Indebtedness Termination Date, the Initial Senior Creditor, and (b) upon and after the Initial Senior Creditor Indebtedness Termination Date, collectively, the Initial Subordinated Creditors.

"*Senior Creditor Documents*" means (a) prior to the Initial Senior Creditor Indebtedness Termination Date, the Initial Senior Creditor Documents, and (b) upon and after Initial Senior Creditor Indebtedness Termination Date, the Initial Subordinated Creditor Documents.

"*Senior Creditor Indebtedness*" means (a) prior to the Initial Senior Creditor Indebtedness Termination Date, the Initial Senior Creditor Indebtedness, and (b) upon and after the Initial Senior Creditor Indebtedness Termination Date, the Initial Subordinated Creditor Indebtedness.

"*Senior Default*" means (a) prior to the Initial Senior Creditor Indebtedness Termination Date, an Initial Senior Default, and (b) upon and after the Initial Senior Creditor Indebtedness Termination Date, an Initial Subordinated Default.

"*Subordinated Creditor*" means (a) prior to the Initial Senior Creditor Indebtedness Termination Date, collectively, the Initial Subordinated Creditors, and (b) upon and after the Initial Senior Creditor Indebtedness Termination Date, the Initial Senior Creditor.

"*Subordinated Creditor Documents*" means (a) prior to the Initial Senior Creditor Indebtedness Termination Date, the Initial Subordinated Creditor Documents, and (b) upon and after the Initial Senior Creditor Indebtedness Termination Date, the Initial the Senior Creditor Documents.

"*Subordinated Creditor Indebtedness*" means (a) prior to the Initial Senior Creditor Indebtedness Termination Date, the Initial Subordinated Creditor Indebtedness, and (b) upon and after the Initial Senior Creditor Indebtedness Termination Date, the Initial Senior Creditor Indebtedness.

"*Subordinated Default*" means (a) prior to the Initial Senior Creditor Indebtedness Termination Date, an Initial Subordinated Default, and (b) upon and after the Initial Senior Creditor Indebtedness Termination Date, an Initial Senior Default.

"*Subsequent Senior Creditor Indebtedness Termination Date*" means the date on which the Initial Subordinated Creditor Indebtedness is Paid in Full.

"*Total Initial Senior Creditor Indebtedness*" means the total amount of Indebtedness, including, but not limited to, the Initial Senior Creditor Priority Amount, due and owing by the Company Parties to the Initial Senior Creditor from time to time pursuant to the Initial Senior Creditor Documents.

"*UCC*" means the Uniform Commercial Code as in effect in New York.

"*United States*" and "*U.S.*" mean the United States of America.

SECTION 1.02    CERTAIN RULES OF CONSTRUCTION.

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "*hereof*," "*herein*," "*hereunder*" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement; and subsection, Section and Schedule references are to this Agreement unless otherwise specified.

(c)    (i)    The term "*documents*" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.

(ii)    The term "*including*" is not limiting and means "including without limitation."

(iii)    In the computation of periods of time from a specified date to a later specified date, the word "*from*" means "*from and including*"; the words "*to*" and "*until*" each mean "to but excluding," and the word "*through*" means "to and including."

(d)    Unless otherwise expressly provided herein:  (i) references to agreements (including this Agreement) and other documents shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms hereof; (ii) references to any Person include, where applicable, such Person's permitted successors and assigns; and (iii) references to any Law are to be construed as including all Laws consolidating, amending, replacing, supplementing or interpreting such Law.

(e)    The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

(f)    This Agreement is the result of negotiations among, and has been reviewed by counsel to, the parties hereto and is the product of all of the parties hereto.  Accordingly, this Agreement shall not be construed against any party hereto merely because of the involvement of any such party hereto in its preparation.

## ARTICLE II
### AGREEMENTS REGARDING SUBORDINATION OF INDEBTEDNESS AND LIENS

SECTION 2.01    SUBORDINATION OF INDEBTEDNESS AND LIENS.

(a)    *Subordination of Indebtedness*.    Each Subordinated Creditor hereby: (i) subordinates, to the extent set forth in this Agreement, all Subordinated Creditor Indebtedness owing to it to all Senior Creditor Indebtedness; and (ii) irrevocably consents and directs that, except for Permitted Subordinated Creditor Payments to which it is entitled, no payment on account of its Subordinated Creditor Indebtedness shall (x) be made to or received by or on behalf of the Initial Subordinated Creditor until the Initial Senior Creditor Indebtedness Termination Date, and (y) upon and after the Initial Senior Creditor Indebtedness Termination

8

Date, be made to or received by or on behalf of the Initial Senior Creditor until the Subsequent Senior Creditor Indebtedness Termination Date.

(b)      *Subordination of Liens*.  In furtherance of the terms of subsections (a) and (c) of this **Section 2.01** and notwithstanding anything to the contrary contained in any of the Creditor Documents and notwithstanding the time of granting of any Liens in favor of any Creditor, or the time of filing or recording of any financing statements, fixture filings, or assignments or other notices under the UCC or any other applicable Law, each Subordinated Creditor hereby subordinates any Liens which such Subordinated Creditor now has (whether directly or through an agent) or hereafter acquires in the Collateral to secure its Subordinated Creditor Indebtedness to the Liens which Senior Creditor now has or may hereafter acquire in the Collateral to secure the Senior Creditor Indebtedness.      Until the Subsequent Senior Creditor Indebtedness Termination Date, (i) each Initial Subordinated Creditor hereby agrees that at no time shall it solicit or obtain a guaranty from any other Person unless such guaranty has been provided to the Initial Senior Creditor and (ii) the Initial Senior Creditor hereby agrees that at no time shall it solicit or obtain a guaranty from, or Lien in, to or upon any Assets of, any other Person unless such guaranty has been provided to the Initial Subordinated Creditor or such Assets serve as Collateral in which the Initial Subordinated Creditor has a Lien to secure the Initial Subordinated Creditor Indebtedness.

(c)      *No other Subordination*.   Except as otherwise specifically provided in this Agreement:  (i) the priority of any Creditor's Liens in any Assets of any Company Party (with respect to such Company Party or any other Person) shall be determined in accordance with the provisions of the UCC or other applicable Law; (ii) each Creditor specifically reserves each of its rights (including the right to assert Liens), Liens, privileges, powers, remedies and other interests against each Company Party and its Assets; and (iii) nothing contained herein is intended to affect or limit, in any way, the Liens of any Creditor in any of the Assets of any Company Party insofar as any Company Party or any other Person (other than Creditors) are concerned.

