# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | ) Chapter 11 |
| SUNGEVITY, INC., *et al.*,[1] | ) |
|  | ) Case No. 17-10561 (___) |
| Debtors. | ) |
|  | ) Joint Administration Pending |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS' ASSETS, INCLUDING APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Sungevity, Inc. (4328), Sungevity SD, LLC (4847), Sungevity Development, LLC (0323), and Sungevity International Holdings LLC (5598). The principal place of business for each of the Debtors is 66 Franklin Street, Suite 310, Oakland, CA 94607.

By this motion (the "Motion"), the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Cases") seek: (a) entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), pursuant to sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (i) approving the proposed auction and bidding procedures attached hereto as **Exhibit B** (the "Bidding Procedures"), (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"), (iii) approving the form and manner of notice of all procedures, protections, schedules, and agreements, and (iv) scheduling a hearing (the "Sale Hearing") to approve the sale transaction (the "Sale Transaction"); and, (b) following the Sale Hearing, entry of a sale order (the "Sale Order") (i) approving the sale of the Debtors' assets free and clear of all liens, claims, interests, and encumbrances ("Interests"), (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (iii) granting related relief. In further support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1. The goal of these chapter 11 cases is simple: to consummate a sale of the Debtors' assets that will maximize recoveries for the Debtors' estates and maintain a viable business that will continue to employ hundreds of individuals, contract with thousands of vendors and service providers, and provide services to tens of thousands of customers. Absent

---

[2] Capitalized terms used but not otherwise defined in this Preliminary Statement have the meanings ascribed to such terms elsewhere in this Motion or the Bidding Procedures, as applicable.

the agreement of LSHC Solar Holdings, LLC ("LSHC") and Hercules Capital, Inc. ("Hercules") to serve as a stalking horse bidder, and to provide debtor-in-possession financing and access to cash collateral to fund the sale process and working capital needs pending a sale, the Debtors would have been forced to cease operations, lay off their remaining employees, and turn the keys over to their prepetition secured lenders. Without the relief requested in this Motion, immediate liquidation likely remains the Debtors' only viable option. For these reasons, and the reasons discussed below, the Motion should be granted, and the Debtors should be authorized to implement the fair and reasonable Bidding Procedures to obtain the highest and best offer for the Debtors' assets.

2.    As detailed in the *Declaration of Andrew Birch in Support of Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration"), which has been filed with the Court concurrently herewith, the Debtors, with the assistance of their advisors, considered all strategic options and concluded that a sale in accordance with the Bidding Procedures set forth herein is the best way to maximize the value of the Debtors' assets and achieve the best possible outcome for their estates. Through this motion, and the relief requested in the DIP Motion, the Debtors, with the assistance of their proposed investment banker, Ducera Securities LLC ("Ducera"), seek to conclude the intense marketing process they began approximately eight weeks ago.

3.    As a result of extensive marketing efforts[3] undertaken by their advisors, on

---

[3]  The Debtors' prepetition marketing and negotiation efforts are detailed in the *Declaration of Joshua S. Scherer in Support of Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Assets, Including Approving Break-Up Fee and Expense Reimbursement, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* attached hereto as **Exhibit C** and incorporated herein by reference (the "Scherer Declaration").

March 13, 2017, the Debtors executed an agreement (the "<u>Stalking Horse Purchase Agreement</u>")[4] with LSHC and Hercules (collectively, the "<u>Stalking Horse Bidders</u>")[5] for the purchase of Sungevity's going concern business (the "<u>Purchased Assets</u>"). The Stalking Horse Purchase Agreement contemplates a purchase price of up to $50 million for the Purchased Assets, payable in the form of a credit bid and subject to adjustment, plus the assumption of certain liabilities, and reflects the Stalking Horse Bidders' agreement to act as a stalking horse purchaser in a Court-supervised bidding and auction process. Under the terms of the Bidding Procedures, the Debtors will solicit competing bids and conduct an efficient and fair auction of their business, to determine whether any other higher and better offers can be obtained.

## BACKGROUND

4. On March 13, 2017 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Cases pursuant to Bankruptcy Rule 1015(b). No party has requested the appointment of a trustee or examiner in the Cases, and no statutory committees have been appointed or designated.

---

[4] Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Stalking Horse Purchase Agreement.

[5] LSHC Solar Holdings, LLC ("<u>LSHC</u>") is an investment vehicle created for this transaction by Northern Pacific Group ("<u>NPG</u>"). International SIF SICAV SA ("<u>International</u>") is a limited partner of NPG and, as a result, will have an indirect interest in LSHC. Prepetition, International was a provider of capital to the Debtors through various debt and equity financings. All of the Debtors' debt and equity held by International was transferred prepetition to an affiliate, Helios Invest LLC. Johan Symmons, an investment advisor to International, is a member of the board of directors of Sungevity, Inc. Mr. Symmons recused himself from all discussions and deliberations regarding the filing of the Cases, the debtor-in-possession financing, and the selection of the stalking horse bid, and he will continue to do so during the chapter 11 cases.

5.     A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the Cases, are set forth in greater detail in the First Day Declaration, filed contemporaneously herewith and incorporated by reference herein.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

7.     By this Motion, the Debtors seek entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**: (a) approving the proposed Bidding Procedures attached hereto as **Exhibit B**, including approval of the Break-Up Fee and the Expense Reimbursement (as such terms are defined below) as allowed administrative expenses with priority pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code over all other administrative expense claims of the Debtors; (b) establishing the Assumption and Assignment Procedures, including notice of proposed cure amounts; (c) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (d) scheduling the Sale Hearing to approve the Sale Transaction.

8.     The Debtors also seek entry of the Sale Order:[6]  (a) approving the sale of the Debtors' assets free and clear of all Interests; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (c) granting related relief.

9.     Contemporaneously herewith, the Debtors have filed a motion seeking to have this motion heard on shortened notice pursuant to Rule 2002 and Local Rules 6004-1(c) and 9006-1(e) (the "Motion to Shorten").

## THE PROPOSED SALE

**A.     Events Leading up to These Chapter 11 Cases**

10.     As set forth in detail in the First Day Declaration, the Debtors and their non-Debtor subsidiaries and affiliates (collectively, "Sungevity") provide sales, marketing, system design, installation, maintenance, financing services, and post-installation services for solar energy systems in the U.S., the U.K., and Europe.  Sungevity is a privately-held technology company that, until relatively recently, was successfully pursuing growth strategies.

11.     Since 2007, Sungevity has doubled year-over-year sales, growing from a staff of four employees servicing the Northern California market to a team of more than 700 employees as of January 1, 2017,[7] conducting business in fourteen U.S. states and the District of Columbia, as well as in the Netherlands, Belgium, Germany and the United Kingdom.  It is now the largest private residential solar installation company in the U.S.  To support its rapid expansion over the last decade, Sungevity has relied on multiple rounds of equity investments and debt financing provided by strategic partners and financial partners.

---

[6]  The proposed form of Sale Order will be filed with the Court on the date that is one (1) calendar day prior to the Sale Hearing.

[7]  In order to preserve liquidity, Sungevity conducted layoffs in January and March of this year, reducing their U.S. workforce to a total of approximately 260 employees.

12.     As a result, in early 2016, the company found itself in the midst of liquidity crisis brought on by its implementation of an aggressive growth strategy that led to an overly leveraged balance sheet. Sungevity attempted to address its liquidity needs by pursuing out of court options for nearly a year. After numerous discussions with various strategic parties, in mid-2016, Sungevity believed it had identified a transaction that would address its capital needs.

13.     On June 28, 2016, Sungevity entered into a merger agreement, as subsequently amended, with Easterly Acquisition Corp. ("Easterly"), a special purpose acquisition corporation, for an initial purchase price of approximately $350 million of Easterly common stock. The proposed transaction was expected to close by the end of 2016. Upon the consummation of the merger, Sungevity would have become a public company and would have been entitled to receive up to $200 million in additional capital to fund its strategic growth plans. In November 2016, the parties amended the merger agreement to reduce the purchase price by nearly $100 million. On December 31, 2016, Easterly terminated the merger agreement altogether. Critically, in connection with the merger agreement, the parties had agreed to a no-shop provision that prevented Sungevity from seeking alternative sources of financing prior to December 31, 2016, without incurring significant financial penalties.

14.     Following the termination of the Easterly transaction, Sungevity found itself in a severe liquidity crisis and quickly pivoted to finding both short and long term solutions to its cash needs. To close the short term liquidity gap, on January 30, 2017, Sungevity, Inc. and Sungevity Development, LLC ("Sungevity Development") obtained a $9.5 million bridge loan from a consortium of lenders, including certain of Sungevity's prepetition lenders, which was guaranteed by Sungevity SD, LLC ("Sungevity SD") and Sungevity International Holdings LLC

("<u>Sungevity International</u>"). The proceeds of that bridge loan were used to fund the Debtors' operations while they aggressively pursued all alternatives.

15. As set forth in the Scherer Declaration, between the time they were retained and mid-February, Ducera, together with the Debtors' other advisors, contacted seventy-seven (77) potential purchasers, including both strategic and financial investors. Seventeen (17) of those parties executed a non-disclosure agreement and received access to a virtual data room to conduct due diligence, and six (6) of those parties met with Sungevity's management regarding potential transactions between February 13th and February 16th. None of those parties were interested in pursuing an out-of-court transaction, although a few parties did express interest in participating in a court-supervised sale process.

16. As their funds dwindled, the Debtors' only other alternative was to immediately cease operations, lay off their remaining employees, and turn the keys to the business over to their prepetition secured lenders. In addition to impacting Sungevity's employees and lenders, such a course of action would be highly damaging to customers who rely on Sungevity to provide them with continued service and warranties on their products, and to thousands of vendors, many of which are small, specialized suppliers for whom Sungevity is a key customer. Presented with this stark reality, the Debtors determined that a chapter 11 filing presented the best—indeed, the only—opportunity to preserve their going concern value and maximize recoveries for stakeholders.

17. Ducera, acting on behalf of the Debtors, reengaged with the handful of parties that had indicated an interest in an in-court transaction and, as a result of those marketing efforts, between February 23rd and March 2nd, the Debtors received three (3) preliminary bids, including

a bid by NPG, and one bid from a party that was solely interested in purchasing Sungevity's non-U.S. business.

18.     Sungevity carefully considered the bids in consultation with its advisors and determined to move forward with a proposal from Hercules, the Debtors' senior secured prepetition lender, and NPG, through a newly formed investment vehicle, to serve as stalking horse bidders (together in such capacity, the "Stalking Horse Bidders") for a sale of substantially all of the Debtors' assets.  Over the course of eleven days, as Sungevity's liquidity became increasingly strained, Sungevity engaged in intensive negotiations with NPG and Hercules regarding the structure and terms of an asset sale.

19.     The Debtors also approached nearly a dozen potential lenders about providing a debtor-in-possession financing facility to fund the sale process and the Debtors' operations during the pendency of their bankruptcy.  LSHC was the only party willing to provide the Debtors with postpetition financing (in such capacity, the "DIP Lender"), but solely on the condition that the Debtors pursue a swift sale process intended to stabilize the business and provide certainty to customers, employees, channel and financing partners, and suppliers as soon as practicable.  On March 6, 2017, all of the parties reached an agreement in principal regarding the terms of a debtor-in-possession financing facility (the "DIP Facility") and an in-court sale process under Bankruptcy Code section 363.

**B.      The Debtors' Execution of Stalking Horse Purchase Agreement**

20.     Since March 6, 2017, the Debtors and their professional advisors engaged in further discussions with NPG and Hercules regarding the terms of the asset purchase agreement, DIP financing agreement, and other ancillary agreements, and have been working to facilitate the remaining legal and financial due diligence necessary to consummate a transaction.

21.     Ultimately, these negotiations resulted in the Debtors' execution of the Stalking Horse Purchase Agreement on March 13, 2017, pursuant to which LSHC, a newly formed newly formed investment vehicle established for this transaction by NPG, and Hercules (together, the "Stalking Horse Bidders") agreed to purchase substantially all of the Debtors' assets (subject to certain exceptions) for a price of up to $50 million, payable in the form of a credit bid, subject to adjustment, and to act as a stalking horse bidder in a Court-supervised auction. The Stalking Horse Purchase Agreement is attached hereto as **Exhibit D**. In consultation with Ducera and their other advisors, the Debtors have determined that the Stalking Horse Bidders' bid maximizes the value of the Debtors' assets and will yield the best outcome for stakeholders by preserving jobs for employees and a viable business partner for vendors and service providers.

22.     On that same date, the Debtors entered into a Debtor-in-Possession Loan and Security Agreement (the "DIP Agreement") with LHSC as lender and Wilmington Trust, National Association, as administrative agent.[8] The DIP Agreement contains certain milestones that are intended to ensure that an expedited sale process will be pursued.

23.     Speed is critical here because, even with the additional liquidity of up to $20 million to be provided by the DIP Facility, the Debtors will run of cash within just a few months. The Debtors' receipt of that $20 million is conditioned on the Debtors' pursuit of an expedited sale process and, without access to those funds, the Debtors will likely have no choice but to pursue immediate an immediate cessation of operations and liquidation of the estates. A rapid sale process is also necessary to stabilize the Debtors' rapidly deteriorating business and

---

[8] The Debtors are seeking approval of the DIP Agreement pursuant to the *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on Superpriority Senior Secured Basis and (B) Use of Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Claims, and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection to Prepetition Lenders, (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (V) Granting Related Relief*, filed contemporaneously herewith.

provide assurances to existing vendors, customers, and employees that they can and should continue to do business with, or remain employed by, Sungevity going forward. With this in mind, the Debtors negotiated for bidding procedures and sale terms that will facilitate a quick but fair process, and thereby preserve their going concern value for the benefit of all stakeholders.

## C.   The Primary Terms of the Stalking Horse Purchase Agreement

24.    The Stalking Horse Purchase Agreement contemplates the sale of the Purchased Assets to the Stalking Horse Bidders, subject to higher or better bids, on the following material terms:[9]

25.    **Sellers**: (i) Sungevity, Inc.; (ii) Sungevity SD, LLC; (iii) Sungevity Development, LLC; and (iv) Sungevity International Holdings, LLC.

26.    **Purchaser**: LSHC (in such capacity, "Purchaser").[10]

27.    **Purchase Price (Stalking Horse Purchase Agreement § 3.1)**:   The Purchase Price consists of:  (a) up to $50 million, subject to adjustments, in the form of a credit bid, which is comprised of (i) $30 million in respect of prepetition senior secured indebtedness owed to Hercules under the Hercules Facility (as defined in the First Day Declaration) and (ii) and up to $20 million in respect of obligations under the DIP Facility; (b) $1 million in cash disbursed

---

[9]   The summary of the terms contained in this Motion is qualified in its entirety by reference to the provisions of the Stalking Horse Purchase Agreement. I n  the event of any inconsistencies between the provisions of the Stalking Horse Purchase Agreement and the summary set forth herein, the  terms of the Stalking Horse Purchase Agreement shall govern.   Unless otherwise defined in the summary set forth in the  accompanying text, capitalized terms shall have the meanings ascribed to them in the Stalking Horse Purchase Agreement.

[10] LSHC Solar Holdings, LLC ("LSHC") is an investment vehicle created for this transaction by Northern Pacific Group ("NPG").  International SIF SICAV SA ("International") is a limited partner of NPG and, as a result, will have an indirect interest in LSHC.  Prepetition, International was a provider of capital to the Debtors through various debt and equity financings.  All of the Debtors' debt and equity held by International was transferred prepetition to an affiliate, Helios Invest LLC.  Johan Symmons, an investment advisor to International, is a member of the board of directors of Sungevity, Inc.  Mr. Symmons recused himself from all discussions and deliberations regarding the filing of the Cases, the debtor-in-possession financing and the selection of the stalking horse bid.

under the DIP Facility, which will remain with the Debtors' estates (the "Excluded Cash"); and (c) the assumption of certain assumed liabilities.

28.     **Acquired Assets (Stalking Horse Purchase Agreement § 2.1)**:  The Stalking Horse Purchase Agreement provides that the Purchaser will acquire substantially all of the Debtors' assets other than Sungevity, Inc.'s equity interests in Sungevity Short Hills 2012, LLC ("Short Hills"), including: (a) all cash except for the Excluded Cash; (b) accounts receivable; (c) claims and causes of action of any Seller against third parties arising out of events occurring prior to the Closing Date, including avoidance actions arising from or relating to the Acquired Assets or the Assumed Obligations; (d) inventory; (e) assumed facility and equipment leases; (f) tangible personal property; (g) intellectual property; (h) assumed executory contracts; (i) assumed employee benefit plans; (j) books and records; (k) permits and licenses; (l) goodwill; and (m) all equity securities held by the Debtors in (i) Sungevity International B.V.; (ii) Sungevity UK Ltd.; (iii) Sungevity Netherlands, B.V.; and (iv) Sungevity Belgium BVBA.

29.     **Excluded Assets (Stalking Horse Purchase Agreement § 2.2)**: The Stalking Horse Purchase Agreement provides that the Purchaser will not acquire, among other things: (a) non-assumed facility and equipment leases; (b) non-assumed executory contracts, including all employment agreements, severance agreements, stay bonus agreements, indemnification agreements, and change in control agreements; (c) Sungevity, Inc.'s equity interests in Short Hills and its direct and indirect subsidiaries; (d) assets related to excluded employee benefits plans; (e) claims and causes of action with respect to any other excluded assets; (d) inventory sold in the ordinary course of business prior to the Closing Date; (f) inventory sold by the Debtors in the ordinary course prior to the Closing Date; and (g) the Excluded Cash.

30.     **Sale of Avoidance Actions (Stalking Horse Purchase Agreement § 2.1(a)(iii))**: The Purchased Assets include avoidance actions arising from or related to any contract or other obligation that will be assumed and assigned to the Purchaser as part of the Sale Transaction. The Stalking Horse Bidders required this provision as part of the Stalking Horse Purchase Agreement to, among other things, enable them to maintain supplier and vendor relationships after consummation of the sale. Accordingly, the Debtors submit that this aspect of the Stalking Horse Purchase Agreement is reasonable and necessary to consummate the sale.

31.     **Assumed Liabilities (Stalking Horse Purchase Agreement § 2.3)**: The Stalking Horse Purchase Agreement provides for the assumption by the Purchaser of various liabilities in connection with the Sale Transaction, including, among other things: (a) all cure amounts and with respect to the executory contracts and real property leases that are being assumed by the Debtors and assigned to the Purchaser; (b) liabilities of the Debtors that arise after the Petition Date through and including the Closing Date, including postpetition referral fees and ordinary course accounts payable; (c) the sponsorship and obligations of the assumed employee benefit plans, if any; (d) compensation and benefits obligations with respect to rehired employees to the extent not paid as of the Closing Date, excluding bonus, retention or severance obligations arising from any violation of law by the Debtors prior to the Closing Date; and (e) any fees payable to Ducera by the Debtors in connection with the Sale Transaction (collectively, the "Assumed Obligations").

32.     **Excluded Liabilities (Stalking Horse Purchase Agreement § 2.4)**: The Stalking Horse Purchase Agreement provides that the Purchaser will not assume various liabilities in connection with the Sale Transaction, including, among other things: (a) claims and liabilities of the Debtors related to excluded assets, including executory contracts and unexpired leases that

are not assumed and assigned to the Purchaser; (b) the Debtors' prepetition tax liabilities, and tax liabilities, if any, related to acquired assets attributable to any taxable period ending on or before the Closing Date; (c) the Debtors' prepetition accounts payable (other than any Cure Amounts payable with respect to assumed executory contracts); (d) any indebtedness of the Debtors; (e) excluded environmental liabilities; (f) WARN Act liabilities relating to any action or inaction of the Debtors prior to or upon the Closing Date; (g) liabilities for infringement or misappropriation intellectual property by the Sellers or their affiliates prior to the Closing Date; (h) the prepetition Debtors' indemnification obligations to the extent not arising pursuant to an assumed contract; (i) employee-related obligations other than with respect to rehired employees and any assumed employee benefit plans; and (j) the Debtors' warranty obligations arising under a contract that is not assumed by the Purchasers to the extent the produce or services covered were provided, developed, designed, manufactured, marketed, sold or distributed prior to the Petition Date.

33. **Limitations on Successor Liability (Stalking Horse Purchase Agreement § 2.4)**:  The Stalking Horse Purchase Agreement provides that the Purchaser shall not be the successor to any Liability of any Debtor, and will not assume, nor in any way be liable or responsible for, any claim or Liability of any Debtor and its Affiliates other than the Assumed Obligations.

34. **Closing and Other Deadlines (Stalking Horse Purchase Agreement § 9.1(c))**: The Stalking Horse Purchase Agreement may be terminated by either the Debtors or the Purchaser if the following milestones are not met (the "Milestones"):

| Milestone | Date |
|---|---|
| Deadline for Entry of the Bidding Procedures Order | March 28, 2017 |
| Bid Deadline – Due Date for Bids, Designation of Contracts and Leases (if applicable) and Deposits | April 7, 2017 |
| Auction (if necessary) | April 8, 2017 |
| Deadline for Entry of the Sale Order | April 10, 2017 |
| Outside Date for Closing to Occur  (subject to extension by written agreement of the parties) | May 12, 2017 |

35. **Break-Up Fee and Expense Reimbursement (Stalking Horse Purchase Agreement §§ 8.2(d)(ii), 9.2)**:   The Stalking Horse Purchase Agreement includes certain protections for the Stalking Horse Bidders.  In particular, subject to Court approval as part of the Bidding Procedures Order, the Debtors will be required to pay to the Stalking Horse Bidders a fee (the "Break-Up Fee") in the amount of $1.25 million, equal to approximately 2.5% of the purchase price, and reimburse the Stalking Horse Bidders for the reasonable and documented out-of-pocket costs and expenses incurred by the Stalking Horse Bidders and their affiliates in connection with the evaluation, consideration, analysis, negotiation, and documentation of the transactions contemplated by the Stalking Horse Purchase Agreement, up to a maximum amount of $1.25 million, also equal to approximately 2.5% of the purchase price (the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections").

36. The Break-Up Fee and Expense Reimbursement will be payable if the Stalking Horse Purchase Agreement is terminated for a reason other than the material breach of the Stalking Horse Purchase Agreement by the Purchaser, including if:  (a) the Milestones are not met; (b) any Debtor consummates an Acquisition Proposal; or (c) any Debtor files a plan

pursuant to the Bankruptcy Code that is not consistent with the Stalking Horse Purchase Agreement. An "Acquisition Proposal" is defined in the Stalking Horse Purchase Agreement as: "a proposal (other than by Purchaser or its Affiliates) relating to any merger, consolidation, business combination, sale or other disposition of ten percent (10%) or more of the Acquired Assets pursuant to one (1) or more transactions (excluding sales of Inventory in the Ordinary Course of Business), the sale of ten percent (10%) or more of the outstanding shares of capital stock or equity interests of any of the [Debtors] (including by way of a tender offer, foreclosure or plan of reorganization or liquidation) or a similar transaction or business combination involving one (1) or more Third Parties and any of the [Debtors]."

37.     Subject to Court approval, the Break-Up Fee and Expense Reimbursement will be allowed and paid as administrative expense claims with priority pursuant to section 503(b) of the Bankruptcy Code.

38.     **"Fiduciary Duty" Out**:   The Bidding Procedures provide that, "[f]or the avoidance of doubt, but without limiting the Bid Protections or the provisions of any Stalking Horse Purchase Agreement, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under applicable law."

39.     **Agreements with Management Regarding Compensation or Future Employment**:  The Stalking Horse Bidders have not discussed or entered into any agreements with management or key employees regarding compensation or future employment following the closing of the Sale Transaction.

40.     **Good Faith Deposit**:  No good faith deposit is required under the Stalking Horse Purchase Agreement.  However, the Stalking Horse Bidders are providing the Debtors with DIP Financing and funding the Debtors' operating costs during the pendency of the Cases.

Accordingly, the Debtors determined that a good faith deposit is not warranted under the circumstances.

41. **Interim Arrangements with Stalking Horse Bidders**: Hercules has requested, and the Debtors have agreed, that Hercules will designate an individual to serve as the chief restructuring officer of Sungevity, Inc. from the Effective Date of the Stalking Horse Purchase Agreement through the closing of the Sale Transaction.

42. **Allocation of Sale Proceeds (Stalking Horse Purchase Agreement § 3.2)**: The Stalking Horse Purchase Agreement provides that the Purchaser shall prepare and deliver to the Debtors an allocation schedule setting forth Purchaser's good faith determination of the allocation of the Purchase Price and Assumed Obligations among the Acquired Assets within sixty (60) days of the Closing Date.

43. **Access to Books and Records (Stalking Horse Purchase Agreement § 2.1(xii))**: The Stalking Horse Purchase Agreement provides that at closing, the Debtors shall deliver to Purchaser "all Books and Records" but that Purchaser agrees that for a period of three (3) years after Closing, the Debtors shall have "reasonable access upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of Purchaser to the Books and Records for purposes of . . . administering and finalizing the Chapter 11 Cases."

44. **Credit Bidding (Stalking Horse Purchase Agreement § 3.1(a) and (b))**: The Stalking Horse Purchase Agreement contemplates that Hercules will credit bid $ 30 million on account of its senior secured prepetition obligations and LHSC will credit bid up to $ 20 million on account of the DIP Obligations.

45. **Relief from Bankruptcy Rule 6004(h) (Stalking Horse Purchase Agreement § 8.3(d))**: The Stalking Horse Purchase Agreement requires, as a condition to closing, that the

Bidding Procedures Order and the consummation by the Debtors of the transactions contemplated therein not be subject to Bankruptcy Rules 6004(h) and 6006(d). The Debtors believe that such relief is necessary to bring certainty to the Sale Transaction in light of their pressing liquidity concerns. The Debtors further believe that such relief is appropriate given the significant undertakings that will be made by the Debtors to ensure that adequate and timely notice of the Sale Transaction is provided to all parties in interest.

## THE PROPOSED STALKING HORSE AND BIDDING PROCEDURES

### A. Bidding Procedures

46. The Bidding Procedures, which are attached hereto as **Exhibit B**, are designed to maximize value for the Debtors' estates, while effectuating an expeditious sale of the Debtors' assets. Among other things, the Bidding Procedures set forth procedures for interested parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the foregoing.

47. Certain of the salient terms of the Bidding Procedures are highlighted below:[11]

---

[11] The summary of the terms contained in this Motion is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the summary set forth herein, the terms of the Bidding Procedures shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

- **Key Dates (subject to the Court's availability):**

| Milestone | Date |
|---|---|
| Deadline for Entry of the Bidding Procedures Order | March 28, 2017 |
| Deadline to Object to Approval of the Sale Transaction to the Stalking Horse Bidders | April 3, 2017 |
| Bid Deadline – Due Date for Bids, Designation of Contracts and Leases (if applicable) and Deposits | April 7, 2017 |
| Auction (if necessary) | April 8, 2017 |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder Other than the Stalking Horse Bidders | April 10, 2017 |
| Sale Hearing | April 10, 2017 |
| Sale Closing | April 11, 2017 |
| Outside Date for Closing to Occur | May 12, 2017 |

- **Bid Deadline:** The following parties must receive a Bid in writing, on or before April 7, 2017 at 5:00 p.m. (EST) or such other date as may be agreed to by the Debtors: (a) the Debtors, their counsel, and Ducera, their investment banker; (b) counsel for LSHC; and (c) counsel for Hercules.

- **Auction Qualification Process:** As set forth in further detail in the Bidding Procedures, a Qualified Bidder must, among other requirements, (a) deliver financial statements demonstrating the financial capability of the bidder to consummate the sale, (b) propose a purchase price for all or substantially all of the Debtors' assets, including any assumption of liabilities, that in the Debtors' reasonable business judgment, has a value in an amount equal to at least $54,000,000 (i.e., the sum of (i) the purchase price set forth in the Stalking Horse Purchase Agreement, (ii) the Break-Up Fee, and (iii) the Expense Reimbursement Amount); (c) provide a good faith deposit in the amount of ten percent (10%) of the purchase price; (d) provide an executed non-contingent sale agreement on the same or better terms as those contained in the Stalking Horse Purchase Agreement filed with the Court; and (e) specify any regulatory or third-party approvals required to consummate the Sale Transaction and the time period that obtaining such approvals is expected to require.

- **Auction and Auction Procedures:** If the Debtors receive a Qualified Bid other than the Bid submitted by the Stalking Horse Bidders by the Bid Deadline, the Debtors shall conduct an Auction on April 8, 2017 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtor, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801, or such other place and time as the Debtors shall notify in writing all Qualified Bidders that have submitted Qualified Bids (including the Stalking Horse Bidders). If the Debtors do not receive any Qualified Bid (other than the Stalking Horse Bid) on or prior to the Bid Deadline, the Debtors shall promptly cancel the Auction and seek approval of the Sale Transaction of the Purchased Assets to the Stalking Horse Bidders pursuant to the Stalking Horse Purchase Agreement at the Sale Hearing.

B.    **Notice Procedures**

48.    Upon entry of an order approving the Motion to Shorten, or as soon practicable thereafter (the "Mailing Date"), in accordance with Bankruptcy Rule 2002(a) and (c), the Debtors (or their agents) shall serve the auction and sale notice (the "Auction and Sale Notice"), substantially in the form attached hereto as **Exhibit E**, by first-class mail or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Successful Bidder; (e) the Office of the United States Trustee; (f) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis, excluding insiders); (g) MMA Energy Capital, LLC; (h) MHA Trust LLC; (i) Atalaya Special Opportunities Fund VI LP; (j) Wilmington Savings Fund Society, FSB; (k) Wilmington Trust, National Association; (l) the Securities & Exchange Commission; (m) the Office of the United States Attorney General for the District of Delaware; (n) the Internal Revenue Service; (o) the U.S. Department of Justice; (p) the offices of the

attorneys general for the states in which the Debtors operate; (q) counsel to LSHC Solar Holdings, LLC; and (r) all parties entitled to notice pursuant to Local Rule 2002-1(B) (collectively, the "Notice Parties").

49.     The Auction and Sale Notice shall indicate that copies of the Motion, the Stalking Horse Purchase Agreement, the Bidding Procedures Order, and all other documents filed with the Court can be obtained on the website of the Debtors' claims and noticing agent, Kurtzman Carson Consultants LLC ("KCC"), www.kccllc.net/Sungevity. The Auction and Sale Notice will also indicate the proposed deadline for objecting to the Sale Transaction to the Successful Bidder and the anticipated date and time of the Sale Hearing, subject to the Court's availability. In addition, the Auction and Sale Notice shall provide notice that the Debtors will seek to assume and assign certain executory contracts to be identified in accordance with the Assumption and Assignment Procedures (as described further below) at the Sale Hearing. The Debtors request that such notice be deemed to be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

50.     Publication Notice:  The Debtors also propose, pursuant to Bankruptcy Rules 2002 and 6004 and Local Rule 6004-1(E)(5), to publish an Auction and Sale Notice, attached hereto as **Exhibit F**, in *The Financial Times* on the Mailing Date or as soon as practicable thereafter. The Debtors request that such publication notice be deemed sufficient and proper notice of the Sale Transaction to any other interested parties whose identities are unknown to the Debtors.

51.     As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, a notice identifying the Successful Bidder(s), substantially in the form attached hereto as **Exhibit G**.

## C.     Assumption and Assignment Procedures

52.     As contemplated in the Stalking Horse Purchase Agreement, at the closing of the Sale Transaction, the Debtors intend to assume certain executory contracts and unexpired leases designated by the Stalking Horse Bidder (or other Successful Bidder) ("Designated Contracts") pursuant to section 365(b) of the Bankruptcy Code and assign such Designated Contracts to the Stalking Horse Bidder (or other Successful Bidder) pursuant to section 365(f) of the Bankruptcy Code.  The Debtors accordingly are seeking approval of proposed procedures to govern the assumption and assignment of all Designated Contracts (the "Assumption and Assignment Procedures").  Because the Assumption and Assignment Procedures are set forth in detail in the attached Bidding Procedures Order, they are not restated herein.  Generally speaking, however, the Assumption and Assignment Procedures: (a) outline the process by which the Debtors will serve notice, in substantially the form attached hereto as **Exhibit H**, to all counterparties to the Designated Contracts regarding the proposed assumption and assignment and related cure amounts, if any; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of Designated Contracts.

## APPLICABLE AUTHORITY

### A.     Approval of the Sale Transaction is Appropriate Under Section 363 of the Bankruptcy Code

53.     The Sale Transaction should be approved as a sound exercise of the Debtors' business judgment.  Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ." 11 U.S.C. § 363(b)(1).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward*

*Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991). Once a court determines that a valid business justification exists for a sale outside of the ordinary course of business, the court must determine whether (a) adequate and reasonable notice of the sale was given to interested parties, (b) the sale will produce a fair and reasonable price for the property, and (c) the parties have acted in good faith. *See In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008). As described below, the proposed Sale Transaction meets each of these requirements.

