IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------X
: 
In re: : Chapter 11
:
SUNGEVITY, INC., *et al.*, : Case No. 17-10561 (KG)
:
      Debtors.[1] : (Jointly Administered)
:
: Re: Docket Nos. 13, 45
:
------------------------------------------------------------------X

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING ON SUPERPRIORITY, SENIOR SECURED BASIS AND (B) USE OF CASH COLLATERAL, (II) GRANTING (A) LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Sungevity, Inc. and its affiliated Chapter 11 debtors (collectively, the "Debtors"), by and through its proposed undersigned counsel, hereby submits this objection (the "Objection") to the *Debtors' Motion for Interim and Final Orders (I) Authorizing The Debtors to (A) Obtain Postpetition Financing on Superpriority, Senior Secured Basis and (B) Use of Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Claims and (B) Adequate Protection To Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion"), and in support of its Objection, the Committee respectfully submits as follows:[2]

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal identification number, are: Sungevity, Inc. (4328), Sungevity SD, LLC (4847), Sungevity Development, LLC (0323), and Sungevity International Holdings LLC (5598). The principal place of business for each of the Debtors is 66 Franklin Street, Suite 310, Oakland, CA 94607.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DIP Motion.

9241482/

## PRELIMINARY STATEMENT

1. Less than six months ago, these Debtors were party to a tentative sale for $350 million. Absent the emergence of another bidder in the twenty-eight (28) days between the Petition Date and the April 10th Bid Deadline, substantially all of the Debtors' assets will be sold to the Stalking Horse for a credit bid totaling less than $50 million and the assumption of certain liabilities.

2. On March 29, 2017, the Court approved the Debtors' Bid Procedures Motion for the sale of substantially all of their assets, subject to certain revisions and additional terms. Still to be considered is the DIP Motion, pursuant to which the Stalking Horse seeks to use the chapter 11 process to implement its loan-to-own strategy with no benefit to the estate or its creditors.

3. The loan-to-own strategy as reflected by the proposed DIP Facility permits the secured lenders to abscond with the value of previously unencumbered assets while providing no benefit to the estate or unsecured creditors. If the DIP Lender and Prepetition Secured Parties are permitted to absorb unencumbered assets, then their collateral should be charged for the costs and expenses attendant to that process—which charges should inure to the benefit of unsecured creditors.

4. The Committee respectfully submits that the terms of the DIP Motion provide the DIP Lender/Stalking Horse with too much and the estates and their stakeholders with too little. Accordingly, absent material modifications, the DIP Motion should be denied.

## BACKGROUND

5. On March 13, 2017 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors continue to operate and manage their businesses as debtors-in-possession.

9241482/

6.	Substantially contemporaneous with the filing of the Chapter 11 petitions, the Debtors filed, among other things: (i) the DIP Motion [Docket No. 13]; and (ii) the *Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Assets, Including Approving Break-Up Fee and Expense Reimbursement, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing To Consider the Proposed Sale; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 15] (the "Bid Procedures Motion"). With the Bid Procedures Motion, the Debtors sought to, among other things, set certain deadlines in connection with the sale process to LSHC Solar Holdings, LLC as the stalking horse bidder (collectively, the "Stalking Horse") pursuant to that certain asset purchase agreement between the Debtors and the Stalking Horse dated March 13, 2017 (the "Stalking Horse Agreement"). Hercules Capital, Inc. ("Hercules"), one of the Prepetition Secured Parties, is a controlling member of the Stalking Horse.

7.	As described more fully in the DIP Motion, the Debtors have obtained a commitment to obtain senior secured postpetition financing on a super-priority basis pursuant to the terms and conditions of that certain Debtor-in-Possession Loan and Security Agreement among Sungevity, Inc. and Sungevity Development, LLC, as borrowers (the "DIP Borrowers"), and Sungevity International Holdings, LLC and Sungevity SD, LLC, as guarantors, and LSHC Solar Holdings, LLC as lender (the "DIP Lender") to provide financing to the Debtors in a principal amount of up to $20 million (the "DIP Loan" or "DIP Facility"), pursuant to an

9241482/

3

agreement dated March 13, 2017 (the "DIP Loan Agreement"). The DIP Facility will be junior to $15 million of the Hercules Loans and senior to all of the Debtors' other prepetition secured and unsecured debt.