Section 2.02    Restriction of Payment of Creditor Indebtedness; Disposition of Payments Received by Creditors.

(a)      *Restriction on Payments*.

(i) Until the Initial Senior Creditor Indebtedness Termination Date (for the avoidance of doubt, at any time when the Subordinated Creditor is, collectively, the Initial Subordinated Creditors), no Company Party shall make, and no Initial Subordinator Creditor shall accept or receive, any payment or benefit in cash, by setoff or otherwise, directly or indirectly, on account of principal, interest (whether by an interest reserve or otherwise) or any other amounts owing on or with respect to any Initial Subordinated Creditor Indebtedness; *provided* that the foregoing shall not restrict any payments on account of the Initial Subordinated Creditor Indebtedness consisting of (w) the Work Fee (as defined in the DIP Loan Agreement), the Facility Charge (as defined in the DIP Loan Agreement), the fees payable pursuant to the the Agent's Fee Letter (as defined in the DIP Loan Agreement), (x) any commitment fee and other fees payable to the Initial Subordinated Creditors on or after the closing date of the DIP Loan

Agreement, (y) reimbursements of expenses (including, but not limited to, the Professional Fees more particularly described in Section 12.11 of the DIP Loan Agreement) payable to the Initial Subordinated Creditors or otherwise required to be paid pursuant to the Initial Subordinated Creditor Documents on or after the closing date of the DIP Loan Agreement and (z) regularly scheduled payments of interest payable in the form of a Permitted Non-Cash Payment (collectively, the "*Permitted Initial Subordinated Creditor Payments*"); and

(ii) upon and after the Initial Senior Creditor Indebtedness Termination Date and until the Subsequent Senior Creditor Indebtedness Termination Date (for the avoidance of doubt, at any time when the Subordinated Creditor is the Initial Senior Creditor), no Company Party shall make, and no Initial Senior Creditor shall accept or receive, any payment or benefit in cash, by setoff or otherwise, directly or indirectly, on account of principal, interest (whether by an interest reserve or otherwise) or any other amounts owing on or with respect to any Initial Senior Creditor Indebtedness; *provided* that the foregoing shall not restrict any payments on account of the Total Initial Senior Creditor Indebtedness consisting of (x) commitment fees and other fees payable to the Initial Senior Creditor, (y) reimbursements of expenses payable to the Initial Senior Creditors, and (z) regularly scheduled payments of interest, which, in each cause of clauses (ii)(x), (ii)(y) and (ii)(z) above, shall be payable in the form of Permitted Non-Cash Payments (collectively, the "*Permitted Subsequent Subordinated Creditor Payment*s").

Notwithstanding anything herein to the contrary, it is understood and agreed that, if the Initial Senior Creditor receives any equity interests of Company in exchange for all or any portion of its Initial Senior Creditor Indebtedness, then each Initial Subordinated Creditor may elect to receive equity interest of Company in exchange for all or any portion of its Initial Subordinated Creditor Indebtedness. Notwithstanding anything in this **Section 2.02(a)** to the contrary, the foregoing shall not restrict any payments of fees, expenses, indemnities or other amounts payable by any Company Party to the Initial Subordinated Lender Agent pursuant to the DIP Loan Agreement or any documents related thereto (including any fee letter) from time to time.

(b)    *Turnover of Payments*.  If any payment is made by any Company Party to any Subordinated Creditor in violation of this Agreement or if a Subordinated Creditor receives any proceeds from any Collateral in violation of this Agreement, then such Subordinated Creditor shall promptly deliver the same to Senior Creditor in the form received, with any endorsement or assignment necessary for the transfer of such payment or amounts setoff from such Subordinated Creditor to Senior Creditor, and Senior Creditor shall apply such amounts in reduction of such Senior Creditor Indebtedness in accordance with the Senior Creditor Documents, and, until so delivered, such Subordinated Creditor shall hold such payment for the benefit of, and as the property of, Senior Creditor; *provided* that any payment made by any Company Party to such Subordinated Creditor held for the benefit of or turned over to Senior Creditor by such Subordinated Creditor shall not constitute a payment on account of the Subordinated Creditor Indebtedness.

49066/0031-14246842v2

SECTION 2.03    ENFORCEMENT.

(a)    *Exercise of Remedies.*  Notwithstanding anything to the contrary contained in the Creditor Documents or this Agreement, from and after the date under Section 5.4(c) of the Limited Liability Company Agreement with respect to LSHC Solar Holdings LLC dated as of March 13, 2017 by and among LSHC Solar Holdings LLC, Lake Street Solar Holdings LLC and Hercules Capital, Inc. that the Initial Senior Creditor has the right to control the foreclosure and other proceedings against the Company to acquire and liquidate the assets of the Company, the Senior Creditor shall have each of the following available to it until (i) the Initial Senior Creditor Indebtedness Termination Date, at any time the Senior Creditor is the Initial Senior Creditor, or (ii) the Subsequent Senior Creditor Indebtedness Termination Date, at any time the Senior Creditor is the Initial Subordinated Creditor: (x) all of the remedies of the Subordinated Creditors under the Subordinated Creditor Documents, including, but not limited to, the termination of the automatic stay imposed pursuant to Section 362 of the Bankruptcy Code, and (y) all of the remedies available to the Senior Creditor under the Senior Creditor Documents and at Law, including, but not limited to, but subject to **Section 2.05** and **Section 2.06**, (1) upon and after the occurrence of a Release Event, to commence any Lien Enforcement Action against the Company Parties and their Assets, (2) to compromise, settle, adjust and in general deal in any manner with any Collateral that such Senior Creditor may deem appropriate, upon such terms and conditions (including the length of time incidental thereto) as Senior Creditor may deem appropriate; (3) to dispose of any Collateral in whatever state it then exists or with such modifications or completions thereto as Senior Creditor may deem appropriate; (4) to engage such third parties to assist it in the effectuation of the foregoing, upon such terms and conditions as Senior Creditor may deem appropriate; and (5) to incur such reasonable and documented out-of-pocket costs and expenses incidental to the actions described in the immediately preceding clauses (1) through (4), as Senior Creditor may reasonably deem appropriate, including the fees and disbursements of one outside legal counsel to Senior Creditor and any other third party professionals engaged by Senior Creditor and approved by the Subordinated Creditors in their reasonable discretion.