> **1.** **The Sale Transaction Represents a Sound Exercise**
> **of the Debtors' Business Judgment**

54. Here, a strong business justification exists for the Sale Transaction. As described above and in the Scherer Declaration, the Debtors have concluded that, due to an extreme shortfall in liquidity, an expedited sale of substantially all their assets to the Stalking Horse Bidders, or any other Successful Bidder, represents the best, if not the <u>only</u>, opportunity for the Debtors to preserve their going concern value for the benefit of their stakeholders. As a result, an expeditious sale of the Debtors' assets is a reasonable exercise of the Debtors' business judgment and is in the best interests of all of the Debtors' stakeholders.

> **2.** **The Bidding Procedures are Fair and Designed to**
> **Maximize the Value Received For the Debtors' Assets**

55. The Debtors believe that the Bidding Procedures satisfy each of the remaining requirements for approval of a sale under section 363 of the Bankruptcy Code by (a) providing sufficient notice of each element of the proposed sale process, (b) facilitating a value maximizing sale, and (c) ensuring an unbiased and good faith sale process. The detailed Bidding Procedures outlined above and set forth in **<u>Exhibit B</u>** provide notice designed to fully inform all parties with

a stake in the sale process regarding the portions of the sale process most relevant to their interests. For example, the Bidding Procedures ensure that any entities asserting an Interest in the Debtors' assets and parties to the Designated Contracts will receive notice of the proposed Sale Transaction, the procedures for objecting to the Sale Transaction, and the proposed assumption and assignment of their respective contracts or leases. Similarly, the Bidding Procedures outline all material aspects of the potential purchaser notification, bid qualification, due diligence, bid submission, bid selection, and auction process, including the timing for each. Thus, the Bidding Procedures provide assurance to each entity potentially interested in purchasing the Debtors' assets that their respective rights will be protected and the Sale Transaction process will be fair and reasonable.

56.     Further, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their reasonable business judgment, and after consultation with any creditors' committee appointed in the Cases, the highest and best offer for the Debtors' assets. Moreover, the Bidding Procedures provide the Debtors with the flexibility to modify the Bidding Procedures, if necessary, to maximize value for the Debtors' estates. Accordingly, the Debtors believe the Court should approve the Bidding Procedures.

57.     The Debtors submit that similar bidding procedures have been approved in the Third Circuit. *See, e.g.*, *In re DirectBuy Holdings, Inc., et al,* No. 16-12435 (CSS) (Bankr. D. Del. Dec. 1, 2016), ECF No. 126; *In re BPS US Holdings, Inc., et al,* No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016), ECF No. 233; *In re Emerald Oil, Inc., et al.*, No. 16-10704 (KG) (Bankr. D. Del. Aug. 31, 2016), ECF No. 664; *Savient Pharms., Inc.*, No. 13-12680 (MFW) (Bankr. D. Del. Nov. 4, 2013, ECF No. 110.[12]

---

[12]  Because of the voluminous nature of the orders cited in this Motion, such orders are not attached hereto. Copies of these orders are available upon request of the Debtors' counsel.

### 3. The Break-Up Fee and Expense Reimbursement are Necessary to Preserve the Value of the Debtors' Estate

58.     The Debtors believe that granting the Bid Protections to the Stalking Horse Bidders will ensure the Debtors' ability to maximize the realizable value of the Debtors' assets for the benefit of the Debtors' estates, their creditors, and other parties in interest. The Stalking Horse Bidders conditioned their willingness to serve as a stalking horse bidder on the inclusion of these provisions in the Stalking Horse Purchase Agreement. If approved by the Court, the Debtors would be required to pay the Stalking Horse Bidders a Break-Up Fee of $1.25 million and up to $1.25 million in Expense Reimbursement in the event that the Break-Up Fee and the Expense Reimbursement are payable under the terms of the Stalking Horse Purchase Agreement.

59.     The United States Court of Appeals for the Third Circuit has held that break-up fees and expense reimbursements must meet the standards applicable to the allowance of administrative expenses under section 503(b) of the Bankruptcy Code. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999)). The Third Circuit has identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if the assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *O'Brien*, 181 F.3d at 537. Second, "if the availability of break-up fees and expense [reimbursements] were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

60.     The Bid Protections should be approved and afforded super-priority administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code because they provide a clear benefit to the Debtors' estates.  By conducting due diligence, participating in negotiations for a potential transaction and entering into the Stalking Horse Purchase Agreement, the Stalking Horse Bidders have established a bid standard, including a price floor, and initiated a sales process that will serve as a catalyst for other bidders to submit higher and better bids.  The Debtors submit that the amount of the Break-Up Fee and the Expense Reimbursement is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidders, including conducting the legal and financial diligence necessary to negotiate and enter into the Stalking Horse Purchase Agreement, which will serve as the baseline for other bids for the Purchased Assets.

61.     Moreover, the Debtors believe that the execution of the Stalking Horse Purchase Agreement by the Stalking Horse Bidders provides an incentive for others who expressed interest initially, but did not take efforts to negotiate definitive documents or submit competitive bids, to consider expending the time and effort to do so now.  To the extent that the Stalking Horse Purchase Agreement entices other potentially interested purchasers to participate in the bidding and auction process, the Break-Up Fee will provide a material benefit to the Debtors' estates in the form of an increased sale price.  On the other hand, in the event that others are not encouraged by the Stalking Horse Bid to undertake additional efforts and participate in the Auction, the Break-Up Fee will not be paid and, thus, should not affect the value received by the Debtors for the Purchased Assets.  As such, the Debtors submit that it is appropriate to enter into the Stalking Horse Purchase Agreement containing the Bid Protections pursuant to the Bidding Procedures.

62. Here, the Stalking Horse Bidders have conditioned their willingness to enter into the Stalking Horse Purchase Agreement on the Court's approval of, among other things, the Break-Up Fee and Expense Reimbursement. The proposed Break-Up Fee and Expense Reimbursement was the result of arms' length negotiations between representatives of the Debtors and the Stalking Horse Bidders, which are not insiders of the Debtors. The Debtors submit that the Break-Up Fee and Expense Reimbursement are justified to induce the Stalking Horse Bidders to enter into the Stalking Horse Purchase Agreement and to adequately compensate them for the risks they are taking.

63. The Debtors further submit that the Purchaser may terminate the Stalking Horse Purchase Agreement if the Court fails to approve the Break-Up Fee and Expense Reimbursement. The proposed transaction with the Stalking Horse Bidders ensures that the Debtors will have at least one substantial offer for the Terminal Assets. The Stalking Horse Bidders have agreed to keep their bid open during the solicitation and marketing process only if the Break-Up Fee and Expense Reimbursement are approved by the Court.

64. The Break-Up Fee, which represents approximately two and a half percent (2.5%) of the purchase price, calculated based on the full amount of the proposed credit bid, is reasonable and well within the range of bid protections typically approved by bankruptcy courts in the Third Circuit. *See, e.g.*, *In re American Apparel, LLC, et al.*, No. 16-12551 (BLS) (Bankr. D. Del. Dec. 5, 2016), ECF No. 216 (approving break-up fee of 3.0% in connection with a $66 million sale of assets); *In re BPS US Holdings Inc., et al.*, No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016), ECF No. 233 (approving break-up fee of 3.5% in connection with a $575 million sale of assets); *In re SynCardia Systems, Inc.*, No. 16-11599 (MFW), ECF No. 175 (Bankr. D. Del. Aug. 5, 2016) (approving break-up fee of 3.0%

in connection with a $19 million sale of assets); *In re Synagro Techs., Inc.*, No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013), ECF No. 137 (approving break-up fee of 3.0% in connection with a $455 million sale of assets); *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012), ECF No. 206 (approving break-up fee of 3.0% in connection with a $258 million sale of assets).

**B.      The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Interests**

65.      The Sale Transaction also meets the requirements to be a sale free and clear of Interests.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

66.      A sale that meets the requirements for a sale free and clear of Interests pursuant to section 363(f) of the Bankruptcy Code also bars claimants from asserting successor liability against the successful purchaser.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re NE Opco, Inc.*, 513 B.R. 871, 876 (Bankr. D. Del. 2014); *In re Ormet Corp.*, No. 13-10334 (MFW), 2014 WL

3542133, at *3 (Bankr. D. Del. July 17, 2014); *Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.)*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

67.    In the Debtors' case, the only creditors holding a secured claim, other than the Debtors' postpetition lenders, are: (a) MMA Energy Capital, LLC in the aggregate principal amount of $10 million; (b) MHA Trust LLC in the aggregate principal amount of $5 million; (c) the Bridge Loan Lenders in the aggregate principal amount of $9.5 million; and (d) Atalaya Special Opportunities Fund VI LP ("Atalaya") in the aggregate principal amount of $32 million. The assets securing Atalaya's claim are not being transferred under the proposed Sale Transaction, and the Debtors anticipate working closely with their other secured creditors to achieve a sale that they find acceptable.  As a result, the Debtors anticipate that the Sale Transaction will satisfy section 363(f)(2) of the Bankruptcy Code.

68.    The Debtors further request that any creditor that receives notice of the Sale Hearing and who fails to timely file an objection to the Sale Transaction be deemed to have consented under section 363(f)(2) of the Bankruptcy Code to a sale free and clear of such creditor's interests, if any.

## C.    A Successful Bidder Should Be Afforded the Protections of Section 363(m) of the Bankruptcy Code

69.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd.* (*In re Mark Bell Furniture Warehouse, Inc.*), 992 F.2d 7, 8 (1st Cir. 1993).

70.     The Debtors will present facts at the Sale Hearing to demonstrate that the Stalking Horse Purchase Agreement was negotiated at arm's length, with both parties represented by their own counsel.    Accordingly, the Debtors request that the Sale Order include a provision concluding that the  Successful Bidder is a "good faith" purchaser within the meaning of  section 363(m) of the Bankruptcy Code.  The Debtors believe that providing the Successful  Bidder with such protection will ensure that the maximum price will be received by the Debtors  and the closing of the same will occur promptly.

**D.      Assumption and Assignment of the
          Designated Contracts Should be Authorized**

71.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a  debtor in possession "subject to the court's approval, may assume or reject any executory  contract or unexpired lease of the debtor."    11 U.S.C. § 365(a).  Further, section 365(f) of the Bankruptcy Code provides that the "trustee may  assign an executory contract . . . only if the trustee assumes such contract . . . and adequate  assurance of future performance . . . is provided. . . ."   11 U.S.C. § 365(f)(2).  Assumption and assignment of the Designated Contracts in connection with the Sale Transaction is appropriate.

**1.      Assumption of the Designated Contracts is a
          Reasonable Exercise of the Debtors' Business Judgment**

72.     Assumption or rejection of a  contract is a matter of the debtor's business judgment.  *See Nat'l Labor Relations Bd. v. Bildisco and Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd sub nom.*, *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test."); *In re Physiotherapy Holdings, Inc.*, 506 B.R. 619, 622 (Bankr. D. Del. 2014) (citing *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003)).  A debtor's decision in this regard is "entitled to great deference from the Court." *See In*

*re Armstrong World Indus.*, 348 B.R. 136, 162 (Bankr. D. Del. 2006). In order to satisfy the business judgment test, a debtor must only show that assumption or rejection of an executory contract will benefit the estate. *See Bildisco*, 682 F.2d at 79; *see also In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) ("Under the business judgment standard, the sole issue is whether the rejection benefits the estate.").

73.     To facilitate the Sale Transaction and to maximize the value received for the Debtors' assets, the Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption and assignment of the Designated Contracts to the Successful Bidder. Certain of the Debtors' executory contracts and unexpired leases will be necessary for the Successful Bidder's continued operation of the Debtors' assets.

74.     The Debtors further request that the Sale Order provide that the Designated Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder, notwithstanding any provisions in the Designated Contracts, including those described in sections 365(b)(2), 365(f)(1), and 365(f)(3) of the Bankruptcy Code that prohibit such assignment.

75.     The Debtors also request that the Sale Order provide that to the extent any provision in any Designated Contract assumed and assigned (a) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, such assumption or assignment (including, without limitation, any "change of control" provision), or (b) is modified, breached, or terminated, or deemed modified, breached, or terminated by any of the following: (i) the commencement of the Cases, (ii) the insolvency or financial condition of the Debtors at any time before the closing of the Cases, (iii) the Debtors' assumption or assumption and assignment (as applicable) of such Designated Contract, or (iv) the consummation of the Sale Transaction, then such provisions shall

be deemed modified so as to not entitle the non-Debtor party thereto to prohibit, restrict or condition such assumption or assignment, to modify, terminate or declare a breach or default under such Designated Contract, or to exercise any other default-related rights or remedies with respect thereto, including, without limitation, any such provision that purports to allow the non-Debtor party thereto to recapture such Designated Contracts, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith. The Debtors request that all such provisions be deemed to constitute unenforceable anti-assignment provisions that are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

### 2. Any Defaults Under the Designated Contracts Will be Cured and Evidence of Adequate Assurance of Future Performance by the Successful Bidder Will be Provided

76. Once an executory contract or unexpired lease is assumed, the trustee or debtor in possession may generally elect to assign such contract, so long as it cures any defaults and provides adequate assurance of future performance. *See* 11 U.S.C. § 365(f)(2)(B) (a debtor may assign an executory contract or unexpired lease of nonresidential property if "adequate assurance of future performance by the assignee of such contract or lease is provided. . . ."). The requirements to show "adequate assurance of future performance" will depend on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001); *In re Decora Indus.*, No. 00-4459 (JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute guaranty of payment."). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re*

*Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

77.     The Debtors contemplate that the Successful Bidder will be able to provide adequate assurance of future performance in connection with any Designated Contracts because such Successful Bidder must submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale Transaction.   The Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Successful Bidder to perform under the Designated Contracts.  The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Designated Contracts, as required under section 365(f)(2)(B) of the Bankruptcy Code.

78.     Moreover, as set forth above, the Debtors have proposed to file a Designated Contract List containing a list of the Designated Contracts and the Cure Amounts that the Debtors believes are due under each such Designated Contract.  The Debtors will serve a Cure Notice on all Contract Notice Parties and provide them with an opportunity to be heard.  In the absence of an objection by a non-Debtor party to a Designated Contract, the Contract Notice Party will receive the specified Cure Amount, if any, at the closing of the Sale Transaction with funds paid by the Stalking Horse Bidders or other Successful Bidder as required under the Stalking Horse Purchase Agreement.

79.     Accordingly, the Debtors submit that implementation of the Assumption and Assignment Procedures regarding assumption and assignment of the Designated Contracts is

appropriate in this case. The Court, therefore, will have a sufficient basis to authorize the Debtors to assume and assign the Designated Contracts as will be set forth in the Stalking Horse Purchase Agreement.

## **SATISFACTION OF BANKRUPTCY RULE 6003**

80. Bankruptcy Rule 6003 provides that the relief requested in the Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm . . . ." *See* Fed. R. Bankr. P. 6003. As described herein, a rapid sale process is critical to the Debtors' ability to preserve their going concern value and maximize the value of their estates. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## **WAIVER OF BANKRUPTCY RULE 6004(h) AND 6006(d); AUTOMATIC STAY**

81. To implement the foregoing immediately, the Debtors seeks a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) and the assumption and assignment of the Designated Contracts under Bankruptcy Rule 6006(d).

82. Here, a waiver of the stay is appropriate because the Sale Transaction was extensively marketed and notice of the Sale Transaction was and will be adequately provided to all parties-in-interest. Likewise, the non-Debtor parties to the Designated Contracts will be provided with adequate notice of, and opportunity to object to, the assumption and assignment of the Designated Contracts.

83. The Debtors also request that the Bidding Procedures Order approve that the automatic stay pursuant to section 362 of the Bankruptcy Code be lifted to the extent necessary to allow the Stalking Horse Bidders to deliver any notice provided for in the Stalking Horse Purchase Agreement, and allow the Stalking Horse Bidders to take any and all actions permitted

under the Stalking Horse Purchase Agreement in accordance with the terms and conditions thereof.

## NOTICE

84.     Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee; (b) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis, excluding insiders); (c) Hercules Capital, Inc.; (d) MMA Energy Capital, LLC; (e) MHA Trust LLC; (f) Atalaya Special Opportunities Fund VI LP; (g) Wilmington Savings Fund Society, FSB; (h) Wilmington Trust, National Association; (i) the Securities & Exchange Commission; (j) the Office of the United States Attorney General for the District of Delaware; (k) the Internal Revenue Service; (l) the U.S. Department of Justice; (m) the offices of the attorneys general for the states in which the Debtors operate; (n) LSHC Solar Holdings, LLC; and (o) such other entities as may be required by applicable Bankruptcy Rules or applicable Local Rules or as may be reasonably requested by the Stalking Horse Bidders.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE the Debtors respectfully request entry of the Bidding Procedures Order and the Sale Order granting the relief requested herein and such other and further relief as is just.

Dated:  March 13, 2017
        Wilmington, Delaware

DRAFT
M. Blake Cleary (No. 3614)
Jaime Luton Chapman (No. 4936)
Kenneth A. Listwak (No. 6300)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

Jonathan I. Levine (*pro hac vice* admission pending)
Jennifer L. Marines (*pro hac vice* admission pending)
Melissa A. Hager (*pro hac vice* admission pending)
Erica J. Richards (*pro hac vice* admission pending)
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for Debtors
and Debtors-in-Possession*

**Exhibit A**

**Proposed Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNGEVITY, INC., *et al.*,[1] | ) | Case No. 17-10561 (___) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | **RE: Docket Nos. ____** |

**ORDER (I) ESTABLISHING BIDDING PROCEDURES AND
GRANTING RELATED RELIEF AND (II) APPROVING THE BID
PROTECTIONS RELATED TO THE SALE OF CERTAIN ASSETS FREE
AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

Upon consideration of the motion (the "Motion")[2] of the above captioned debtors and

debtors in possession (the "Debtors") for the entry of an order (this "Bidding Procedures

Order"):  (a) approving the proposed bidding procedures attached as **Schedule 1** to this Bidding

Procedures Order (the "Bidding Procedures"), by which the Debtors will solicit and select the

highest or otherwise best offer for the sale of all or substantially all of their assets (the "Sale");

(b) establishing procedures for the assumption and assignment of executory contracts and

unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment

Procedures"); (c) approving the form and manner of notice with respect to certain procedures,

protections, schedules, and agreement described herein and attached hereto; (d) approving the

Debtors' selection of LSCH Solar Holdings, LLC and Hercules Capital, Inc. ("Hercules") as the

stalking horse bidders (the "Stalking Horse Bidders"), the Bid Protections (as defined below) for

---

[1]  The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Sungevity, Inc. (4328), Sungevity SD, LLC (4847), Sungevity Development, LLC (0323), and Sungevity International Holdings LLC (5598).  The principal place of business for each of the Debtors is 66 Franklin Street, Suite 310, Oakland, CA 94607.

[2]  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion or the Bidding Procedures, as applicable.

the Stalking Horse Bidders, and that certain asset purchase agreement (the "<u>Stalking Horse Purchase Agreement</u>") among the Debtors and the Stalking Horse Bidders; (e) scheduling a final hearing (the "<u>Sale Hearing</u>") to approve the Sale; and (f) granting related relief, and upon the Debtors' further request that, at the Sale Hearing, this Court enter an order (a "<u>Sale Order</u>"), a proposed form of which will be filed on the date that is one (1) calendar day prior to the Sale Hearing, (x) authorizing the sale of all or substantially all of the Debtors' assets free and clear of liens, claims, interests, and encumbrances (collectively, the "<u>Interests</u>") with any such Interests to attach to the proceeds thereof with the same validity, extent and priority (under the Bankruptcy Code) as such Interests had immediately prior to the consummation of the Sale; (y) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (z) granting related relief, all as more fully described in the Motion; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT**:

A.     The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014, and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").  The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties-in-interest.

D.     Notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this Bidding Procedures Order was adequate and sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Notice of the Motion has been given to:  (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' assets during the past six (6) months; (b) all entities known to have asserted any Interest in or upon any of the Debtors' assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts that could

potentially be assumed and assigned to the Successful Bidder; (e) the Office of the United States Trustee; (f) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis, excluding insiders); (g) MMA Energy Capital, LLC; (h) MHA Trust LLC; (i) Atalaya Special Opportunities Fund VI LP; (j) Wilmington Savings Fund Society, FSB; (k) Wilmington Trust, National Association; (l) the Securities & Exchange Commission; (m) the Office of the United States Attorney General for the District of Delaware; (n) the Internal Revenue Service; (o) the U.S. Department of Justice; (p) the offices of the attorneys general for the states in which the Debtors operate; (q) counsel to LSHC Solar Holdings, LLC, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Ross M. Kwasteniet and Brad Weiland; and (r) all parties entitled to notice pursuant to Local Rule 2002-1(B) (collectively, the "Notice Parties").  Accordingly, no further notice of the Motion or this Bidding Procedures Order is necessary or required.

   E. The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation:  (a) approval of the Bidding Procedures; (b) approval of the selection of LSHC Solar Holdings, LLC and Hercules as the Stalking Horse Bidders; (c) approval of the Assumption and Assignment Procedures; (d) approval of the form and manner of notice of all procedures, protections, schedules, and agreement described in the Motion and attached thereto; (e) the scheduling of a date for the Sale Hearing; and (f) all related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

F.      Entry into the Stalking Horse Purchase Agreement, which is attached hereto as **Schedule 2**, with the Stalking Horse Bidders, is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.[3]  The Stalking Horse Purchase Agreement provides the Debtors with the opportunity to sell all or substantially all of their assets in order to preserve and realize their optimal value.

G.      The Bidding Procedures, in the form attached hereto as **Schedule 1** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates.  The Bid Protections:  (a) shall, if triggered, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code in accordance with the Stalking Horse Purchase Agreement; (b) are commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidders; (c) are reasonable and appropriate, including in light of the size and nature of the Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidders, notwithstanding that the Sale is subject to higher or better offers; and (d) were necessary for the Stalking Horse Bidders to pursue the Sale and to be bound by the Stalking Horse Purchase Agreement.

H.      The Bidding Procedures and the Bid Protections were a material inducement to, and express condition of, the willingness of the Stalking Horse Bidders to submit bids through execution of the Stalking Horse Purchase Agreement that will serve as a minimum or floor bid on which the Debtors, their creditors, suppliers, vendors, and other bidders may rely.

---

[3]  To the extent there are any conflicts between any specific terms of this Bidding Procedures Order and any specific terms of the Stalking Horse Purchase Agreement, the terms of this Bidding Procedures Order shall govern.

I.      The Bidding Procedures and the Stalking Horse Purchase Agreement were negotiated by the parties at arms' length and in good faith by the Debtors and the Stalking Horse Bidders.

J.      The Motion and the Assumption and Assignment Notice are reasonably calculated to provide counterparties to the Debtors' Designated Contracts with proper notice of the intended assumption and assignment of their executory contracts or unexpired leases, any cure amounts relating thereto, and the Assumption and Assignment Procedures.

K.      The sale notice [Docket No. ●] (the "Sale Notice"), which is incorporated herein by reference as if fully set forth in this Bidding Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the assets, including, without limitation:  (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) reasonably specific identification of the assets to be sold; (e) instructions for promptly obtaining copies of the Stalking Horse Purchase Agreement; (f) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests (except as set forth in the Sale Order and Stalking Horse Purchase Agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of Designated Contracts to the Stalking Horse Bidders pursuant to the Stalking Horse Purchase Agreement (or to another Successful Bidder(s) arising from the Auction, if any), and no other or further notice of the Sale shall be required.  As evidenced by the affidavits of service previously filed with this Court [Docket Nos. ●], the Debtors served the Sale Notice on March [●], 2017 upon (i) the Notice Parties; (ii) all known creditors of the Debtors, including their

contract counterparties, and (iii) all registered holders of equity securities in the Debtors. In addition, as evidenced by the affidavits of service previously filed with this Court [Docket Nos. ●], the Debtors published the Sale Notice on March [●], 2017 in *The Financial Times*.

L.　　The Post-Auction Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bidder(s), and no other or further notice is required.

M.　　The Debtors' marketing process has been reasonably calculated to maximize value for the benefit of all stakeholders.

**IT IS HEREBY ORDERED THAT:**

1.　　The Motion is granted as provided herein.[4]

2.　　All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

3.　　The record establishes that the Debtors' prior actions in connection with the marketing process, as it relates to the assets, were appropriate and reasonably calculated to lead to the highest and best offer for the Sale.

**I.　　Timeline for the Sale**

4.　　The Debtors are authorized to perform any obligations of the Debtors set forth in the Stalking Horse Purchase Agreement attached to this Order as **<u>Schedule 2</u>**, that are intended to be performed prior to the Sale Hearing or entry of the Sale Order. The Debtors are authorized to proceed with the Sale in accordance with the Bidding Procedures and are authorized to take any

---

[4]　Notwithstanding anything to the contrary herein, the consummation of the Sale is subject to entry of the Sale Order.

and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| Action | Deadline |
|---|---|
| Sale Objection Deadline | 4:00 p.m. (prevailing Eastern Time) on April 3, 2017. |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on April 7, 2017 as the deadline by which bids for the assets (as well as all other documentation required under the Bidding Procedures for Potential Bidders (as defined in the Bidding Procedures)) must be actually received (the "Bid Deadline"). |
| Auction | 10:00 a.m. (prevailing Eastern Time) on April 8, 2017, if needed, at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (or at any other time and location as the Debtors may hereafter designate on proper notice). |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder Other than the Stalking Horse Bidders | At or prior to the Sale Hearing. |
| Sale Hearing | 10:00 a.m. (prevailing Eastern Time) on April 10, 2017. |

5.       For the avoidance of doubt, the Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures, in consultation with the Stalking Horse Bidders, in accordance with the provisions of the Bidding Procedures, subject to the terms of the Stalking Horse Purchase Agreement.

**II.       The Bidding Procedures**

6.       The Bidding Procedures, substantially in the form attached hereto as **Schedule 1**, are approved in their entirety.  The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith and the Stalking Horse Purchase Agreement.  The failure to specifically include or reference a particular

provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision.

7.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest. As further described in the Bidding Procedures, the Bid Deadline shall be 4:00 p.m. (prevailing Eastern Time) on April 7, 2017. Any disputes or objections to the selection of Qualified Bids, Successful Bids, or Backup Bids (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

8.      The Stalking Horse Bidders are deemed Qualified Bidders, and the Stalking Horse Bid as set forth in the Stalking Horse Purchase Agreement is deemed a Qualified Bid.

9.      The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures. The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at 10:00 a.m. (prevailing Eastern Time) on April 8, 2017 at the offices of the proposed co-counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (or at any other location as the Debtors may hereafter designate on proper notice).

10.      Any creditor with a valid and perfected lien on any assets of the Debtors' estates (each, a "Secured Creditor") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law, to credit bid all or any portion of such Secured Creditor's allowed secured claims to the extent that such secured claims are valid and undisputed pursuant to Bankruptcy Code section 363(k) or other applicable law, and any such credit bid shall be deemed a Qualified Bid, and any such Secured Creditor a Qualified Bidder, for all purposes hereof.

11.     Further, in the event of a competing Qualified Bid, the Stalking Horse Bidders will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include the full amount of the Bid Protections in lieu of cash and for purposes of evaluating the overbid equal to cash in the same amount.  Notwithstanding the preceding sentence, the inclusion in any overbid of the Bid Protections shall not be deemed to create a secured claim or constitute an offset against any such claim under section 363(k) of the Bankruptcy Code.

**III.     Stalking Horse Bidders, Bid Protections, and Stalking Horse Purchase Agreement**

12.     The Debtors are authorized to enter into the Stalking Horse Purchase Agreement, subject to higher or otherwise better offers at the Auction.  The Bid Protections contained in the Stalking Horse Purchase Agreement are approved in their entirety, and shall survive termination of the Stalking Horse Purchase Agreement.  The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidders on account of the Stalking Horse Bidders' Bid Protections upon the Debtors' consummation of the Sale with a purchaser other than the Stalking Horse Bidders.   If triggered, the Bid Protections shall be allowed administrative expenses under Bankruptcy Code section 503(b) and 507(a)(2), in accordance with the terms of the Stalking Horse Purchase Agreement.

**IV.     Notice Procedures**

13.     The Sale Notice is approved.

*A.     Notice of Sale, Auction, and Sale Hearing.*

14.     Within one business day after the entry of this Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "Mailing Date"), the Debtors shall serve the Stalking Horse Purchase Agreement, Bidding Procedures Order, and Bidding Procedures by first-class mail or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon the Notice Parties.

15.     Service of the Sale Notice as described above in Paragraph K shall be sufficient and proper notice of the Sale with respect to known interested parties. Publication of the Sale Notice as described above in Paragraph K shall be sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

    B.      *Notice of Successful Bidder(s).*

16.     As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, a notice identifying the Successful Bidder(s), substantially in the form attached hereto as **Schedule 4** (the "Post-Auction Notice").

**V.      Assumption and Assignment Procedures**

17.     The Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidders (or other Successful Bidder, following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code and in accordance with the Stalking Horse Purchase Agreement are hereby approved to the extent set forth herein.

    A.      *Notice of Assumption and Assignment.*

18.     As soon as practicable following entry of this Order, (any such date, the "Assumption and Assignment Service Date") the Debtors shall file with the Court, and post on the following website, www.kccllc.net/Sungevity, (the "Case Website"), the Notice of Assumption and Assignment and, included therewith, a list (the "Designated Contracts List") that specifies: (a) each of the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (the "Designated Contracts"), including the name of each non-Debtor counterparty to such Designated Contract (the "Designated Contract Counterparty"); and (b) the proposed amount necessary, if any, to cure all monetary defaults, if

any, under the Designated Contract (the "Cure Costs").  The Debtors shall serve, via first class mail, a customized version of the Notice of Assumption and Assignment, in substantially the form attached hereto as **Schedule 3**, without the Designated Contracts List, which will include: (i) instructions regarding how to view that list on the Case Website (the "DCL Instructions"); (ii) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Designated Contracts and rights thereunder; (iii) Cure Costs, if any; and (iv) the procedures for objecting thereto ((ii)–(iv) collectively, the "Necessary Notice Information") on all Designated Contract Counterparties.  The Debtors shall serve on the Rule 2002 Notice List, via first class mail, a modified version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information.  Service as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice is necessary.

19.    A Designated Contract Counterparty listed on the Notice of Assumption and Assignment may file an objection (a "Designated Contract Objection") to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any.  All Designated Contract Objections must (a) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any, (b) include appropriate documentation in support thereof, and (c) be filed and served on the Objection Recipients (as defined below) no later than 4:00 p.m. (prevailing Eastern Time) fourteen (14) days following the Assumption and Assignment Service Date (the "Assumption and Assignment Objection Deadline").

20.    If a Designated Contract Counterparty files a Designated Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to

consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

   B. *Supplemental Notice of Assumption and Assignment.*

   21. The Stalking Horse Bidders may modify the list of Designated Contracts until the opening of business on the date of the Auction. Following the conclusion of the Auction, if any, and the selection of the Successful Bidder, the Debtors reserve the right, but only in accordance with the Stalking Horse Purchase Agreement, or as otherwise agreed by the Debtors and the Successful Bidder(s), at any time after the Assumption and Assignment Service Date, before or after the closing of the Sale, to: (a) supplement the list of Designated Contracts on the Notice of Assumption and Assignment with previously omitted Designated Contracts; (b) remove a Designated Contract from the list of executory contracts and unexpired leases ultimately selected as a Designated Contract that the Successful Bidder(s) proposes be assumed and assigned to it in connection with the Sale or add to such list; and/or (c) modify the previously stated Cure Cost associated with any Designated Contract.

   22. In the event that the Stalking Horse Bidders or Debtors exercise any of the rights reserved above, the Debtors will promptly serve a supplemental notice of assumption and assignment by electronic transmission, hand delivery, or overnight mail on the Designated Contract Counterparty, and its attorney, if known, to each impacted Designated Contract at the last known address available to the Debtors (a "Supplemental Notice of Assumption and Assignment"). Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed Designated Contracts as was included in the Notice of Assumption and Assignment.

23.     Any Designated Contract Counterparty listed on a Supplemental Notice of Assumption and Assignment may file an objection (a "<u>Supplemental Designated Contract Objection</u>") to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any.   All Supplemental Designated Contract Objections must: (a) state, with specificity, the legal and factual basis thereof as well as what Cure Costs the objecting party believes are required, if any; (b) include appropriate documentation in support of the objection; and (c) be filed and served on the Objection Recipients no later than fourteen (14) days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the Supplemental Notice of Assumption and Assignment.