8. The Debtors' prepetition indebtedness is set out fully in the *Declaration of Andrew Birch in Support of Chapter 11 Petitions and Requests for First Day* Relief [Docket No. 3].

9. On March 15, 2017, following the "first day" hearing, the Court issued the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Bases and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief* [Docket No. 45] (the "Interim DIP Order").

10. On March 22, 2017, the United States Trustee for the District of Delaware appointed the Committee. See *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 97].[3]

11. On March 24, 2017, the Debtors filed the *Notice of Filing of Second Amended DIP Budget* [Docket No. 108] (the "DIP Budget"). The DIP Budget runs through the week of April 21, 2017.

12. A hearing to consider the Bid Procedures Motion was held on March 29, 2017 (the "Bid Procedures Hearing").

---

[3] The Committee is comprised of the following entities: (i) Mario Palumbo c/o Millenium Partners; (ii) LG Electronics U.S.A., Inc.; (iii) Locus Energy, Inc.; (iv) Andrew Adelman c/o Jack Raisner, Esq. and Rene Roupinian, Esq.; and (v) SolarEdge Technologies, Inc.

9241482/

**OBJECTION**

13. To obtain postpetition, debtor-in-possession financing under Bankruptcy Code section 364(d), a debtor must show, among other things, that the terms of the financing are fair, reasonable, and adequate. In re Ames Dept. Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990). The Court should only approve the proposed DIP Facility to the extent it is "in the best interests of the general creditor body." See In re Roblin Indus., 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985).

14. Conversely, where, as here, the proposed DIP Facility favors a secured creditor at the expense of the Debtors' general creditor body, it should not be approved. See A&K Endowment, Inc. v. Gen. Growth Props., Inc. (In re Gen. Growth Props., Inc.), 423 B.R. 716, 725 (S.D.N.Y. 2010) ("proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate") (quoting Ames, 115 B.R. at 39). Below, the Committee addresses the specific defects in the DIP Motion that prevent its approval in present form.

### A. There is No Basis for Waiving the Estates' Rights under Bankruptcy Code Section 506(c).

15. By the DIP Motion, the Debtors seek to waive the estates' right to surcharge the DIP Lender or the Prepetition Secured Parties for expenses associated with the preservation and disposition of the DIP Collateral and Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code. See Interim Order, ¶¶ 7, 38. Given that these cases benefit only the Prepetition Secured Parties/Stalking Horse and leave nothing for unsecured creditors, such relief is entirely inappropriate. Section 506(c) of the Bankruptcy Code allows a debtor to charge the costs of preserving or disposing of a secured lender's collateral to the collateral itself. See, e.g., Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.), 57 F.3d 321, 325 (3d

Cir. 1995).[4] The policy behind this provision is straightforward: the cost of protecting a secured lender's collateral should not be paid from unsecured creditor recoveries. See Kivitz v. CIT Group/Sales Fin., Inc., 272 B.R. 332, 334 (D. Md. 2000) ("the reason for [section 506(c)] is that unsecured creditors should not be required to bear the cost of protecting property that is not theirs").

16. A section 506(c) waiver is particularly harmful here, given the merits of a potential surcharge claim brought against the Stalking Horse. These chapter 11 cases have been run for the Stalking Horse's sole benefit. Rather than pursue a more streamlined out-of-court sale transaction, the Stalking Horse itself elected to pursue a section 363 sale. In other words, the Stalking Horse employed the chapter 11 process to avail itself of the ability to obtain a lien on previously unencumbered assets, shed debt, and limit successor liability, while preserving the company's going concern value. Nothing is improper with this objective in principle; however, chapter 11 comes with a cost. The DIP Lender should be required to cover the costs of the sale process it elected to exercise for its own benefit, and thus, upon sale must restore for the benefit of unsecured creditors the previously unencumbered assets.

17. If the Stalking Horse was not prepared to shoulder the expenses associated with selling its collateral in bankruptcy, these cases should not have been commenced under chapter 11. Accordingly, the Court should preserve all surcharge rights and reject the attempt to shield the Stalking Horse from liability through a section 506(c) waiver.