Without limiting the generality of the foregoing, (A) until the Initial Senior Creditor Indebtedness Termination Date, the Initial Subordinated Creditors shall not, and (B) upon and after the Initial Senior Creditor Indebtedness Termination Date and until the Subsequent Senior Creditor Indebtedness Termination Date, the Initial Senior Creditor shall not: (i) take any action of any kind to hinder, interfere with, object to or delay Senior Creditor in (a) the enforcement of any of its Liens on the Collateral or the liquidation or foreclosure thereof or (b) the manner in which Senior Creditor chooses to effectuate such enforcement, liquidation or foreclosure, (ii) demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisement, valuation or other similar right that may otherwise be available under applicable law or any other similar rights a junior creditor may have under applicable law, (iii) bring any action to contest the validity, legality, enforceability, perfection, priority of any of the amounts due and owing under the Senior Creditor Documents or the Liens of any of the Senior Creditor in or on any of the Collateral or (iv) make any demand under any guaranty.

Notwithstanding the foregoing or any other provision of this Agreement, upon and during the continuation of an Event of Default (as defined in the DIP Loan Agreement), each Initial Subordinated Creditor may at any time:  (1) take any action (not adverse to the priority status of

the Liens securing the Initial Senior Creditor Indebtedness) to exercise its rights under the Initial Subordinated Creditor Documents, including, but not limited to, the creation, perfection, preservation or protection of its Lien on any Collateral or the termination of the automatic stay imposed pursuant to Section 362 of the Bankruptcy Code; (2) file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any third party objecting to or otherwise seeking the disallowance of the claims for any of the Initial Subordinated Creditor Indebtedness, so long as such filing is in each case not inconsistent with the terms of this Agreement; (3) file any pleadings, objections, motions or agreements which assert rights or interests available to the Initial Subordinated Creditor arising under the Cases not inconsistent with the terms of this Agreement; (4) take any action to the extent necessary to prevent the running of any applicable statute of limitation or similar restriction on claims, or to assert a compulsory cross-claim or counterclaim against any Company Party; (5) take any action to seek and obtain specific performance or injunctive relief to compel a Company Party to comply with (or not violate or breach) an obligation under the Initial Subordinated Creditor Documents, so long as it is not accompanied by a claim for monetary damages; (6) inspect or appraise the Collateral or request information or reports concerning the Collateral pursuant to the Initial Subordinated Creditor Documents; (7) enforce any provision of this Agreement, (8) declare an Event of Default under and as defined in the applicable Initial Subordinated Creditor Documents (including, without limitation, accelerating any of the Initial Subordinated Creditor Indebtedness); (9) accept or receive any Permitted Initial Subordinated Creditor Payments (provided that, amounts payable pursuant to clause (x) of the definition thereof shall be in the form of a Permitted Non-Cash Payment); (10) engage consultants, valuation firms, investment bankers, and perform or engage third parties to perform audits, examinations and appraisals of the Collateral for the sole purpose valuing the Collateral and not for the purpose of marketing or conducting a disposition of such Collateral; provided, however, that the Initial Subordinated Creditors shall not take any of the foregoing actions in this clause 10 if they would materially interfere with the exercise of Secured Creditor's remedies; (11) the imposition of default interest (and interest on interest) under the Initial Subordinated Creditor Documents, payable in the form of a Permitted Non-Cash Payment; and (12) the bidding for (including credit bidding in conjunction with a cash bid sufficient to cause the Initial Senior Credit Indebtedness Termination Date to occur) and, if such bidding is successful, purchasing Collateral at any disposition of Collateral that would constitute an exercise of Secured Creditor's remedies.

(b)     *Proceeds; No Setoff; Payments Over.*     (i) Until the Initial Senior Creditor Indebtedness Termination Date, the Initial Subordinated Creditors shall not, and (ii) upon and after the Initial Senior Creditor Indebtedness Termination Date and until the Subsequent Senior Creditor Indebtedness Termination Date, the Initial Senior Creditor shall not: (x) exercise any right of setoff or counterclaim with respect to the Collateral or with respect to any proceeds thereof and all proceeds of Collateral shall be paid to Senior Creditor for application to the Senior Creditor Indebtedness in accordance with the Senior Creditor Documents; (y) any proceeds of Collateral received by any Subordinated Creditor and any other cash or other property on account of any Subordinated Creditor's interest in any Collateral received by a Subordinated Creditor in contravention of this Agreement shall be held for the benefit of Senior Creditor and paid over to Senior Creditor in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct; *provided* that any

12

payment made by any Company Party to Subordinated Creditor held for the benefit of or turned over to Senior Creditor by Subordinated Creditor shall not constitute a payment on account of the Subordinated Creditor Indebtedness; and (z) in connection with the foregoing, each Subordinated Creditor hereby (1) authorizes Senior Creditor to make any such endorsements as the agent and attorney-in fact for such Subordinated Creditor; and (2) acknowledges and agrees that its foregoing authorization, being coupled with an interest, is irrevocable.

SECTION 2.04    APPROVAL OF CERTAIN MATTERS REGARDING THE COLLATERAL.

Notwithstanding anything to the contrary contained in any of the Creditor Documents but subject to **Section 2.03(c)**, **Section 2.05** and **Section 2.06**, (a) until the Initial Senior Creditor Indebtedness Termination Date, during the continuance of a Release Event, only the Initial Senior Creditor shall have the right to restrict or permit or approve or disapprove, the sale, transfer or other disposition of all or any of the Collateral; and (b) upon and after the Initial Senior Creditor Indebtedness Termination Date and until the Subsequent Senior Creditor Indebtedness Termination Date, during the continuance of a Release Event, only the Initial Subordinated Creditor shall have the right to restrict or permit or approve or disapprove, the sale, transfer or other disposition of all or any of the Collateral.

SECTION 2.05    RELEASE EVENT MATTERS.