24.     If a Designated Contract Counterparty files a Supplemental Designated Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors will seek an expedited hearing before the Court (a "<u>Supplemental Designated Contract Hearing</u>") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts.   If there is no such objection, then the Debtors will obtain an order of this Court, including by filing a certification of no objection, (a "<u>Supplemental Designated Contract Order</u>") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

*C.     Additional Notice of Assumption and Assignment Procedures.*

25.     If the Designated Contract Counterparty does not file and serve a Designated Contract Objection or Supplemental Designated Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court in connection with such objection establishing an alternative Cure Cost, (a) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and

Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and (b) the Designated Contract Counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the Successful Bidder(s), or the property of any of them.

26. Any objections to the Successful Bidder(s)'s proposed form of adequate assurance of future performance must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

27. The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not: (a) obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder(s) to take assignment of such Designated Contract; or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract. Only those Designated Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder(s) (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder(s).

**VI. Sale Hearing.**

28. A Sale Hearing to (a) approve the sale of certain of the assets to the Successful Bidder(s) and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held at [10:00 a.m. (prevailing Eastern Time) on April 11, 2017], and may be adjourned or rescheduled without notice. At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid and the Backup Bid. The Sale Hearing shall be

an evidentiary hearing on matters relating to the Sale and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder(s) cannot or refuses to consummate the Sale, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder(s), and the Debtors shall be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.

29. Any and all objections, if any, to the Sale (a "<u>Sale Objection</u>"), must be filed by 4:00 p.m. (prevailing Eastern Time) on April 11, 2017 or raised in person at the Sale Hearing (the "<u>Sale Objection Deadline</u>") and served on (a) the proposed co-counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, Attn: M. Blake Cleary (mbcleary@ycst.com) and Jaime Luton Chapman (jchapman@ycst.com); (b) the proposed co-counsel the Debtors, Morrison & Foerster LLP, 250 West 55 Street, New York, New York 10019, Attn: Jonathan I. Levine (jonlevine@mofo.com) and Jennifer L. Marines (jmarines@mofo.com); (c) Hercules; (d) MMA Energy Capital, LLC; (e) MHA Trust LLC; (f) Wilmington Savings Fund Society, FSB; (g) counsel to LSHC Solar Holdings, LLC, Kirkland & Ellis LLP,300 North LaSalle, Chicago, Illinois 60654, Attn: Ross Kwasteniet (ross.kwasteniet@kirkland.com) and Brad Weiland (brad.weiland@kirkland.com); (h) counsel to the Successful Bidder(s), if known on the Sale Objection Deadline; (i) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801; (j) counsel to any official committee of unsecured creditors appointed in these chapter 11 cases (upon such appointment); and (k) all parties that have requested notice in these chapter 11 cases (collectively (a)-(k), the "<u>Objection Recipients</u>"). Any party failing to timely file a Sale Objection will be forever barred from objecting and will be deemed to have consented to the Sale, including the transfer of the Debtors' right, title and

interest in, to, and under the assets free and clear of any and all liens, claims, interests, and encumbrances in accordance with the definitive agreement for the Sale.

**VII.    Miscellaneous.**

30.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

31.    This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

32.    To the extent any of the deadlines set forth in this Bidding Procedures Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Bidding Procedures Order shall govern.

33.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

34.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Stalking Horse Purchase Agreement, and the implementation of this Bidding Procedures Order.

Dated: March __, 2017
       Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

# Schedule 1

## Bidding Procedures

## Schedule 2

### Stalking Horse Purchase Agreement

## Schedule 3

**Notice of Assumption and Assignment**

## Schedule 4

## Post-Auction Notice

# Exhibit B

## Bidding Procedures

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SUNGEVITY, INC., *et al.*,[1] | ) | Case No. 17-10561 (___) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## BIDDING PROCEDURES FOR
## THE SALE OF THE DEBTORS' ASSETS

On March [●], 2017, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Establishing Bidding Procedures and Granting Related Relief and (II) Approving the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* [Docket No. [●]] (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures.  These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "Auction") for the sale (the "Sale") of all or substantially all of the Debtors' assets (collectively, the "Assets"), in accordance with and as described in that certain agreement (the "Stalking Horse Purchase Agreement"), dated as of March 13, 2017, by and among the Debtors, and LSHC Solar Holdings, LLC ("LSHC") and Hercules Capital, Inc. (the "Stalking Horse Bidders"), and attached as **Schedule 1** hereto.

1. **Submissions to the Debtors**.

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "Notice Parties"):

a. **Debtors**.  Sungevity, Inc., 66 Franklin Street, Suite 310, Oakland, CA 94607, Attn:  Elizabeth Rushforth.

b. **Debtors' Co-Counsel**.  Morrison & Foerster LLP, 250 West 55th Street, New York, New York, Attn: Jonathan I. Levine (jonlevine@mofo.com) and Jennifer L. Marines (jmarines@mofo.com); and Young Conaway Stargatt & Taylor, LLP, 100 North King Street, Wilmington, Delaware 19801, Attn:  M. Blake Cleary (mbcleary@ycst.com) and Jaime Luton Chapman (jchapman@ycst.com).

---

[1]  The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Sungevity, Inc. (4328), Sungevity SD, LLC (4847), Sungevity Development, LLC (0323), and Sungevity International Holdings LLC (5598).  The principal place of business for each of the Debtors is 66 Franklin Street, Suite 310, Oakland, CA 94607.

[2]  All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

c. **Debtors' Investment Banker**. Ducera Securities LLC, 499 Park Avenue, New York, New York 10022, Attn: Joshua Scherer (jscherer@ducerapartners.com).

d. **LSHC's Counsel**. Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Ross Kwasteniet (ross.kwasteniet@kirkland.com) and Brad Weiland (brad.weiland@kirkland.com).

e. **Hercules Capital, Inc.'s Counsel**. Cole Schotz P.C., 25 Main Street, Hackensack, New Jersey 07601, Attn: Stuart Komrower (skomrower@coleschotz.com).

## 2. **Potential Bidders**.

The Debtors and their financial advisors have identified, and may in the future identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate) a competing transaction. To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "Potential Bidder") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion:

a. an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement"), to the extent not already executed; and

b. the most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, and (ii) a written commitment acceptable to the Debtors and their advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale).

## 3. **Qualified Bidders**.

a. A "Qualified Bidder" is a Potential Bidder: (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, as determined in the Debtors' sole discretion; (ii) whose Bid (as defined below) is a Qualified Bid (as defined below); and (iii) whom the Debtors, in their sole discretion, determine should be considered a Qualified Bidder. On the date of the Bid Deadline, by no later than 11:59 p.m., the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder, and shall provide a copy of each Qualified Bid to the Stalking Horse Bidders. Both of the Stalking Horse Bidders shall be deemed a Qualified Bidder at all times.

b. For the avoidance of doubt, two or more Potential Bidders may submit a Bid for any or all of the Assets, provided that such Bid(s), when taken as a whole

(collectively, a "<u>Joint Bid</u>"), is determined by the Debtors, in accordance with Section 3(a) of these Bidding Procedures, to constitute a Qualified Bid.

c. If any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three business days after the Bid Deadline.

d. Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Except as otherwise set forth in the Stalking Horse Purchase Agreement, without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

e. Any disputes related to these Bidding Procedures, including whether a Bid (including a Joint Bid) constitutes a Qualified Bid, shall be resolved by the Court.

**4. Due Diligence**.

a. **Diligence Provided to Potential Bidders**.

Only Potential Bidders approved by the Debtors shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors. **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**. The Debtors will provide to each approved Potential Bidder reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any Potential Bidder to the Debtors' electronic data room. For all Potential Bidders other than the Stalking Horse Bidders, the due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Assets, the Debtors' liabilities, or the Sale ("<u>Confidential Sale Information</u>") to any person, *except* to an approved Potential Bidder or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement; *provided*, *however*, that nothing herein shall limit the Debtors' ability to furnish Confidential Sale Information to the professional advisors of any official committee appointed in the Debtors' chapter 11 cases (each, an "<u>Official Committee</u>"), in each case on a professionals' eyes only basis. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such

information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Debtors also reserve the right to withhold any diligence materials that the Debtors determine, in their sole discretion, are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors as a Potential Bidder.

**All due diligence requests must be directed to Ducera Partners LLC, 499 Park Avenue, New York, New York 10022, Attn: Joshua Scherer.**

b.      **Diligence Provided by Potential Bidders**.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the applicable bidder; (c) to the professional advisors of any Official Committee, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

**5.      Bid Requirements**.

A proposal, solicitation, or offer (each, a "Bid") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "Bid Requirements"), as determined by the Debtors in their reasonable business judgment, shall constitute a "Qualified Bid." For the avoidance of doubt, the Stalking Horse Purchase Agreement will be deemed a Qualified Bid for all purposes.

a. **Assets**.  Each Bid must provide for the purchase of all or substantially all of the Assets and must clearly state which assets the Qualified Bidder is agreeing to purchase, and which liabilities of the Debtors the Qualified Bidder is agreeing to assume ("Assumed Liabilities").

b. **Purchase Price**.  Each Bid must clearly set forth the purchase price to be paid, including and identifying separately any cash and non-cash components (the "Purchase Price").

c. **Minimum Bid**.  The aggregate consideration proposed by each Bid must equal or exceed the sum of (i) the purchase price set forth in the Stalking Horse Purchase Agreement, (ii) the Breakup Fee (as defined below), and (iii) the Expense Reimbursement (as defined below) (a "Minimum Bid").

d. **Deposit**.  With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to **10 percent** of the aggregate cash and non-cash Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit").

e. **Assumption of Obligations**.  Each Bid must expressly assume all of the Assumed Obligations (as defined in the Stalking Horse Purchase Agreement) on terms no less favorable to the Debtors than the Stalking Horse Purchase Agreement, as determined in the Debtors' business judgment.

f. **Same or Better Terms**.  Each Bid must be on terms that are not more burdensome than the terms of the Stalking Horse Purchase Agreement, as determined in the Debtors' sole discretion.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of assumed contracts to the extent applicable to the Bid, and a copy of the Stalking Horse Purchase Agreement clearly marked to show all changes requested by the Potential Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid (the "Qualified Bid Documents").

g. **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on (i) obtaining financing, (ii) shareholder, board of directors, or other internal approval, or (iii) the outcome or completion of a due diligence review by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties, (ii) or the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome, as determined in the Debtors' business judgment, than those set forth in the Stalking Horse Purchase Agreement.

h.     **Identity**.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

i.     **Demonstrated Financial Capacity**.  A Qualified Bidder must have, in the Debtors' business judgment the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

j.     **Committed Financing**.  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing documented to the satisfaction of the Debtors, which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

k.     **Binding and Irrevocable**.  A Qualified Bid must be irrevocable unless and until the Debtors accept a higher Bid and such Qualified Bidder is not selected as the Backup Bidder (as defined herein).

l.     **Expenses; Disclaimer of Fees**.  Each Bid (other than the Stalking Horse Purchase Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

m.     **Authorization**.  Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

n.     **As-Is, Where-Is**.  Each Bid must include a written acknowledgement and representation that the Potential Bidder:  (i) has had an opportunity to conduct any

and all due diligence regarding the Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

o. **Adherence to Bid Procedures**.  By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

p. **Regulatory Approvals and Covenants**.  A Bid must set forth each regulatory and third-party approval to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible).

q. **Consent to Jurisdiction**.  Each Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

r. **Bid Deadline**.  Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before 5:00 p.m. (prevailing Eastern Time) on April 7, 2017 (the "Bid Deadline") by the Notice Parties.

**6. Right to Credit Bid**.

At the Auction, any Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid all or a portion of the value of its secured claim only to the extent such secured claim is not disputed.  In the event of a competing Qualified Bid, the Stalking Horse Bidders will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to include the full amount of the Bid Protections in lieu of cash and for purposes of evaluating the overbid equal to cash in the same amount.  Notwithstanding the preceding sentence, the inclusion in any overbid of the Bid Protections shall not be deemed to create a secured claim or constitute an offset against any such claim under section 363(k) of the Bankruptcy Code.

Credit bids, if any, by Secured Creditors will not impair or otherwise affect the Stalking Horse Bidders' entitlement to the Bid Protections granted under the Bidding Procedures Order.

7.     **Auction**.

If the Debtors receive a Qualified Bid, other than the Stalking Horse Purchase Agreement, the Debtors will conduct an Auction to determine the Successful Bidder(s). If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Purchase Agreement), the Debtors will not conduct an Auction and shall designate the Stalking Horse Bidders' Bid as the Successful Bid.

On the date of the Bid Deadline, by no later than 11:59 p.m. (prevailing Eastern Time), the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' reasonable business judgment (the "Baseline Bid"), and provide copies of the applicable Qualified Bid Documents supporting the Baseline Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, which may include, among other things: (a) the number, type, and nature of any changes to the applicable Stalking Horse Purchase Agreement, if any, requested by the Qualified Bidder, including the type and amount of Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").

The Auction shall take place at 10:00 a.m. (prevailing Eastern Time) on April 8, 2017, at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801, or such later date and time as selected by the Debtors. The Auction shall be conducted in a timely fashion according to the following procedures:

a.     **The Debtors Shall Conduct the Auction**.

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (defined below) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only the following parties shall be entitled to attend the Auction: (a) Qualified Bidders and their legal and financial advisors, (b) the Debtors and their legal and financial advisors, (c) the Stalking Horse Bidders and their legal and financial advisors, and (d) the legal and financial advisors of any Official Committee. The Qualified Bidders and the Stalking Horse Bidders may appear at the Auction in person or through duly authorized representatives.

b.      **Terms of Overbids**.

"Overbid" means any bid made at the Auction by a Qualified Bidder[3] subsequent to the Debtors' announcement of the Baseline Bid.  Each Overbid must comply with the following conditions:

(i)     **Minimum Overbid Increment**.  The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the sum of $**250,000.00** (a "Minimum Overbid Increment").  Upon the solicitation of each subsequent round of Overbids, the Debtors may, in their business judgment, reduce the amount of the applicable Minimum Overbid Increment.

Additional consideration in excess of the amount set forth in the respective Baseline Bid may include: (1) cash and/or noncash consideration; *provided* that the value for such noncash consideration shall be determined by the Debtors in their reasonable business judgment; and (2) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of such secured creditors' allowed secured claim.

(ii)    **Conclusion of Each Overbid Round**.  Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

(iii)   **Overbid Alterations**.  An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

(iv)    **Announcing Highest Bid**.  Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified in the initial applicable Overbid round, an Overbid as being higher or otherwise better than the Initial Minimum Overbid for such asset package, or in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for a given asset package (for each asset package, the "Prevailing Highest Bid").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid.

---

[3] Or Qualified Bidders, in the event of a Joint Bid.

c.    **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Debtors and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

d.    **Closing the Auction**.

(i)    The Auction shall continue until there is only one Bid or Joint Bid, as applicable, that the Debtors determine, in their reasonable business judgment, to be the highest or otherwise best Bid. Such Bid or Joint Bid, as applicable, shall be declared the "Successful Bid," and such Qualified Bidder (or Qualified Bidders, in the event of a Joint Bid) the "Successful Bidder(s)," at which point the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

(ii)    For the avoidance of doubt, but without limiting the Bid Protections or the provisions of any Stalking Horse Purchase Agreement, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under applicable law.

(iii)    The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

(iv)    As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid to be filed with the Court.

e.    **No Collusion; Good-Faith Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder(s).

8.    **Backup Bidder**.

a.    Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise

second-best Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

b.      The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder(s). The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder(s). The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder(s) and shall thereafter be returned within five (5) business days.

c.      If a Successful Bidder(s) fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder(s), and such Backup Bidder shall be deemed a Successful Bidder(s) for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder(s)'s Deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder(s), including with respect to specific performance.

**9.      Reservation of Rights.**

Without prejudice to the rights of the Stalking Horse Bidders under the terms the Stalking Horse Purchase Agreement, the Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids or Bids.

**10.      Sale Hearing.**

A hearing to consider approval of each Sale of the Assets to the Successful Bidder(s) (or to approve the Stalking Horse Purchase Agreement, as applicable, if no Auction is held) (the "Sale Hearing") is currently scheduled to take place on or before 10:00 a.m. (prevailing Eastern Time) on [the first business day following the Auction], before the [●], at the Court, 824 Market Street, [●] Floor, Courtroom No. [●], Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such**

**continuance will be required to be provided to any party (including the Stalking Horse Bidders).**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Court for approval.

## 11. Bid Protections.

To provide an incentive and to compensate the Stalking Horse Bidders for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Purchase Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Stalking Horse Bidders, under the conditions and in the amount set forth in the Bidding Procedures Order:

    a.    a break-up fee in the amount of $1,250,000 (the "Breakup Fee"); and

    b.    a reasonable expense reimbursement for documented and reasonable out-of-pocket expenses equal to up to $1,250,000 (the "Expense Reimbursement Fee" and, together with the Breakup Fee, the "Bid Protections"), each payable pursuant to the terms of the Stalking Horse Purchase Agreement in the event that the Stalking Horse Purchase Agreement is terminated due to the Debtors entering into an agreement regarding an alternative transaction and consummating such alterative transaction.

The Bid Protections will be an allowed administrative expense priority claim in accordance with the terms of the Stalking Horse Purchase Agreement.

The Stalking Horse Bidders shall have standing to appear and be heard on all issues related to the Auction, the Sale, and related matters, including the right to object to the sale of the Assets or any portion thereof (including the conduct of the Auction and interpretation of these Bidding Procedures).

## 12. Return of Deposit.

The Deposit of the Successful Bidder(s) shall be applied to the Purchase Price of the transaction at closing. The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder(s) and the Backup Bidder) on or within five business days after the Auction.

If the Successful Bidder(s) fails to consummate the Sale because of a breach by the Successful Bidder(s), the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder(s), which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Court.

**13.**     **Fiduciary Out**.

      Nothing in these Bidding Procedures shall require the Debtors' board of directors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent the Debtors' board of directors determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law; provided that in the event of any such action, all rights and remedies of the Stalking Horse Bidders in these Bidding Procedures or the Stalking Horse Purchase Agreement shall be preserved.

*[Remainder of page intentionally left blank]*

## Schedule 1

**Stalking Horse Purchase Agreement**

# **Exhibit C**

**Scherer Declaration**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| SUNGEVITY, INC., *et al.*,[1] | ) Chapter 11 |
| | ) |
| | ) Case No. 17-10561 (___) |
| Debtors. | ) |
| | ) Joint Administration Pending |

## DECLARATION OF JOSHUA S. SCHERER IN SUPPORT OF THE BIDDING PROCEDURES AND SALE MOTION

I, Joshua S. Scherer, make this Declaration under 28 U.S.C. § 1746 and state:

1.  I am a Partner at Ducera Securities LLC ("Ducera"), proposed investment banker to the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"). I submit this Declaration in support of the proposed sale (the "Sale") of substantially all of the Debtors' operating assets to LSHC Solar Holdings, LLC ("LHSC")[2] and Hercules Capital, Inc. ("Hercules", and, along with LHSC, the "Stalking Horse Bidders") pursuant to an Asset Purchase Agreement dated March 13, 2017 (the "Stalking Horse APA"), or to the successful higher bidder under the proposed "Bidding Procedures Order," all as more fully described in the *Debtors' Motion For Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Assets, Including Approving Break-up Fee and Expense Reimbursement, (B) Establishing Procedures Relating to the Assumption and Assignment of*

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Sungevity, Inc. (4328), Sungevity SD, LLC (4847), Sungevity Development, LLC (0323), and Sungevity International Holdings LLC (5598).  The principal place of business for each of the Debtors is 66 Franklin Street, Suite 310, Oakland, CA 94607.

[2] LSHC Solar Holdings, LLC ("LSHC") is an investment vehicle created for this transaction by Northern Pacific Group ("NPG").  International SIF SICAV SA ("International") is a limited partner of NPG and, as a result, will have an indirect interest in LSHC.  Prepetition, International was a provider of capital to the Debtors through various debt and equity financings.  All of the Debtors' debt and equity held by International was transferred prepetition to an affiliate, Helios Invest LLC.  Johan Symmons, an investment advisor to International, is a member of the board of directors of Sungevity, Inc.  Mr. Symmons recused himself from all discussions and deliberations regarding the filing of the Cases, the debtor-in-possession financing, and the selection of the stalking horse bid, and he will continue to do so during the chapter 11 cases.

*Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "Bidding Procedures and Sale Motion").[3]

2.      Except as otherwise indicated, all statements in this Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals, and my personal knowledge and experience. If I were called upon to testify, I could and would testify to each of the facts set forth below.

### Qualifications of Declarant and Ducera

3.      I have more than 23 years of experience advising corporations and other constituents on restructuring transactions, in addition to considerable experience with mergers, acquisitions, and financings. I have testified as an expert witness in a multitude of cases on various topics including valuation, sales processes, and plan feasibility.[4] The primary individuals at Ducera responsible for day-to-day discussions with the Debtors relating to general restructuring advice, financing efforts, and the Sale have been Adam Verost and me.

4.      Established in 2015, Ducera is a leading investment banking boutique providing financial advisory services, including mergers and acquisitions, and restructuring advice, across a broad range of industries. Ducera serves a diverse set of clients around the world from its offices in New York. Ducera's business reorganization professionals, including while employed at other firms, have served as financial advisors and investment bankers to

---

[3] Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures and Sale Motion.

[4] Such cases include Caesars Entertainment Operating Company, Inc.; Crusader Energy Group, Inc.; Hawker Beechcraft, Inc.; Hercules Offshore, Inc.; Hostess Brands, Inc.; Pierre Foods, Inc.; Plainwell, Inc.; Spectrum Brands, Inc.; Texas Petrochemicals LP; Tropicana Entertainment, LLC; Vertis Holdings, Inc.; and Workflow Management, Inc.

companies, creditors, buyers, and investors in numerous chapter 11 cases, including Accuride Corporation; Allegiance Telecom Inc.; Alpha Natural Resources, Inc.; American Airlines, Inc.; American Apparel, Inc.; Boston Generating, LLC; Calpine Corporation; DACCO Transmission Parts, Inc.; Delta Air Lines Inc.; Hawker Beechcraft Corporation; Hercules Offshore, Inc.; Hostess Brands, Inc.; Masonite Corporation; Maxxim Medical Inc.; Paragon Offshore PLC; School Specialty Inc.; Spectrum Brands Inc.; Solutia, Inc.; Tropicana Entertainment, LLC; and Verso Corporation, among others.

5.      I joined Ducera in 2015 as a Partner. Prior to joining Ducera, I was a Partner at Perella Weinberg Partners, which I joined in 2007. I was also a director at Houlihan Lokey, which I joined in 1999. I have extensive experience representing companies, creditors and other constituents in complex restructuring, mergers, acquisitions, and financing transactions across a wide range of industries. Selected company-side experience includes representing Atari, Inc.; Caesars Entertainment Operating Company, Inc.; Hawker Beechcraft, Inc.; Hostess Brands, Inc.; James River Coal Company; Pierre Foods, Inc.; Spectrum Brands, Inc.; and Vertis Holdings, Inc., among others. I have also represented creditor and equity constituencies in various transactions including American Color Graphics, Inc.; Cengage Learning, Inc.; Hercules Offshore, Inc.; Paragon Offshore, Inc.; Neff Rental Corp.; One Communications, Inc.; and Workflow Management, Inc., among others.

### Prepetition Marketing Process and Efforts to Obtain Debtor-In-Possession Financing

6.      The Debtors engaged Ducera as restructuring advisor on January 23, 2017 to advise the company regarding potential restructuring opportunities, to identify potential sources of capital and buyers, and to assist in arranging and executing a potential sale of the Debtors' business.[5]

---

[5] I understand that the Debtors intend to file an application as soon as practicable seeking to retain Ducera as their investment banker in these chapter 11 cases, effective *nunc pro tunc* to the Petition Date.

7.     Since its engagement, Ducera, together with the Debtors and the Debtors' other advisors, has been exploring various strategic alternatives for these cases, including a chapter 11 plan of reorganization and a transaction involving the sale of all or substantially all of the Debtors' assets. To ensure that the Debtors had sufficient liquidity to continue operating while that process was underway, on January 30, 2017, Sungevity, Inc. and Sungevity Development, LLC obtained a $9.5 million bridge loan from a consortium of lenders, including certain of Sungevity's prepetition lenders, which was guaranteed by Sungevity SD, LLC and Sungevity International Holdings LLC. The proceeds of the bridge loan were used to provide Sungevity with additional liquidity and runway to run a comprehensive restructuring and sale process, negotiate debtor-in-possession financing terms, and prepare the company and its operations for a soft landing once in chapter 11.

8.     Upon its retention, Ducera and the Debtors' other advisors contacted a combined total of seventy-seven (77) potential purchasers, including both strategic and financial investors. Seventeen (17) of those parties executed a non-disclosure agreement and received access to a virtual data room to conduct due-diligence. While the Debtors were unable to reach an agreement with the various parties on an out-of-court basis, I believe this process was sufficiently broad to reach the full universe of parties likely to be interested, and reflected a reasonable attempt to reach an out-of-court transaction with a strategic or financial party given the Debtors' liquidity and time constraints.

9.     Given the Debtors' liquidity constraints and the difficulty of securing long term financing to support reorganization, the Debtors and their advisors ultimately determined that the best way to maximize the value of these estates was through the sale of all or substantially all of the assets. Accordingly, Ducera, in combination with the Debtors' management team, the Strategic Committee of the Board of Directors of Sungevity, Inc. (the "Strategic Committee"), and the Debtors' other advisors sought to identify potential strategic and financial investors to provide a stalking horse bid for an asset sale pursuant to section 363 of the Bankruptcy Code. Ducera developed an initial list of parties to contact by (a) reviewing the parties previously

contacted in an effort to secure out-of-court financing for, or a sale of, the Debtors, and (b) identifying additional parties that might be willing to participate in a sale of the Debtors' assets through a bankruptcy process.

10.     On February 10, 2017 Ducera was authorized by the Strategic Committee to reach out to potential providers of debtor-in-possession financing ("DIP Financing"). Initially Ducera reached out to eight (8) potential DIP Financing parties to discuss the opportunity on a "no-names" basis. Of these parties, only three (3) parties decided to sign a non-disclosure agreement and receive materials about the Debtors to help them evaluate the DIP Financing opportunity. Ultimately, each of the three (3) parties declined to pursue the opportunity or provide a proposal due to several factors, including the limited assets of the Debtors, the Debtors' history of negative cash flows, and the likely necessity to engage in a "priming fight" with the Debtors' existing senior secured lender, Hercules Capital Inc. ("Hercules"). At various points in time, Ducera, as well as other representatives of the Debtors, asked Hercules if it would consider providing DIP Financing for a sale of assets pursuant to section 363 of the Bankruptcy Code. At no point did Hercules indicate any willingness to provide DIP Financing.

11.     On February 24, 2017, Ducera was authorized by the Strategic Committee to contact parties to discuss a potential 363 auction process (or, in the alternative, a sponsored plan of reorganization) and solicit non-binding indications of interest from such parties. Ducera had not previously been authorized to hold such conversations with many of the parties as the Debtors were focused on discussions with such parties regarding providing an out-of-court investment. Between February 24th and February 26th, the Debtors held conversations with six (6) parties to discuss their interest in providing a stalking horse bid. One party immediately declined, while the others indicated varying levels of interest. The interested parties were subsequently sent letters providing procedures and a deadline for submission of non-binding indications of interest. The initial deadline of February 27th was extended to February 28th to allow additional time for parties to express their interest. As of the deadline,

no parties had submitted non-binding indications of interest, although conversations with multiple parties were still ongoing.

12.     Ultimately, one party, NPG, indicated interest in participating in a sale process or plan of reorganization of the Debtors through a bankruptcy process.  The Debtors and NPG had originally considered a plan of reorganization to be sponsored by NPG, but over the course of the next eleven (11) days, as Sungevity's liquidity became increasingly strained, Ducera, the Debtors, and the Debtors' other professional advisors engaged in intensive negotiations with NPG regarding the structure and terms of an asset sale.  The Debtors and their professional advisors also engaged in extensive discussions with Hercules, the Debtors' senior secured prepetition lender, regarding the terms of access to cash collateral and a debtor-in-possession financing facility (the "DIP Facility").  On March 6, 2017, all of the parties reached an agreement in principal regarding debtor-in-possession financing and an in-court sale process under Bankruptcy Code section 363.

**Negotiations Regarding the Stalking Horse APA**

13.     Since March 6, 2017, Ducera, the Debtors, and the Debtors' other professional advisors engaged in further discussions with NPG and Hercules regarding the terms of the asset purchase agreement, DIP financing agreement, and other ancillary agreements, and the remaining legal and financial due diligence necessary to consummate a transaction. Ultimately, these negotiations resulted in the Debtors' execution of the Stalking Horse APA on March 13, 2017, whereby LHSC, a newly formed investment vehicle established for the transaction by NPG, and Hercules agreed to purchase substantially all of the Debtors' assets (excluding Sungevity, Inc.'s equity interests in Sungevity Short Hills 2012, LLC) for a purchase price consisting of:  (a) up to $50 million, subject to adjustments, in the form of a credit bid, comprised of (i) $30 million in respect of prepetition senior secured indebtedness owed to Hercules on account of its prepetition senior secured obligations, and (ii) and up to $20 million in respect of obligations under the DIP Facility; (b) $1 million in cash disbursed

under the DIP Facility, which will remain with the Debtors' estates (the "Excluded Cash"); and (c) the assumption of assumed liabilities. In addition, LSHC and Hercules agreed to act as the Stalking Horse Bidders for those assets in a Court-supervised auction.

14. On that same date, the Debtors entered into a Debtor-in-Possession Loan and Security Agreement (the "DIP Agreement") with LHSC as lender and Wilmington Trust, National Association, as administrative agent. The DIP Agreement is contingent on the Debtors' pursuit of an expedited sale process. The Debtors agreed to that contingency because, even with the additional liquidity of up to $20 million to be provided by the DIP Facility, the Debtors will run of cash within just a few months. Absent the DIP Facility, there would be no choice but to immediately shutdown the Debtors' operations and promptly liquidate their assets resulting in the immediate loss of all employees and no company for the Debtors' numerous customers, vendors and suppliers to do business with. An efficient sale process is necessary to stabilize the Debtors' rapidly deteriorating business and provide assurances to existing vendors, customers, and employees that they can and should continue to do business with, or remain employed by, Sungevity going forward. With this in mind, the Debtors negotiated for bidding procedures and sale terms that will facilitate a streamlined but fair process, and thereby preserve their going concern value for the benefit of all stakeholders.

**The Stalking Horse APA**

15. It is my opinion that the Stalking Horse APA was negotiated at arm's length as part of good faith negotiations. The Stalking Horse APA does not contain special treatment for the Debtors' affiliates or insiders and was unanimously approved by the voting members of the Debtors' Board of Directors.

**The Bidding Procedures**

16. It is my opinion that the Bidding Procedures will allow the Debtors to obtain the maximum recovery for their creditors under the circumstances. The Bidding Procedures are designed to establish a fair, open, and competitive postpetition bidding

process, subject to the time limitations driven by the Debtors' lack of liquidity and ongoing negative cash flow.

17.     In my opinion, an expedited sale process is unlikely to have a significant negative impact on the Debtors' ability to achieve a value maximizing sale, because some or all of the parties that originally expressed interest in purchasing the Debtors' assets will have the opportunity to participate in the bidding process, as will parties that did not participate in the pre-chapter 11 marketing process.

18.     As a condition to their willingness to serve as stalking horse bidders, the Stalking Horse Bidders required the inclusion of a breakup fee of $1.25 million (the "Breakup Fee") and reimbursement of certain of its costs and out-of-pocket expenses up to $1.25 million (the "Expense Reimbursement" and together with the Breakup Fee, the "Bid Protections").  It is my opinion that the Bid Protections are fair, reasonable and necessary to induce LHSC and Hercules to serve as stalking horse bidders.

19.     I believe that the proposed Bid Protections will help the Debtors to maximize the realizable value of the Debtors' assets for the benefit of the Debtors' estates, their creditors, and other parties in interest, and that such protections are reasonable under the circumstances and consistent with market practices.  The aggregate consideration being paid by the Stalking Horse Bidders includes up to $50 million in the form of a credit bid, plus the assumption of designated liabilities.   Assuming the full $50 million is credit bid, the proposed Breakup Fee is therefore less than 2.5% of the aggregate consideration even before the value of assumed liabilities is taken into account, and the proposed Expense Reimbursement is capped at the same level.