    B.    **The Value of Unencumbered Assets Must Be Preserved for Benefit of Unsecured Creditors.**

18. Section 506(c) is a safeguard to prevent secured creditors from benefitting from the disposition of their assets in a chapter 11 case while leaving the estate with insufficient

---

[4] Such expenses include all costs that the Debtors can show "that absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure." Brookfield Prod. Credit Ass'n v. Borron, 738 F.2d 951, 952 (8th Cir. 1984) (citations omitted).

9241482/

funding to fully administer the case. That policy is precisely what is being undermined here. On the Petition Date, the Debtors' intellectual property assets (the "Intellectual Property") were unencumbered—thus, their value would have been available for the Debtors and their unsecured creditors. The purpose of this case is a sale of assets for the benefit of the Stalking Horse—a prepetition lender with a limited prepetition collateral package. With the chapter 11 filing, the Stalking Horse is seeking to enhance its collateral package to encumber previously unencumbered assets and leave the estate with nothing to look to after the sale of its now fully encumbered assets.

19. The cost of selling and protecting Hercules' prepetition collateral is being borne by the unsecured creditors—that is, from the value of the unencumbered Intellectual Property. How is that so? The Stalking Horse proposes to grab a lien on the Intellectual Property as collateral to support the DIP Loan. This is one way of monetizing an unencumbered asset—use it to fund a Chapter 11 case. To put the estates back where they were on the Petition Date, upon the consummation of the sale, Hercules' collateral should be charged in cash to "pay back" to the estate the funds used to preserve and protect the collateral that the DIP Lender acquired through its credit bid – funds at least in the amount equal to the value of the previously unencumbered Intellectual Property.

20. If the DIP-to-sale is permitted under these circumstances, the protections of 506(c) will be rendered a nullity. It would mean that in *every* case where the sole purpose is to rush through a section 363 sale of all assets, including unencumbered assets, the secured lender need only take a lien on the unencumbered assets through a DIP loan. Then, the cost to get to that sale—i.e., a private foreclosure via bankruptcy—would wipe out the value that would otherwise go to unsecured creditors in the same sale transaction outside of bankruptcy.

9241482/

7

### C. The Proposed Budget is Insufficient to Avoid Administrative Insolvency.

21. In addition, unless the DIP Lender provides sufficient funding in the form of a consensual budget that ensures administrative solvency and a controlled exit from chapter 11, the Stalking Horse should not be granted a 506(c) waiver. See Hartford Underwriters Ins. Co. v. Magna Bank, NA (In re Hen House Interstate, Inc.), 150 F.3d 868, 872 (8th Cir. BAP 1998), *vac'd on other grounds*, 530 U.S. 1 (2000) (section 506(c) waivers deemed unenforceable where they "operate as a windfall to the secured creditor at the expense of administrative claimants"); Hartford Fire Ins. Co. v. Nw. Bank Minn., NA (In re Lockwood Corp.), 223 B.R. 170, 176 (8th Cir. BAP 1998) (same).[5] Given that the economic terms set forth in the DIP Budget will not ensure administrative solvency, the Committee cannot and does not agree to any such waiver. See, e.g., In re Mortgage Lenders Network USA, Inc., Hearing Transcript (Docket No. 346) at 21, Case No. 07-10146 (PJW) (Bankr. D. Del. Mar. 20, 2007) (recognizing that 506(c) waivers require committee consent and stating that "if the Committee doesn't agree [to a waiver], it doesn't happen").

22. The Debtors have woefully failed to satisfy their burden to prove that the proposed DIP Budget is sufficient to pay administrative expenses, including professional fees, and to ensure that the Debtors have sufficient funding to effect an orderly wind down of the estates after the sale. In fact, many of the payments to be made under the DIP Budget provide illusory value to the estate while benefitting the DIP Lender/Stalking Horse.

---

[5] Further, on appeal of Hen House Interstate, the Supreme Court made clear that such waivers, since they are binding upon all parties in interest, should not be lightly granted, nor may the management of a debtor in possession concede this issue for any but compelling reasons. See 530 U.S. at 12 (debtor's decision to waive section 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require").