During the continuance of a Release Event, (I) until the Initial Senior Creditor Indebtedness Termination Date, at any time the Senior Creditor is the Initial Senior Creditor, and (y) upon and after the Initial Senior Creditor Indebtedness Termination Date and until the Subsequent Senior Creditor Indebtedness Termination Date, at any time the Senior Creditor is, collectively, the Initial Subordinated Creditors:

(a)    upon the written request of Senior Creditor with respect to the Collateral identified in such request as set forth below (which request shall specify the proposed terms of the sale or other disposition and the type and amount of consideration to be received in connection therewith), each Subordinated Creditor shall release or otherwise terminate the Liens held by it on such Collateral, in each case without representation, warranty or indemnity, provided that Senior Creditor is also releasing its Liens, effective upon such sale or other disposition of such Collateral either by (i) Senior Creditor or its agents or (ii) any Company Party with the prior written consent of Senior Creditor;

(b)    promptly upon the request of Senior Creditor, each Subordinated Creditor shall authorize, execute or deliver such release documents as Senior Creditor may reasonably require in connection therewith; *provided* that:

(i)    subject to the terms of this Agreement, such release shall not extend to or otherwise affect any of the rights of the Subordinated Creditors to the proceeds from any such sale or other disposition of Collateral;

(ii)    subject to the Senior Creditor Documents, Senior Creditor shall promptly apply such proceeds to the Senior Creditor Indebtedness;

13

(iii)    no such release documents need be delivered more than three (3) Business Days prior to the date of the closing of such sale or other disposition of such Collateral; *provided* that Senior Creditor shall hold such release documents in escrow pending the closing of such sale or other disposition (and, upon such closing, such release documents shall automatically and without further action on the part of any Person shall be and shall be deemed to be delivered and released) and, if the closing of such sale or other disposition of such Collateral is not consummated, Senior Creditor shall promptly return all such release documents to the applicable Subordinated Creditor;

(iv)    no such release shall be required to the extent the purchaser or transferee in such sale or disposition is a Company Party or any affiliate thereof; and

(v)    each such release shall be effective only with respect to the Collateral described in such request and only on the terms described in such request or on substantially similar terms and shall lapse in the event such sale or other disposition does not occur within three (3) Business Days of the anticipated closing date set forth in Senior Creditor's written request to the applicable Subordinated Creditor.

SECTION 2.06    OTHER COLLATERAL MATTERS.

Nothing contained herein shall be construed to in any way limit or impair the right of: (a) a Creditor to bid for or purchase Collateral at any private or judicial foreclosure upon such Collateral initiated by any other Creditor (including the submission of a credit bid so long as such credit bid would result in the Payment in Full of the Senior Creditor Indebtedness); (b) any Subordinated Creditor to join (but not control) any foreclosure or other Lien Enforcement Action initiated by Senior Creditor so long as it does not delay or interfere in any material respect with the exercise by such Senior Creditor of its rights as provided in this Agreement; and (c) each Subordinated Creditor to receive payments from the proceeds of the collection, sale or other disposition of the Collateral in accordance with the express terms of this Agreement provided that the Initial Senior Creditor Indebtedness Termination Date or Subsequent Senior Indebtedness Termination Date, as applicable, shall have occurred.  Furthermore, other than with respect to the Lien of the Initial Subordinated Creditors securing the Initial Subordinated Creditor Indebtedness that shall be senior to the Lien of the Initial Senior Creditor with respect to that portion of the Total Initial Senior Creditor Indebtedness in excess of the Initial Senior Creditor Priority Amount, nothing contained in this Agreement shall be deemed to modify, limit or otherwise affect the rights and Liens, including the priority thereof, of the Initial Senior Creditor with respect to the Total Initial Senior Creditor Indebtedness.

SECTION 2.07    AMENDMENTS TO INITIAL SENIOR CREDITOR DOCUMENTS.

Initial Senior Creditor shall not, without the prior written consent of each Initial Subordinated Creditor, agree to any amendment, modification or supplement of the Initial Senior Creditor Documents.

14

SECTION 2.09    AMENDMENTS TO INITIAL SUBORDINATED CREDITOR DOCUMENTS.

No Initial Subordinated Creditor shall, without the prior written consent of Initial Senior Creditor, agree to any amendment, modification or supplement of its Initial Subordinated Creditor Documents that would: (a) on or prior to the Initial Senior Creditor Indebtedness Termination Date:  (i) subject to the last paragraph of this Section 2.9, increase the amount of the Initial Subordinated Creditor Indebtedness (other than that portion of the Initial Subordinated Creditor Indebtedness consisting of interest, indemnities, costs and expenses) to an amount more than the existing maximum commitment of Initial Subordinated Creditor to make financial accommodations to Company under the Initial Subordinated Creditor Documents as of the date hereof; (ii) increase the non-default rate of interest on any Initial Subordinated Creditor Indebtedness by more than 200 basis points (provided that such 200 basis points shall be payable in kind) in excess of the maximum non-default rate of interest set forth in the Initial Subordinated Creditor Documents as in effect as of the date hereof; (iii) increase the default rate of interest or fees on any Initial Subordinated Creditor Indebtedness from that set forth in the Initial Subordinated Creditor Documents as in effect as of the date hereof; or (iv)  prohibit the making of any payment or the performance of any obligation by any Company Party under the Initial Senior Creditor Documents; or (b) shorten the final maturity or termination date of the Initial Subordinated Creditor Indebtedness.

Notwithstanding the foregoing, the Initial Subordinated Lenders (or future lenders that acquire or fund loans pursuant to the Initial Subordinated Loan Documents) may increase the principal amount of the Initial Subordinated Creditor Indebtedness under the Initial Subordinated Loan Agreement extended to the Company Parties such that the aggregate principal amount of all advances under the Initial Subordinated Loan Documents does not exceed $30,000,000 plus Permitted Non-Cash Payments, without obtaining any prior written consent of the Initial Senior Creditor.

Section 2.10    Notifications.

Each Creditor shall give each other Creditor:  (a) concurrently with the giving thereof to each Company Party (i) a copy of any written notice by such Person of a Senior Default or a Subordinated Default, as applicable, or written notice of demand of payment from any Company Party, and (ii) a copy of any written notice sent by such Person to any Company Party at any time a Senior Default or a Subordinated Default, as applicable, exists stating such Person's intention to exercise any of its enforcement rights or remedies, including written notice pertaining to any Lien Enforcement Action or other judicial or non-judicial remedy in respect thereof to the extent permitted hereunder, and any legal process served or filed in connection therewith; and (b) concurrently with the giving thereof to any other Creditor, each notice to any Creditor hereunder or demand upon any other Creditor hereunder.   Notwithstanding anything to the contrary contained in this **Section 2.10**, the failure of any Creditor to give notice as required hereby shall not result in liability of such Person nor shall it affect the validity of this Agreement, the relative priorities of the respective Creditor Indebtedness and Liens of the Creditors as provided herein or the validity or effectiveness of any such notice as against any Company Party.