20.     In conclusion, I believe that approval of the proposed Bidding Procedures and the sale process contemplated by the Sale Motion will enable the Debtors to obtain the highest recovery for their creditors under the circumstances, and maximize the value of the Debtors' assets to the benefit of all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

/s/ Joshua S. Scherer
Joshua S. Scherer, Partner
Ducera Securities LLC

## Exhibit D

## Stalking Horse Purchase Agreement

**ASSET PURCHASE AGREEMENT**

**dated as of March 13, 2017**

between

**LSHC SOLAR HOLDINGS, LLC,**

**HERCULES CAPITAL, INC.**

**SUNGEVITY, INC.**

**AND**

**THE OTHER SELLERS PARTY HERETO**

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION** ............................................1
    1.1    Definitions..............................................................................................1
    1.2    Rules of Construction ..........................................................................13

**ARTICLE II PURCHASE AND SALE; ASSUMPTION OF CERTAIN**
**LIABILITIES**...............................................................................................**13**
    2.1    Purchase and Sale of Assets.................................................................13
    2.2    Excluded Assets ...................................................................................15
    2.3    Assignment and Assumption of Liabilities...........................................16
    2.4    No Other Liabilities Assumed ..............................................................17
    2.5    Revisions to Schedules to Sections 2.1 to 2.4......................................20
    2.6    Actions With Respect to Contracts .......................................................20
    2.7    Cure Amounts ......................................................................................21
    2.8    Deemed Consents and Cures ................................................................22
    2.9    Acquired Assets Sold "As Is, Where Is" ..............................................22

**ARTICLE III BASIC TRANSACTION**.............................................................................**23**
    3.1    Purchase Price......................................................................................23
    3.2    Allocation of Purchase Price ................................................................24

**ARTICLE IV CLOSING** ...............................................................................................**24**
    4.1    Closing .................................................................................................24
    4.2    Closing/Post-Closing Payments............................................................24
    4.3    Deliveries by Sellers ...........................................................................25
    4.4    Deliveries by Purchaser .......................................................................26
    4.5    Form of Instruments ............................................................................26
    4.6    Further Assurances...............................................................................26
    4.7    Withholding .........................................................................................26

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS** .........................**27**
    5.1    Organization; Standing ........................................................................27
    5.2    Validity of Agreement; Power..............................................................27
    5.3    Subsidiaries .........................................................................................28
    5.4    No Conflicts or Violations ...................................................................28
    5.5    Contracts ..............................................................................................28
    5.6    Real Property .......................................................................................30
    5.7    Title to Assets; Assets Necessary to Business .....................................30
    5.8    Affiliate Transactions..........................................................................31
    5.9    Permits ................................................................................................31
    5.10   Environmental Matters.........................................................................31
    5.11   Employee Benefits ...............................................................................32
    5.12   Names and Locations...........................................................................33
    5.13   Bank Accounts Schedule .....................................................................33

| | | |
|---|---|---|
| 5.14 | Taxes | 33 |
| 5.15 | FCPA | 33 |
| 5.16 | Compliance with Customs & International Trade Laws | 34 |

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER** ... **35**

| | | |
|---|---|---|
| 6.1 | Organization | 35 |
| 6.2 | Authority | 35 |
| 6.3 | Consents | 35 |
| 6.4 | Financing | 35 |
| 6.5 | Brokers | 35 |

**ARTICLE VII PRE-CLOSING COVENANTS** ... **35**

| | | |
|---|---|---|
| 7.1 | Consents and Approvals | 35 |
| 7.2 | Access to Information and Facilities | 36 |
| 7.3 | Conduct of the Business Pending the Closing | 36 |
| 7.4 | Notification of Certain Matters | 40 |
| 7.5 | Bankruptcy Actions | 41 |
| 7.6 | Other Bids | 41 |
| 7.7 | Other Bankruptcy Matters | 42 |
| 7.8 | Daily Reports | 42 |
| 7.9 | Sale of Subsidiary Shares Prior to Closing | 42 |

**ARTICLE VIII CONDITIONS TO CLOSING** ... **43**

| | | |
|---|---|---|
| 8.1 | Conditions to Parties' Obligations | 43 |
| 8.2 | Conditions to Purchaser's Obligations | 43 |
| 8.3 | Conditions to Sellers' Obligations | 45 |

**ARTICLE IX TERMINATION** ... **46**

| | | |
|---|---|---|
| 9.1 | Termination | 46 |
| 9.2 | Breakup Fee and Expense Reimbursement | 47 |
| 9.3 | Effect of Termination or Breach | 48 |

**ARTICLE X POST-CLOSING COVENANTS** ... **48**

| | | |
|---|---|---|
| 10.1 | Employees | 48 |
| 10.2 | Employee Benefit Plans | 49 |
| 10.3 | COBRA Coverage. | 49 |
| 10.4 | WARN Act | 50 |
| 10.5 | Payroll Reporting and Withholding | 50 |
| 10.6 | Certain Consents | 50 |
| 10.7 | Name Changes | 50 |
| 10.8 | Accounts Receivable; Collections | 51 |
| 10.9 | Confidentiality | 51 |
| 10.10 | Taxes | 51 |
| 10.11 | Purchaser Cooperation Regarding Adequate Assurance Information | 53 |

**ARTICLE XI MISCELLANEOUS** ... **53**

| | | |
|---|---|---|
| 11.1 | Non-Survival of Representations and Warranties | 53 |

| | | |
|---|---|---|
| 11.2 | Expenses | 54 |
| 11.3 | Amendment | 54 |
| 11.4 | Waivers | 54 |
| 11.5 | Notices | 54 |
| 11.6 | Counterparts; Electronic Execution | 56 |
| 11.7 | Headings | 56 |
| 11.8 | SUBMISSION TO JURISDICTION; WAIVER OF TRIAL BY JURY | 56 |
| 11.9 | Governing Law | 56 |
| 11.10 | Binding Nature; Assignment | 56 |
| 11.11 | No Third Party Beneficiaries | 57 |
| 11.12 | Construction | 57 |
| 11.13 | Public Announcements | 57 |
| 11.14 | Entire Understanding | 57 |
| 11.15 | Closing Actions | 57 |
| 11.16 | Conflict Between Transaction Documents | 58 |
| 11.17 | Time Periods | 58 |
| 11.18 | No Right of Set-Off | 58 |
| 11.19 | Action For Sellers; Joint and Several Liability | 58 |

**SCHEDULES**

| | |
|---|---|
| Schedule 2.1(a)(vi) | Assumed Facility Leases |
| Schedule 2.1(a)(vii) | Assumed Equipment Leases |
| Schedule 2.1(a)(viii) | Assumed Personal Property |
| Schedule 2.1(a)(ix) | Assumed Intellectual Property |
| Schedule 2.1(a)(x) | Assumed Contracts |
| Schedule 2.1(a)(xi) | Assumed Employee Benefit Plans |
| Schedule 2.2(a)(i) | Excluded Facility Leases |
| Schedule 2.2(a)(xv) | Other Excluded Assets |
| Schedule 2.3(a)(i) | Cure Amounts |
| Schedule 2.3(a)(iii) | Accounts Payable |
| Schedule 2.3(a)(v) | Rehired Employee Obligations |
| Schedule 5.1 | Foreign Qualifications |
| Schedule 5.4 | No Conflicts or Violations |
| Schedule 5.5(a) | Contracts |
| Schedule 5.5(b) | Contract Exceptions |
| Schedule 5.5(c) | Description of Oral Contracts |
| Schedule 5.6(c) | Facility Leases |
| Schedule 5.8 | Affiliate Transactions |
| Schedule 5.9 | Permits |
| Schedule 5.10(a) | Compliance with Environmental Laws |
| Schedule 5.10(b) | Notices with respect to Environmental Laws |
| Schedule 5.10(c) | Hazardous Substances |
| Schedule 5.11(a) | Company Benefit Plans |
| Schedule 5.11(b) | Multiemployer Plans |
| Schedule 5.12 | Names and Locations |
| Schedule 5.13 | Bank Accounts |
| Schedule 6.2 | Purchaser Authority |
| Schedule 6.3 | Purchaser Consents |
| Schedule 7.3 | Conduct of the Business Pending the Closing |
| Schedule 8.2(f) | Required Consents |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into as of this 13th day of March, 2017 (the "Effective Date"), by and between LSHC Solar Holdings, LLC, a Delaware limited liability company ("Purchaser"), Hercules Capital, Inc. (formerly known as Hercules Technology Growth Capital, Inc.), a Maryland corporation ("Secured Party"), Sungevity, Inc., a Delaware corporation ("Parent"), and the Debtor Subsidiaries (collectively with Parent, "Sellers").

## RECITALS

Sellers are engaged in the business of providing a technology platform that enables the sale and installation of solar energy systems to residential and commercial customers (the "Business").

Parent, along with certain of its Affiliates (as hereafter defined), intends to commence proceedings (collectively, the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code (as hereafter defined) in the Bankruptcy Court (as hereafter defined) and, subject to approval of the Bankruptcy Court and on the terms and subject to the conditions set forth herein and pursuant to a Sale Order (as hereafter defined), the parties desire to enter into this Agreement pursuant to which, among other things, Sellers shall sell to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in and to the Acquired Assets (as hereafter defined) and Purchaser shall assume from Sellers and thereafter pay, discharge and perform the Assumed Obligations (as hereafter defined).

The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and would be consummated only pursuant to a Sale Order to be entered by the Bankruptcy Court and applicable provisions of the Bankruptcy Code.

In consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

1.1     Definitions.  Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Accounts Receivable" means all accounts and notes receivable (whether current or non-current) in respect of goods shipped, products sold or services rendered by Sellers relating to the Business prior to the Closing Date.

"Acquired Assets" has the meaning set forth in Section 2.1(a).

"Acquisition Proposal" means a proposal (other than by Purchaser or its Affiliates) relating to any merger, consolidation, business combination, sale or other disposition of ten percent (10%) or more of the Acquired Assets pursuant to one (1) or more transactions

(excluding sales of Inventory in the Ordinary Course of Business), the sale of ten percent (10%) or more of the outstanding shares of capital stock or equity interests of any of the Sellers (including by way of a tender offer, foreclosure or plan of reorganization or liquidation) or a similar transaction or business combination involving one (1) or more Third Parties and any of the Sellers.

"<u>Affiliate</u>" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether by contract, through the ownership of voting securities or otherwise.

"<u>Affiliated Group</u>" means an "affiliated group" as defined in Section 1504 of the Code (or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax Law) of which Parent is or has been a member.

"<u>Agreement</u>" means this Asset Purchase Agreement, including all of the Schedules hereto, as the same may be amended from time to time in accordance with its terms.

"<u>Allocation</u>" has the meaning set forth in <u>Section 3.2</u>.

"<u>Assignment and Assumption Agreements</u>" has the meaning set forth in <u>Section 4.3(b)</u>.

"<u>Assumed Contracts</u>" has the meaning set forth in <u>Section 2.1(a)(x)</u>.

"<u>Assumed Employee Benefit Plans</u>" has the meaning set forth in <u>Section 2.1(a)(xi)</u>.

"<u>Assumed Equipment Leases</u>" has the meaning set forth in <u>Section 2.1(a)(vii)</u>.

"<u>Assumed Executory Contracts</u>" means the Assumed Contracts and the Assumed Leases.

"<u>Assumed Facility Leases</u>" has the meaning set forth in <u>Section 2.1(a)(vi)</u>.

"<u>Assumed Leased Facilities</u>" means the Leased Facilities identified in the Assumed Facility Leases.

"<u>Assumed Leases</u>" has the meaning set forth in <u>Section 2.1(a)(vii)</u>.

"<u>Assumed Obligations</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Auction</u>" means the auction conducted by Sellers pursuant to the Bidding Procedures Order for substantially all of the Acquired Assets in the event a Qualified Bid (as defined in the Bidding Procedures Order) is timely received prior to the Bid Deadline.

"<u>Auction Deadline Date</u>" means the date that is eleven (11) days after the date of entry of the Bidding Procedures Order.

"<u>Avoidance Actions</u>" means any causes of action arising under Chapter 5 of the Bankruptcy Code, including any and all preference or other avoidance claims and actions of the

Sellers, including all such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Bid Deadline" means the date that is ten (10) days after the date of entry of the Bidding Procedures Order.

"Bidding Procedures Order" means the order of the Bankruptcy Court, in form and substance acceptable to the Purchaser in its sole discretion, which, among other things, grants the Breakup Fee and Expense Reimbursement in favor of the Purchaser and establishes a date for the Auction no later than the Auction Deadline Date, a date for the deadline for competing bidders to submit bids for the Acquired Assets no later than the Bid Deadline, and a date for a hearing to consider entry of the Sale Order no later than the Sale Order Deadline.

"Bidding Procedures Order Deadline" means the date that is fifteen (15) days after the Petition Date.

"Bids" means has the meaning defined in the Bidding Procedures Order.

"Books and Records" means all records and lists of the Business, including (i) all inventory, merchandise, analysis reports, marketing reports, research and development materials and creative material pertaining to the Acquired Assets, the Facilities or the Business, (ii) all records relating to customers, suppliers or personnel of Sellers or of the Business (including customer lists, mailing lists, e-mail address lists, recipient lists, personnel files and similar records relating to Rehired Employees, sales records, correspondence with customers, customer files and account histories, supply lists and records of purchases from and correspondence with suppliers), (iii) all records relating to all product, business and marketing plans of Sellers or the Business, (iv) all accounting records, Tax records and Tax Returns and (v) all books, ledgers, files, reports, plans, drawings and operating records of every kind; provided, however, that "Books and Records" shall not include (A) the originals of Sellers' minute books, stock books or Tax Returns, (B) personnel files for employees of Sellers who are not hired by Purchaser, (C) such files as may not be transferred under any applicable Law regarding privacy, (D) any materials containing privileged communications or materials which are otherwise subject to attorney client or any other privilege or documents that Sellers are not permitted to transfer pursuant to any contractual confidentiality obligation owed to any Third Party, (E) any "personally identifiable information" as defined under the Bankruptcy Code, or (F) documents to the extent relating solely to an Excluded Asset or Excluded Liability; provided, further, that "Books and Records" shall be limited to those in the possession of the Sellers.

"Breakup Fee" has the meaning set forth in Section 9.2(a).

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in the State of Delaware are authorized by Law to close.

"Business Employees" has the meaning set forth in Section 10.1.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) and any Laws promulgated thereunder.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Chief Restructuring Officer" means an individual designated by Secured Party, from time to time, who shall serve as the chief restructuring officer of Parent from the Effective Date through and including the Closing Date.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means any Contract or other binding agreement or arrangement (written or oral) with any labor union or organization, works council or other employee representative.

"Company Benefit Plan" has the meaning set forth in Section 5.11(a).

"Contract" means any agreement, license, contract, commitment, Collective Bargaining Agreement or other binding arrangement or understanding, whether written or oral, and with respect to any Contract to which any Seller is a party, such contract which such Seller is permitted under the Bankruptcy Code to assume and assign other than an Employee Benefit Plan.

"Cure Amount" has the meaning set forth in Section 2.3(a)(i).

"Customs & International Trade Laws" means any Law, executive order, Permit, license, award, or other decision or requirement having the force or effect of law, of any Governmental Authority, concerning the importation of merchandise, the export or re-export of products (including technology and services), the terms and conduct of international transactions, and the making or receiving of international payments, including the Tariff Act of 1930, as amended, and other Laws and programs administered or enforced by U.S. Customs and Border Protection ("Customs"), U.S. Immigration and Customs Enforcement, and their predecessor agencies, the Export Administration Act of 1979, as amended, the Export Administration Regulations, the International Emergency Economic Powers Act, as amended, the Trading With the Enemy Act, as amended, the Arms Export Control Act, the International Traffic in Arms Regulations, any

other export control regulations administered by an agency of the U.S. government, the Foreign Trade Regulations, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), as amended, executive orders of the President regarding embargoes and restrictions on transactions with designated entities (including countries, terrorists, organizations and individuals), the embargoes and restrictions administered by the U.S. Office of Foreign Assets Control, the Money Laundering Control Act of 1986, as amended, requirements for the marking of imported merchandise, prohibitions or restrictions on the importation of merchandise made with the use of slave or child labor, the Foreign Corrupt Practices Act, as amended, the UK Bribery Act of 2010, as amended, and any other antibribery or anticorruption statutes designed to cover conduct similar to that covered by the Foreign Corrupt Practices Act or the UK Bribery Act of 2010, the antiboycott regulations administered by the U.S. Department of Commerce, the antiboycott regulations administered by the U.S. Department of the Treasury, legislation and regulations of the U.S. and other countries implementing the North American Free Trade Agreement and other free trade agreements to which the U.S. is a party, the antidumping and countervailing duty Laws, and Laws adopted by the Governmental Authorities of other countries concerning the ability of U.S. persons to own businesses or conduct business in those countries, restrictions by other countries on holding foreign currency or repatriating funds, or otherwise relating to the same subject matter as the U.S. statutes and regulations described above.

"<u>Daily Report</u>" shall mean, as of any given day, the reports on cash balances and installations pursuant to Section 7.1(g) of the DIP Credit Agreement, together with a daily report of the accounts receivable and inventory of the Sellers.

"<u>Debtor Subsidiaries</u>" shall mean Sungevity SD, LLC, Sungevity Development, LLC and Sungevity International Holdings, LLC, collectively.

"<u>DIP Available Funds</u>" means the funds available pursuant to the DIP Financing as of the Closing Date.

"<u>DIP Budget</u>" shall mean the operating budget under the terms of the DIP Financing.

"<u>DIP Credit Agreement</u>" means that certain Debtor-In-Possession Loan and Security Agreement by and among Parent, Sungevity Development, LLC, the subsidiary guarantors party thereto, Purchaser and the other lenders from time to time party thereto, and Wilmington Trust, National Association, as administrative agent, as amended, modified or restated.

"<u>DIP Financing</u>" means the debtor-in-possession financing facility to be provided by Purchaser (and the other lenders from time to time party to the DIP Credit Agreement) to Sellers.

"<u>DIP Obligations</u>" means, as of a particular time, all Indebtedness outstanding under the DIP Credit Agreement as of such time.

"<u>Disclosure Schedules</u>" means the Schedules provided pursuant to this Agreement.

"<u>Effective Date</u>" has the meaning set forth in the preamble.

"<u>Electronic Delivery</u>" has the meaning set forth in <u>Section 11.6</u>.

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" (as defined in ERISA §3(3)) and any other benefit or compensation plan, program, agreement or arrangement maintained, sponsored, or contributed or required to be contributed to by Seller or with respect to which Sellers have any Liability.

"<u>Environmental Laws</u>" means, whenever in effect, all federal, state, provincial, local and foreign statutes, Laws (including CERCLA and analogous state Laws), ordinances, directives and other provisions having the force or effect of law, all judicial and administrative Orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health and safety, or pollution or protection of the environment.

"<u>ERISA Affiliate</u>" means any Person that, at any relevant time, is or was treated as a single employer with any Seller for purposes of section 414 of the Code.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"<u>Excess Cure Amounts</u>" has the meaning set forth in <u>Section 2.7</u>.

"<u>Exchange Act</u>" means the United States Securities Exchange Act of 1934, as amended.

"<u>Excluded Assets</u>" has the meaning set forth in <u>Section 2.2</u>.

"<u>Excluded Cash</u>" means cash in an amount equal to $1,000,000.00.

"<u>Excluded Contracts</u>" has the meaning set forth in <u>Section 2.2(a)(iii)</u>.

"<u>Excluded Employee Benefit Plans</u>" has the meaning set forth in <u>Section 2.4(a)(xiv)</u>.

"<u>Excluded Environmental Liabilities</u>" means any Liability (including any investigatory, corrective or remedial obligation) arising under Environmental Laws and relating to (i) any Seller or any predecessor or Affiliate of any Seller, (ii) the operation of the Business prior to the Closing, (iii) any Excluded Asset, (iv) any property, facility, or location other than the Assumed Leased Facilities, or (v) any operations, events, conditions, or circumstances occurring or existing on or prior to the Closing Date at any location including, without limitation, at the Assumed Leased Facilities, including any Release, threatened Release, treatment, storage, disposal, or arrangement for disposal of or any exposure of any Person to Hazardous Substances occurring or existing on or prior to the Closing Date (whether or not constituting a breach of any representation or warranty herein and whether or not set forth on any Disclosure Schedule).

"<u>Excluded Equipment Leases</u>" has the meaning set forth in <u>Section 2.2(a)(ii)</u>.

"<u>Excluded Facility Leases</u>" has the meaning set forth in <u>Section 2.2(a)(i)</u>.

"<u>Excluded Leases</u>" has the meaning set forth in <u>Section 2.2(a)(ii)</u>.

"<u>Excluded Liabilities</u>" has the meaning set forth in <u>Section 2.4(a)</u>.

"Executive Officer" of a Person means its chairman, chief executive officer, chief financial officer, president, any vice president, secretary, controller, treasurer or general counsel.

"Expense Reimbursement" has the meaning set forth in Section 9.2(a).

"Facilities" means collectively the premises at which Sellers operate.

"Facility Leases" means all right, title and interest of Sellers in all leases, subleases, licenses, concessions and other agreements (written or oral) and all amendments, modifications, extensions, renewals, guaranties and other agreements with respect thereto, including the right to all security deposits and other amounts and instruments deposited by or on behalf of Sellers thereunder, pursuant to which any Seller holds a leasehold or subleasehold estate in, or is granted the right to use or occupy, a Leased Facility.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Foreign Corrupt Practices Act" means the Foreign Corrupt Practices Act of 1977, as amended, and all Laws issued thereunder.

"Fundamental Representations" means each of the representations and warranties contained in Sections 5.1 (Organization, Standing), 5.2 (Validity of Agreement; Power), and 5.7 (Title to Assets; Assets Necessary to Business).

"GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or taxing authority, or arbitral body.

"Guaranty" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon the Indebtedness, obligation or other Liability of any other Person (other than by endorsements of instruments in the ordinary course of collection), or guaranties of the payment of dividends or other distributions upon the shares of any other Person.

"Hazardous Substances" means any wastes, pollutants, contaminants or chemicals, any industrial, toxic or otherwise hazardous materials, substances or wastes, any explosive or radioactive substances, and any other substance with respect to which Liability or standards of conduct may be imposed under applicable Law, including petroleum and petroleum related substances, products, by products and wastes, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon, urea, formaldehyde, mold, lead based paint, noise, odor and radiation.

"Indebtedness" means, with respect to any Person as of any date of determination, without duplication: (i) all obligations of such Person for borrowed money or in respect of loans or advances, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or debt securities, (iii) the maximum amount of all obligations in respect of letters of credit and bankers' acceptances issued for the account of such Person, (iv) all obligations arising from cash/book overdrafts, (v) all obligations arising from deferred compensation arrangements, (vi) all obligations of such Person secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, (vii) all Guaranties of such Person in connection with any of the foregoing, (viii) all capital lease obligations, (ix) all deferred rent, (x) all indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables incurred in the Ordinary Course of Business which are not past due), (xi) all obligations under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (xii) all obligations (determined on the basis of actual, not notional, obligations) with respect to interest rate protection agreements, interest rate swap agreements, foreign currency exchange agreements, or other interest or exchange rate hedging agreements or arrangements, (xiii) all customer rebates and allowances and (xiv) all fees, accrued and unpaid interest, premiums or penalties related to any of the foregoing.

"Insider" means, any Executive Officer, director, governing body member, stockholder, partner or Affiliate, as applicable, of any Seller or any predecessor or Affiliate of any Seller or any individual related by marriage or adoption to any such individual or any entity in which any such Person owns any beneficial interest.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications and invention disclosures, together with all reissuances, continuations, continuations in part, revisions, divisionals, extensions and reexaminations thereof, (ii) trademarks, service marks, designs, trade dress, logos, slogans, trade names, internet domain names, corporate names, all applications, registrations and renewals in connection therewith, and all translations, adaptations, derivations and combinations of any of the foregoing, together with all goodwill associated with any of the foregoing, (iii) copyrights, mask works and copyrightable works, and all applications, registrations and renewals in connection therewith, (iv) trade secrets and confidential information (including formulations, ideas, research and development, know-how, inventions, technology, formulas, compositions, manufacturing and production processes and techniques, technical data, financial and marketing plans, customer and supplier lists and information, designs, drawings, plans, proposals and specifications), (v) computer software and systems (including source code, executable code, data, databases and related documentation), websites, URLs, email addresses, and telephone numbers, (vi) copies and tangible embodiments of any of the foregoing in whatever form or medium and (vii) other proprietary and intellectual property rights.

"Inventory" means all inventory of any kind or nature, whether or not prepaid, and wherever located, held or owned by any Seller, including all raw materials, work in process, semi-finished and finished products, replacement and spare parts, packaging materials, operating supplies, in-transit or consigned inventory, fuels and other and similar items and inventory for amounts currently subject to reserve.

"Law" means any law, statute, regulation, code, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Leased Facilities" means any land, buildings, structures, improvements, fixtures or other interest in real property which any Seller has the right to use, or which is used or intended to be used by a Seller or used or intended to be used in, or otherwise related to, the Business.

"Liability" means any Claim, obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether determined or determinable, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes, product liability or infringement liability.

"Lien" or "Liens" means any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, right of pre-emption, right of first refusal or other Third Party right, Tax (including foreign, federal, state and local Tax), Order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that any Purchaser is a successor, transferee or continuation of a Seller or the Business, and (iv) any leasehold interest, license or other right, in favor of a Third Party or an Affiliate of a Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Material Adverse Change" or "Material Adverse Effect" means, any event, change, condition or matter that, individually or in the aggregate is or would reasonably be expected to be materially adverse to, or materially impair the revenue or anticipated revenue of the Business or impair the value of, the Acquired Assets or results in a material adverse effect or change in the operation, results of operations, condition (financial or otherwise) of the Acquired Assets or the Business, taken as a whole, or which materially impairs the ability of any Seller to perform its obligations under this Agreement or has a material adverse effect on or would reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby; provided, however, that in determining whether there has been a Material Adverse Change or Material Adverse Effect, any effect to the extent attributable to any of the following shall be disregarded (subject to the qualification of disproportionality set forth in the last provision of this definition): (i) with respect to the Acquired Assets, any change in the general condition of the national or global economy, (ii) the announcement of this Agreement or the transactions contemplated hereby in accordance with the terms hereof, (iii) the filing by Sellers of the Chapter 11 Cases in and of itself, (iv) actions or omissions of Sellers resulting from restrictive covenants contained in this Agreement which Purchaser does not waive following an explanation and request from Sellers, (v) the sale process of the Business to the extent in accordance with the terms of the Bidding Procedures Order, other than with respect to the foregoing clause (i), to the extent such event, change, condition or matter has or would

reasonably be expected to have a disproportionate effect on the Sellers (taken as a whole) relative to other businesses operating in the industry in which the Sellers operate.

"Material Contracts" has the meaning set forth in Section 5.5(b).

"Miscellaneous Excluded Contracts" has the meaning set forth in Section 2.2(a)(iii).

"Multiemployer Plan" means any "multiemployer plan" (as defined in ERISA Section 3(37)) contributed to by any Seller or any ERISA Affiliate or with respect to which any Seller or any ERISA Affiliate has any Liability.

"Notice" means any notice, summons, citation, directive, Order, claim, litigation, proceeding, letter or other communication, written or oral, actual or threatened, from any Governmental Authority, or any other entity or any individual, and shall include any notice or similar filing in the Chapter 11 Cases and the imposition of any Lien on property owned, leased, occupied or used by any Seller pursuant to any Environmental Law.

"Order" means any award, decision, decree, settlement, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business by Sellers in the usual and ordinary course in the manner Sellers operated prior to the commencement of the Chapter 11 Cases (including with respect to quantity and frequency).

"Outside Date" has the meaning set forth in Section 9.1(c).

"Parties" means Purchaser, Secured Party and each of the Sellers.

"Permits" means licenses, permits, approvals, franchises, bonds, accreditations, certificates of occupancy, authorizations, operating permits, registrations, plans and the like.

"Permitted Liens" means each of the following Liens: (i) statutory liens of landlords and Liens of carriers, warehousemen, mechanics and materialmen, and created in the Ordinary Course of Business which are not then due or delinquent but only to the extent that such Liens are related to an Assumed Obligation; (ii) Liens for real property Taxes not yet due and payable as of the Closing Date; (iii) any defects, exceptions, existing easements, covenants, conditions, rights-of-way, restrictions and other encumbrances (other than monetary liens) and matters currently of record affecting title to the real property which, taken individually or as a whole, do not or would not materially impair the present ownership, use or operations of such properties or assets; and (iv) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property assets or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business thereon.

"Person" means any corporation, partnership (including any limited partnership and any limited liability partnership), joint venture, limited liability company, organization, trust, entity, authority or natural person.

"<u>Petition Date</u>" means the date of the filing of the Chapter 11 petitions of Sellers.

"<u>Pre-Closing Tax Period</u>" has the meaning set forth in <u>Section 10.9</u>.

"<u>Proceeding</u>" means any action, claim, charge, complaint, dispute, demand, grievance, action, litigation, audit, investigation, review, inquiry, arbitration, liability, damage, suit in equity or at law, administrative, regulatory or quasi-judicial proceeding, account, cost, expense, setoff, contribution, attorney's fee or cause of action of whatever kind or character.

"<u>Proration Items</u>" has the meaning set forth in <u>Section 10.9(d)</u>.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Purchaser</u>" has the meaning set forth in the preamble.

"<u>Rehired Employees</u>" has the meaning set forth in <u>Section 10.1</u>.

"<u>Release</u>" means any release, emission, disposal, leaching or migration into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Substances) or any structure, facility or property.

"<u>Restricted Names</u>" has the meaning set forth in <u>Section 10.6</u>.

"<u>Rule</u>" or "<u>Rules</u>" means the Federal Rules of Bankruptcy Procedure.

"<u>Sale Order</u>" means the Final Order of the Bankruptcy Court to be entered by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code, which Final Order, amongst other approvals, approves the sale of the Business and the Acquired Assets to Purchaser free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Obligations) pursuant to Section 363(f) of the Bankruptcy Code, and which has not been modified in any respect without the prior consent of Purchaser and which is, in any case, in a form to be mutually agreed between Parent and Purchaser prior to the Closing.

"<u>Sale Order Deadline</u>" means the date that is twelve (12) days after the date of entry of the Bidding Procedures Order (or if such date falls on a day that is not a Business Day, the next Business Day).

"<u>Schedules</u>" means the schedules attached hereto (including the Disclosure Schedules).

"<u>Secured Party</u>" has the meaning set forth in the recitals.

"<u>Sellers</u>" has the meanings set forth in the preamble.

"<u>Seller Contracts</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>Senior Secured Obligations</u>" means the aggregate amount of $55,000,000 in principal indebtedness outstanding, plus (i) interest accrued as of the Petition Date, and interest to accrue thereafter subject to 11 U.S.C. § 506(b), and (ii) all fees, costs and charges, including professional expenses, and any other amounts outstanding under the Senior Facility pursuant to

the Senior Credit Documents including obligations in respect of the cash management system, cash collateral for letters of credit, purchase charge cards, purchase card services, fees, expenses, and indemnity.

"<u>Straddle Period</u>" has the meaning set forth in Section 10.09(a).

"<u>Subsidiary</u>" means, with respect to any Person, any corporation a majority of the total voting power of shares of stock of which is entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one (1) or more of the other Subsidiaries of that Person or a combination thereof, or any partnership, limited liability company, association or other business entity a majority of the partnership or other similar ownership interest of which is at the time owned or controlled, directly or indirectly, by that Person or one (1) or more Subsidiaries of that Person or a combination thereof. For purposes of this definition, a Person is deemed to have a majority ownership interest in a partnership, limited liability company, association or other business entity if such Person is allocated a majority of the gains or losses of such partnership, limited liability company, association or other business entity or is or controls the managing director or general partner of such partnership, limited liability company, association or other business entity.

"<u>Subsidiary Shares</u>" means all equity securities held by any Seller in the following entities: (i) Sungevity International B.V., (ii) Sungevity UK Ltd., (iii) Sungevity Netherlands, B.V. and (iv) Sungevity Belgium BVBA.

"<u>Tax</u>" and, with correlative meaning, "<u>Taxes</u>" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated, gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock, franchise, profits, license, registration, recording, documentary, escheat or unclaimed property, intangibles, conveyancing, gains, employee or other withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real or personal), environmental or windfall profit tax, customs, duty or other tax, governmental fee or other like assessment, charge or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (domestic or foreign) responsible for the imposition of any such tax, whether such Tax is disputed or not, (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto).

"<u>Tax Return</u>" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by any Person relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Third Party" means any Person other than Sellers, Secured Party, Purchaser or any of their respective Affiliates.

"Transaction Documents" means this Agreement, and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar Law.