9241482/

23.     First, while the DIP Loan purports to provide "new money" financing of up to $20 million, it does not.[6] Although the scheduled draws under the DIP Budget total $20 million, at the end of the budget period more than $5.5 million will remain in cash, which goes to the Stalking Horse at the closing of the sale. Moreover, $796,000 of the first draw under the DIP Loan was immediately due to be paid on account of DIP fees.

24.     Further, although the DIP Budget attributes $4,292,500 to Restructuring Professional Fees, $2,250,000 of those fees are attributed to Ducera Securities LLC and Greentech Capital Advisors Securities, LLC (the "Ducera/GCA Fees"). The Ducera/GCA Fees, which constitute more than half of the total amount attributed for Restructuring Professional Fees, already constitute an assumed liability under the Stalking Horse Agreement. See Stalking Horse Purchase Agreement § 2.3(a)(iv). Accordingly, the Ducera/GCA Fees should not be included as part of the DIP Loan. After removing the remaining cash ($5.9 million) and the Ducera/GCA Fees ($2.25 million), in actuality, the Debtors will draw less than $11.1 million under the DIP Loan.

25.     In addition, the proposed Final Order seeks to limit the Committee's investigation budget to $50,000. Interim Order, ¶ 33(b). Such an amount is insufficient and clearly was imposed to prevent the Committee from undertaking a thorough investigation. See In re Tenney Village Co., Inc., 104 B.R. 562, 568-69 (Bankr. D.N.H. 1989) (refusing to approve DIP financing because fee cap thereunder unacceptably limited the right of debtor's counsel to

---

[6] Moreover, in Borrego Springs Bank, N.A. v. Skuna River Lumber, LLC, the stalking horse argued that its collateral could not be surcharged under Bankruptcy Code 506(c) because it paid via credit bid and no additional cash flowed to the estate. 381 B.R. 211 (N.D. Miss. 2008), rev'd on other grounds, 564 F.3d 353 (5th Cir. 2009). Relying significantly on public policy considerations, the court disagreed: "to disallow reimbursement of expenses and compensation to [debtor's professionals] would significantly discourage professionals...from attempting to assist debtors and trustees in efforts to market assets if a credit bid could negate the prospects of being compensated . . . As the highest bidder at auction, [the stalking horse] is responsible for [debtor's professionals] compensation. . . . [T]he bankruptcy court is hereby authorized to enter such orders *as it deems necessary to effect payment of this debt by [the stalking horse]*." Id. at 216 (emphasis added); see also In re A-1 Plank & Scaffold Mfg., Inc., 437 B.R. 689, 694-96 (Bankr. D. Kan. 2010) (assessing 6% broker's fee on amount of credit bid under § 506(c) where creditor benefited because the broker enabled the creditor to leverage an offer on resale).

9241482/

payment for bringing actions against prepetition lender, thereby creating a financial incentive for debtor to avoid bringing such actions, in derogation of its fiduciary duties to the estate); In re Cuisinarts, Inc., 115 B.R. 744, 751 (Bankr. D. Conn. 1990) (rejecting DIP financing provisions that restricted the estate from using monies derived from bank funding to investigate validity of bank's claims). The Committee must have a sufficient budget to satisfy its fiduciary duty and properly investigate the Stalking Horse Bidders' prepetition liens and claims. Accordingly, the Committee respectfully requests that it be granted at least a $100,000 challenge budget to allow it to conduct a comprehensive review of the liens and claims asserted by the Stalking Horse Bidders. Moreover, the DIP Order improperly seeks to limit the Committee's professionals' ability to be paid its fees and expenses only from unencumbered assets, particularly whereas here DIP Lenders and Prepetition Secured Parties seek a lien on all assets, even those previously unencumbered. Interim Order, ¶ 33(b). Additionally, it is also unclear whether the DIP Budget provides adequate funding to pay all administrative expenses, including claims arising under section 503(b)(9) of the Bankruptcy Code.