49066/0031-14246842v2

SECTION 2.11    REINSTATEMENT OF SENIOR CREDITOR INDEBTEDNESS.

If Senior Creditor is required to disgorge any distribution, proceeds of Collateral or other amount received by Senior Creditor (whether because such distribution, proceeds of Collateral or other amount is invalidated, declared to be fraudulent or preferential or otherwise) or turn over or otherwise pay any amount previously received by it on account of the Senior Creditor Indebtedness (a "*Recovery*") to the estate or to any creditor or representative of any Company Party or any other Person, then the Senior Creditor Indebtedness shall be reinstated (to the extent of such Recovery) as if such Senior Creditor Indebtedness had never be paid and, to the extent a Subordinated Creditor has received proceeds of Collateral or a distribution to which such Subordinated Creditor would not have been entitled under this Agreement had such reinstatement occurred prior to receipt of such proceeds of Collateral or distribution made, then such proceeds or distribution shall promptly be turned over to Senior Creditor for reapplication to the Senior Creditor Indebtedness; *provided* that any such payment made by a Subordinated Creditor to Senior Creditor shall not constitute a payment on account of the applicable Subordinated Creditor Indebtedness and such Subordinated Creditor shall be subrogated to Senior Creditor's rights under Section 502(h) of the Bankruptcy Code with respect thereto.  If this Agreement shall have been terminated prior to such Recovery, then this Agreement shall be reinstated in full force and effect to the extent of such Recovery, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the parties hereto with respect to such Recovery.  All rights, interests, agreements, and obligations of Creditors under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of any Case by or against any Company Party or any other Person and irrespective of any other circumstance that otherwise might constitute a defense available to, or a discharge of any Company Party or any other Person in respect of the Senior Creditor Indebtedness.

SECTION 2.12    [INTENTIONALLY OMITTED]

SECTION 2.13    CONSENTS AND ACKNOWLEDGEMENTS.

Each Subordinated Creditor hereby gives its consent, to the extent required under any of its Subordinated Creditor Documents, to each Company Party (a) subject to the provisions of this Agreement, to perform all of such Company Party's obligations under the Senior Creditor Documents or in respect thereof, and (b) to grant Liens to the Senior Creditor and other Subordinated Creditors in the Collateral to secure any and all of the Senior Creditor Indebtedness or Subordinated Creditor Indebtedness, as applicable, subject to the terms of this Agreement. Senior Creditor hereby gives its consent, to the extent required under any Senior Creditor Document, to each Company Party (i) to incur all of the Subordinated Creditor Indebtedness and to enter into the Subordinated Creditor Documents, (ii) subject to the provisions of this Agreement, to perform all of such Company Party's obligations thereunder or in respect thereof and (iii) to grant Liens to each Subordinated Creditor in the Collateral to secure any and all of its Subordinated Creditor Indebtedness, subject to the terms of this Agreement.  In furtherance of the foregoing, each Creditor and each Company Party acknowledges and agrees to:  (A) the right, title and interest of Senior Creditor in and to the Collateral; and (B) the right, title and interest of each Subordinated Creditor in and to the Collateral.

16

SECTION 2.14    CONTINUING NATURE OF AGREEMENT; APPLICATION TO SPECIFIED INDEBTEDNESS.

This Agreement shall be a continuing agreement and shall apply to all Creditor Indebtedness. Each Company Party and each Subordinated Creditor shall mark each evidence of Subordinated Creditor Indebtedness with a legend stating that it is subject to this Agreement.

SECTION 2.15    CERTAIN AGREEMENTS BY SUBORDINATED CREDITOR AND COMPANY PARTIES.

Each Subordinated Creditor and each Company Party hereby acknowledges that: (a) if such Subordinated Creditor purportedly terminates this Agreement or any of the terms thereof (other than as a result of the occurrence of the Initial Senior Creditor Indebtedness Termination Date or the Subsequent Senior Creditor indebtedness Termination Date, as applicable, or repayment of the applicable Subordinated Creditor Indebtedness in accordance with the terms hereof), such purported termination shall constitute a Senior Default (unless otherwise consented to in writing by the Senior Creditor); (b) any payment received by a Subordinated Creditor from or on behalf of any Company Party and retained in violation of the terms hereof shall constitute a Senior Default (unless otherwise consented to in writing by the Senior Creditor and, if applicable, the other Subordinated Creditors); and (c) should any Subordinated Creditor purport to terminate this Agreement (although nothing contained herein shall or shall be deemed to permit any Subordinated Creditor to terminate this Agreement prior to the the Initial Senior Creditor Indebtedness Termination Date or the Subsequent Senior Creditor indebtedness Termination Date, as applicable) for any reason (other than as a result of the occurrence of the the Initial Senior Creditor Indebtedness Termination Date or the Subsequent Senior Creditor indebtedness Termination Date, as applicable), the obligations of such Subordinated Creditor hereunder shall continue with respect to all of its Subordinated Creditor Indebtedness which existed at the time of such purported termination or thereafter arose pursuant to any agreement to extend credit (including any extension, renewal or modification of any of its Subordinated Creditor Documents) by which such Subordinated Creditor was bound at the time of its receipt of such notice. Subject to **Section 2.11**, on the Subsequent Senior Creditor Indebtedness Termination Date, all obligations of the parties hereto under this Agreement shall terminate and become void and of no further effect and there shall be no liability of any party hereto to any other party.

SECTION 2.16    REPRESENTATIONS AND WARRANTIES; INFORMATION.

(a)    *No Prior Transfer or Subordination.* Each Company Party represents and warrants to each Creditor that as of the date hereof (or, in the case of any Company Party that becomes a party hereto on a date following the date hereof, as of the date such Person becomes a party hereto): (i) no interest in any Creditor Indebtedness owed by such Company Party has been assigned or otherwise transferred to any other Person; and (ii) no Creditor Indebtedness has been previously subordinated to any other creditor of such Company Party.