1.2     Rules of Construction. Unless the context otherwise clearly indicates, in this Agreement:

(a)     the singular includes the plural;

(b)     "includes" and "including" are not limiting;

(c)     "may not" is prohibitive and not permissive; and

(d)     "or" is not exclusive.

**ARTICLE II**
**PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES**

2.1     Purchase and Sale of Assets.

(a)     Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers shall sell, contribute, convey, assign, transfer and deliver to Purchaser, free and clear of all Liens, whether arising prior to, on or following the Petition Date, other than Permitted Liens, and Purchaser shall purchase, acquire and take assignment and delivery of, for the consideration specified in ARTICLE III, all rights, titles and interests of every kind and nature of Sellers (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights of Sellers (contractual or otherwise) used in or relating to the Business as of the Closing Date to the extent assignable other than the Excluded Assets, whether tangible or intangible, real or personal and wherever located and by whomever possessed, whether or not listed below but including for the avoidance of doubt all of the following properties, assets and rights (all of the assets to be sold, assigned, transferred and delivered pursuant to this Section 2.1(a) shall be referred to herein as the "Acquired Assets"):

(i)     all cash (including checking account balances, certificates of deposit and other time deposits and petty cash) net of overdrafts and marketable and other securities, other than Excluded Cash;

(ii)     all Accounts Receivable and all claims, including deposits, advances, prepaid and other current assets, rights under warranties and Guaranties, rights in respect of promotional allowances, vendor rebates and to other refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether known or unknown or contingent or non-contingent); the right to receive and retain mail, Accounts Receivable payments and other communications of Sellers; and the right to bill and receive

payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

(iii)     any rights, claims or causes of action of any Seller against third parties arising out of events occurring prior to the Closing Date (including, for the avoidance of doubt, those arising out of events occurring prior to the Petition Date), including any and all Avoidance Actions arising from or related to the Acquired Assets or the Assumed Obligations;

(iv)     all bank accounts, safety deposit boxes, lock boxes and the like;

(v)     all Inventory;

(vi)     all of Sellers' rights existing under the Facility Leases set forth on Schedule 2.1(a)(vi) (the "Assumed Facility Leases"), including all rights to security deposits held pursuant thereto;

(vii)     all of Sellers' rights existing under those equipment, personal property and intangible property leases, rental agreement, licenses, contracts, agreements and similar arrangements set forth on Schedule 2.1(a)(vii) (the "Assumed Equipment Leases", together with the Assumed Facility Leases, the "Assumed Leases");

(viii)     all tangible personal property, including all machinery, equipment (including all transportation and office equipment), vehicles, computers, mobile phones, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible personal property of any kind owned by any Seller, wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by any Seller or any other space where any of Sellers' properties and or any other assets may be situated, including but not limited to those items set forth on Schedule 2.1(a)(viii);

(ix)     all Intellectual Property owned, licensed, used or held for use by any Seller, including but not limited to the Intellectual Property set forth on Schedule 2.1(a)(ix), along with all income, royalties, damages and payments due or payable to any Seller as of the Closing or thereafter, including damages and payments for past, present or future infringements or misappropriations thereof or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof or other conflicts therewith, and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

(x)     all rights of Sellers under the Contracts of Sellers set forth on Schedule 2.1(a)(x) (the "Assumed Contracts"), including all security deposits thereunder, all contractual rights of Sellers to indemnification, exculpation, advancement or reimbursement of expenses, and all rights to proceeds under insurance policies;

(xi)     all rights of Sellers under each Company Benefit Plan which is identified on Schedule 2.1(a)(xi), if any (the "Assumed Employee Benefit Plans"), including all pre-payments, deposits and refunds thereunder, and any assets maintained pursuant thereto or in connection therewith;

(xii)    all Books and Records and all advertising, marketing and promotional materials and all other printed or written materials (provided, however, that Purchaser agrees that for a period of three (3) years after Closing, Sellers shall have reasonable access upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of Purchaser to the Books and Records for purposes of completing its Tax Returns, for regulatory compliance reasons, for purposes of defending or prosecuting any litigation or other claims and otherwise administering and finalizing the Chapter 11 Cases);

(xiii)    all Permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records of Sellers held by such permitting, licensing and certifying agencies;

(xiv)    all goodwill as a going concern;

(xv)    the Subsidiary Shares; and

(xvi)    all such other properties, assets and rights (contractual or otherwise) of Sellers used in or relating to the Business as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed which are not otherwise expressly set forth above as Acquired Assets and are not Excluded Assets.

2.2    Excluded Assets.

(a)    Notwithstanding anything to the contrary in this Agreement, the following assets of Sellers shall be retained by Sellers and are not being sold or assigned to Purchaser hereunder (all of the following are referred to collectively as the "Excluded Assets"):

(i)    all Facility Leases of Sellers other than the Assumed Facility Leases (the "Excluded Facility Leases"), including the Facility Leases set forth on Schedule 2.2(a)(i);

(ii)    all equipment leases of Sellers other than the Assumed Equipment Leases (the "Excluded Equipment Leases", together with the Excluded Facility Leases, the "Excluded Leases");

(iii)    all Contracts of Sellers other than the Assumed Contracts, including all employment agreements, severance agreements, stay bonus agreements, indemnification agreements, and change in control agreements (the "Miscellaneous Excluded Contracts", and together with the Excluded Leases, the "Excluded Contracts"), together with all claims and causes of actions with respect to or arising in connection with such Excluded Contracts;

(iv)    originals of Sellers' minute books and stock books, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, other documents relating to the organization, maintenance, and existence of each Seller as a corporation or other entity, and any document, instrument or agreement excluded from the definition of Books and Records in Section 1.1 above;

(v)     the equity securities or other ownership interest of Parent in Sungevity Short Hills 2012, LLC and its direct and indirect Subsidiaries;

(vi)     all assets associated with any Excluded Employee Benefits Plan;

(vii)     Sellers' insurance policies and any prepaid premiums with respect thereto to the extent such policies cover any Excluded Liabilities;

(viii)     all claims, deposits, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment with respect to any Excluded Assets (including, without limitation, with respect to insurance policies);

(ix)     any rights, claims or causes of action of any Seller against third parties arising out of events occurring prior to the Closing Date (including, for the avoidance of doubt, those arising out of events occurring prior to the Petition Date), including any and all Avoidance Actions that do not arise from or relate to the Acquired Assets or the Assumed Obligations

(x)     all deposits with respect to legal, accounting, financial advisory, valuation and investment banking fees and expenses incurred by or on behalf of Sellers or their Affiliates;

(xi)     Inventory sold by Sellers in the Ordinary Course of Business prior to the Closing Date;

(xii)     all rights of Sellers arising under this Agreement or any of the other Transaction Documents;

(xiii)     any Contract terminated or expired prior to the Closing Date in accordance with its terms or in the Ordinary Course of Business;

(xiv)     all rights, claims and causes of action of Sellers that are not related to the Acquired Assets or the Assumed Obligations;

(xv)     all of the Excluded Cash; and

(xvi)     all other assets listed on Schedule 2.1(a)(xv).

2.3     Assignment and Assumption of Liabilities.

(a)     Subject to the terms and conditions set forth in this Agreement, including this Section 2.3, Purchaser shall assume from Sellers and thereafter be responsible for the payment, performance or discharge of only the following liabilities and obligations of Sellers to the extent related to the Business (all such liabilities and obligations assumed pursuant to this Section 2.3(a) shall be referred to herein as the "Assumed Obligations"):

(i)     any costs of cure with respect to the Assumed Executory Contracts, in an amount up to the amount set forth next to such Assumed Executory Contract on

Schedule 2.3(a)(i) as the same may be updated pursuant to Section 2.7, (the "Cure Amounts", or with respect to an individual Assumed Executory Contract, the "Cure Amount") (for the avoidance of doubt, it is agreed and understood that to the extent no amount is set forth next to an Assumed Executory Contract on Schedule 2.3(a)(i), the Cure Amount is deemed to be zero);

(ii)     all Liabilities first arising on or after the Petition Date through and including the Closing Date. The parties acknowledge and agree that referral fees generated from referrals prior to the Petition Date shall be considered pre-Petition Date claims for this purpose;

(iii)     other than with respect to claims for accounts payable incurred and arising out of transactions occurring prior to the Petition Date, the ordinary course post-petition accounts payable of Sellers as of the Closing Date to the extent payable to the third parties;

(iv)     the sponsorship and obligations of the Assumed Employee Benefit Plans, if any, other than any Liabilities associated with such Assumed Employee Benefit Plans arising in connection with any breach of any representation, warranty or covenant hereunder occurring on or prior to the Closing Date;

(v)     with respect to the Rehired Employees, the liabilities with respect to any unpaid base wages and base salaries, and accrued commissions, vacation, sick leave, personal time (to the extent not paid) as of the Closing Date to the extent such Liabilities are set forth in Schedule 2.3(a)(v) or such liabilities are specifically assumed by Purchaser pursuant to Sections 10.1 and 10.2, but not including any bonus, retention or severance obligations or arising from any violation of Law by Sellers prior to the Closing Date; and

(vi)     any fees payable by Sellers to Ducera Partners LLC in connection with the transactions contemplated by this Agreement.

For the avoidance of doubt, the Assumed Obligations shall not include any item listed in Sections 2.4(a)(i)-2.4(a)(xix).

(b)     Section 2.3(a) shall not limit any claims or defenses Purchaser may have against any party other than Sellers. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any Third Party against Purchaser or Sellers as compared to the rights and remedies which such Third Party would have had against Sellers absent the Chapter 11 Cases and had Purchaser not assumed such Assumed Obligations.

2.4     No Other Liabilities Assumed.

(a)     Purchaser shall not be the successor to any Liability of any Seller, and each Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser will not assume, nor in any way be liable or responsible for, any claim or Liability of any Seller and its Affiliates (including Liabilities relating to the pre-petition or post-petition operation of the Business, the Excluded Assets or to the Acquired Assets (and the use thereof)), whether relating to or arising out of the Business, the Excluded Assets, the Acquired Assets or otherwise, and whether or not listed below, including any Indebtedness, Excluded Employee Benefit Plan, Collective Bargaining Agreement or other Liability of any Seller or any predecessor or Affiliate of any Seller whatsoever or any ERISA Affiliate other than the Assumed

Obligations (any such obligations, the "Excluded Liabilities"); provided, that, in furtherance and not in limitation of the foregoing, the Assumed Obligations do not include, and Purchaser is expressly not assuming, any of the following Liabilities, whenever or wherever arising:

(i)     all claims or Liabilities of Sellers that relate to any of the Excluded Assets, including executory Contracts and unexpired Leases that are not Assumed Executory Contracts;

(ii)     all Liabilities of Sellers relating to Taxes (including with respect to the Business or the Acquired Assets or otherwise) including (A) Taxes that may arise as a result of any claim, audit, investigation, assessment, or adjustment for any amount of Tax proposed, asserted, or assessed by any taxing authority, court or other Governmental Authority against any Seller or any Affiliated Group of which any Seller was a member, (B) Taxes that may arise as a result of the sale of the Acquired Assets or the assumption of the Assumed Obligations pursuant to this Agreement, (C) any deferred Taxes of any nature or (D) Taxes of any Person under Treasury Regulation §1.1502-6 (or any similar provision of state, local, or non-U.S. Law), as a transferee or successor or by contract, or otherwise;

(iii)     all Liabilities for Taxes attributable to the Acquired Assets or the Business for any taxable periods (or the portion thereof) ending on or before the Closing Date;

(iv)     all accounts payable of Sellers or any predecessors or Affiliates of Sellers, except for Cure Amounts payable by Purchaser pursuant to Section 2.7 and accounts payable assumed by Purchaser pursuant to Section 2.3(a)(i) or 2.3(a)(iii);

(v)     all Liabilities in respect of Indebtedness of Sellers or any predecessors or Affiliates of Sellers;

(vi)     all Excluded Environmental Liabilities (regardless of whether such Liabilities accrue to Sellers or to Purchaser in the first instance);

(vii)     all Liabilities pursuant to the WARN Act relating to any action or inaction of Sellers prior to or upon the Closing;

(viii)     except for Cure Amounts payable by Purchaser as contemplated in Section 2.7 and assumed by Purchaser pursuant to Section 2.3(a)(i), all Liabilities of Sellers resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of Sellers (or any of their current or former officers, directors, employees or agents) anywhere or ownership or lease of any properties or assets or any properties or assets previously used by Sellers at any time, or other actions, omissions or events occurring prior to the Closing and which (i) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any Law or (ii) relate to any and all Proceedings against Sellers or their predecessors or Affiliates whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened;

(ix)     all Liabilities arising out of any Proceeding commenced against any Seller or any predecessor or Affiliate of any Seller after the Closing to the extent arising out of or relating to any occurrence or event happening prior to the Closing;

(x)     all Liabilities under any Assumed Executory Contract which arises after the Closing but arises out of or relates to any breach that occurred prior to the Closing;

(xi)     all Liabilities arising out of or relating to any infringement or misappropriation of, or other conflict with, the Intellectual Property of any Third Party to the extent arising out of or related to the conduct of the Business or any act or omission of Sellers or any predecessor or Affiliate of any Seller prior to the Closing;

(xii)     all Liabilities arising out of, or relating to, any indemnification obligations of Sellers, including indemnification obligations pursuant to supply agreements, service agreements, purchase agreements, leases and any other type of Contract that, in each case does not arise pursuant to an Assumed Contract, to the extent arising out of or related to the conduct of the Business or any act or omission of Sellers or any predecessors or Affiliates of Sellers prior to the Petition Date and Liabilities to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Sellers;

(xiii)     except as set forth in Section 2.3(a)(iv) or 2.3(a)(v), all Liabilities with respect to the current or former employees, consultants or contractors (or any applicants for such positions) (or their representatives or beneficiaries) of Sellers arising prior to, on or after the Closing Date, including payroll, wages, salaries, bonuses, commissions, benefits, retention or stay bonus arrangements, other compensation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or benefits, or any other employee plans or benefits or other compensation of any kind (except for with respect to the Assumed Employee Benefit Plans) to any employee, and obligations of any kind, including Liabilities arising under any employment, severance, retention or termination agreement with any employee, consultant or contractor (or their representatives) of any Seller or any Collective Bargaining Agreement;

(xiv)     all Liabilities relating to or arising under or in connection with (A) any Employee Benefit Plan that is excluded under Section 2.2(a)(iii) (including, for the avoidance of doubt, any Liabilities associated with any Multiemployer Plan) and (B) any other employee benefit or compensation plan, program, agreement or arrangement at any time maintained, sponsored or contributed or required to be contributed to by Sellers or any ERISA Affiliate, or with respect to which Sellers or any ERISA Affiliate has any Liability (including, without limitation, any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) subject to Title IV of ERISA) that is not specifically an Assumed Employee Benefit Plan (collectively, the "Excluded Employee Benefit Plans");

(xv)     all Liabilities arising out of or relating to services, products or product or service warranties of Sellers or any predecessor(s) or Affiliate(s) of Sellers arising under any contract that is not an Assumed Contract, to the extent provided, developed, designed, manufactured, marketed, sold or distributed prior to the Petition Date;

(xvi)     all Liabilities of any Seller to any current, former or prospective shareholder or other equity interest holder of any Seller, including all Liabilities of any Seller related to the right to or issuance of any capital stock or other equity securities;

(xvii) all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by Sellers in connection with, resulting from or attributable to the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise;

(xviii) all Liabilities of Sellers or any predecessors or Affiliates of Sellers based upon such Person's acts or omissions occurring after the Closing; and

(xix) all Liabilities of Sellers to Purchaser, its Affiliates, and its Affiliates' agents, advisors and representatives, whether under the Transaction Agreements or otherwise.

(b) The parties acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement or otherwise shall not create an Assumed Obligation or other Liability of Purchaser, except where such disclosed obligation has been expressly assumed by Purchaser as an Assumed Obligation and is not listed in Sections 2.4(a)(i)-(a)(xix).

2.5 Revisions to Schedules to Sections 2.1 to 2.4. Notwithstanding anything in this Agreement to the contrary, Purchaser may revise the Schedules to Sections 2.1 to 2.4 (other than Schedule 2.3(a)(v)) at any time on or before the opening of business on the date of the Auction to include or exclude in the definition of Acquired Assets, Assumed Obligations, Excluded Assets or Excluded Liabilities, as applicable, any asset or property, or any portion, part or parcel of any such asset or property (other than Seller Contracts, which shall be governed by Section 2.6) or Liability not otherwise included therein, as the case may be, and as a result thereof, Sellers agree to give required notice to any Third Party that should receive notice with respect to such asset or property or as otherwise reasonably requested by Purchaser; provided, that such exclusion or inclusion, as the case may be, shall not serve to reduce or otherwise affect the amount of the Purchase Price. For purposes of clarification, nothing in this Section 2.5 shall limit Purchaser's rights under Section 2.6.

2.6 Actions With Respect to Contracts.

(a) Sellers' Obligation to Maintain Seller Contracts Until Closing. From and after the Effective Date until the Closing Date, Sellers shall not reject or alter (or attempt to alter) any executory Contracts or unexpired leases to which any Seller is a party (collectively, the "Seller Contracts") unless otherwise agreed to in writing by Purchaser or as provided below in Section 2.6(c) of this Agreement. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to Seller Contracts and take all other actions necessary to cause such Seller Contracts to be assumed by Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code to the extent that such Seller Contracts are Assumed Executory Contracts at the Closing. Sellers shall have no obligation to Purchaser to provide adequate assurance of future performance under the Assumed Executory Contracts in connection with the assumption and assignment thereof by Sellers.

(b) Excluding or Adding Assumed Executory Contracts Prior to Closing. At the Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents reasonably requested by Purchaser,

assume and sell and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assumed Executory Contracts which may be assigned by Sellers to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code and which shall be set forth on the Schedules delivered pursuant to Section 2.1(a). Purchaser shall have the right in its sole and absolute discretion to notify Parent in writing of any Assumed Executory Contract that it does not wish to assume or a Seller Contract that it wishes to add as an Assumed Executory Contract up to the opening of business on the date of the Auction. At the sole discretion and instruction of Purchaser, any such previously considered Assumed Executory Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assumed Executory Contracts, and automatically deemed to be an Excluded Contract (subject to any applicable requirement under the Sale Order to provide the counterparty to such Excluded Executory Contract with notice of such removal). At the sole discretion and instruction of Purchaser, any such previously considered Excluded Contract that Purchaser wishes to assume as an Assumed Executory Contract shall be automatically deemed added to the Schedules related to Assumed Executory Contracts and assumed by Sellers to sell and assign to Purchaser (subject to any applicable requirement under the Sale Order to provide the counterparty to such Assumed Executory Contract counterparty with notice and an opportunity to object to any proposed Cure Amount or to the assumption and assignment).

      (c)     Assumption of Executory Contracts Post-Closing. To the extent that any executory Contract or unexpired lease relating to the Business is not identified prior to the Closing Date on Schedule 5.5(a), and provided that such executory Contract or unexpired lease has not been rejected by Sellers and the Chapter 11 Cases are still pending, Purchaser shall, upon discovery of such executory Contract or unexpired lease, in its sole discretion, determine whether such executory Contract or unexpired lease shall be deemed an Assumed Executory Contract or an Excluded Contract and, if determined by Purchaser to be an Assumed Executory Contract, Sellers shall seek to assume and assign such Assumed Executory Contract to Purchaser (subject to any applicable requirement under the Sale Order to provide the counterparty to such Assumed Executory Contract Counterparty with notice and an opportunity to object to any proposed Cure Amount or to the assumption and assignment). The covenants set forth in this Section 2.6(c) shall survive the Closing.

      2.7    Cure Amounts. At least two (2) Business Days prior to the Closing, Sellers shall provide to Purchaser an update to Schedule 2.3(a)(i), which update shall include any costs of cure with respect to the Assumed Executory Contracts, if any, added by Purchaser after the date hereof pursuant to Section 2.6(b). If the actual costs of cure with respect to any Assumed Executory Contract are at any time determined or asserted to be greater than the Cure Amounts set forth on the originally delivered Schedule 2.3(a)(i), including after the Closing Date as a result of a timely objection asserted by the counterparty to the Assumed Executory Contract, then such amounts shall be substituted on Schedule 2.3(a)(i) and Purchaser shall have the option, at its sole discretion and upon written notice to Sellers and the counterparty at any time prior to payment of the Cure Amount associated with such Assumed Executory Contract, including after the Closing Date, of removing such Assumed Executory Contract from the Schedules related to Assumed Executory Contracts, automatically deeming such Assumed Executory Contract to be an Excluded Contract, and having such newly identified Excluded Contract rejected by Sellers in accordance with Section 2.6(c). Unless removed from Schedule 2.3(a)(i) in accordance with the preceding sentence, Purchaser will be responsible for paying all Cure Amounts set in connection

with the assignment and assumption of the Assumed Executory Contracts, including any Cure Amounts in excess of the Cure Amounts for such Assumed Executory Contracts as set forth on Schedule 2.3(a)(i) as of the date hereof.

2.8    Deemed Consents and Cures.  For all purposes of this Agreement (including all representations and warranties of Sellers contained herein), Sellers shall be deemed to have obtained all required consents in respect of the assignment of any Assumed Executory Contract (and any Excluded Contract ultimately becoming an Assumed Executory Contract) if, and to the extent that, pursuant to the Sale Order or other Bankruptcy Court Order, Sellers are authorized to assume and assign to Purchaser, and Purchaser is authorized to accept, such Assumed Executory Contracts pursuant to Section 365 of the Bankruptcy Code, and any applicable Cure Amount has been satisfied by Purchaser or Sellers as provided in this Agreement. If the consent required to effectuate the assignment of any Assumed Executory Contracts to Purchaser cannot be obtained pursuant to the Sale Order or other Bankruptcy Court Order, then the parties shall endeavor to obtain such consent pursuant to Sections 4.6, 7.1 and 10.5.

2.9    Acquired Assets Sold "As Is, Where Is".

EXCEPT AS EXPLICITLY SET FORTH IN THIS AGREEMENT (INCLUDING ARTICLE V), PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY OR INVENTORY COMPRISING A PART OF THE ACQUIRED ASSETS OR WHICH IS THE SUBJECT OF ANY OTHER LEASE OR CONTRACT TO BE ASSUMED BY PURCHASER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS WHICH ARE THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY PURCHASER AT THE CLOSING, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE ACQUIRED ASSETS (INCLUDING ANY RIGHTS RESERVED TO OR VESTED IN ANY GOVERNMENTAL AUTHORITY TO CONTROL OR REGULATE THE ACQUIRED ASSETS AND ALL OBLIGATIONS AND DUTIES UNDER ALL LAWS OR UNDER ANY PERMIT ISSUED BY ANY GOVERNMENTAL AUTHORITY), THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED OBLIGATIONS, THE TITLE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY, THE INVENTORY OR ANY OTHER PORTION OF THE ACQUIRED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS SET FORTH IN THIS AGREEMENT (INCLUDING ARTICLE V), SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS

CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT (INCLUDING <u>ARTICLE V</u>), PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

**ARTICLE III**
**BASIC TRANSACTION**

3.1 <u>Purchase Price</u>.

(a) In consideration of the sale of the Acquired Assets to Purchaser, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions hereinafter set forth, the purchase price (the "<u>Purchase Price</u>") for the Acquired Assets shall be:

(i) $30,000,000 in respect of the Senior Secured Obligations and up to $20,000,000 of the DIP Obligations, which shall be satisfied in the form of a credit against the Senior Secured Obligations and the DIP Obligations, respectively, all in accordance with <u>Section 3.1(b)</u> (collectively, the "<u>Credit Bid Amount</u>"); plus

(ii) the Excluded Cash; plus

(iii) the Purchaser's assumption of the Assumed Obligations.

For the avoidance of doubt, the calculation of the Purchase Price will be determined without duplication of any other items counted in such calculation.

(b) At the Closing:

(i) the Excluded Cash shall to the extent necessary be funded from the DIP Available Funds (which shall be wired to such account or accounts designated by Parent immediately prior to the Closing and evidenced by executed releases and waivers from the applicable lenders (including Purchaser or its Affiliates)); <u>provided</u>, if the amount of the DIP Available Funds exceeds the Excluded Cash, all amounts of DIP Available Funds in excess of the Excluded Cash shall be returned to Purchaser, by wire transfer, at the Closing;

(ii) the Purchase Price shall be payable (x) with respect to the Credit Bid Amount, in Purchaser's sole discretion, by (A) delivering to Parent fully executed releases and waivers from the applicable lenders (including Purchaser or its Affiliates) under the Senior Secured Obligations or DIP Credit Agreement, with respect to all or a part of Sellers' obligations thereunder, as applicable, or (B) with the written consent of the applicable lenders (including Purchaser or its Affiliates) under the DIP Credit Agreement, assuming all or a part of Sellers'

obligations thereunder on terms reasonably acceptable to Purchaser and providing Parent with fully executed releases and waivers from the applicable lenders (including Purchaser or its Affiliates) under the DIP Credit Agreement with respect to all of Sellers' obligations thereunder or (y) in cash, in Purchaser's sole discretion; provided that the Credit Bid Amount is paid in whole pursuant to clause (x)(A), clause (x)(B) or any combination thereof.

(iii)     For the avoidance of doubt, at any time, and from time to time, during the Auction, Purchaser may increase the Purchase Price, including by increasing the amount of the Credit Bid Amount to the full amount then outstanding and owing under Senior Secured Obligations and DIP Obligations.

3.2     Allocation of Purchase Price.  Purchaser shall prepare and deliver to Parent an allocation schedule setting forth Purchaser's good faith determination of the allocation of the Purchase Price and Assumed Obligations among the Acquired Assets (the "Allocation") within sixty (60) days of the Closing Date.  Such Allocation shall be subject to the reasonable comments and approval of Parent, not to be unreasonably withheld, conditioned or delayed. The Allocation shall be prepared in accordance with section 1060 of the Code and shall be used by the parties in preparing Form 8594 (Asset Acquisition Statement) for each of Purchaser and Sellers and all Tax Returns of Purchaser and Sellers. Purchaser and Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) in a manner that is consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith for Tax purposes unless required by applicable Law (including as a result of a successful challenge to the allocation in any audits or examinations by any Governmental Authority or any other Proceeding). Purchaser and Sellers shall cooperate in the filing of any required forms (including Internal Revenue Service Form 8594 under Section 1060 of the Code) with respect to such Allocation. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 3.2 shall survive the Closing without limitation.

## ARTICLE IV
## CLOSING

4.1     Closing.  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "Closing") will take place at the offices of Kirkland & Ellis LLP, 300 N. LaSalle Street, Chicago, IL 60654 at 11:00 A.M. Central Standard Time or remotely upon the electronic exchange of signatures as soon as practicable after the date on which the conditions set forth in ARTICLE VIII have been satisfied or waived but no later than three (3) days thereafter; or on such other date or place as Purchaser and Parent may determine (the "Closing Date").

4.2     Closing/Post-Closing Payments.

(a)     On the Closing Date:

(i)     The Credit Bid shall become effective;

(ii)     Purchaser shall pay the Cure Amounts; and

(iii)    Purchaser shall fund cash in an amount equal to the Excluded Cash, *minus* the aggregate amount of cash of Parent as of the Closing Date.

4.3    Deliveries by Sellers.  At the Closing, Sellers shall deliver or procure delivery to Purchaser of:

(a)    physical possession of all of the Acquired Assets capable of passing by delivery with the intent that title in such Acquired Assets shall pass by and upon delivery;

(b)    one (1) or more assignments and assumptions of the Assumed Obligations, in the form to be mutually agreed by the Parties in good faith prior to the Closing Date (collectively, the "Assignment and Assumption Agreements"), duly executed by Sellers;

(c)    one (1) or more bills of sale, in the form to be mutually agreed by the Parties in good faith prior to the Closing Date, conveying in the aggregate all of the owned personal property of Sellers included in the Acquired Assets, duly executed by Sellers;

(d)    assignments of the Intellectual Property included in the Acquired Assets in the forms to be mutually agreed by the Parties in good faith prior to the Closing Date and which shall be forms acceptable for recordation in the United States Patent and Trademark Office, the United States Copyright Office and any other similar domestic or foreign office, department or agency each duly executed by Sellers and each in recordable form to the extent necessary to assign such rights;

(e)    an assignment and assumption of lease in customary form with respect to each of the Assumed Facility Leases;

(f)    a copy of the Sale Order entered with the Bankruptcy Court;

(g)    certificates of title and title transfer documents to all titled motor vehicles;

(h)    an assignment and assumption agreement with respect to Sellers' Permits, whereby Sellers shall assign to Purchaser (to the extent assignable) all of its rights in and to any Permits relating (directly or indirectly) to the Acquired Assets or the Business;

(i)    such documentation as may be necessary to change the authorized signatories on any bank accounts or powers of attorney relating (directly or indirectly) to the Acquired Assets;

(j)    certified copies of the resolutions of each of the board of directors (or similar governing body) of Sellers authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby;

(k)    an affidavit from each Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that such Seller is not a foreign person as defined in Section 1445 of the Code;

(l)     copies of all approvals of Governmental Authorities and other Third Parties obtained pursuant to Section 7.1 or otherwise required by Section 8.2(f);

(m)     all of the Books and Records (except to the extent constituting an Excluded Asset); and

(n)     such other documents or instruments requested by Purchaser at least two (2) Business Days prior to the Closing Date to vest in Purchaser good and marketable title in and to the Acquired Assets in accordance with the provisions hereof.

4.4     Deliveries by Purchaser.  At the Closing, Purchaser will deliver to Parent:

(a)     the Assignment and Assumption Agreements duly executed by Purchaser;

(b)     certified copies of the resolutions of the board of managers or similar governing body of Purchaser authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby; and

(c)     such other documents or instruments as are required to be delivered by Purchaser at the Closing pursuant to the terms hereof or that Parent reasonably requests prior to the Closing Date to effect the transactions contemplated hereby.

4.5     Form of Instruments.  To the extent that a form of any document to be delivered hereunder is not attached as an exhibit, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Purchaser and Parent.

4.6     Further Assurances.  From time to time prior to and after the Closing until the date that is three months following the Closing, and without further consideration, (i) Sellers, upon the request of Purchaser, shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate (or prepare to consummate) more effectively the purchase and sale of the Acquired Assets as contemplated hereby, to vest in Purchaser title to the Acquired Assets transferred hereunder and to permit Purchaser to perfect, record or protect its interests in the Acquired Assets, or to otherwise more fully consummate the transactions contemplated by this Agreement, and (ii) Purchaser, upon the reasonable request of Parent, shall execute and deliver such documents and instruments of contract or lease assumption as Parent may reasonably request in order to confirm any Purchaser's Liability for the Assumed Obligations or otherwise to more fully consummate the transactions contemplated by this Agreement. Parent shall provide notice of the transactions contemplated by this Agreement and the Chapter 11 Cases to all parties entitled to such notice, including all environmental authorities in jurisdictions applicable to Sellers and all other Persons with current or potential claims with respect to any Excluded Environmental Liabilities or other Liabilities or obligations arising under Environmental Laws.

4.7     Withholding.  Notwithstanding anything herein to the contrary, Purchaser shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to Sellers such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code and the rules and regulations promulgated thereunder,

or any provision of state, local or foreign Tax Law; provided, however, that Purchaser shall provide Sellers at least three (3) Business Days prior written notice before making any such deduction, which such notice shall set forth the basis for such proposed deduction and withholding. To the extent that such withheld amounts are paid over to or deposited with the appropriate Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to Sellers.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed in the Disclosure Schedules (with specific reference to the respective Sections of this Agreement to which the information stated in the Disclosure Schedules relates); provided, that (i) disclosure in any section of the Disclosure Schedules shall be deemed to be disclosed with respect to any other Section of this Agreement to the extent that it is reasonably apparent on the face of the Disclosure Schedules that such disclosure is applicable to such other Section notwithstanding the omission of a reference or cross-reference thereto, and (ii) the mere inclusion of an item in the Disclosure Schedules as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had, would have or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Sellers, each Seller jointly and severally represents and warrants on the date of this Agreement and on the Closing Date to Purchaser that the statements contained in this ARTICLE V are correct and complete.

5.1     Organization; Standing.  Each Seller is a legal entity duly formed, validly existing and in good standing under the Laws of the state of its organization, has all requisite corporate or similar power and authority and all material Permits necessary to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing or with active status as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or in good standing, has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. All jurisdictions in which each Seller is qualified to do business and all material Permits held by each Seller are set forth on Schedule 5.1.