26.  During the Bid Procedures Hearing, the Court stated that it would not permit these cases to become administratively insolvent.[7] After a brief recess, the DIP Lender advised the Court that it would be willing to leave behind cash in the amount of $2 million (the "Leave Behind") after the sale, a modest improvement from the $1 million in the Stalking Horse Agreement. At the conclusion of the Bid Procedures Hearing, the Court approved the Bid Procedures Motion, incorporating the Leave Behind but reserving the right of the Committee to object.

---

[7] March 29, 2017 Hearing Transcript at p.7 [Docket No. 140] ("[T]his is a Chapter 11 case. You know, it's expensive, it costs – there are administrative costs including professional fees, there are other priority claims that need to be paid."); and pp. 90-91 ("I'm also going to require the purchaser to assume the administrative cost. I don't want to have an administratively insolvent case. That's very important to me.").

9241482/

10

27. Even with the modest improvement in the Leave Behind, there are still significant concerns. While the Stalking Horse unequivocally stated on the record that the first $1 million of the Leave Behind was unencumbered by any liens, it is unclear whether the other $1 million of the Leave Behind is also unencumbered. Even if the full $2 million is unencumbered, the Debtors have not prepared the standard 13-week budget or a wind-down budget to confirm whether $2 million is sufficient. Moreover, the DIP Budget ceases after the week of April 21, 2017, notwithstanding that the outside date for closing on the proposed sale is May 12, 2017. In addition, even if the sale closes prior to the expiration of the DIP Budget, the estates will most assuredly incur administrative expenses, including the professional fees of the Debtors and the Committee, which expenses are not contemplated to be funded.[8]

28. At bottom, because the DIP Lender seeks to receive the benefits of a Chapter 11 process undertaken for its benefit, it must pay the costs of that process. Accordingly, the estates' rights under section 506(c) of the Bankruptcy Code must be preserved and the proceeds of the DIP Collateral must be made available to pay the costs and expenses of preserving and disposing of such collateral, including all administrative expense claims.

29. The Committee maintains now, as it did during the Bid Procedures Hearing, that the Leave Behind is inadequate to ensure that the estate is not administratively insolvent on the date that the sale closes. Accordingly, the Court should deny the DIP Motion, absent a requirement that the DIP Lender provide a budget through the sale closing that ensures that the estates are not rendered administratively insolvent by a process that has been, and continues to be, run for the benefit of the Stalking Horse.

---

[8] Arguably, the Interim DIP Order requires the DIP Lender to pay all unpaid Allowed Professional Fees incurred through the sale closing. However, it is unclear whether such payment is limited to the amounts permitted under the DIP Budget, and whether such fees must be "Allowed" or simply incurred, but subject to allowance. The Final DIP Order, if entered by this Court, should clarify that all professional fees of the Debtors and Committee incurred through the sale closing must be funded by the DIP Lender. Sufficient funds should also be made available for an orderly wind-down of the estates after the sale closing.

9241482/

### D. The Court Should Not Permit the DIP Lenders to Credit Bid More Than the Value of Previously Unencumbered Assets or Receive Liens on Certain Previously Unencumbered Assets.

30. As noted above, the DIP Credit Agreement grants to the DIP Lender liens and superpriority claims on substantially all of the Debtors' unencumbered assets including, but not limited to, the Debtors' Intellectual Property and the proceeds of any avoidance actions brought on behalf of the Debtors (the "Avoidance Actions"). See DIP Credit Agreement, ¶ 3.1; Interim Order, ¶ 8.

31. Prior to the Petition Date, the Intellectual Property was unencumbered. As explained above, the DIP Lender will have loaned less than $11.1 million for the six weeks between the Petition Date and the approval of the sale. Based upon its preliminary investigation, the Committee anticipates that the value of the Intellectual Property may significantly exceed $11.1 million. The DIP Lender certainly should not be permitted to credit bid to the extent the value of the Intellectual Property (and other previously unencumbered assets) exceeds the amount that it loaned to the Debtors postpetition. The Committee respectfully submits that, to the extent that the Stalking Horse is the successful bidder for the Debtors' assets, the issue of the value of the Intellectual Property and allocation of the purchase price to certain assets should be reserved for subsequent determination—in which case, the Stalking Horse/DIP Lender has the burden to prove the extent of its interest in collateral. 11 U.S.C. § 363(p)(2). Assuming *arguendo* a section 506(c) waiver is granted, if the value of the Intellectual Property exceeds the amount loaned by the DIP Lender, the estates are entitled to unencumbered cash proceeds on account of the sale of the Intellectual Property.