(b)    *Power and Authority.* Subject to the approval of the Bankruptcy Court in the case of the Company Parties, each party hereto represents and warrants to the others that as of the date hereof or the date on which it becomes a party hereto, as applicable, it has the requisite power

17

and authority to enter into and perform its obligations under this Agreement and that this Agreement represents a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

(c)    *Creditor Representations and Warranties*.  Each Creditor represents and warrants to the other Creditors that as of the date hereof it has established adequate and independent means of obtaining from each Company Party on a continuing basis financial and other information pertaining to each Company Party's Assets, cash flow management systems and reporting and financial condition generally.  Each Creditor agrees to keep adequately informed from such means of any facts, events or circumstances that might in any way affect its risks hereunder, and each Creditor agrees that the other Creditors shall not have any obligation to disclose to it information or material about any Company Party that is acquired by such Creditors in any manner.  Each Creditor may, at its sole option but without obligation to do so, disclose to the other Creditors any information or material relating to any Company Party that is acquired by it by any means, and each Company Party hereby agrees to and authorizes any such disclosure by any Creditor.  Nothing in this **Section 2.16(c)** shall be deemed to create any obligation or duty on the part of the Initial Subordinated Lender Agent vis-a-vis the other Subordinated Creditors to monitor, observe or review any financial or other information or the occurrence of any fact, event or circumstance of any Company Party.

SECTION 2.17    OTHER AGREEMENTS; NO IMPLIED BENEFICIARIES.

(a)    Except as specifically set forth herein, Senior Creditor shall not have any direct or indirect obligations to any Subordinated Creditor of any kind with respect to the manner or time in which Senior Creditor exercises (or refrains from exercising) any of their respective rights or remedies with respect to the Senior Creditor Indebtedness, the Company Parties or any of the Collateral.  Notwithstanding anything to the contrary contained herein, any amounts received by Senior Creditor pursuant to the terms hereof which is to be applied to the Senior Creditor Indebtedness or distributed to Senior Creditor shall be applied to the Senior Creditor Indebtedness or distributed to Senior Creditor in any case in accordance with the Senior Creditor Documents.

(b)    Each Creditor understands that there may be various agreements between each Company Party and the other Creditors evidencing and governing the Creditor Indebtedness owed to such other Creditors, and each Creditor acknowledges and agrees that it is not intended to be a beneficiary of such agreements to which it is not an express party.  Each Creditor further acknowledges and agrees that, subject to the express provisions hereof, such Creditor may administer its Creditor Indebtedness and any of its Creditor Documents in any way that such Creditor deems appropriate, without regard to the other Creditors or the Creditor Indebtedness owed to the other Creditors.  Each Subordinated Creditor hereby specifically waives and renounces any rights that it may have, whether at law or in equity, to require Senior Creditor to marshal any collateral (or any portion thereof) it may hold or otherwise to require Senior Creditor to seek satisfaction from any particular obligor or to direct or affect the manner or timing with which Senior Creditor enforces any of its security.

(c)    Except as expressly set forth herein, this Agreement shall not impair or adversely affect any right, privilege, power or remedy of any Creditor with respect to the Creditor Indebtedness owed to it or regarding the Company Parties or any Assets of the Company Parties, including any such Creditor's right to:  (i) waive, release or subordinate any of such Creditor's security or rights; (ii) waive or ignore any defaults by any Company Party; or (iii) restructure, renew, modify or supplement the Creditor Indebtedness owed to it, or any portion thereof, or any Creditor Document to which it is a party.  Except as expressly set forth herein, all rights, privileges, powers and remedies of any Creditor may be exercised from time to time by such Creditor without notice to or consent of the other Creditors.

(d)    No delay, failure or discontinuance of a Creditor in exercising any right, privilege, power or remedy hereunder shall be deemed a waiver of such right, privilege, power or remedy; nor shall any single or partial exercise of any such right, privilege, power or remedy preclude, waive or otherwise affect the further exercise thereof or the exercise of any other right, privilege, power or remedy.  Nothing contained in this Agreement is intended to or shall impair, as between any Company Party and any Creditor, the obligations of such Company Party, which are absolute and unconditional, to pay the Creditor Indebtedness owed to each Creditor as and when the same shall become due and payable in accordance with its terms, or affect, other than as explicitly set forth herein, the relative rights of the Creditors or other creditors of such Company Party.

(e)    This Agreement is solely for the benefit of Creditors, and their respective successors and assigns, and neither any Company Party nor any other Person is intended to be a third party beneficiary hereunder or to have any right, benefit, priority or interest under, or because of the existence of, or to have any right to enforce, this Agreement.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of the Cases.  All references in this Agreement to any Company Party shall include any such Company Party as a debtor-in-possession and any receiver or trustee for such Company Party in any of the Cases.

SECTION 2.18    AGENT FOR PERFECTION.

Each Creditor agrees to hold all Control Collateral and Cash Collateral, as applicable, and which is in its respective possession, custody, or control (or in the possession, custody, or control of its agents or bailees) as agent for the other Creditors solely for the purpose of perfecting the Lien or security interest granted to each Creditor in such Control Collateral or Cash Collateral, subject to the terms and conditions of this **Section 2.18**.  No Creditor, as applicable, shall have any obligation whatsoever to the others to assure that the Control Collateral is genuine or owned by any Company Party or any other Person or to preserve their respective rights or benefits or those of any Person.  The duties or responsibilities of the Creditors under this **Section 2.18** are and shall be limited solely to holding or maintaining control of the Control Collateral and the Cash Collateral as agent for the other for purposes of perfecting the Lien held by the other Creditors, as applicable.  No Creditor shall be deemed to be a fiduciary of any kind for the other Creditors or any other Person.  Upon the occurrence of (a) the Initial Senior Creditor Indebtedness Termination Date, each Company Party hereby instructs Initial Senior Creditor to

19

promptly deliver all Control Collateral and Cash Collateral previously delivered to, and in the possession of, Initial Senior Creditor to Initial Subordinated Creditor; and (b) the Subsequent Senior Creditor Indebtedness Termination Date, each Company Party hereby instructs Initial Subordinated Creditor to promptly deliver all Control Collateral and Cash Collateral previously delivered to, and in the possession of, Initial Subordinated Creditor to Initial Senior Creditor.