5.2     Validity of Agreement; Power.  Subject to any necessary authorization from the Bankruptcy Court, each Seller has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The board of directors (or similar governing body) of each Seller has duly approved the Transaction Documents to which such Seller is a party and has duly authorized the execution and delivery of such Transaction Documents and the consummation of the transactions contemplated thereby. No other corporate or organizational proceedings on the part of any Seller is necessary to approve and authorize the execution and delivery of the Transaction Documents to which such Seller is a party and the consummation of the transactions contemplated thereby. Subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents to which any Seller is a party have been duly executed and delivered by each Seller, except such Transaction Documents that are required by the terms hereof to be executed and delivered by

Sellers after the date hereof, in which case such Transaction Documents will be duly executed and delivered by Sellers at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Sellers, enforceable against Sellers in accordance with their terms.

5.3     Subsidiaries.     Schedule 5.3 lists each Subsidiary of Sellers, its place of incorporation or formation, its outstanding equity interests and the owners of all of its outstanding equity interests. No Seller owns or holds the right to acquire any stock, partnership interest or joint venture interest or other equity interest in any other Person.  Sellers own, directly or indirectly, of record and beneficially, all capital stock and other equity interests in each of their respective Subsidiaries, free and clear of all Liens, and all such capital stock and other equity interests are validly issued, fully paid and non-assessable (to the extent such concept is applicable to such equity interests).  Each of such Subsidiaries is duly formed or organized, validly existing and in good standing (or its equivalent, if applicable) under the applicable Laws of its jurisdiction of formation or organization, and each of such Subsidiaries has all requisite power and authority to own, lease and operate its properties and to carry on its businesses as now conducted.  Each of such Subsidiaries is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of business as now conducted requires it to qualify, except where the failure to be so qualified would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

5.4     No Conflicts or Violations.  Subject to the entry of the Sale Order, the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby by Sellers do not and shall not conflict with, result in any breach, default or violation of, give rise to a right of modification, termination, acceleration or loss of a material benefit under, result in the creation of any Lien or Liability under, require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Governmental Authority, under (i) any provision of the certificate of incorporation or bylaws or other equivalent organizational document of Sellers, (ii) any material Contract to which any Seller is a party to or by which it is bound or (iii) any determination or Order of any Governmental Authority or Law applicable to any Seller or its property or assets.

5.5 Contracts.

(a) No Seller is a party to or bound by, whether written or oral, any:

(i)     Collective Bargaining Agreement, pension, profit sharing, stock option, employee stock purchase or other plan or arrangement providing for deferred or other compensation to employees or any other Employee Benefit Plan, arrangement or practice;

(ii)     settlement, conciliation or similar agreement which imposes any payment or other material obligations on Sellers after the execution date of this Agreement;

(iii)     Contract with any Government Authority;

(iv)    Contract relating to borrowed money or other Indebtedness or the mortgaging, pledging or otherwise placing a Lien on any material asset or group of material assets of Sellers or any letter of credit arrangements, or any Guaranty therefor;

(v)    Facility Lease;

(vi)    Contract under which any Seller is a (A) lessee of or holds or operates any personal property owned by any other Person, except for any lease of personal property under which the aggregate annual rental payments do not exceed $10,000 in any twelve (12) month period or (B) lessor of or permits any Person to hold, operate or occupy any property, real or personal, owned or controlled by Sellers;

(vii)    Contract or group of related Contracts (other than purchase and sale orders entered into in the Ordinary Course of Business) with the same party or group of Affiliated parties continuing over a period of more than six (6) months from the date or dates thereof, not terminable by Sellers upon 30 days or less notice without penalty or involving more than $10,000;

(viii)    Contract relating to the ownership of, investments in or loans and advances to any Person, including investments in joint ventures and minority equity investments;

(ix)    Contract with respect to any Intellectual Property, including any Contract under which any Seller is a licensor or licensee (excluding licenses for commercially available, standard, off-the-shelf, unmodified software, with a replacement cost and/or annual license and maintenance fee of less than a total cost of $10,000 in the aggregate, but including open source software);

(x)    Contract that contains any provision pursuant to which any Seller is obligated to indemnify or make any indemnification payments to any Person (other than Contracts entered into in the Ordinary Course of Business where such obligation would not reasonably be expected to result in Liabilities in excess of $10,000 per year);

(xi)    agent, sales representative, sales or distribution Contracts (other than purchase and sale orders entered into in the Ordinary Course of Business);

(xii)    Contract relating to the marketing or advertising of Sellers' products or services;

(xiii)    power of attorney or other similar Contracts or grant of agency;

(xiv)    Contract prohibiting any Seller, now or in the future, from freely engaging in any business or competing anywhere in the world or restricting its use or disposition of any Intellectual Property owned, licensed or held for use by Sellers;

(xv)    Contract (A) providing for Sellers to be the exclusive provider of any product or service to any Person or the exclusive recipient of any product or service of any Person or that otherwise involves the granting by any Person to Sellers of exclusive rights of any kind, (B) providing for any Person to be the exclusive provider of any product or service to any

Seller or (C) granting to any Person a right of first refusal or right of first offer on the sale of any part of the business of any Seller;

(xvi)  Contract providing for any Seller to guarantee, grant or otherwise promise to any Person the sale or provision of any product or service at the best, lowest or otherwise most favored price or terms; and

(xvii)  any other individual Contract that is otherwise material to the assets, operations or financial condition of any Seller.

(b) All of the Contracts set forth or required to be set forth on Schedule 5.5(a) are referred to herein as the "Material Contracts", and each individually, a "Material Contract".  (i) To the knowledge of Sellers, no Material Contract has been breached or canceled by the other party, and there is no anticipated breach by any other party to any contract set forth on Schedule 5.5(b), (ii) except for defaults that will be cured through the Cure Amounts listed on Schedule 2.3(a)(i) or arising solely as a consequence of the commencement of the Chapter 11 Cases, no Seller nor any other party thereto is in default or breach in any material respect under the terms of any Material Contract and, to the knowledge of Sellers, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute a default or breach thereunder, (iii) no Seller has assigned, delegated or otherwise transferred to any Person any of its rights, title or interest under any Material Contract, and (iv) each Material Contract is legal, valid, binding, enforceable and in full force and effect and, subject to the terms of this Agreement, will continue as such following the consummation of the transactions contemplated hereby.

(c) Each Seller has provided Purchaser with true and correct copies of all Material Contracts, in each case together with all amendments, waivers or other changes thereto and Schedule 5.5(c) contains an accurate and complete description of all material terms of all oral Contracts referred to therein.

5.6    Real Property. Sellers do not own any real property which is used or intended to be used, or otherwise related to, the Business.

5.7    Title to Assets; Assets Necessary to Business.

(a)    Sellers have good and marketable title to, or a valid leasehold interest in or all rights to use, all Acquired Assets, subject only to any Permitted Liens and liens under the DIP Financing and the pre-petition credit agreements which such liens shall be released under the Sale Order.

(b)    The assets of Sellers are in good operating condition and repair (ordinary wear and tear excepted) and are fit for use in the Ordinary Course of Business.

(c)    Assuming that the Acquired Assets constitute substantially all of the assets and Contracts of the Sellers, the Acquired Assets constitute all of the assets, including all Contracts, Permits and properties, necessary to conduct the Business as presently conducted. Subject to the entry of the Sale Order, following the Closing, Purchaser shall have the right to use all of the Acquired Assets free and clear of any Liens of any kind, other than Permitted

Liens. Assuming that the Acquired Assets constitute substantially all of the assets and Contracts of the Sellers, each asset that is material to the operation of the Business as presently conducted is an Acquired Asset as of the date hereof.

(d)     Subject to Bankruptcy Court approval and the Sale Order, Sellers have the power and the right to sell, assign and transfer and, at the Closing, Sellers will sell and deliver to Purchaser, and upon consummation of the transactions contemplated by this Agreement, Purchaser will acquire good and marketable title to the Acquired Assets, free and clear of all Liens, other than Permitted Liens.

5.8     Affiliate Transactions.   No Insider is a party to any agreement, Contract, commitment or transaction with any Seller or has any interest in the Acquired Assets or any property, real or personal or mixed, tangible or intangible of Sellers or owns, or licenses (whether or not to Sellers), any assets or properties (tangible or intangible) used in the Business or provides any service to the Business.

5.9     Permits.  Each Seller holds and is, in all material respects, in compliance with all Permits of all Governmental Authorities required for the conduct of the Business and the ownership of their properties, and Schedule 5.9 sets forth a list of all such Permits.  No notices have been received by any Seller alleging the failure to hold any Permit.  All Permits issued to Sellers will be transferred to and available for use by Purchaser promptly after the Closing.

5.10     Environmental Matters.

(a) Each Seller is and has at all times been in compliance with all Environmental Laws, which compliance has included obtaining and complying at all times with all Permits required pursuant to Environmental Laws.

(b) No Seller nor any predecessor or Affiliate of Sellers has received any Notice, report or other information regarding any actual or alleged violation of, or any Liabilities (including any investigatory, remedial or corrective obligation) under, Environmental Laws.

(c) No Seller nor any predecessor or Affiliate of Sellers has treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, Released, or exposed any Person to, any substance, including any Hazardous Substances, or owned or operated any property or Facility contaminated by any substance, so as to give rise to any current or future Liabilities, including any Liability for response costs, corrective action costs, personal injury, property damage, natural resources damages or attorney fees, or any material investigatory, corrective or remedial obligations, pursuant to CERCLA or any other Environmental Laws.

(d) No Seller nor any predecessor or Affiliate of Sellers, has manufactured, produced, sold, marketed, installed or distributed products or items containing asbestos or other Hazardous Substances and none of the foregoing Persons have any Liability with respect to the presence or alleged presence of asbestos or other Hazardous Substances in any product or item or at or upon any property or Facility.

(e) Sellers have provided to Purchaser true and correct copies of all environmental audits, reports and other documents materially bearing on environmental, health

and safety matters relating to the past or current operations, properties or Facilities of the Business.

5.11    Employee Benefits.

(a)    Schedule 5.11(a) sets forth a complete and correct list of all Employee Benefit Plans that are sponsored, maintained or contributed by Sellers for or on behalf of any of any current or former employees, directors officers or independent contractors of the Business, including any dependents or beneficiaries thereof, (each a "Company Benefit Plan" and, collectively, the "Company Benefit Plans").

(b)    No Seller nor any ERISA Affiliate maintains, sponsors, contributes to, has any obligation to contribute to, or has any liability or potential liability under or with respect to (i) any "defined benefit plan" as defined in Section 3(35) of ERISA or any other plan subject to the funding requirements of Section 412 of the Code or Section 302 of Title IV of ERISA, (ii) Multiemployer Plan, except as set forth on Schedule 5.11(b), (iii) any employee benefit plan, program or arrangement that provides for post-retirement medical, life insurance or other welfare-type benefits (other than health continuation coverage required by COBRA), (iv) "multiple employer welfare arrangement" (as such term is defined in Section 3(40) of ERISA), or  (v) any "multiple employer plan" within the meaning of 210 of ERISA or Section 413(c) of the Code.  No Seller nor any ERISA Affiliate has incurred any Liability due to a complete or partial withdrawal (as described in Section 4201 of ERISA) from any Multiemployer Plan. No Acquired Assets are or would be subject to any lien associated with any Employee Benefit Plan under ERISA, the Code or other applicable law.

(c)    Each Assumed Employee Benefit Plan (and each related trust, insurance contract or fund) has been maintained, funded and administered in accordance with its terms and the terms of any applicable Collective Bargaining Agreement and complies in form and in operation in all material respects with all applicable requirements of ERISA, the Code and other applicable Laws.

(d)    Sellers have delivered to Purchaser complete and correct copies of the plan documents and summary plan descriptions, the most recent determination letter received from the IRS, the most recent annual report (Form 5500, with all applicable attachments), and all related trust agreements, insurance contracts, and other funding arrangements that implement each Assumed Employee Benefit Plan.

(e)    No Seller has material liability by reason of an individual who performs or performed services for Sellers in any capacity being improperly excluded from participating in any Assumed Employee Benefit Plan or any individual being improperly allowed to participate in any Assumed Employee Benefit Plan.

(f)    The consummation of the transactions contemplated by this Agreement alone, or in combination with a termination of any employee, officer, director, stockholder or other service provider of Sellers (whether current, former or retired), will not give rise to any material liability under any Company Benefit Plan, including liability for severance pay, unemployment compensation, termination pay or withdrawal liability, or accelerate the time of

payment, funding or vesting or increase the amount of compensation or benefits due to any Business Employees (whether current, former or retired) or their beneficiaries. No Seller has any indemnity obligation on or after the Closing Date for any Taxes imposed under Section 4999 or 409A of the Code.

5.12 <u>Names and Locations</u>. During the five (5) year period prior to the execution and delivery of this Agreement, no Seller nor its predecessors has used any name or names under which it has invoiced account debtors, maintained records concerning its assets or otherwise conducted business. All of the tangible assets and properties of Sellers are located at the locations set forth on <u>Schedule 5.12</u>.

5.13 <u>Bank Accounts Schedule</u>. <u>Schedule 5.13</u> lists all bank accounts, safety deposit boxes and lock boxes (designating each authorized signatory with respect thereto) for Sellers.

5.14 <u>Taxes</u>.

(a) Each Seller has filed all Tax Returns that it was required to file, and all such filed Tax Returns were correct and complete in all material respects. All Taxes owed by Sellers and all Taxes with respect to the Acquired Assets (in each case, whether or not shown on any Tax Return) have been paid. No claim has ever been made in writing by a Governmental Authority in a jurisdiction where Sellers do not file Tax Returns that Sellers or the Business is or may be subject to taxation by that jurisdiction. There is no audit, dispute, claim or controversy concerning any Tax liability or Tax Return of Sellers or with respect to the Business claimed, threatened or raised orally or in writing by any taxing authority.

(b) None of the Sellers nor Purchaser will be required to include any amount in taxable income for any Tax period (or portion thereof) ending after the Closing Date, including pursuant to Section 481, as a result of transactions or events occurring, sales or receipts received, or accounting methods employed, prior to the Closing.

(c) No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(d) None of the Assumed Obligations is an obligation to make a payment that will not be deductible under Section 280G of the Code. No Seller (i) has been a member of an Affiliated Group filing a consolidated federal income Tax Return or any state, local or non-U.S. equivalent thereof and (ii) has Liability for the Taxes of any Person under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local, or foreign Law), as a transferee or successor, by Contract, or otherwise.

5.15 <u>FCPA</u>. During the three (3) year period preceding the date hereof, no Seller nor any of their directors, officers, equityholders or employees or other Persons acting on their behalf, have used any corporate or other funds for unlawful contributions, payments, gifts, or entertainment, or made any unlawful expenditures relating to political activity to government officials or others or established or maintained any unlawful or unrecorded funds, in each case in violation of the Foreign Corrupt Practices Act. No Seller nor any of their directors, officers, equityholders, employees or other Persons acting on their behalf, have accepted or received any unlawful contributions, payments, gifts, or expenditures. Sellers have complied and are in

compliance with all applicable laws, including but not limited to, the Foreign Corrupt Practices Act, as amended, the UK Bribery Act of 2010, as amended, any other anti-bribery or anti-corruption statutes designed to cover conduct similar to that covered by the Foreign Corrupt Practices Act or the UK Bribery Act of 2010.

5.16    <u>Compliance with Customs & International Trade Laws</u>.  Without in any way limiting the representations and warranties otherwise provided in <u>ARTICLE V</u> of this Agreement:

(a)    During the three (3) year period preceding the Effective Date, Sellers have been in compliance with all applicable Customs & International Trade Laws, and at no time during such period has any Seller committed any material violation of the applicable Customs & International Trade Laws.  There are no material unresolved questions or claims concerning any liability of Sellers with respect to any such Laws;

(b)    To the knowledge of Sellers, no Seller is subject to any pending civil or criminal investigation, litigation, audit, compliance assessment, focused assessment, penalty proceeding or assessment, liquidated damages proceeding or claim, forfeiture or forfeiture action, record-keeping inquiry, assessment of additional duty for failure to properly mark imported merchandise, notice to properly mark merchandise or return merchandise to Customs custody, claim for additional customs duties or fees, denial order, suspension of export privileges, government sanction, or any other action, proceeding or claim by a Governmental Authority involving or otherwise relating to any alleged or actual violation of the applicable Customs & International Trade Laws or relating to any alleged or actual underpayment of customs duties, fees, taxes or other amounts owed pursuant to the applicable Customs & International Trade Laws.  Sellers have paid all customs duties and fees, all other import duties and fees, and brokerage fees owed and due for merchandise imported by it or imported on its behalf into the United States;

(c)    No Seller has made or provided any material false statement or omission to any Governmental Authority or to any purchaser of products, in connection with the importation of merchandise, the valuation or classification of imported merchandise, the duty treatment of imported merchandise, the eligibility of imported merchandise for favorable duty rates or other special treatment, country-of-origin marking, NAFTA Certificates, export licenses or other export authorizations, U.S.-content requirements, licenses or other approvals required by a foreign Governmental Authority, or any other requirement relating to the applicable Customs & International Trade Laws; and

(d)    None of the products or materials imported by, for or on behalf of Sellers for which final liquidation has not yet occurred is subject to or otherwise covered by an antidumping duty order or countervailing duty order that remains in effect or is subject to or otherwise covered by any pending antidumping or countervailing duty investigation by agencies of the United States government.

# ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers on the date of this Agreement and on the Closing Date that the statements contained in this <u>ARTICLE VI</u> are correct and complete.

6.1     <u>Organization</u>.  Purchaser is a limited liability company validly existing and in good standing under the Laws of the State of Delaware, and has the full power and authority to execute, deliver and perform this Agreement and to consummate all transactions contemplated hereby.

6.2     <u>Authority</u>.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of Purchaser and do not and will not violate any provisions of its organizational documents, any applicable Law or, except as set forth on <u>Schedule 6.2</u>, any contract or Order binding upon Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting creditors' rights generally from time to time in effect, and to general equitable principles.

6.3     <u>Consents</u>.  No notice to, filing with, authorization of, exemption by, or consent (other than the approval of the Bankruptcy Court) of any Person, except as set forth on <u>Schedule 6.3</u>, is required in order for Purchaser to consummate the transactions contemplated hereby.

6.4     <u>Financing</u>.  Purchaser shall have at the Closing sufficient cash or other sources of immediately available funds (not conditioned on Third Party approvals or other commitments) to enable it to fulfill its obligations hereunder.

6.5     <u>Brokers</u>.  Purchaser has not incurred or contractually agreed to pay any Liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby.

# ARTICLE VII
## PRE-CLOSING COVENANTS

7.1     <u>Consents and Approvals</u>.

(a)     <u>Consents</u>. Sellers shall, at their sole cost and expense, use reasonable efforts (i) to obtain all necessary consents and approvals, as reasonably requested by Purchaser, to consummate the purchase and sale of the Acquired Assets and the assignment of the Assumed Obligations, together with any other necessary consents and approvals to consummate the transactions contemplated hereby, including obtaining entry of the Bidding Procedures Order and Sale Order, (ii) to make, as reasonably requested by Purchaser, all filings, applications, statements and reports to all authorities that are required to be made prior to the Closing Date by or on behalf of Sellers or any of their Affiliates pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby and (iii) to obtain, as requested by

Purchaser, all required consents and approvals (if any) necessary to assign and transfer Sellers' Permits to Purchaser at Closing (to the extent assignable) and, to the extent that one (1) or more of Sellers' Permits are not transferable, to assist Purchaser in obtaining replacements therefor, for purposes of this clause (iii), at Purchaser's cost and expense. In the event that any of Sellers' Permits or any Assumed Contracts are not transferable or replacements therefor are not obtainable on or before the Closing, but such Permits, Assumed Contracts, consents and approvals to transfer, or replacements therefor are obtainable prior to the sixtieth (60th) day following the Closing, Sellers shall continue to use such reasonable efforts in cooperation with Purchaser after the Closing until the sixtieth (60th) day following the Closing as may be required to obtain all required consents and approvals to transfer, or obtain replacements for, such Permits or Assumed Contracts after Closing and shall do all things necessary to give Purchaser the benefits that would be obtained under such Permits and Assumed Contracts, in each case at Purchaser's sole cost and expense. Purchaser shall give any other notices to, make any other filings with, and use reasonable best efforts to cooperate with Sellers to obtain, any other authorizations, consents and approvals in connection with the matters contemplated by this Section 7.1(a).

(b)     Governmental Consents. Each of the parties shall give any other notices to, make any other filings with, and use best efforts to obtain, any other authorizations, consents and approvals of any Governmental Authority in connection with the matters contemplated by this Agreement.

7.2     Access to Information and Facilities.  Each Seller agrees that, prior to the Closing Date, Purchaser and its respective representatives shall be given full access to the Sellers' senior management team (including the Chief Restructuring Officer of Parent) and other key senior employees requested by Purchaser and, upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of Sellers, have reasonable access during normal business hours to all Facilities, and shall be entitled to make such reasonable investigation of the properties, businesses and operations of Sellers (including conducting a physical inventory of the Inventory and maintaining a consultant on-site at the Facilities during normal business hours) and such examination of the Books and Records and financial condition of Sellers as it reasonably requests and to make extracts and copies to the extent necessary of the Books and Records; provided, that no investigation pursuant to this Section 7.2 shall affect any representations or warranties made herein or the conditions to the obligations of the respective parties to consummate the transactions contemplated by this Agreement.

7.3     Conduct of the Business Pending the Closing.  Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Purchaser or except as described on Schedule 7.3, and subject in all cases to Sellers' compliance with the prohibitions and restrictions of each of the Bankruptcy Code, any Orders entered by the Bankruptcy Court and the DIP Budget, from the date hereof until the Closing Date, each Seller:

(i)     shall not sell, transfer, abandon, permit to lapse or otherwise dispose of any of the assets of Sellers used in the Business, except for the sale of Inventory in the Ordinary Course of Business;

(ii)    shall conduct the Business in the Ordinary Course of Business (including timely payment of accounts payable, purchasing and maintaining appropriate levels of Inventory based, with respect to such Inventory, on historical practices, maintenance of the Books and Records, performing all maintenance and repairs, making capital expenditures and collecting Accounts Receivable);

(iii)    shall not authorize, declare or pay any dividends on or make any distribution with respect to its outstanding shares of capital stock (whether in cash, assets, stock or other securities);

(iv)    shall not reclassify, combine, split, subdivide, redeem, or purchase or otherwise acquire, directly or indirectly, any of its capital stock or membership interests, or make any other change with respect to its capital structure;

(v)    shall not issue, sell, pledge, dispose of or encumber, or authorize the issuance, sale, pledge, disposition or encumbrance of, any shares of its capital stock or other ownership interest in any Seller or any securities convertible into or exchangeable for any such shares or ownership interest, or any rights, warrants or options to acquire or with respect to any such shares of capital stock, ownership interest or convertible or exchangeable securities or take any action to cause to be exercisable any otherwise unexercisable option under any existing stock option plan;

(vi)    shall use commercially reasonable efforts to preserve intact the Business, to keep available the services of its current employees and agents (including the Chief Restructuring Officer) and to maintain its relations and goodwill with its suppliers, customers, distributors and any others with whom or with which it has business relations;

(vii)    shall not, directly or indirectly, cause or permit any state of affairs, action or omission that constitutes, or could lead to, a Material Adverse Change;

(viii)    shall not, except as required by Applicable Law, (A) grant or announce any stock option, equity or incentive awards or the increase in the salaries, bonuses or other compensation and benefits payable by Sellers to any of the employees, directors or other service providers of the Business; (B) hire any new employees to the Business, except in the Ordinary Course of Business consistent with past practice with respect to employees with an annual base and incentive compensation opportunity not to exceed Fifty Thousand Dollars ($50,000), (C) pay or agree to pay any pension, retirement allowance, termination or severance pay, bonus, stay bonus or other employee benefit not required by any existing Employee Benefit Plan to any employee, director or other service provider of the Business, whether past or present, (D) enter into or amend any Contracts of employment or any consulting, bonus, severance, retention, retirement or similar agreement except for agreements for newly hired employees in the Ordinary Course of Business consistent with past practice with an annual base and incentive compensation opportunity not to exceed Fifty Thousand Dollars ($50,000), (E) except as required to ensure that any Employee Benefit Plan is not then out of compliance with applicable Law or the renewal of any existing Employee Benefit Plan that is a "welfare plan" (as such term is defined in Section 3(1) of ERISA) on substantially similar or other market terms and in the Ordinary Course of Business, enter into or adopt any new, or materially increase benefits under

or renew, amend or terminate any existing, Employee Benefit Plan or any Collective Bargaining Agreement, (F) grant any increase in the compensation payable or to become payable to any employee of Sellers, except such increases as are required by contract or (G) except as required by Law, enter into any Collective Bargaining Agreement or other Contract with any labor organization;

(ix)     shall not change in any material respect any financial accounting or cash management practices, policies or procedures or any of its methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP or applicable Law;

(x)     shall not adopt any amendments to its certificate of formation or limited liability company agreement or similar applicable governing documents;

(xi)     shall not create any new Subsidiary;

(xii)     other than with respect to the DIP Financing, shall not incur, assume, guarantee, prepay or otherwise become liable for, or modify in any material respect the terms of, any Indebtedness for borrowed money, shall not sell, lease, license, transfer, exchange or swap, mortgage or otherwise encumber (including securitizations), or subject to any Lien or otherwise dispose of (whether by merger, consolidation or acquisition of stock or assets, license or otherwise), any material portion of its or its Affiliates' properties or assets, including the capital stock of Affiliates, other than (A) pursuant to existing agreements in effect prior to the execution of this Agreement, (B) as may be required by applicable Law or any Governmental Authority in order to permit or facilitate the consummation of the transactions contemplated by this Agreement or (C) dispositions of obsolete equipment in the Ordinary Course of Business;

(xiii)     shall not fail to pay any Tax that is set forth in the DIP Budget on or before the date when it becomes due and payable;

(xiv)     shall not make or change any election for Tax purposes, change an annual accounting period, adopt or change any accounting method, file any amended Tax Return, enter into any closing agreement, settle any Tax claim or assessment, surrender any right to claim a refund of Taxes, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, or take any other similar action relating to the filing of any Tax Return or the payment of any Tax;

(xv)     shall not modify, amend, terminate or waive any rights under any material Contract, or any Contract that would be material if in effect on the date of this Agreement except in the Ordinary Course of Business;

(xvi)     shall not enter into any material Contracts, or terminate or reject (whether pursuant to Section 365 of the Bankruptcy Code or otherwise) any Contract other than in accordance with the terms of Section 2.6 above;

(xvii)     shall not (A) disclose any confidential information to any Third Party (except in the Ordinary Course of Business and/or in accordance with the Bidding Procedures Order, and subject to an appropriate confidentiality agreement), or (B) enter into any

agreement with any other Person that limits or restricts the ability of Sellers to conduct certain activities or use or dispose of certain assets (including any Intellectual Property included in the Acquired Assets);

(xviii) shall not sell, transfer or otherwise dispose of, encumber, or take or fail to take any action that would reasonably be expected to result in, any loss, lapse, abandonment, expiration, invalidity or unenforceability of, any Intellectual Property, or (B) enter into any agreement with any other Person that limits or restricts the ability of Sellers to conduct certain activities or use or dispose of certain assets (including any Intellectual Property);

(xix) shall not authorize, or make any commitment with respect thereto, any capital expenditure in excess of Fifty Thousand Dollars ($50,000) individually or One Hundred Thousand Dollars ($100,000) in the aggregate;

(xx) shall not fail to maintain in full force and effect material insurance policies covering Sellers and their respective properties, assets and businesses in a form and amount consistent with past practice;

(xxi) shall not enter into, amend, waive or terminate (other than terminations in accordance with their terms) any transaction with any Insider of Sellers;

(xxii) shall not enter into any new line of business or discontinue any line of business;

(xxiii) shall not settle, pay or discharge any litigation, investigation, arbitration, Proceeding or other claim, Liability or obligation (absolute, accrued, asserted or unasserted, contingent or otherwise), excluding any amounts which may be paid under existing insurance policies;

(xxiv) shall not acquire (including by merger, consolidation, or acquisition of stock or assets) or make any investment in any interest in any corporation, partnership, limited liability company, association, trust or any other entity, group (as such term is used in Section 13 of the Exchange Act) or organization (including a Governmental Authority), or any division thereof or any assets thereof;

(xxv) shall maintain compliance with all Laws of all Governmental Authorities that relate to the Business or the Acquired Assets;

(xxvi) shall not implement any plant closings or employee layoffs that could implicate the WARN Act;

(xxvii) shall not terminate, discontinue, close or dispose of any Leased Facility or business operation of Sellers;

(xxviii) shall not (A) delay or postpone the payment of any accounts payable or commissions or agree or negotiate with any party to extend the payment date of any accounts payable or commissions other than in the Ordinary Course of Business (it being agreed and understood that it is Sellers' practice of paying all accounts payable or commissions that are

due as of the Monday of each week or the previous business week (via the issuance of checks and/or the initiation of wire or ACH transfers) on or before the Friday of such week) or (B) accelerate the collection of (or discount) any accounts or notes receivable other than in the Ordinary Course of Business, but in no event shall Sellers accelerate the collection of (or discount of) any such accounts or notes receivable that have a due date of, on, or after five (5) Business Days prior to the date of the Auction (and Sellers may only accelerate the collection of (or discount of) accounts or notes receivable in a manner and to a degree consistent with its historical practices);

(xxix)  shall not adjust Inventory reserves other than dollar-for-dollar adjustments to account for the actual sales of Inventory documented by purchase orders or sales orders in the Ordinary Course of Business (which such dollar-for-dollar adjustments shall be based on the cost of such Inventory);

(xxx)  shall not agree, in writing or otherwise, or announce an intention, to take any of the foregoing actions; and

(xxxi)  shall not take any action which is inconsistent with its obligations under this Agreement or with the consummation of the Closing.

7.4    Notification of Certain Matters.

(a)    Parent shall give prompt written notice (which shall in no event be later than 24 hours of any Seller learning of any relevant facts or circumstances) to Purchaser of (i) the occurrence or nonoccurrence of any event that would be likely to cause either (A) any representation or warranty of any Seller contained in this Agreement, or in connection with the transactions contemplated hereunder, to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing or (B) directly or indirectly, any Material Adverse Effect on Sellers, or (ii) any material failure of Sellers to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder. Notwithstanding the foregoing, the delivery of any notice pursuant to this Section 7.4(a) shall not (x) be deemed to amend or supplement any of the Disclosure Schedules contemplated hereby, (y) be deemed to cure any breach of any representation, warranty, covenant or agreement or to satisfy any condition, or (z) limit or otherwise affect the remedies available hereunder to the party receiving such notice.

(b)    To the extent not already included, Sellers shall add Purchaser and Purchaser's counsel to Sellers' so-called "Rule 2002 notice list" and otherwise provide notice to Purchaser of all matters that are required to be served on Sellers' creditors pursuant to the Bankruptcy Code and Rules.

(c)    Purchaser and Sellers acknowledge that certain of the representations and warranties of Sellers affirmatively require that Sellers list certain factual information on the Disclosure Schedules. Sellers shall be permitted to update the Disclosure Schedules on or prior to the Closing Date with the consent of Purchaser. No additional disclosure or update by Sellers pursuant to this Section 7.4(c), however, shall be deemed to amend or supplement the Disclosure Schedules or to prevent or cure any misrepresentation, breach of warranty, breach of covenant,

or right of Purchaser to terminate this Agreement or limit or otherwise affect the remedies available hereunder to the party receiving such notice.

7.5     Bankruptcy Actions.

(a)     Sellers shall: (i) obtain entry of the Bidding Procedures Order by no later than the Bidding Procedures Order Deadline, (ii) ensure that Bids are due no later than the Bid Deadline, (iii) ensure that the Auction (to the extent required by the Bankruptcy Court) shall be held no later than the Auction Deadline Date, (iv) obtain entry of the Sale Order by no later than the Sale Order Deadline, and (v) consummate the Closing as soon as practicable after the approval of the Sale Order and no later than three (3) days following the approval of the Sale Order.

(b)     Sellers will provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, petitions, schedules and supporting papers relating to the transactions contemplated by this Agreement prepared by Sellers (including forms of Orders and Notices to interested parties) prior to the filing thereof in the Chapter 11 Cases.  All motions, applications, petitions, schedules and supporting papers prepared by Sellers and relating (directly or indirectly) to the transactions contemplated by this Agreement to be filed on behalf of Sellers after the date hereof must be reasonably satisfactory in form and substance to Purchaser.

(c)     Sellers will promptly take such actions as are reasonably requested by Purchaser to assist in obtaining entry of the Sale Order and the Bidding Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and the Transaction Documents and demonstrating that Purchaser is a good faith buyer under Section 363(m) of the Bankruptcy Code.