32. Additionally, the Debtors seek to grant the DIP Lender a security interest in the proceeds of all of the Debtors' Avoidance Actions.[9] This is inappropriate. Avoidance powers, of course, are intended to allow a debtor-in-possession or a trustee to recover certain payments for the benefit of unsecured creditors. See Buncher Co. v. Official Comm. Of Unsecured Creditors of GenFarm Ltd. P.'ship IV, 229 F.3d 245, 250 (3d Cir. 2000) ("[W]hen recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors.") (citation omitted); Mellon Bank, N.A. v. Glick (In re Integrated Testing Prods. Corp.), 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting for the benefit of all creditors, has a right to recover preference payments) (citations omitted). Here, the Avoidance Actions belong to the unsecured creditor body, not to the Debtors' themselves. See In re Boomerang Tube, LLC, No. 15-11247 (MFW) (Bankr. D. Del. July 24, 2015) [D.I. 291, 293]; In re AFA Inv., Inc., No. 12-11127 (MFW) (Bankr. D. Del. Apr. 27, 2012) [D.I. 194] at 29:25-30:8; Official Comm. of Unsecured Creditors v. Goold Electronics Corp. (In re Goold Electronics Corp.), 1993 WL 408366, *3-4 (N.D. Ill. Sept. 22, 1993) (vacating lien on preference actions granted under bankruptcy court financing order). Avoidance actions may not be pursued for the exclusive benefit of a secured creditor. Indeed, to grant such liens and superpriority administrative claims under these circumstances would be "granting the lender excessive control over the debtor or its assets so as to unduly prejudice the rights of other parties in interest" and "convert[ing] the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender." See In re Mid-State Raceway, Inc., 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) (citation omitted).

---

[9] The Debtors have not yet filed their schedules and statement of financial affairs. As a result, the Committee is therefore unable to determine at this time the scope, and value, of potential avoidance actions, including as to any transfers made for the benefit of officers and directors and other insiders.

9241482/

33. In addition to Avoidance Actions, there may be other claims or causes of action that could benefit unsecured creditors. Any claims or causes of action against the Debtors' directors or officers, insiders and lenders, any commercial tort claims, and any insurance proceeds relating to such claims or causes of action should categorically be preserved for the benefit of unsecured creditors. The DIP Lender's status as postpetition lender, prepetition lender, and buyer renders such a preservation even more crucial. Accordingly, the Committee objects to the DIP Motion to the extent it seeks to encumber proceeds of Avoidance Actions and any other claims or causes of action.

34. Thus, any Final Order approving the DIP Motion should (i) not include any lien on or superpriority interest in the proceeds of the Avoidance Actions or any other claims or causes of action, and (ii) expressly provide that the Order for the sale of substantially all of the Debtors' assets shall reserve the issue of the value of the Intellectual Property. In the event it is determined that the value of the Intellectual Property exceeds the amount loaned by the DIP Lender, the estates should receive all of the value of the Intellectual Property in excess of the amount loaned under the DIP Facility.

### E. The Proposed Adequate Protection Is Improper.

35. Additionally, the Interim Order provides that the Prepetition Secured Parties shall receive adequate protection in the form of liens and superpriority claims in unencumbered collateral. Interim Order, ¶ 12(b), (c) and (d). This is improper.

36. Section 363(e) of the Bankruptcy Code entitles a secured party to adequate protection to "safeguard [against] diminution in the value of its interest during [a] Chapter 11 reorganization." 11 U.S.C. § 363(e). But adequate protection is not intended to *enhance* a secured creditor's position. See In re Pine Lake Village Apartment Co., 19 B.R. 819, 824 (Bankr. S.D.N.Y. 1982) ("Neither the legislative history nor the [Bankruptcy] Code indicate that

9241482/

14

Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a diminution in the value of the collateral securing the debt."). Rather, in order to receive adequate protection, a secured creditor must "prove [a] decline in value—or the threat of a decline—in order to establish a prima facie case." In re Gunnison Ctr. Apts., LP, 320 B.R. 391, 396 (Bankr. D. Colo. 2005); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).