## ARTICLE III
### GENERAL PROVISIONS

SECTION 3.01    AMENDMENTS; NO WAIVER; CUMULATIVE REMEDIES.

No amendment or waiver of any provision of this Agreement, nor consent to any departure by a party hereto therefrom, shall in any event be effective unless the same shall be in writing and signed by the party to be charged, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure or delay on the part of a party hereto in exercising any power, right or remedy hereunder and no course of dealing between or among any of the parties shall operate as a waiver thereof, nor shall any single or partial exercise of any power, right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other power, right or remedy hereunder. The powers, rights and remedies herein expressly provided are cumulative and not exclusive of any powers, rights or remedies that a party hereto would otherwise have.

SECTION 3.02    NOTICES.

All notices and other communications provided for herein shall be in writing and shall be delivered by hand or nationally recognized overnight courier service, mailed by certified or registered mail, first class postage prepaid and return receipt requested. Notices sent by hand or such overnight courier service, or so mailed by certified or registered mail, shall be deemed to have been given when received or refused. Each party hereto may change its notice information hereunder by notice to the other parties hereto as otherwise specified herein. Each Creditor shall be entitled to rely and act upon any notices purportedly given by or on behalf of any Company Party even if (a) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (b) the terms thereof, as understood by the recipient, varied from any confirmation thereof. Each Company Party shall indemnify each Creditor and its Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by any such Person on each notice purportedly given by or on behalf of such Company Party in accordance with such Creditor's Creditor Documents.

SECTION 3.03    SUCCESSORS AND ASSIGNS.

The provisions of this Agreement shall be binding upon and inure to the benefit of Creditors and, without further action, their respective successors and assigns permitted hereby; *provided* that no Creditor may sell, transfer, convey or otherwise assign all or any portion of its Creditor Indebtedness to any Person unless: (a) such Creditor shall have provided prior written notice to the other Creditor party hereto of such transaction; and (b) the Person obtaining an interest in all or any portion of such Creditor Indebtedness, at the time it obtains such interest,

20

executes and delivers to the other Creditor party hereto:  (i) a written agreement pursuant to which it agrees to be bound by the terms hereof to the same extent as the assigning Creditor; or (ii) an agreement in form and substance the same as this agreement, *mutatis mutandis*.  Any purported assignment or transfer in violation of this **Section 3.03** shall be null and void.  Nothing in this Agreement, whether express or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each Creditor) any legal or equitable right, remedy or claim under or by reason of this Agreement.

SECTION 3.04      COUNTERPARTS; INTEGRATION; EFFECTIVENESS.

(a)      This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)      This Agreement constitutes the entire agreement among the parties hereto relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

(c)      This Agreement shall become effective as of the date hereof when it shall have been executed by each of Senior Creditor, each Subordinated Creditor and each Company Party and thereafter delivered by each such party to all other such parties.

(d)      This Agreement and any document required or permitted to be executed and delivered in connection herewith may be signed and transmitted by telefacsimile transmission or by the transmission by electronic mail of a document in "portable document format."  The effectiveness of any such documents and signatures shall, subject to applicable Laws, have the same force and effect as manually-signed originals and shall be binding on the parties thereto or indicated to be bound thereby.  Any party may also require that any such documents and signatures be confirmed by a manually-signed original thereof; *provided* that the failure to request or deliver the same shall not limit the effectiveness of any facsimile document or signature.

(e)      To the extent there are any inconsistencies between this Agreement and the Creditor Documents, the terms of this Agreement shall control.

SECTION 3.05      SURVIVAL OF REPRESENTATIONS AND WARRANTIES.

Except as otherwise expressly provided herein, all representations and warranties made hereunder and in any other document delivered pursuant hereto or in connection herewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by each party hereto and shall continue in full force and effect until all Creditor Indebtedness has been Paid in Full.

SECTION 3.06     SEVERABILITY.

If any provision of this Agreement is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 3.07     USA PATRIOT ACT NOTICE.

Each Creditor that is subject to the Act hereby notifies each Company Party that, pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies such Company Party, which information includes the name and address of such Company Party and other information that will allow such Creditor to identify such Company Party in accordance with the Act.

SECTION 3.08     FURTHER ASSURANCES.

From time to time, each of the parties hereto shall take such actions and provide such additional information as may reasonably be required to carry out the terms of this Agreement and any documents executed in connection herewith or therewith.    Without limiting the generality of the foregoing, each Subordinated Creditor agrees, upon the request of any holder of Senior Creditor Indebtedness, to execute and deliver an agreement with such Person containing terms substantially identical to those contained herein (subject to changing names of parties, documents and addresses, as appropriate).

**SECTION 3.09     GOVERNING LAW; SERVICE OF PROCESS.**

**(a)     *GOVERNING LAW*.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

**(B)     *SERVICE OF PROCESS*.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 3.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.  EACH OF THE PARTIES HERETO REPRESENTS THAT EACH HAS REVIEWED THIS CONSENT AND EACH HAS KNOWINGLY AND VOLUNTARILY CONSENTED TO SERVICE OF PROCESS IN THE MANNER DESCRIBED ABOVE FOLLOWING CONSULTATION WITH LEGAL COUNSEL ON SUCH MATTER.**

**SECTION 3.10     WAIVER OF RIGHT TO JURY TRIAL.**

**EACH OF THE PARTIES HERETO HEREBY WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY,**

**INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.  EACH OF THE PARTIES HERETO REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH HAS KNOWINGLY AND VOLUNTARILY WAIVED ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL ON SUCH MATTER.**

SECTION 3.11   OBLIGATIONS OF SUBORDINATED CREDITORS SEVERAL.