(d)     Sellers shall execute such documents and use their reasonable best efforts to take or cause to be taken all actions and do or cause to be done all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement (including to put Purchaser in actual possession and operating control of the Acquired Assets, to effectuate, record or perfect the transfer of the Acquired Assets to Purchaser, to confirm the title of the Acquired Assets in Purchaser, to assist Purchaser in exercising rights relating thereto, to obtain all consents, approvals and authorizations of Third Parties, to make all filings with and give all notices to Third Parties which may be necessary or required in order to effectuate the transactions contemplated hereby, and to obtain landlords' estoppels and landlords' lenders' waivers). Sellers shall use best efforts to fulfill or obtain the fulfillment of the conditions set forth in Sections 8.1 and 8.2 of this Agreement.

7.6     Other Bids.  Pursuant to the terms of the proposed Bidding Procedures Order, Parent will solicit bids (solely in connection with the Auction) from other prospective purchasers for the sale of all or substantially all of the Acquired Assets, on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to Sellers) and in accordance with the procedures set forth in the proposed Bidding Procedures Order; provided that, following completion of the Auction until the Closing, Sellers shall not, directly or

indirectly, through any officer, director, employee, agent, professional or advisor, solicit any Acquisition Proposal.

7.7     Other Bankruptcy Matters.

(a)     Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets and the assumption and assignment of the Assumed Contracts are subject to Bankruptcy Court approval. Sellers and Purchaser acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the Acquired Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court, and (ii) Purchaser must provide adequate assurance of future performance under the to-be-assigned Assumed Executory Contracts.

(b)     In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, Sellers shall immediately notify Purchaser of such appeal or stay request and shall promptly provide to Purchaser a copy of the related Notice of appeal or Order of stay. Sellers shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such Orders.

(c)     From and after the Effective Date, Sellers shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of Bidding Procedures Order.

7.8     Daily Reports.  By 5:00 P.M. Pacific Standard Time of each Business Day after the date of this Agreement through the Closing, Sellers shall deliver to Purchaser copies of the Daily Report for such Business Day.

7.9     Sale of Subsidiary Shares Prior to Closing.  Notwithstanding anything to the contrary herein, and without limitation on any other rights Purchaser may have herein, Purchaser may, at any time prior to the Closing, upon delivery of written notice (a "Subsidiary Sale Notice") to Parent, cause the Sellers to sell, assign and transfer all or a portion of their right, title and interest in and to the Subsidiary Shares to a Third Party and on the terms and conditions, in each case, as set forth in the Subsidiary Sale Notice (a "Subsidiary Sale").  In anticipation of the potential delivery of a Subsidiary Sale Notice, the Sellers shall request authority from the Bankruptcy Court (including in the Motion to Approve the Bidding Procedures and APA) to sell the Subsidiary Shares to a Third Party as soon as reasonably practicable. Within three (3) Business Days of the entry of an order by the Bankruptcy Court approving such Subsidiary Sale, the Seller shall deliver to the applicable Third Party instruments of assignment in respect of all of the Subsidiary Shares subject to the Subsidiary Sale Notice and, to the extent any such Subsidiary Shares are certificated, original certificates representing such Subsidiary Shares, duly endorsed for transfer to such Third Party purchaser.  Notwithstanding anything to the contrary contained herein, the proceeds from any Subsidiary Sale shall be retained by the Sellers.  Further, and for the avoidance of doubt, Bankruptcy Court approval of a Subsidiary Sale shall not be required after the Closing.

# ARTICLE VIII
## CONDITIONS TO CLOSING

8.1     <u>Conditions to Parties' Obligations</u>.  The obligations of Purchaser and Sellers under this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by Purchaser and Sellers (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

(a)     <u>Required Approvals</u>. All authorizations, consents, filings and approvals necessary to permit the parties to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance, reasonably satisfactory to Parties, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect. All terminations or expirations of waiting periods imposed (and any extension thereof) by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

(b)     <u>No Order or Proceeding</u>. No Order shall be issued by and no Proceeding shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or involving a claim that consummation thereof would result in the violation of any Law of any Governmental Authority having appropriate jurisdiction.

8.2     <u>Conditions to Purchaser's Obligations</u>.  The obligations of Purchaser under this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by Purchaser (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

(a)     <u>Accuracy of Representations and Warranties</u>. Each of the Fundamental Representations shall be true and correct in all respects at and as of the Closing Date (except for those representations and warranties made as of a specified date, which shall be true and correct as of that date), and each of the representations and warranties set forth in <u>ARTICLE V</u> other than the Fundamental Representations shall be true and correct (without giving effect to any materiality or Material Adverse Effect or Material Adverse Change qualification or exception contained therein, other than the defined term Material Contract) at and as of the Closing Date in all material respects (except for those representations and warranties made as of a specified date, which shall be true and correct as of that date).

(b)     <u>Performance of Covenants</u>. Sellers shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date.

(c)     <u>Officer's Certificate</u>. Sellers shall deliver to Purchaser a certificate signed by Sellers, dated the date of the Closing Date (in form and substance reasonably satisfactory to Purchaser), certifying that the conditions specified in <u>Sections 8.1</u> and <u>8.2</u> have been satisfied as of the Closing.

43

(d)     Bankruptcy Conditions.

(i)     The Bidding Procedures Order shall have been entered on the docket of the Bankruptcy Court as soon as practicable and no later than the Bidding Procedures Order Deadline. The Sale Order shall have been entered on the docket of the Bankruptcy Court as soon as practicable and no later than the Sale Order Deadline and shall have become a Final Order.

(ii)     The Bidding Procedures Order shall grant the Breakup Fee and Expense Reimbursement in favor of the Purchaser and shall establish a date for the Auction no later than the Auction Deadline Date, a date for the deadline for competing bidders to submit bids for the Acquired Assets no later than the Bid Deadline, and a date for a hearing to consider entry of the Sale Order no later than the Sale Order Deadline.

(iii)     The Sale Order shall approve and authorize the transactions contemplated by this Agreement, including the assumption and assignment of the Assumed Executory Contracts, and the Assumed Executory Contracts shall have been actually assumed and assigned to Purchaser such that the Assumed Executory Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Purchaser, among other things, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing.

(iv)     Notwithstanding Sections 8.2(a) and 4.1, nothing in this Agreement shall preclude Purchaser or Sellers from consummating the transactions contemplated herein if Purchaser, in its sole discretion, waives the requirement that the Sale Order or any other Order shall have become Final Orders. No notice of such waiver of this or any other condition to Closing need be given except to Parent, any official committee appointed in the Chapter 11 Cases or the trustee (if one is appointed in the Chapter 11 Cases), it being the intention of the parties hereto that Purchaser shall be entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine or any similar statute or body of law if the Closing occurs in the absence of Final Orders.

(e)     Material Adverse Change. There shall not have occurred a Material Adverse Change since the Effective Date.

(f)     Receipt of Required Consents. Sellers shall have delivered duly executed copies of all Third Party approvals and governmental approvals set forth on Schedule 8.2(f).

(g)     Accounts Receivable.  Purchaser shall have conducted (or caused to be conducted on its behalf) a review of the Accounts Receivable within fifteen (15) days following the date hereof) and determined in its good faith sole discretion that on such inspection date no less than 97% of the Accounts Receivable reflected on the Daily Report generated by Sellers on such inspection date are valid receivables arising in the Ordinary Course of Business and accurately reflect the invoice and due date information with respect to such receivables.

(h)     Inventory.  Purchaser shall have conducted (or caused to be conducted on its behalf) a physical counting of the Inventory within fifteen (15) days following the date hereof and determined in its good faith sole discretion that as of the inspection date of such Inventory

no less than 97% of the Inventory (on a SKU unit-level basis as measured by dollar balance for such SKU), is in saleable condition and accurately reflects the unit, quantity and location of such Inventory as set forth on the Daily Report generated by Sellers on such inspection date.

(i)      <u>Bank Accounts</u>. Sellers shall have caused all bank accounts, safety deposit boxes and lock boxes for the Parent and the Debtor Subsidiaries to be transferred to Purchaser, and shall have caused the authorized signatories on any bank accounts to be transferred to authorized signatories of Purchaser.

(j)      <u>Closing Deliveries</u>. Sellers shall have delivered to Purchaser the items set forth in <u>Section 4.3</u> of this Agreement.

(k)      <u>No Default</u>.  There shall not be a default under the DIP Credit Agreement.

(l)      <u>Sale Order</u>. The form of Sale Order shall be complete and in form and substance acceptable to the Purchaser.

8.3    <u>Conditions to Sellers' Obligations</u>.    The obligations of Sellers under this Agreement are subject to the satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by Parent (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

(a)      <u>Accuracy of Representations and Warranties</u>. Purchaser shall make all of the representations and warranties set forth in <u>ARTICLE VI</u> on and as of the Closing Date, and such representations and warranties shall be true and correct as of the Closing Date in all material respects (except for those representations and warranties made as of a specified date, which shall be true and correct as of that date).

(b)      <u>Performance of Covenants</u>. Purchaser shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

(c)      <u>Officer's Certificate</u>. Purchaser shall deliver to Parent a certificate signed by Purchaser, dated the date of the Closing Date (in form and substance reasonably satisfactory to Parent), certifying that the conditions specified in <u>Sections 8.1</u> and <u>8.3</u> have been satisfied as of the Closing;

(d)      <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered an Order approving the execution of this Agreement by Sellers and the consummation by Sellers of the transactions contemplated herein that is not subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

(e)      <u>Closing Deliveries</u>. Purchaser shall have delivered to Parent the items set forth in <u>Section 4.4</u> of this Agreement.

## ARTICLE IX
## TERMINATION

9.1     <u>Termination</u>.  This Agreement may be terminated prior to the Closing as follows:

(a)     by mutual written agreement of Purchaser and Parent;

(b)     by Purchaser or Parent if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(c)     by Purchaser or Parent (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of the other party, which breach is not cured within ten (10) days following written notice to the party committing such breach or which breach, by its nature, cannot be cured prior to May 12, 2017 (as such date may be extended by written agreement of the parties, the "<u>Outside Date</u>");

(d)     by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if they shall have reasonably determined that one (1) or more conditions set forth in <u>Section 8.2</u> has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied); unless such reason for non-fulfillment or non-satisfaction shall be due solely to the failure of Purchaser to perform or comply with any of the covenants or agreements herein to be performed or complied by it prior to the Closing;

(e)     automatically upon the Bankruptcy Court's entry of an order approving an Acquisition Proposal;

(f)     by Purchaser if Sellers have not commenced the Chapter 11 Cases by no later than two (2) Business Days after the Effective Date;

(g)     by Purchaser if (i) the Bankruptcy Court has not entered the Bidding Procedures Order by no later than the Bidding Procedures Order Deadline (or such later date as Purchaser may determine in its sole discretion), or (ii) following the entry of the Bidding Procedures Order but prior to the entry of the Sale Order, the Bidding Procedures Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction;

(h)     by Purchaser if the Bidding Procedures Order does not require that Bids be due no later than the Bid Deadline;

(i)     by Purchaser if the Auction has not occurred by no later than the Auction Deadline Date;

(j)     by Purchaser if (i) the Bankruptcy Court has not entered the Sale Order by no later than the Sale Order Deadline, or (ii) the Sale Order ceases to be in full force and effect,

or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction;

(k)     by Purchaser on any day on or after the Outside Date if the Closing shall not have occurred by such date (or by such later date as shall be mutually agreed to by Purchaser and Parent in writing), unless the Closing has not occurred due to a material failure of Purchaser to perform or observe its obligations as set forth in this Agreement required to be performed or observed by it on or before the Closing Date;

(l)     by Parent on any day on or after the third (3rd) Business Day after the Outside Date if the Closing shall not have occurred by such date (or by such later date as shall be mutually agreed to by Purchaser and Parent in writing), unless the Closing has not occurred due to a material failure of any Seller to perform or observe its obligations as set forth in this Agreement required to be performed or observed by it on or before the Closing Date;

(m)     by Parent (provided that no Seller is then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one (1) or more conditions set forth in Section 8.3 (other than Section 8.3(d)) has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied), unless such reason for non-fulfillment or non-satisfaction shall be due solely to the failure of any Seller to perform or comply with any of the covenants or agreements herein to be performed or complied by it prior to the Closing;

(n)     by Purchaser if (i) the Chapter 11 Cases are dismissed or converted into a case under Chapter 7 of the Bankruptcy Code or (ii) an examiner or trustee is appointed in the Chapter 11 Cases;

(o)     by Purchaser if, as of any date prior to the Closing, the average gross profits of the Sellers for any seven-day period are less than ninety percent (90%) of the amount specified therefor in Section 7.34(c) of the DIP Credit Agreement; and

(p)     by Purchaser if, as of any date prior to the Closing, the cumulative sales of the Sellers for the previous business week are less than the applicable volume specified therefor in Section 7.33 of the DIP Credit Agreement.

9.2     Breakup Fee and Expense Reimbursement.

(a)     In the event that this Agreement is terminated or if the transactions hereby are not consummated for any reason other than a termination by Parent pursuant to Section 9.1(c) or Section 9.1(m), Sellers shall promptly pay (on a joint and several basis) to Purchaser an amount equal to all documented costs and out-of-pocket expenses incurred by Purchaser in connection with its legal, environmental, accounting and business due diligence and the preparation and negotiation of this Agreement up to $1,250,000 (the "Expense Reimbursement"). Upon the first to occur of (i) the date any Seller consummates an Acquisition Proposal or (ii) the date any Seller files a "plan" pursuant to the Bankruptcy Code (which plan is not consistent with this Agreement), Sellers shall immediately pay (on a joint and several basis) to Purchaser a breakup fee equal to $1,250,000 (the "Breakup Fee"); provided, however, that the Breakup Fee

shall not be payable if this Agreement has been terminated by Parent pursuant to <u>Section 9.1(c)</u> or <u>Section 9.1(m)</u>.

(b) Sellers' obligation to pay the Breakup Fee and the Expense Reimbursement pursuant to this <u>Section 9.2</u> shall survive termination of this Agreement and shall constitute an administrative expense of Sellers under Section 503(b) of the Bankruptcy Code.

9.3 <u>Effect of Termination or Breach</u>. No termination of this Agreement pursuant to <u>Section 9.1</u> shall be effective until written notice thereof is given to the non-terminating party specifying the provision hereof pursuant to which such termination is made. If the transactions contemplated hereby are not consummated, this Agreement shall become null and void and of no further force and effect, except (i) for this <u>Section 9.3</u>, and (ii) for the provisions of <u>Sections 9.2</u>, <u>11.1</u>, <u>11.8</u>, <u>11.9</u>, <u>11.10</u>, <u>11.11</u>, and <u>11.12</u> hereof. In the event this Agreement is terminated pursuant to <u>Section 9.1</u> for any reason, no party shall be entitled to any damages, losses, or payment from any other party (or such other party's Affiliates or any Third Party), except with respect to Purchaser's rights to the Breakup Fee and Expense Reimbursement as set forth herein.

## ARTICLE X
## POST-CLOSING COVENANTS

10.1 <u>Employees</u>. Effective upon the Closing, Sellers shall terminate the employment of all employees actively employed or engaged principally in the Business (the "<u>Business Employees</u>") to the extent such Business Employees are offered employment with Purchaser as set forth in this <u>Section 10.1</u>. Purchaser shall offer employment, effective on the date of the Closing, immediately prior to the Closing (but contingent on the occurrence of the Closing) to such Business Employees as determined by Purchaser in its sole discretion (such employees who accept such offer of employment and commence active employment with Purchaser, the "<u>Rehired Employees</u>") on terms and conditions of employment (including compensation and benefits) as determined by Purchaser in its sole discretion (provided that if such terms constitute a constructive termination under the Worker Adjustment and Retraining Notification Act or any similar state or foreign law, the amount of payments required under such statute shall be deemed a post-petition liability). Nothing contained in this Agreement shall confer upon any Rehired Employee any right to any term or condition of employment or to continuance of employment by Purchaser or any of its Affiliates. Nothing herein shall (i) interfere with the right of Purchaser or any of its Affiliates to terminate the employment of any employee, including any Rehired Employee, at any time, with or without notice and for any or no reason, or (ii) restrict Purchaser or any of its Affiliates in modifying any of the terms or conditions of employment of any employee, including any Rehired Employee after the Closing. Except for the Assumed Obligations, Sellers shall be responsible for (and Sellers shall indemnify and hold Purchaser harmless from and against), any and all wages, bonuses, commissions, employee benefits, retention or stay bonus arrangements, and other compensation (including all obligations under any Employee Benefit Plans other than the Assumed Employee Benefit Plans and accrued paid time off specifically assumed under <u>Section 2.3(a)(v)</u>), if any, due to the employees of Sellers arising out of their employment with Sellers prior to and as of the Closing. To the extent set forth in <u>Section 2.3(a)(v)</u>, Purchaser will honor accrued commissions, vacation, sick leave, and personal time. Purchaser shall make available to such Rehired Employees competitive benefits to those Purchaser and its Affiliates currently make available to their similarly situated

employees. Purchaser shall use commercially reasonable efforts to waive any waiting period, pre-existing condition or requirement for evidence of insurability otherwise imposed with respect to all Rehired Employees under any employee benefit plan that is a welfare plan under which any such Rehired Employee is eligible to participate during the plan year in which the Closing occurs, to the same extent such waiting period, pre-existing condition or requirement for evidence of insurability requirements were met under the corresponding Employee Benefit Plan as of the Closing Date. Purchaser shall use commercially reasonable efforts to give credit to such Rehired Employees and his or her covered dependents for all deductibles, co-pays, and out-of-pocket expense limitations incurred under any new employee benefit plan that is a welfare plan under which any such Rehired Employee is eligible to participate in during the plan year in which the Closing occurs, to the same extent recognized under the corresponding Employee Benefit Plan as of the Closing Date and to the extent that such Rehired Employee can provide documentation of such expenses.

10.2    <u>Employee Benefit Plans</u>.  Except for the sponsorship of Assumed Employee Benefit Plans and accrued paid time off specifically assumed under <u>Section 2.3(a)(v)</u>, if any, Purchaser shall not assume any Employee Benefit Plan or any Liability thereunder or related thereto and Purchaser shall provide only those benefits to Rehired Employees as of or after the Closing as Purchaser shall determine in its sole discretion. Except for obligations relating solely to the Assumed Employee Benefit Plans and accrued vacation specifically assumed under <u>Section 2.3(a)(v)</u> and as set forth in <u>Section 10.3</u>, Sellers shall indemnify, defend and hold harmless Purchaser from and against any and all obligations, claims, or Liabilities at any time arising under or in connection with any Employee Benefit Plan. Nothing contained in this Agreement, express or implied: (a) shall be construed to establish, amend, or modify any benefit or compensation plan, program, agreement or arrangement; (b) shall alter or limit the ability of Purchaser or any of its Affiliates to amend, modify or terminate any benefit or compensation plan, program, agreement or arrangement at any time assumed, established, sponsored or maintained by any of them; or (c) is intended to confer upon any Person (including employees, retirees, or dependents or beneficiaries of employees or retirees) any rights as a third party beneficiary of this Agreement. Sellers and Purchaser agree to use commercially reasonable efforts to consummate the transfer of sponsorship of any Assumed Employee Benefit Plans (including any Contracts thereto) from Sellers to Purchaser, effective as of the Closing Date. Purchaser shall take appropriate action to waive any waiting period, pre-existing condition or requirement for evidence of insurability otherwise imposed with respect to all Rehired Employees. Purchaser shall give credit to such Rehired Employees and their respective covered dependents for all deductibles, co-pays, and out-of-pocket expense limitations incurred under the Employee Benefit Plan.

10.3    <u>COBRA Coverage</u>..  Purchaser shall be responsible for perpetuating the group health plan continuation coverages pursuant to Code section 4980B and ERISA sections 601 through 609 for all Business Employees and their spouses and dependents who are M & A qualified beneficiaries with respect to the transaction contemplated by this Agreement or whose qualifying event occurs on or after Closing. Purchaser shall indemnify and hold the Sellers harmless for any liability Sellers incur at any time after the Closing Date under the provisions of Code section 4980B or ERISA sections 601 through 609 with respect to M & A qualified beneficiaries in connection with the transaction contemplated by this Agreement and their

dependents or spouses and with respect to all Business Employees and their spouses and dependents.

10.4 <u>WARN Act</u>. Sellers will indemnify and hold Purchaser harmless from any Liability with respect to any employees of Sellers under the WARN Act due solely to Sellers' actions or omissions occurring prior to or upon the Closing. Provided that Sellers provide Purchaser with a true and accurate list, by date and location, of employee layoffs implemented by Sellers in the ninety (90) days preceding the Closing, Purchaser will indemnify and hold Sellers harmless from any Liability with respect to any employees employed by Purchaser after the Closing under the WARN Act due, in whole or in part, to Purchaser's actions or omissions occurring after the Closing Date.

10.5 <u>Payroll Reporting and Withholding</u>. If applicable, Purchaser shall adopt the "standard procedure" for preparing and filing Internal Revenue Service Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 2004-53. Under this procedure, Purchaser as the successor employer shall provide Forms W-2 to all Rehired Employees reflecting all wages paid and Taxes withheld by Purchaser as the successor employer for the portion of the calendar year beginning on the day after the Closing Date. Sellers as the predecessor employer shall provide Forms W-2 to all Rehired Employees reflecting all wages paid and Taxes withheld by Sellers for the portion of the calendar year ending on the Closing Date. If applicable, Purchaser shall adopt the "standard procedure" of Rev. Proc. 2004-53 for purposes of Internal Revenue Service Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate). Under this procedure, Sellers shall keep on file the Forms W-4 and W-5 provided by the Rehired Employees for the period required by applicable Law concerning record retention. Purchaser shall obtain new Internal Revenue Service Forms W-4 and W-5 with respect to each Rehired Employee.

10.6 <u>Certain Consents</u>. If a consent of a Third Party which is required in order to assign any Acquired Asset (or claim, right or benefit arising thereunder or resulting therefrom) is not obtained prior to the Closing Date, or if an attempted assignment would be ineffective or would adversely affect the ability of Sellers to convey their interest in question to Purchaser, Sellers will cooperate with Purchaser and use commercially reasonable efforts in any lawful arrangement to provide that Purchaser shall receive the interests of Sellers in the benefits of such Acquired Asset. If any consent or waiver is not obtained before the Closing Date and the Closing is nevertheless consummated, Sellers agree to continue to use commercially reasonable efforts to obtain all such consents as have not been obtained prior to such date. Sellers' commercially reasonable efforts shall include, at minimum, maintaining at least one officer post-Closing to provide such efforts in furtherance of the foregoing.

10.7 <u>Name Changes</u>. By no later than ten (10) Business Days after the Closing Date, Sellers shall take all necessary action to change its name and the names of all Affiliates of Sellers to a name that does not include the word "Sungevity" or any other name or mark included in the Intellectual Property included as an Acquired Asset or any name or mark confusingly similar thereto (collectively, the "<u>Restricted Names</u>"). Sellers shall seek to obtain all required authority for such name change(s) in the Sale Order. Sellers shall promptly notify Purchaser of such name change(s) and the new name(s) chosen by Sellers and all Affiliates of Sellers, as applicable. After Closing, without limiting Purchaser's rights in any Intellectual Property included in the

Acquired Assets, Sellers and all Affiliates of Sellers shall cease all use of any Restricted Name, including by removing all Restricted Names from all letterhead, stationery, signage and tangible assets included in the Excluded Assets.

10.8     Accounts Receivable; Collections.  After the Closing, Sellers shall permit, and hereby authorize, Purchaser to collect, in the name of Sellers, all Accounts Receivable constituting part of the Acquired Assets and to endorse with the name of Sellers for deposit in Purchaser's account any checks or drafts received in payment thereof. Sellers shall promptly deliver to Purchaser any cash, checks or other property that they may receive after the Closing in respect of any Accounts Receivable or other asset constituting part of the Acquired Assets. Purchaser shall promptly deliver to Parent any cash, checks or other property that they may receive after the Closing in respect of any Accounts Receivable or other asset not related to the Business.

10.9     Confidentiality.  Following the Closing, Sellers shall maintain as confidential and shall not use or disclose (except as required by Law or as authorized in writing by Purchaser) (a) any information or materials relating to the Business, operations and affairs of Sellers, and (b) any materials developed by Purchaser or any of its representatives (including its accountants, advisors, environmental, labor, employee benefits and any other consultants, lenders and legal counsel). Except as otherwise permitted and provided above, in the event any Seller is required by Law to disclose any such confidential information, Sellers shall promptly notify Purchaser in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with Purchaser to obtain a protective order and otherwise preserve the confidentiality of such information consistent with applicable Law. Information subject to the confidentiality obligations in this Section 10.8 does not include any information which at the time of disclosure is generally available to the public (other than as a result of disclosure in violation of this Agreement by any Seller or any of their respective Affiliates, officers, directors, employees, agents or representatives).

10.10     Taxes. On or prior to the Closing, Sellers shall pay all income Taxes, sales Taxes, use Taxes, payroll Taxes, and other Taxes of any kind whatsoever owed or owing with respect to the Acquired Assets or the Business and attributable to taxable periods or portions thereof ending on or prior to the Closing Date (a "Pre-Closing Tax Period") and, including (for the avoidance of doubt) any Taxes incurred as a result of the sale of the Acquired Assets or the assumption of the Assumed Obligations pursuant to this Agreement.  In addition, all other Taxes required to be paid by any Seller for any Pre-Closing Tax Period or any taxable periods beginning on or before, and ending after, the Closing Date (a "Straddle Period") shall be timely paid. To the extent that any Seller receives or realizes the benefit of any Tax refund, abatement or credit that is an Acquired Asset, such Seller receiving the benefit shall transfer an amount equal to such refund, abatement or credit to Purchaser (or one of its Subsidiaries designated by Purchaser) within fourteen (14) days of receipt or realization of the benefit.

(a) Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, registration, use or other Taxes and recording charges, and all conveyance fees and other fees and charges (including any penalties and interest) due and which may be payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated in this Agreement and not

exempted under the Sale Order or by section 1146(c) of the Bankruptcy Code shall be borne by Sellers and timely paid.

(b) Neither Purchaser nor any Subsidiary of Purchaser shall be bound by or have any Liability under any Tax-sharing agreements, Tax allocation agreements, Tax indemnity obligations, or similar agreements, arrangements, understandings, or practices with respect to or involving Sellers or the Acquired Assets as of the Closing Date.

(c) Purchaser and Sellers shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns and any audit, litigation or other Proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. All costs and expenses incurred in connection with this Section 1.1(d) shall be borne by the party who is subject to such Proceeding.

(d) Personal property Taxes, real property Taxes and other similar Taxes (the "Proration Items") with respect to the Acquired Assets for any Straddle Period shall be prorated on a per diem basis between Purchaser and Sellers as of the Closing Date. The amount of the Proration Items attributable to Sellers shall be equal to the amount of Tax for the period multiplied by a fraction, the numerator of which shall be the number of days from the beginning of the period through and including the Closing Date and the denominator of which shall be the entire number of days in the period. The amount of all such Proration Items attributable to Sellers shall be estimated as of the Closing Date and paid over to Purchaser at the Closing; provided, however, that final payments with respect to the Proration Items that are not able to be calculated as of the Closing Date shall be calculated and Sellers shall pay over any additional amount as soon as practicable after the Closing Date, but no later than five (5) Business Days after determination of such additional amounts.

(e) Prior to the Closing Date, Sellers shall prepare and timely file (or cause to be prepared and timely filed) all Tax Returns required to be filed prior to such date (taking into account any extension of time to file granted or obtained) that relate to Sellers and the Acquired Assets in a manner consistent with past practices (except as otherwise required by Law), and shall provide Purchaser opportunity for review and comment and shall obtain Purchaser's written approval prior to filing any such Tax Returns, such approval not to be unreasonably withheld. After the Closing Date, at Purchaser's election, Purchaser (or one of its Subsidiaries) shall prepare, and Sellers shall timely file, any Tax Return relating to Sellers for any Pre-Closing Tax Period or Straddle Period due after the Closing Date or other taxable period of any entity that includes the Closing Date, and shall provide Seller opportunity for review and comment and shall obtain Seller's written approval prior to filing any such Tax Returns, which approval may not be unreasonably withheld. Purchaser (or one of its Subsidiaries) shall prepare and file all other Tax Returns required to be filed after the Closing Date in respect of the Acquired Assets. Sellers shall prepare and file all other Tax Returns relating to the Tax Period of Sellers after the Closing, subject to the prior review and approval of Purchaser, which approval may not be unreasonably withheld. Sellers shall not be entitled to any payment or other consideration in addition to the Purchase Price with respect to the acquisition or use of any Tax items or attributes

by Purchaser or any of its Subsidiaries or Affiliates. Purchaser shall be entitled to make all determinations which could reasonably be expected to have an effect on the Acquired Assets, including the right to make or cause to be made any elections with respect to Taxes and Tax Returns of Sellers, with respect to Pre-Closing Tax Periods and Straddle Periods and the other transactions contemplated by this Agreement, including (i) the "date of distribution or transfer" for purposes of Section 381(b) of the Code, if applicable; (ii) the relevant Tax periods of Sellers and Purchaser and its Affiliates; and (iii) any other determinations required under Section 381 of the Code. Purchaser shall have the sole right to represent the interests, as applicable, of Sellers in any Tax proceeding in connection with any Tax Liability or any Tax item for any Pre-Closing Tax Period, Straddle Period or other Tax period which could reasonably be expected to have an effect on the Acquired Assets in any such earlier Tax period.

(f)        After the Closing, at Purchaser's election, Purchaser (or one of its Subsidiaries) shall exercise exclusive control over the handling, disposition and settlement of any inquiry, examination or proceeding (including an audit) by a Governmental Authority (or that portion of any inquiry, examination or proceeding by a Governmental Authority) with respect to the Acquired Assets, provided that, to the extent any such inquiry, examination or proceeding by a Governmental Authority could materially affect the Taxes due or payable by Sellers, Sellers may participate in the handling thereof, and Purchaser may not settle or dispose of such matter without Sellers' prior written approval. Each party shall notify the other party (or parties) in writing promptly upon learning of any such inquiry, examination or proceeding. The parties and their Affiliates shall cooperate with each other in any such inquiry, examination or proceeding as a party may reasonably request. No Seller nor any of its Affiliates shall extend, without Purchaser's prior written consent, the statute of limitations for any Tax for which Purchaser or any of its Affiliates may be liable.

(g)        No party shall take any position with respect to the transactions contemplated by the Agreement that is inconsistent with the position determined in accordance with this Section 10.9, unless, and then only to the extent, otherwise required to do so by a final determination.

10.11        Purchaser Cooperation Regarding Adequate Assurance Information.  Purchaser shall provide information Purchaser reasonably believes satisfies the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code for responses (if any) to any inquiries from any counterparty to any Assumed Contract regarding adequate assurance of future performance.  For the avoidance of doubt, Purchaser shall have no obligation under this Agreement to provide monetary or other consideration as adequate assurance of future performance for any Assumed Contract.

# ARTICLE XI
# MISCELLANEOUS

11.1        Non-Survival of Representations and Warranties.  The representations and warranties respectively made by Sellers and Purchaser in this Agreement and in any certificate delivered hereunder will expire as of the Closing. Following the Closing, no claim with respect to any breach of any representation or warranty contained in this Agreement may be pursued or maintained (either hereunder or otherwise) against any other party. The parties hereto agree that

the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

11.2 <u>Expenses</u>.

(a) Except as otherwise provided herein, each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby. Notwithstanding the foregoing, in the event of any Proceeding to interpret or enforce this Agreement, the prevailing party in such Proceeding (i.e., the party who, in light of the issues contested or determined in the Proceeding, was more successful) shall be entitled to have and recover from the non-prevailing party such costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

(b) The parties hereto agree that if any claims for commissions, fees or other compensation, including brokerage fees, finder's fees, or commissions are ever asserted against Purchaser or Sellers in connection with this transaction, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify (with counsel reasonably satisfactory to the party(ies) entitled to indemnification) and hold the other harmless from and against any and all such claims or demands asserted by any Person, firm or corporation in connection with the transaction contemplated hereby.

11.3 <u>Amendment</u>. This Agreement may not be amended, modified or supplemented except by a written instrument signed by Parent, Secured Party and Purchaser.

11.4 <u>Waivers</u>. The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a party of any condition or of any breach of any term, covenant, representation or waiver contained in this Agreement shall be effective unless in writing by Parent, in the case of a waiver by any Seller, or Purchaser, in the case of any waiver by Purchaser, and no waiver in any one (1) or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

11.5 <u>Notices</u>. All notices, requests, demands and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, (b) when sent by facsimile (with hard copy to follow) during a Business Day upon delivery confirmation (or on the next business day if sent after the close of normal business hours or on any non-Business Day), (c) when sent by electronic mail (with hard copy to follow) during a Business Day upon confirmation of receipt (or on the next Business Day if sent after the close of normal business hours or on any non-Business Day), (d) one (1) Business Day after being sent by reputable overnight express courier (charges prepaid), or (e) three (3) Business Day following mailing by certified or registered mail, postage prepaid and return receipt requested. Unless another address is specified in writing, notices, requests, demands and communications to the parties shall be sent to the addresses indicated below:

To any Seller:   Sungevity, Inc.
        66 Franklin Street, Suite 310
        Oakland, CA 94607
        Attn: Chief Executive Officer
        Phone: (866) 786-4255
        Fax: (510) 380-6875

with copies to:   Morrison & Foerster LLP
        250 West 55th Street
        New York, NY 10019
        Attn: Jonathan Levine
           Jennifer Marines
        Fax: (212) 468-7900
        E-mail: jonlevine@mofo.com
           jmarines@mofo.com

To Purchaser or Secured Party:

        LSHC Solar Holdings, LLC
        c/o Northern Pacific Group
        315 E. Lake Street, Suite 301
        Wayzata, MN 55391
        Attn: Scott Honour
        Phone: 952-456-5301
        E-mail: shonour@northernpacificgroup.com

        Hercules Capital, Inc.
        400 Hamilton Avenue, Suite 310
        Palo Alto, CA 94301
        Legal Department
        Attn: Chief Legal Officer and Brian Sapp
        Phone: (650) 289-3060
        Fax: (650) 473-9194
        E-mail: bsapp@herculestech.com

with copies to:   Kirkland & Ellis LLP
        300 North LaSalle Street
        Chicago, IL 60654
        Attn: Ross Kwasteniet
           Brad Weiland
           Rick Madden
           Brandon Vongsawad
        Fax: (312) 862-2200
        E-mail: rkwasteniet@kirkland.com
           brad.weiland@kirkland.com
           rick.madden@kirkland.com

11.6 <u>Counterparts; Electronic Execution</u>. This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, may be executed in one (1) or more counterparts, all of which shall constitute one and the same instrument. Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "<u>Electronic Delivery</u>") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto or thereto shall re-execute the original form of this Agreement and deliver such form to all other parties. No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

11.7 <u>Headings</u>. The headings preceding the text of the Articles and Sections of this Agreement and the Schedules are for convenience only and shall not be deemed part of this Agreement.

11.8 <u>SUBMISSION TO JURISDICTION; WAIVER OF TRIAL BY JURY</u>. THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS-CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH (I) THIS AGREEMENT OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR (II) THE ACTIONS OF THE PARTIES IN THE NEGOTIATION, AUTHORIZATION, EXECUTION, DELIVERY, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

11.9 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the Delaware (regardless of the Laws that might otherwise govern under applicable Delaware principles of conflicts of Law) as to all matters, including matters of validity, construction, effect, performance and remedies.

11.10 <u>Binding Nature; Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties (which shall not be unreasonably withheld or delayed); except (a) that Purchaser may assign any of its rights and obligations hereunder to any Affiliate or Subsidiary of Purchaser (whether wholly owned or otherwise) or to its lender as collateral security and, following the Closing, in whole or in part to

any successor-in-interest to any Person acquiring all or any portion of the Business or the Acquired Assets; (b) the rights and interests of Sellers hereunder may be assigned to a trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code or assigned to or enforced by the Secured Party; (c) this Agreement may be assigned to any entity appointed as a successor to any Seller pursuant to a confirmed Chapter 11 plan; and (d) as otherwise provided in this Agreement. Sellers hereby agree that Purchaser may grant a security interest in its rights and interests hereunder to its lenders, and Sellers will sign a consent with respect thereto if so requested by Purchaser or its lender, and that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code.

11.11   <u>No Third Party Beneficiaries</u>.   This Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and permitted assigns, any rights, remedies, obligations, claims, or causes of action under or by reason of this Agreement. No party hereto shall have any right to specific performance hereunder.

11.12   <u>Construction</u>.   The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party. Any reference to any federal, state, local or foreign statute or Law shall be deemed also to refer to all rules and Laws promulgated thereunder, unless the context requires otherwise. Whenever a party's consent, approval or satisfaction is required under this Agreement, the decision as to whether or not to consent or approve or be satisfied shall be in the sole and exclusive discretion of such party, and such party's decision shall be final and conclusive.

11.13   <u>Public Announcements</u>.   Except as required by Law or in connection with the Chapter 11 Cases, none of the Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other parties hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned. Prior to making any public disclosure required by applicable Law, the disclosing parties shall give the other party a copy of the proposed disclosure and reasonable opportunity to comment on the same. Notwithstanding the foregoing, Purchaser shall not be restricted from making any public announcements or issuing any press releases after the Closing.

11.14   <u>Entire Understanding</u>.   This Agreement and the Schedules set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and the Agreement and the Schedules supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder (other than as set forth in <u>Section 11.11</u> above).

11.15   <u>Closing Actions</u>.   All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

11.16   <u>Conflict Between Transaction Documents</u>.   The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other agreement or document referred to herein, this Agreement shall govern and control.

11.17   <u>Time Periods</u>.   Unless specified otherwise, any action required hereunder to be taken within a certain number of days shall be taken within that number of calendar days (and not Business Days); <u>provided</u>, <u>however</u>, that if the last day for taking such action falls on a day that is not a Business Day, the period during which such action may be taken shall be automatically extended to the next Business Day.

11.18   <u>No Right of Set-Off</u>.   Except as set forth in <u>Section 2.7</u>, Purchaser for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser or any of its Affiliates, successors and assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith on or prior to the Closing Date. Each Seller, for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Sellers or any of their Affiliates, successors and assigns have or may have with respect to any payments to be made by Sellers pursuant to this Agreement or any other document or instrument delivered by Sellers in connection herewith on or prior to the Closing Date.

11.19   <u>Action For Sellers; Joint and Several Liability</u>.

(a)      Each Seller, by virtue of its execution of this Agreement, hereby irrevocably nominates, constitutes and appoints Parent as the agent, agent for service of process and true and lawful attorney-in-fact of such Person, with full power of substitution, to act in the name, place and stead of such Person with respect to this Agreement and the taking by Parent of any and all actions (whether prior to, contemporaneously with, or after such nomination, constitution and appointment) and the making of any decisions required or permitted to be taken or made by the Parent or the Sellers under this Agreement, which in each case and as applicable shall have accordingly been ratified by such Person, including the exercise of the power to execute, deliver, acknowledge, certify and file (in the name of any or all of the Sellers or otherwise) any and all documents and to take any and all actions that Parent may, in its sole discretion, determine to be necessary, desirable or appropriate on or after the date of this Agreement, including the power to act on behalf of the Sellers in any dispute or Proceeding involving this Agreement.

(b)      All notices delivered to Parent (whether pursuant to this Agreement or otherwise) shall constitute notice to the Sellers.

(c)      The appointment of Parent shall be deemed coupled with an interest and shall be irrevocable and shall survive the Closing.  Without limiting the generality of this <u>Section 11.19</u> and notwithstanding anything to the contrary contained in this Agreement, Purchaser and Secured Party shall be entitled to deal exclusively with Parent on all matters relating to any Seller under this Agreement and each of them shall be entitled to rely conclusively (without

further evidence of any kind whatsoever) on any document executed or purported to be executed by or on behalf of any Seller if delivered or executed by Parent, and on any other action taken or purported to be taken by Parent on behalf of any Seller as fully binding upon such Person.

(d)       Notwithstanding anything herein to the contrary, each Seller, by virtue of its execution of this Agreement, hereby agrees to be jointly and severally liable with all other Sellers for all of the obligations of each Seller (including Parent).

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**PURCHASER:**

**LSHC SOLAR HOLDINGS LLC**

By: _____
Name: Scott M. Honour
Its: President

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**SECURED PARTY:**

**HERCULES CAPITAL, INC.**

By: _____

Name: Zhuo Huang

Its: Associate General Counsel

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**SELLERS:**

**SUNGEVITY, INC.**

By: _____

Name: Andrew Birch

Its:　　Chief Executive Officer

**SUNGEVITY SD, LLC**

By: _____

Name: Andrew Birch

By:　　Chief Executive Officer of Sungevity, Inc.,
　　　　as Sole Member of Sungevity SD, LLC

**SUNGEVITY DEVELOPMENT, LLC**

By: _____

Name: Andrew Birch

By:　　Chief Executive Officer of Sungevity, Inc.,
　　　　as Sole Member of Sungevity Development,
　　　　LLC

**SUNGEVITY INTERNATIONAL HOLDINGS LLC**

By: _____

Name: Andrew Birch

Its:　　Chief Executive Officer

*[Signature Page to Asset Purchase Agreement]*

## Exhibit E

### Form of Auction and Sale Notice

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|                                          |     |                          |
| ---------------------------------------- | --- | ------------------------ |
|                                          | )   |                          |
| In re:                                   | )   |                          |
|                                          | )   | Chapter 11               |
| SUNGEVITY, INC., *et al.*,[1]            | )   |                          |
|                                          | )   | Case No. 17-10156 (___)  |
|                                          | )   |                          |
| Debtors.                                 | )   |                          |
|                                          | )   | Jointly Administered     |

**NOTICE OF PROPOSED SALE, BIDDING PROCEDURES,**
**AUCTION, AND SALE HEARING**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on March 13, 2017 (the "Petition Date").

**PLEASE TAKE FURTHER NOTICE** that on March 13, 2017, the Debtors filed a motion (the "Sale Motion") with the Bankruptcy Court, seeking entry of orders, among other things, approving (a) the sale of the Debtors' Acquired Assets[2] to LHSC Solar Holdings, LLC and Hercules Capital, Inc. (the "Stalking Horse Bidders"), for $50 million, subject to adjustment (the "Sale Transaction"), subject to the submission of higher or better offers in an auction process (the "Auction"); (b) procedures for the solicitation of bids in connection with the Auction, to the Sale Motion (the "Bidding Procedures"), attached as Exhibit B to the Sale Motion; (c) the form and manner of notices related to the Sale Transaction; and (d) procedures for the assumption and assignment of contracts and leases in connection with the Sale Transaction (the "Assumption and Assignment Procedures"). **THE BIDDING PROCEDURES HAVE NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE** that approval of the Sale of the Acquired Assets to the Stalking Horse Bidders or other Successful Bidder may result in, among other things, the assumption, assignment, and/or transfer by the Debtors of certain executory contracts and unexpired leases. If you are counterparty to an executory contract or unexpired lease with the Debtors, you will receive a separate notice regarding the Assumption and Assignment Procedures that contains additional relevant dates and other information that may impact you as counterparty to such executory contract or unexpired lease.

**PLEASE TAKE FURTHER NOTICE** that, on March [ ], 2017, the Court entered an order shortening the notice period with respect to the hearing (the "Bidding Procedures Hearing"), which may be adjourned and continued without further notice than announcement in open court or through the filing of a notice or other document on the Bankruptcy Court's docket, to consider entry of the proposed order (the "Proposed Bidding Procedures Order"), attached as Exhibit A to the Sale Motion, approving, among

---

[1]  The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Sungevity, Inc. (4328), Sungevity SD, LLC (4847), Sungevity Development, LLC (0323), and Sungevity International Holdings LLC (5598).  The principal place of business for each of the Debtors is 66 Franklin Street, Suite 310, Oakland, CA 94607.

[2]  Capitalized terms used in this Notice and not immediately defined have the meanings given to such terms in the Sale Motion.

other things, the Bidding Procedures, which establish the key dates and times related to the Sale Transaction and the Auction.  To the extent that there are any inconsistencies between the terms of an order entered by the Bankruptcy Court approving the Bidding Procedures (the "Entered Bidding Procedures Order"), the proposed Bidding Procedures, and the summary descriptions of the proposed Bidding Procedures in this notice, the Entered Bidding Procedures Order shall control in all respects.  All interested bidders should carefully read the proposed Bidding Procedures Order and the proposed Bidding Procedures attached to the Sale Motion in their entirety.  The proposed deadline by which all Bids must be *actually received* is **4:00 p.m. on April 7, 2017 (EDT)** (the "Bid Deadline").

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth in detail the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Acquired Assets **must** comply strictly with the Bidding Procedures.  **Only Qualified Bids will be considered by the Debtors**.  Any persons interested in making an offer to purchase the Acquired Assets should contact:

| **Proposed Investment Banker to Debtors** | **Proposed Lead Counsel to Debtors** |
|---|---|
| Ducera LLC<br>499 Park Avenue, 16th Floor<br>New York, New York 10022<br>Attn: Joshua Scherer<br>(jscherer@ducerapartners.com)<br>(212) 671-9771 | Morrison & Foerster LLP<br>250 West 55th Street<br>New York, New York 10019<br>Attn: Jonathan I. Levine (jonlevine@mofo.com) and<br>Jennifer L. Marines (jmarines@mofo.com)<br>(212) 468-8000 |

## Obtaining Additional Information

Additional copies of the Sale Motion (including the Proposed Bidding Order and proposed Bidding Procedures) and, when entered by the Bankruptcy Court, the Entered Bidding Procedures Order, and any Post-Auction Notice, as well as all related exhibits including the Stalking Horse Agreement and all other documents filed with the Bankruptcy Court, are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Kurtzman Carson Consultants LLC, www.kccllc.net/Sungevity.

## Important Proposed Dates and Deadlines

The dates and deadlines set forth below have been requested by the Debtors but are subject to Court-approval at the Bidding Procedures Hearing.  **These dates and deadlines will be finalized in the Entered Bidding Procedures Order and remain subject to change.**

1. The proposed deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "Sale Order") and all objections related to the Stalking Horse Bidders (collectively, "Sale Objections") is **4:00 p.m. Eastern Time on April 3, 2017 (EDT)** (the "Sale Objection Deadline").

2. The proposed deadline to submit a Qualified Bid is **5:00 p.m. on April 7, 2017 (EDT)**.

3. In the event that the Debtors timely receive a Qualified Bid in addition to the Qualified Bid of the Stalking Horse Bidders, the Debtors intend to conduct an Auction for the Acquired Assets.  The Debtors proposed to hold the Auction, if any, at **10:00 a.m. (EDT)**

**on April 8, 2017** at the offices of the proposed co-counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (or at any other location as the Debtors may hereafter designate on proper notice).

4. The proposed deadline for objections to the conduct of the Auction and the terms of a Sale to a Successful Bidder other than the Stalking Horse Bidders (collectively, "Auction Objections") **is at or prior to the Sale Hearing** (the "Auction Objection Deadline").

5. The Debtors propose that the hearing (the "Sale Hearing") to consider the proposed Sale be held at **on April 10, 2017**, or such other date as determined by the Court, at 824 North Market Street, Wilmington, Delaware 19801.

6. Upon approval of the Bidding Procedures, the Entered Bidding Procedures Order setting forth the finalized dates and deadlines shall be made available online at www.kccllc.net/Sungevity.

**Filing Sale Objections**

Sale Objections, if any, must: (a) be in writing; (b) state with specificity the nature of such objection; (c) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; and (d) be filed with the Bankruptcy Court and served upon, so as to be **actually received** on or prior to the Sale Objection Deadline by the following parties: (i) the Debtors, 66 Franklin Street, Suite 310, Oakland, California 94607, Attn: Elizabeth Rushforth; (ii) co-counsel to the Debtors, Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Jonathan I. Levine, Esq. (jonlevine@mofo.com) and Jennifer L. Marines, Esq. (jmarines@mofo.com); (iii) co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: M. Blake Cleary, Esq. (mbcleary@ycst.com) and Jaime Luton Chapman, Esq. (jchapman@ycst.com); (iv) counsel to any official committee appointed in these chapter 11 cases; and (v) the Office of the United States Trustee for the District of Delaware.

**CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION:**

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE A SALE OBJECTION ON OR BEFORE THE SALE OBJECTION DEADLINE, OR RAISE AN AUCTION OBJECTION ON OR BEFORE THE AUCTION OBJECTION DEADLINE, IN ACCORDANCE WITH THE ENTERED BIDDING PROCEDURES ORDER MAY BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE TRANSFERRED ASSETS OF THE DEBTOR ESTATES FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS EFFECTED THEREUNDER.**

**NO SUCCESSOR OR TRANSFEREE LIABILITY**

The Stalking Horse Agreement and proposed Sale Order provide that the Stalking Horse Bidders and/or Successful Bidder, if applicable, will have no responsibility for, and the Acquired Assets will be sold free and clear of, any successor liability, including, but not limited to, the following: (a) any liability or other obligation of the Debtors' estates or related to the Debtors' Acquired Assets other than as expressly set forth in the Stalking Horse Agreement; or (b) any claims against the Debtors, their estates, or any of their predecessors or affiliates. Except as expressly provided in the Sale Order or the Stalking Horse Agreement, the Stalking Horse Bidders or Successful Bidder shall not be the successor to any liability of any Seller and shall not assume, nor in any way be liable or responsible for, any claim or liability of the Debtors or their non-Debtor affiliates, whether relating to or arising out of the Business, the Excluded Assets, the Acquired Assets or otherwise.

M. Blake Cleary (No. 3614)
Jaime Luton Chapman (No. 4936)
Kenneth A. Listwak (No. 6300)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Jonathan I. Levine
Jennifer L. Marines
Melissa A. Hager
Erica J. Richards
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for Debtors and Debtors-in-Possession*

**<u>Exhibit F</u>**

**Form of Publication Notice**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| SUNGEVITY, INC., *et al.*,[1] | ) | |
| | ) | Case No. 17-10561 (____) |
| Debtors. | ) | |
| | ) | Jointly Administered |

## NOTICE OF PROPOSED SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court") on March 13, 2017. On March 13, 2017, the Debtors filed a motion (the "Sale Motion") with the Court, seeking entry of orders, among other things, approving (a) the sale of the Debtor's Acquired Assets[2] (the "Sale") to LSHC Solar Holdings, LLC and Hercules Capital, Inc. (the "Stalking Horse Bidders"), subject to the submission of higher or better offers in an auction process (the "Auction"); (b) procedures for the solicitation of bids in connection with the Auction (the "Bidding Procedures"); (c) the form and manner of notices related to the Sale; and (d) procedures for the assumption and assignment of contracts and leases in connection with the Sale (the "Assumption and Assignment Procedures"). **THE BIDDING PROCEDURES HAVE NOT YET BEEN APPROVED BY THE COURT.**

**PLEASE TAKE FURTHER NOTICE** that, on March [ ], 2017, the Court entered an order shortening the notice period with respect to a hearing to consider entry of a proposed order approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale and the Auction. To the extent that there are any inconsistencies between the terms of an order entered by the Court approving the Bidding Procedures (the "Entered Bidding Procedures Order"), the proposed Bidding Procedures, and the summary descriptions thereof contained in this notice, the Entered Bidding Procedures Order shall control. All interested bidders should carefully read the proposed Bidding Procedures, attached to the Sale Motion. The proposed deadline by which all Bids must be *actually received* is **4:00 p.m. on April 7, 2017 (EDT)** (the "Bid Deadline").

### Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Acquired Assets **must** comply strictly with the Bidding Procedures. **Only Qualified Bids will be considered by the Debtors**. Any interested persons should contact:

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Sungevity, Inc. (4328), Sungevity SD, LLC (4847), Sungevity Development, LLC (0323), and Sungevity International Holdings LLC (5598). The principal place of business for each of the Debtors is 66 Franklin Street, Suite 310, Oakland, CA 94607.

[2] Capitalized terms used in this Notice and not immediately defined have the meanings given to such terms in the Sale Motion.

| Proposed Investment Banker to Debtors | Proposed Lead Counsel to Debtors |
|---|---|
| Ducera LLC<br>499 Park Avenue, 16th Floor<br>New York, New York 10022<br>Attn: Joshua Scherer<br>(jscherer@ducerapartners.com)<br>(212) 671-9771 | Morrison & Foerster LLP<br>250 West 55th Street<br>New York, New York 10019<br>Attn: Jonathan I. Levine (jonlevine@mofo.com)<br>and Jennifer L. Marines (jmarines@mofo.com)<br>(212) 468-8000 |

**Obtaining Additional Information**

Copies of the Sale Motion and Bidding Procedures, as well as all related documents including the Stalking Horse Agreement, are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Kurtzman Carson Consultants LLC, www.kccllc.net/Sungevity.

**Important Proposed Dates and Deadlines**

The dates and deadlines set forth below have been requested by the Debtors but are subject to Court approval. **These dates and deadlines will be finalized in the Entered Bidding Procedures Order and remain subject to change.**

1. The proposed deadline to file an objection with the Court to the entry of an order approving the sale and all objections related to the Stalking Horse Bidder (collectively, "Sale Objections") is **4:00 p.m. Eastern Time on April 3, 2017 (EDT)** (the "Sale Objection Deadline").

2. The proposed deadline to submit a Qualified Bid is **5:00 p.m. on April 7, 2017 (EDT)**.

3. In the event that the Debtors timely receive a Qualified Bid in addition to the Qualified Bid of the Stalking Horse Bidders, the Debtors intend to conduct an Auction for the Acquired Assets. The Debtors proposed to hold the Auction, if any, at **10:00 a.m. (EDT) on April 8, 2017** at the offices of the proposed co-counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (or at any other location as the Debtors may hereafter designate on proper notice).

4. The proposed deadline for objections to the conduct of the Auction and the terms of a Sale to a Successful Bidder other than the Stalking Horse Bidders (collectively, "Auction Objections") is **at or prior to the Sale Hearing** (the "Auction Objection Deadline").

5. The Debtors propose that the hearing (the "Sale Hearing") to consider the proposed Sale be held at **on April 10, 2017**, or such other date as determined by the Court, at 824 North Market Street, Wilmington, Delaware 19801.

6. Upon approval of the Bidding Procedures, the Entered Bidding Procedures Order setting forth the finalized dates and deadlines shall be made available online at www.kccllc.net/Sungevity.

**Filing Objections**

Sale Objections, if any, must: (a) be in writing; (b) state with specificity the nature of such objection; (c) comply with the Bankruptcy Rules and the Local Rules of the United States Bankruptcy Court for the District of Delaware; and (d) be filed with the Court and served upon, so as to be **actually received** on or prior to the Sale Objection Deadline: (i) the Debtors, 66 Franklin Street, Suite 310, Oakland, California 94607, Attn: Elizabeth Rushforth; (ii) co-counsel to the Debtors, Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, Attn: Jonathan I. Levine, Esq. (jonlevine@mofo.com) and Jennifer L. Marines, Esq. (jmarines@mofo.com); (iii) co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: M. Blake Cleary, Esq. (mbcleary@ycst.com) and Jaime Luton Chapman, Esq. (jchapman@ycst.com); (iv) counsel to any official committee appointed in these chapter 11 cases; and (v) the Office of the United States Trustee for the District of Delaware.

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION:

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE A SALE OBJECTION ON OR BEFORE THE SALE OBJECTION DEADLINE, OR RAISE AN AUCTION OBJECTION ON OR BEFORE THE AUCTION OBJECTION DEADLINE, IN ACCORDANCE WITH THE ENTERED BIDDING PROCEDURES ORDER MAY BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE TRANSFERRED ASSETS OF THE DEBTOR ESTATES FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS EFFECTED THEREUNDER.**

**<u>Exhibit G</u>**

**Form of Post-Auction Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SUNGEVITY, INC., *et al.*,[1] | ) | Case No. 17-10561 (___) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## NOTICE OF SUCCESSFUL BIDDER

**PLEASE TAKE NOTICE THAT:**

1.       Pursuant to the *Order (I) Establishing Bidding Procedures and Granting related relief and (II) Approving the Bid Protections Related to the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Interests* (the "Bidding Procedures Order")[2] entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on [●], 2017, the above captioned debtors and debtors-in-possession (collectively, the "Debtors") have accepted the bid of [●] for the purchase of substantially all of the Debtors' assets (the "Sale").  The terms of the bid are set forth in the asset purchase agreement (the "APA") dated as of [●], 2017 between the Debtors and [●] (the "Purchaser"), substantially in the form attached hereto as Exhibit A.

2.       At the Sale Hearing to be held on [April 10], 2017 at [●] (prevailing Eastern Time) before the [●], at the Bankruptcy Court, 24 Market Street, [●] Floor, Courtroom No. [●], Wilmington, Delaware 19801, the Debtors will seek entry of an order, approving the Sale free

---

[1]  The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Sungevity, Inc. (4328), Sungevity SD, LLC (4847), Sungevity Development, LLC (0323), and Sungevity International Holdings LLC (5598).  The principal place of business for each of the Debtors is 66 Franklin Street, Suite 310, Oakland, CA 94607.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

and clear of all liens, claims, interests and encumbrances except as otherwise provided in the APA.

Dated:  April [__], 2017
       Wilmington, Delaware

_____

M. Blake Cleary (No. 3614)
Jaime Luton Chapman (No. 4936)
Kenneth A. Listwak (No. 6300)
**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

Jonathan I. Levine
Jennifer L. Marines
Melissa A. Hager
Erica J. Richards
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

_Proposed Counsel for Debtors
and Debtors-in-Possession_

01:21672824.1

**<u>Exhibit H</u>**

**Form of Notice of Assumption and Assignment**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| SUNGEVITY, INC., *et al.*,[1] | ) | |
| | ) | Case No. 17-10561 (___) |
| Debtors. | ) | |
| | ) | Jointly Administered |

**PLEASE TAKE NOTICE THAT** the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on March 13, 2017 (the "Petition Date").

**PLEASE TAKE FURTHER NOTICE** that on March 13, 2017, the Debtors filed a motion (the "Sale Motion") with the Bankruptcy Court, seeking entry of orders, among other things, approving (a) the sale of the Debtors' Acquired Assets[2] to LHSC Solar Holdings, LLC and Hercules Capital, Inc. (the "Stalking Horse Bidders"), for $50 million, subject to adjustment (the "Sale Transaction"), subject to the submission of higher or better offers in an auction process (the "Auction"); (b) procedures for the solicitation of bids in connection with the Auction (the "Bidding Procedures"), attached as **Exhibit B** to the Sale Motion; (c) the form and manner of notices related to the Sale Transaction; and (d) procedures for the assumption and assignment of executory contracts and unexpired leases ("Designated Contracts") in connection with the Sale Transaction (the "Assumption and Assignment Procedures").

**PLEASE TAKE FURTHER NOTICE THAT** on [       ] [__], 2017, the Bankruptcy Court entered an order (the "Bidding Procedures Order") [Docket No. ___] granting certain of the relief sought in the Motion, including, among other things, approving:  (a) the Bidding Procedures and (b) the Assumption and Assignment Procedures.  Copies of the Bidding Procedures Order (which sets forth the Assumption and Assignment Procedures) and the Bidding Procedures are enclosed herein.

---

[1]   The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Sungevity, Inc. (4328), Sungevity SD, LLC (4847), Sungevity Development, LLC (0323), and Sungevity International Holdings LLC (5598).  The principal place of business for each of the Debtors is 66 Franklin Street, Suite 310, Oakland, CA 94607.

[2]   Capitalized terms used in this Notice and not immediately defined have the meanings given to such terms in the Sale Motion.

**PLEASE TAKE FURTHER NOTICE THAT** upon the closing of the Sale, the Debtors intend to assume and assign to the Stalking Horse Bidders or any other Successful Bidder(s) the Designated Contracts. A schedule listing the Designated Contracts (the "Designated Contracts List") may be accessed free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Kurtzman Carson Consultants LLC, www.kccllc.net/Sungevity. In addition, the cure payments, if any, necessary for the assumption and assignment of the Designated Contracts (the "Cure Payments") are set forth on the Designated Contracts List.

**YOU ARE RECEIVING THIS NOTICE BECAUSE THE STALKING HORSE BIDDERS HAVE IDENTIFIED YOU AS A COUNTERPARTY TO A POTENTIAL DESIGNATED CONTRACT**. Under the terms of the Assumption and Assignment Procedures, the Stalking Horse Bidders may modify the list of Designated Contracts until the opening of business on the date of the Auction, and the Debtors reserve the right at any time after the Assumption and Assignment Service Deadline and before the closing of a Sale, to: (a) supplement the list of Designated Contracts with previously omitted executory contracts or unexpired leases; (b) remove an executory contract or unexpired lease from the list of executory contracts and unexpired leases ultimately selected as Designated Contracts that a Successful Bidder(s) proposes be assumed and assigned to it in connection with a Sale or add to such list; and/or (c) modify the previously stated Cure Payment associated with any Designated Contract. Any counterparty impacted by such a modification will receive notice thereof (the "Supplemental Assumption Notice") and an opportunity to object to the proposed assumption and assignment of the Designated Contract, if applicable.

## Obtaining Additional Information

Additional copies of the Bidding Procedures Order, the Bidding Procedures and any other related documents are available free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Kurtzman Carson Consultants LLC, www.kccllc.net/Sungevity.

## Important Dates and Deadlines

1. The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "Sale Order") is [**4:00 p.m. Eastern Time on April 3, 2017]** (the "Sale Objection Deadline").

2. The Auction for the Acquired Assets, if one is necessary, will commence at [**10:00 a.m. Eastern Time on April 8, 2017]**, at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (or at any other time and location as the Debtors may designate on proper notice).

3. A hearing (the "Sale Hearing") to consider the proposed Sale will be held before the Bankruptcy Court at [**10:00 a.m. Eastern Time on April 10, 2017**], or such other date as determined by the Court, at 824 North Market Street, Wilmington, Delaware 19801.

## Filing Assumption and Assignment Objections

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of a Designated Contract ("Designated Contract Objections"), including any objection relating to the Cure Payment and/or adequate assurance of future performance, must: (a) be in writing; (b) state with specificity the nature of such objection and alleged Cure Payment, including applicable and appropriate documentation in support of such alleged Cure Payment; (c) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and (d) be filed with the Bankruptcy Court and served so as to be **actually received** on or before **(i) fourteen days (14) after the date on which this notice was served, or (ii) for those counterparties that receive a Supplemental Assumption Notice, fourteen days (14) after service of such Supplemental Assumption Notice ("Supplemental Designated Contract Objection")**.

If a counterparty to a Designated Contract files a Supplemental Designated Contract Objection in a manner that is consistent with the requirements set forth in the Assumption and Assignment Procedures, and the parties are unable to consensually resolve the dispute, the Debtors will seek an expedited hearing before the Court (a "Supplemental Designated Contract Hearing") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts, unless the Successful Bidder elects not to assume the Designated Contract.

Any objections to the Successful Bidder(s)'s proposed form of adequate assurance of future performance must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

Failure to timely file a Designated Contract Objection shall constitute a waiver of any objections related to accepting performance by, or rendering performance to, the Stalking Horse Bidders or Successful Bidder(s), as applicable, for purposes of section 365(c)(1) of the Bankruptcy Code.

Any objections will be considered at the Sale Hearing, or as soon thereafter as counsel may be heard, and must be served on the following parties: (a) the proposed co-counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, Attn: M. Blake Cleary (mbcleary@ycst.com)

and Jaime Luton Chapman (jchapman@ycst.com); (b) the proposed co-counsel the Debtors, Morrison & Foerster LLP, 250 West 55 Street, New York, New York 10019, Attn: Jonathan I. Levine (jonlevine@mofo.com) and Jennifer L. Marines (jmarines@mofo.com); (c) Hercules; (d) MMA Energy Capital, LLC; (e) MHA Trust LLC; (f) Wilmington Savings Fund Society, FSB; (g) counsel to LSHC Solar Holdings, LLC, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Ross Kwasteniet (ross.kwasteniet@kirkland.com) and Brad Weiland (brad.weiland@kirkland.com); (h) counsel to the Successful Bidder(s), if known on the Sale Objection Deadline; (i) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801; (j) counsel to any official committee of unsecured creditors appointed in these chapter 11 cases (upon such appointment); and (k) all parties that have requested notice in these chapter 11 cases

**CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION:**

**ANY COUNTERPARTY TO A DESIGNATED EXECUTORY CONTRACT WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF SUCH DESIGNATED EXECUTORY CONTRACT IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER AND THE ASSUMPTION AND ASSIGNMENT PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE DESIGNATED EXECUTORY CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON THE DESIGNATED CONTRACTS LIST, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE DESIGNATED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.**

Dated:  [__], 2017
        Wilmington, Delaware

---

M. Blake Cleary (No. 3614)
Jaime Luton Chapman (No. 4936)
Kenneth A. Listwak (No. 6300)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

Jonathan I. Levine
Jennifer L. Marines
Melissa A. Hager
Erica J. Richards
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for Debtors and Debtors-in-Possession*