37. Here, Hercules retains a first priority lien on account of $15 million of the prepetition secured debt. The "subordination" of the remaining $40 million of prepetition secured debt is a red herring. The Stalking Horse and DIP Lender are the same entity. Hercules is a controlling member of the Stalking Horse/DIP Lender. Thus, it is unclear what risk Hercules has assumed by subordinating its own debt to itself. Rather, the subordination offers a convenient means to obtain an adequate protection lien on assets in which Hercules did not hold a prepetition lien.

38. The purported adequate protection liens provide the Prepetition Secured Parties with that which they could not obtain outside of a chapter 11 filing. The Court should not countenance this attempt at a collateral grab, particularly where unsecured creditors receive no benefit for 'losing' their right to the value of unencumbered assets. Further, the Final DIP Order should make clear that any adequate protection, including payment of professional fees and expenses, remains subject to recharacterization or disgorgement in the event that any of the prepetition liens are avoided or found to be undersecured.

F.  **Additional Objectionable Provisions.**

39. In addition to the foregoing, the following provisions of the Interim Order are objectionable to the Committee for the reasons stated below:

- **Waiver of Section 552(b)**: The proposed section 552(b) waiver is without merit. The purpose of section 552(b) and its "equity exception" is to prevent the appreciation in the value of collateral from providing a windfall to a secured creditor at the expense of unsecured creditors. See e.g., Stanziale v. Finova Capital Corp. (In re Tower Air, Inc.), 397 F.3d 191, 205 (3d Cir. 2005) (section 552(b) is relevant "to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate") (citation omitted). This is of critical concern to the Committee. A waiver of the "equity exception" should be authorized, if ever, only when it would be critical to the financing. Here, however, the Debtors have not—and cannot—make any showing that a waiver of the equities of the case exception under Section 552(b) is critical to the DIP Financing in these cases, particularly since the DIP Loan is being made in connection with a loan-to-own process.

- **Marshalling Waiver**: Additionally, the proposed "marshalling" waiver is entirely unwarranted. "[Marshalling] requires the senior secured creditor to first collect its debt against the collateral other than that in which the junior secured creditor holds an interest, thereby leaving that collateral for the junior secured creditor's benefit." In re Advanced Marketing Servs., Inc., 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007) (citation omitted). Marshalling therefore "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." Meyer v. United States, 375 U.S. 233, 236 (1963). The Debtors have provided no basis for curtailing the Court's power to marshal assets. Moreover, the case law is clear than an official creditors' committee can stand in the shoes of the debtor-in-possession to pursue marshalling rights on behalf of the estate and all unsecured creditors. In re America's Hobby Ctr., Inc., 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1988); In re High Strength Steel, Inc., 269 B.R. 560, 573 (Bankr. D. Del. 2001). Particularly whereas here, there are unencumbered assets, the proposed waiver of marshalling rights will adversely impact unsecured creditor's rights in these cases.

- **No Distribution of Proceeds**: Similarly, in light of the existence of unencumbered assets and potential disputes regarding the allocation of the purchase price among various assets, nothing in the Final DIP Order or DIP Documents should permit the payment of proceeds of assets to any party, including the Prepetition Secured Parties, except with respect to the DIP Lender. See Interim DIP Order, ¶ 22.

- **Automatic Standing**: In light of the complexity of these cases, the Committee should not be forced to bear the burden of seeking standing to investigate potential claims. The Committee therefore submits that it should be granted automatic standing to commence any Rule 2004 investigation and file any adversary proceeding against the Prepetition Secured Parties as set forth in Paragraph 36 of the Interim DIP Order.

Although the Committee believes that the Challenge Period is short, particularly since the Committee's immediate attention should be focused upon the imminent sale, the Committee is willing to abide by the May 29th deadline. There is no reason, however, for the DIP Order to preclude the Committee from immediate standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates. The Debtors have already conceded any potential challenges against the Prepetition and DIP Lenders. To require that the Committee prepare and prosecute a motion for standing presents an unnecessary cost, particularly where such standing is usually and customarily granted to creditors' committees. See, e.g., Grubb & Ellis Company, et al., No. 12-10685 (Bankr. S.D.N.Y. March 22, 2012) [D.I. 801] (granting automatic standing to creditors' committee); In re Quebecor World (USA) Inc., No. 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008) [D.I. 470] (same); In re Dana Corp., No. 06-10354 (Bankr. S.D.N.Y. Mar. 29, 2006) [D.I. 721] (same).

- **DIP Fees and Other Expenses**: The Committee should be entitled to the same notice and right to review the fee statements of the DIP Lender and Prepetition Secured Parties' professional fees as is provided to the United States Trustee's office.

- **Limited Right to Credit Bid**: The right of the DIP Lender and Prepetition Secured Parties to credit bid must be consistent with the Bid Procedures Order and must be limited to the value of the underlying collateral. Interim Order ¶ 43. The Stalking Horse Bidder's right to credit bid must also be subject to any challenge initiated by the Committee in advance of the Auction. Likewise, just because Hercules has the right to credit bid, under 363(k) its credit bid cannot cover assets not subject to its lien. See 3 Collier on Bankruptcy ¶ 363.09[3] (where a "creditor's lien reaches only some of the property to be sold, the creditor cannot credit bid the secured claim for the unencumbered property *but must pay cash*.") (emphasis added); see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132 S. Ct. 2065, 2070 n.2 (2012) ("The ability to credit-bid helps to protect a creditor against the risk that *its collateral* will be sold at a depressed price.") (emphasis added); Quality Props. Asset Mgmt. Co. v. Trump Va. Acquisitions, LLC, No. 11 Civ. 00053, 2012 WL 3542527, at *8 n.13 (W.D. Va. Aug. 16, 2012) (a "credit bid allows the secured creditor to bid for *its collateral* using the debt it is owed to offset the purchase price") (emphasis added); In re Hickey Props., Ltd., 181 B.R. 171, 173 (D. Vt. 1995) (secured creditor could not credit bid at sale of partnership interest because partnership interest was not collateral asset).

- **Indemnification and Releases**: The Committee should be able to seek disgorgement or recharacterization of any interest, fees and expenses paid to the Prepetition Secured Parties. Moreover, no party, including the DIP Lender, should receive any indemnification or release prior to the expiration of the Challenge Period.

9241482/

17

- **Discharge Waiver**: The discharge waiver set forth in Paragraph 45 of the Interim DIP Order is overreaching. There is simply no basis for providing the Prepetition Secured Parties a discharge waiver. Moreover, if the DIP Lender is not paid in full, it is likely because the DIP Lender terminated the DIP Facility or Stalking Horse APA. There should be no predetermination of the treatment of the DIP Lenders' claims in those circumstances.

- **Modification of DIP Order**: The Final DIP Order requires the Debtors to irrevocably waive their right to seek any modification or extension of the Order. In exercise of their fiduciary duty, the Debtors should be entitled to seek any such modification or extension, and the DIP Lender shall be entitled to object to any such requested relief.

## RESERVATION OF RIGHTS

40. The Committee reserves all of its rights to address the issues raises herein, and any other facts or issues identified by the Committee, with respect to the hearing to consider the DIP Motion.

[Remainder Of Page Intentionally Left Blank]

## CONCLUSION

**WHEREFORE**, for foregoing reasons, the Committee respectfully requests that the Court (i) deny the DIP Motion (or condition approval on modifications consistent with this Objection); and (ii) grant such other and further relief as is just and proper.

Dated: April 3, 2017　　　　　　　　　　**MORRIS JAMES LLP**

Wilmington, DE

_____
Jeffrey R. Waxman (No. 4159)
Eric J. Monzo (No. 5214)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801-1494
Telephone: (302) 888-5842
Facsimile: (302) 504-3942 (fax)

and

**BROWN RUDNICK LLP**
Steven D. Pohl, Esq.
Sunni P. Beville, Esq.
Christopher M. Floyd, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201

*Proposed Counsel to the Official Committee of Unsecured Creditors*

9241482/