The obligations of the Subordinated Creditors hereunder are several and not joint. Without limiting the generality of the foregoing, no Subordinated Creditor shall be liable for (i) amounts required to be paid by any other Subordinated Creditor to the Senior Creditor or (ii) any breach of this Agreement by another Subordinated Creditor.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.*]

49066/0031-14246842v2

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

| | |
|---|---|
| | HERCULES CAPITAL, INC., as Senior Creditor<br><br><br>By:    _____<br>        Name:<br>        Title: |
| | |
| | _____, as a Subordinated Creditor<br><br><br>By:    _____<br>        Name: _____<br>        Title:  _____ |
| | |
| | _____, as a Subordinated Creditor<br><br>By:    _____<br>        Name: _____<br>        Title:  _____ |
| | |
| | WILMINGTON TRUST, NATIONAL ASSOCIATION, as Initial Subordinated Lender Agent<br><br>        By:    _____<br>                Name: _____<br>                Title:  _____ |

49066/0031-14246842v2

The undersigned hereby acknowledges (a) the terms of the foregoing Agreement and agrees to abide by any of the terms applicable to it, (b) that the foregoing Agreement is for the sole benefit of the Creditors and that it has no rights or benefits under such Agreement, (c) that the foregoing Agreement is for the purpose of defining the rights, duties authority and responsibilities of the Creditors and that nothing therein shall impair, as between any Company Party and any Creditor, the obligations of such Company Party under the related Creditor Documents and (d) that the provisions of the foregoing Agreement may be waived, amended or modified in accordance with Section 3.01 thereof.

Company hereby agrees to cause any new Company Party, within five (5) Business Days after the formation or acquisition of such Company Party or the date on which any Person becomes a Company Party, to execute and deliver to the Creditors, a joinder or other agreement containing an acknowledgment and agreement by such new Company Party to the terms and provisions of the foregoing Agreement in substantially the form set forth in the immediately preceding paragraph.

COMPANY PARTIES

| SUNGEVITY, INC.<br><br>By:_____<br>Name:<br>Title: | SUNGEVITY DEVELOPMENT, LLC<br><br>By:_____<br>Name:<br>Title: |
|---|---|
| SUNGEVITY SD, LLC<br><br>By:_____<br>Name:<br>Title: | SUNGEVITY INTERNATIONAL HOLDINGS, LLC<br><br>By:_____<br>Name:<br>Title: |

S-2

## SCHEDULE A TO INTERCREDITOR AGREEMENT

### NOTICE INFORMATION

ADDRESSES OF CREDITORS AND COMPANY PARTIES

**SENIOR CREDITOR:**

|  | **Address for Notices** |
|---|---|
| Hercules Capital, Inc. | 400 Hamilton Avenue, Suite 310 Palo Alto, CA  94301 Legal Department Attention:  Chief Legal Officer and Brian Sapp Email: Bsapp@herculestech.com Facsimile:  650-473-9194 Telephone:  650-289-3060 |

**SUBORDINATED CREDITORS:**

LSHC Solar Holdings LLC**:**

**Address for Notices**

LSHC Solar Holdings LLC
315 E. Lake St., Suite 301
Wayzata, MN 55391
Attn: Scott Honour

With a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
333 Hope Street
Los Angeles, CA 90071
Attention: David M. Nemecek, P.C.
Email: david.nemecek@kirkland.com

## INITIAL SUBORDINATED LENDER AGENT:

**WILMINGTON TRUST,**

**NATIONAL ASSOCIATION:**

### Address for Notices

Wilmington Trust, National Association
50 South Sixth Street
Suite 1290
Minneapolis, MN 55402
Attention: Jeffery Rose
Email: jrose@wilmingtontrust.com
Telephone: (612) 217-5630

With a copy to (which shall not constitute notice):

Alston & Bird LLP
101 South Tryon Street
Suite 4000
Charlotte, NC 28280
Attention: Jason Solomon
Email: jason.solomon@alston.com
Telephone : 704-444-1295

**COMPANY PARTIES:**

|  | **Address for Notices** |
|---|---|
| Sungevity, Inc. | 66 Franklin Street, Suite 310 |
| Sungevity Development, LLC | Oakland, CA  94607 |
| | Attention: |
| Sungevity SD, LLC | Email: |
| Sungevity International Holdings, LLC | Telephone: |

With a copy to:

SUNGEVITY, INC.
66 Franklin Street, Suite 310
Oakland, CA  94607
Attention: General Counsel
Email: legal@sungevity.com
Telephone:  510-496-5595

**EXHIBIT J-1**

**FORM OF PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

[•], 20[•]

Reference is made to the Debtor-In-Possession Loan and Security Agreement, dated as of [•], 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among Sungevity, Inc., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code ("Parent"), Sungevity Development, LLC, a Delaware limited liability company and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code ("Sungevity Development" and together with Parent, "Borrower") and certain of Parent's Domestic Subsidiaries as Guarantors and Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code, the Lenders from time to time party thereto and Wilmington Trust, National Association, as Agent. Capitalized terms used but not defined herein have the meanings ascribed to them in the Credit Agreement.

Pursuant to the provisions of Section 11.20(g) of the Credit Agreement, the undersigned hereby certifies that (1) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, and (2) it is not (i) a "bank" as such term is used in Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended from time to time (the "Code")), (ii) a "10-percent shareholder" of Borrower within the meaning of Code Section 871(h)(3)(B), or (iii) a "controlled foreign corporation" with respect to Borrower as described in Code Section 881(c)(3)(C).

The undersigned has furnished the Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER],

By:_____
Name: _____
Title: _____

For any Person requiring a second signature block:

By:_____
Name: _____
Title: _____

Address:

**EXHIBIT J-2**

**FORM OF PORTFOLIO INTEREST CERTIFICATE**

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

[•], 20[•]

Reference is made to the Debtor-In-Possession Loan and Security Agreement, dated as of [•], 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among Sungevity, Inc., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code ("Parent"), Sungevity Development, LLC, a Delaware limited liability company and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code ("Sungevity Development" and together with Parent, "Borrower") and certain of Parent's Domestic Subsidiaries as Guarantors and Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code, the Lenders from time to time party thereto and Wilmington Trust, National Association, as Agent. Capitalized terms used but not defined herein have the meanings ascribed to them in the Credit Agreement.

Pursuant to the provisions of Section 11.20(g) of the Credit Agreement, the undersigned hereby certifies that (1) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (2) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)) and (3) neither the undersigned nor any of its direct or indirect partners/members is (i) a "bank" as such term is used in Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended from time to time (the "Code")), (ii) a "10-percent shareholder" of Borrower within the meaning of Code Section 871(h)(3)(B), or (iii) a "controlled foreign corporation" with respect to Borrower as described in Code Section 881(c)(3)(C).

The undersigned has furnished the Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER],

By:_____

Name: _____

Title: _____

For any Person requiring a second signature
block:

By: _____
Name: _____
Title: _____

Address: