## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| SUNGEVITY, INC., et al.,[1] | Case No. ~~17-10156~~ 17-10561 (KG) |
| Debtors. | Jointly Administered |
|  | **RE: Docket No. 13, 14, 45, 150, 151, 162, and 164** |

## FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING ON A SUPER-PRIORITY, SENIOR SECURED BASIS AND (B) USE CASH COLLATERAL, (II) GRANTING (A) LIENS AND SUPER-PRIORITY CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] [Docket No. 13], dated March 13, 2017, of Sungevity, Inc. and certain of its affiliates, as debtors and debtors in possession in the above captioned cases (each, a "Debtor" and, collectively, the "Debtors") pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d), 364(e), and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of a final order (this "Final Order") providing for, among other things:

(i)     authority for the Debtors to obtain senior secured postpetition financing on a super-priority basis pursuant to the terms and conditions of that certain Debtor-in-Possession Loan and Security Agreement, by and among Sungevity, Inc. and Sungevity

---

[1]   The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Sungevity, Inc. (4328), Sungevity SD, LLC (4847), Sungevity Development, LLC (0323), and Sungevity International Holdings LLC (5598).  The principal place of business for each of the Debtors is 66 Franklin Street, Suite 310, Oakland, CA 94607.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

Development, LLC, as borrowers (the "DIP Borrowers"), and Sungevity International Holdings LLC and Sungevity SD, LLC, as guarantors, and LSHC Solar Holdings LLC as lender (the "DIP Lender"), and Wilmington Trust, N.A., as the administrative agent for the DIP Lenders (the "DIP Agent"), substantially in the form attached hereto as **Exhibit 1** (as such agreement may be amended, restated, amended and restated, extended, modified, supplemented, or replaced from time to time in accordance with its terms, the "DIP Credit Agreement") and the $20 million in financing made available thereto (the "DIP Facility") and that certain Subordination and Intercreditor Agreement by and among Hercules Capital, Inc., the several banks and financial institutions and signatories thereto and the DIP Agent (as such agreement may be amended, restated, amended and restated, extended, modified, supplemented, or replaced from time to time in accordance with its terms, the "DIP Intercreditor Agreement");

(ii)    authority for the Debtors to (a) execute, deliver, and perform under the DIP Credit Agreement and all other related or ancillary documents and agreements (including the Budget (as defined below) and the DIP Intercreditor Agreement) (together, as modified by this Final Order, with the DIP Credit Agreement, the "DIP Credit Documents"), and (b) perform such other acts as may be necessary or desirable in connection with the DIP Credit Documents;

(iii)    authority for the Debtors to (a) use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code and/or under the DIP Credit Documents, as applicable (the "Cash Collateral"), subject to (x) the restrictions set forth in the DIP Credit Documents and this Final Order and (y) the grant of adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition

Collateral (each as defined herein), and (b) access and use up to $20 million of the postpetition term loan made available under the DIP Credit Agreement on a final basis (the "DIP Financing") to (x) fund the Debtors' chapter 11 cases and the continued operation of their businesses as Debtors and (y) fund certain fees and expenses associated with the consummation of the transactions contemplated in the DIP Credit Documents, each on the terms set forth herein and in the DIP Credit Documents;

(iv)    a grant of automatically perfected, valid, enforceable, and unavoidable security interests and liens, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, on all DIP Collateral (as defined herein) and assets of the DIP Borrowers and the other Debtors providing credit support under the DIP Credit Agreement (the "Credit Parties"), including with respect to those Avoidance Actions (as defined below) to be acquired by the DIP Lender under the Asset Purchase Agreement, as more fully described herein;

(v)    a grant, with respect to the obligations of the DIP Borrowers and the other Credit Parties hereunder and under the other DIP Credit Documents (and subject only to the Carve-Out and Senior Carve-Out, described in paragraphs 33 and 7, respectively), of an allowed super-priority administrative expense claim in each of the Debtors' bankruptcy cases (and against each of the Debtors' estates created pursuant to section 541 of the Bankruptcy Code) pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in or arising under any section of the Bankruptcy Code (including sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), or 726 thereof);

ny-1278150

(vi)    authority for the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Credit Documents as such become due, including the reasonable and documented fees and disbursements of the DIP Agent's and DIP Lender's attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the DIP Credit Documents;

(vii)    a modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Documents and this Final Order, as set forth herein; and

(viii)    approval of the milestones set forth in Section 7.23 of the DIP Credit Agreement (the "Milestones");

and the Court having considered the Motion, the *Declaration of Andrew Birch in Support of Chapter 11 Petitions and Requests for First Day Relief* and the *Declaration of Joshua S. Scherer in Support of the Motion* (the "DIP Declaration"), each filed concurrently with the Motion, the DIP Credit Documents, the evidence submitted or proffered at the interim hearing to consider the relief requested in the Motion held on March 15, 2017 (the "Interim Hearing"); and this Court having entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting (A) Liens and Super-Priority Claims and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 45] (the "Interim Order"), approving the Motion on an interim basis; and notice of the final hearing on the Motion having been given in accordance with Bankruptcy Rules 4001(b), (c), and (d), and 9014, as provided in the Interim Order; and the final hearing on the Motion having been held and concluded on April 7, 2017 (the "Final Hearing"); and the

4

Court having considered the Motion, the DIP Declaration, the DIP Credit Documents, all submitted objections and supporting declarations, and the evidence submitted or proffered at the Interim Hearing and the Final Hearing; and any objections to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and based on all pleadings filed with this Court, and all proceedings held before the Court; and it appearing to the Court that granting the relief requested in the Motion on a final basis, to the extent and on the terms provided herein, is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and adequate protection being provided on account of the interests of certain holders of liens on the property of the estates on which liens are to be granted; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS THAT:**

A.      *Petition Date*.  On March 13, 2017  (the "<u>Petition Date</u>"), each of the Debtors filed a separate voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") commencing these chapter 11 cases.

B.      *Debtors-in-Possession*.  The Debtors continue to operate their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

C.      *Jurisdiction and Venue*.  The Court has jurisdiction over these proceedings and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  Consideration of the Motion constitutes a core

5

proceeding under 28 U.S.C. § 157(b)(2). The Court may enter a final order consistent with Article III of the United States Constitution. Venue for these chapter 11 cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D. _Committee Formation_. On March 22, 2017, pursuant to Bankruptcy Code section 1102, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") [Docket No. 97].

E. _Debtors' Stipulations_. Subject only to the rights of parties in interest as set forth in paragraph 36 hereof, after consultation with their attorneys and financial advisors, the Debtors (on behalf of, and for themselves) admit, stipulate, acknowledge, and agree to the following:

(i) _Senior Credit_. Sungevity, Inc., and Sungevity Development, LLC, as borrowers, and certain of Sungevity Development LLC's subsidiaries as guarantors, entered into that certain loan and security agreement, dated as of March 31, 2015 (as amended, supplemented, or modified from time to time) (the "Senior Credit Agreement," and together with all other related or ancillary documents and agreements, the "Senior Credit Documents") with Hercules Capital, Inc. (f/k/a Hercules Technology Growth Capital, Inc.) as agent and on behalf of any lender(s) thereto (the "Senior Creditor"). The Senior Credit Agreement provided the Debtors with a $35 million term loan and a $20 million revolver (the "Senior Facility"). As of the Petition Date, the aggregate amount of $55,000,000 in principal indebtedness was outstanding, plus accrued interest and interest to accrue thereafter subject to 11 U.S.C. § 506(b), and (ii) all fees, costs and charges, including professional expenses and any other amounts outstanding under the Senior Facility pursuant to the Senior Credit Documents, including obligations in respect of the cash management system, cash collateral for letters of credit, purchase charge cards,

6

purchase card services, fees, expenses, and indemnity (collectively, the "Senior Secured Obligations"). The Senior Facility is secured by first priority security interests and liens on certain of the Debtors' property, including, without limitation, the Debtors' accounts receivables, inventory, cash deposit and securities accounts and such other assets related to or arising out of, evidencing or governing any of the foregoing, including, without limitation, all cash, money and cash equivalents and proceeds thereof (collectively, and in any case as more fully described in the definition of "Collateral" in the Senior Credit Agreement, the "Senior Collateral" and the "Senior Secured Liens," as applicable).

    (ii)   *Junior Liens*.

        (a)   Bridge Loan.  Sungevity, Inc., and Sungevity Development, LLC, as borrowers, and certain of Sungevity Development LLC's subsidiaries as guarantors, together with lenders from time to time and Wilmington Savings Fund Society FSB, in its capacity as collateral agent, entered into that certain loan and security agreement, dated as of January 30, 2017 (as amended, supplemented, or modified from time to time) (the "Bridge Loan Credit Agreement," and together with all other related or ancillary documents and agreements, the "Bridge Loan Documents"). The Bridge Loan Credit Agreement provided the Debtors with a $9.5 million term loan (the "Bridge Loan"). As of the Petition Date, approximately $9.5 million was outstanding, plus interest accrued and accruing at the rates set forth in the Bridge Loan (together with any other amounts outstanding under the Bridge Loan pursuant to the Bridge Loan Documents, including obligations in respect of the cash management system, cash collateral for letters of credit, purchase charge cards, purchase card services, fees, expenses,

and indemnity, the "Bridge Loan Obligations"). The Bridge Loan is secured by second priority security interests and liens on the Senior Collateral (as more fully described in the definition of "Collateral" in the Bridge Loan Credit Agreement, the "Bridge Loan Collateral" and the "Bridge Loan Liens," as applicable).

(b)     MMA Loan. Sungevity, Inc., and Sungevity Development, LLC, as borrowers, and certain of Sungevity Development LLC's subsidiaries as guarantors (collectively, the "MMA Loan Borrowers"), and MMA Energy Capital, LLC, in its capacity as lender, entered into that certain loan and security agreement, dated as of September 20, 2016 (as amended, supplemented, or modified from time to time) (the "MMA Loan Agreement," and together with all other related or ancillary documents and agreements, the "MMA Loan Documents"). The MMA Loan Agreement provided the Debtors with a $10 million term loan (the "MMA Loan"). As of the Petition Date, approximately $10 million was outstanding thereunder, plus interest accrued and accruing at the rates set forth in the MMA Loan (together with any other amounts outstanding under the MMA Loan pursuant to the MMA Loan Documents, including obligations in respect of the cash management system, cash collateral for letters of credit, purchase charge cards, purchase card services, fees, expenses, and indemnity, the "MMA Obligations"). The MMA Loan is secured by second priority security interests and liens on the Senior Collateral (as more fully described in the definition of in the definition of "Collateral" in the MMA Loan Agreement, the "MMA Loan Collateral").

(c)    MHA Loan.  Sungevity, Inc., and Sungevity Development, LLC, as borrowers, and certain of Sungevity Development LLC's subsidiaries as guarantors, and MHA Trust, LLC, in its capacity as lender, entered into that certain loan and security agreement, dated as of November 10, 2016 (as amended, supplemented, or modified from time to time) (the "MHA Loan Agreement", and together with all other related or ancillary documents and agreements, the "MHA Loan Documents").  The MHA Loan Agreement provided the Debtors with a $5 million term loan (the "MHA Loan").  As of the Petition Date, approximately $5 million was outstanding, plus interest accrued and accruing at the rates set forth in the MHA Loan (together with any other amounts outstanding under the MHA Loan pursuant to the MHA Loan Documents, including obligations in respect of the cash management system, cash collateral for letters of credit, purchase charge cards, purchase card services, fees, expenses, and indemnity, the Bridge Loan Obligations and the MMA Obligations, collectively, the "Junior Secured Obligations").  The MHA Loan is secured by second priority security interests and liens on the Senior Collateral (as more fully described in the definition of "Collateral" in the MHA Loan Agreement, the "MHA Loan Collateral").  For the avoidance of doubt, the Bridge Loan Liens, MMA Liens, and MHA Liens (collectively, the "Junior Secured Liens") on the Bridge Loan Collateral, MMA Loan Collateral, and MHA Loan Collateral, respectively (collectively, the "Junior Collateral") *pari passu* with each other and are all junior to the Senior Secured Liens.

(iii)    *Intercreditor Agreement.*  On January 30, 2017, the Senior Creditor, MMA Energy Capital LLC, MHA Trust LLC, and Wilmington Savings Fund Society, FSB, as agent (collectively, the "Prepetition Secured Parties") entered into that certain Second Amended and Restated Intercreditor Agreement that, among other things, assigned relative priorities to certain claims and liens, including the Senior Secured Liens and Junior Secured Liens on the Senior Collateral and Junior Collateral (collectively, the "Prepetition Collateral") owed to the Prepetition Secured Parties (the "Prepetition Intercreditor Agreement," and together with the Senior Credit Documents, the Bridge Loan Documents, the MMA Loan Documents, and MHA Loan Documents, the "Prepetition Financing Documents").

(iv)    *Validity and Priority of Prepetition Indebtedness and Liens.*   After consultation with their attorneys and financial advisors, the Debtors and the DIP Lender acknowledge and agree that (a) the liens on the Prepetition Collateral granted pursuant to the Prepetition Financing Documents, respectively, are valid, binding, enforceable, non-avoidable, and perfected liens, and are not subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement, counterclaim, surcharge, recharacterization, or subordination, pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except as expressly set forth in the Prepetition Financing Documents); (b) the Prepetition Financing Documents are valid and enforceable by the Prepetition Secured Parties party to such agreements against each of the Debtors party to such agreements; (c) the Senior Secured Obligations and Junior Secured Obligations constitute legal, valid, binding, and unavoidable obligations of the Debtors, enforceable in accordance with the terms and conditions of the Prepetition Financing Documents;

ny-1278150

(d) no offsets, challenges, defenses, claims, or counterclaims of any kind or any nature to any of the obligations under the Prepetition Financing Documents exist, and no portion of such obligations is subject to avoidance, recharacterization, disallowance, or subordination pursuant to the Bankruptcy Code or other applicable law, except as expressly set forth in the Prepetition Financing Documents; (e) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code against the Prepetition Secured Parties and/or any of such parties' respective affiliates, parents, subsidiaries, controlling persons, agents, attorneys, advisors, professionals, officers, directors, or employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code) or arising under or in connection with any of the Prepetition Financing Documents (or the transactions contemplated thereunder), the Senior Secured Obligations, Junior Obligations or the security interests and liens in the Prepetition Collateral; (f) as of the Petition Date, the Prepetition Obligations constitute allowed claims within the meaning of section 502 of the Bankruptcy Code, together with accrued and unpaid interest, fees, including attorneys' fees and related expenses, costs, expenses, and other charges of whatever nature owing in respect thereof; (g) the Debtors have waived, discharged, and released any right to challenge any of the obligations under the Prepetition Financing Documents, the priority of the Debtors' obligations thereunder, and the security for (and the priority of the liens securing) such obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action, and/or choses in action

against the Prepetition Secured Parties, and/or any of their respective officers, directors, or employees; (h) any payments made on account of the obligations under the Prepetition Financing Documents to or for the benefit of the Prepetition Secured Parties prior to the Petition Date were payments out of the Prepetition Collateral in accordance with the Prepetition Intercreditor Agreement, as applicable, and such payments did not diminish any property otherwise available for distribution to unsecured creditors; and (i) the Prepetition Intercreditor Agreement are effective, binding, and enforceable upon all parties thereto.

(v)    *Cash Collateral.*    The Debtors acknowledge and stipulate that substantially all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes "Cash Collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) of the Prepetition Secured Parties.

(vi)    *Default by the Debtors.*    The Debtors acknowledge and stipulate that the Debtors are in default of their debts and obligations under the Prepetition Financing Documents. Furthermore, the Debtors acknowledge and stipulate that by filing petitions for relief under chapter 11 of the Bankruptcy Code and commencing these chapter 11 cases, all of their debts and obligations under the Prepetition Financing Documents (including, without limitation, any premiums payable thereunder) are immediately due and payable.

F.    *Findings Regarding the Postpetition Financing.*

(i)    *Request for Postpetition Financing.*    The Debtors seek authority on a final basis to: (a) use Cash Collateral on the terms described herein and (b) access and use the

ny-1278150

liquidity provided under the DIP Credit Agreement to:  (i) finance ongoing debtor-in-possession working capital expenses, as provided for in the Budget, and fund other general corporate expenses and (ii) finance transaction fees, costs and expenses related to the DIP Credit Agreement.

(ii)    *Priming of Certain Prepetition Liens.*  The priming of the liens of the Prepetition Secured Parties on the Prepetition Collateral, to the extent provided and as contemplated by the DIP Credit Documents and as further described below, will enable the Debtors to obtain the cash to continue to operate their businesses for the benefit of their estates and creditors.  However, the Prepetition Secured Parties are each entitled to receive adequate protection as set forth in the Interim Order and this Final Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for and to the extent of any postpetition diminution in the value of each of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from the Debtors' use, sale, or lease of such collateral, the imposition of the automatic stay, the priming of the prepetition liens granted on the Prepetition Collateral to the extent provided herein, and the subordination to the Carve-Out described in paragraph 33 hereof, the Senior Carve-Out described in paragraph 7 hereof, and the DIP Liens (as defined herein) (collectively, the "Diminution in Value").  As adequate protection, the Prepetition Secured Parties will receive the adequate protection described in paragraph 12 of this Final Order.  However, as set forth in paragraph 7 below, notwithstanding anything to the contrary contained in this Order or any other Order relating to DIP financing provided by the DIP Lender, the liens, claims, interests and rights of the Senior Creditor with respect to $15 million of the Senior

ny-1278150

Secured Obligations secured by the Senior Secured Liens shall not be primed and shall remain senior in all respects to all DIP Obligations and DIP Liens.

(iii)   *Need for Postpetition Financing and Use of Cash Collateral.*   The Debtors' need to use Cash Collateral and to obtain credit pursuant to the DIP Credit Agreement as provided for herein is necessary to enable the Debtors to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise to finance their operations and complete the sales process contemplated in these Cases requires the availability of working capital from the DIP Credit Agreement and the use of Cash Collateral.  Without the ability to access the DIP Credit Agreement or Cash Collateral, the Debtors, their estates, their creditors, and the possibility to complete the sale of substantially all the Debtors' assets would suffer immediate and irreparable harm.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

(iv)   *No Credit Available on More Favorable Terms.*   Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Credit Agreement.  The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the

14

Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Lender (a) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (b) superpriority claims and priming liens, and (c) the other protections set forth in this Final Order.

(v)　　*Adequacy of the Budget.*  As set forth in the DIP Credit Documents, the Debtors have prepared and delivered to the DIP Agent and DIP Lender a budget (as may be modified, amended, restated or supplemented with the consent of the DIP Lender in its sole discretion on the terms set forth in the DIP Credit Documents and paragraph 15 hereof, the "Budget").   The Budget has been thoroughly reviewed by the Debtors, their management, and their advisors.   The Debtors, their management, and their advisors believe the Budget and the estimate of administrative expenses due or accruing during the period covered by the Budget were developed using reasonable assumptions, and based on those assumptions the Debtors believe there should be sufficient available assets to pay all administrative expenses due or accruing during the period covered by the Budget.

G.　　*Section 506(c).*  In exchange for (i) the DIP Lender's agreement to subordinate its liens and superpriority claims to the Carve-Out and Senior Carve-Out, and (ii) the subordination of the liens and claims of the Prepetition Secured Parties to the Carve-Out, Senior Carve-Out, and the DIP Liens, the DIP Lender and the Prepetition Secured Parties shall each receive a waiver of the provisions of section 506(c) of the Bankruptcy Code.

ny-1278150

H.    *Section 552*.  In exchange for (i) the DIP Lender's agreement to subordinate its liens and superpriority claims to the Carve-Out and the Senior Carve-Out, and (ii) the Prepetition Secured Parties' agreement to subordinate their liens and claims to the Carve-Out, the Senior Carve-Out, and the DIP Liens, the DIP Lender and the Prepetition Secured Parties shall each receive all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply.

I.    *Modification.* As part of the consideration provided to the DIP Lender, under the DIP Credit Agreement, the Debtors waived any right to seek any modification or extension of this Final Order (in whole or in part) without the prior consent of each of the DIP Lender and the Senior Creditor, and agreed that no consent shall be implied by any other action, inaction, or acquiesce of acquiescence of the DIP Lender or Senior Creditor.

J.    *Good Faith of the DIP Agent and DIP Lender*.

(i)    *Willingness to Provide Financing.*  The DIP Lender has indicated a willingness to provide financing to the Debtors subject to:  (a) the entry of this Final Order; (b) approval by this Court of the terms and conditions of the DIP Facilities and the DIP Credit Documents on a final basis; and (c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Lender is extending credit to the Debtors pursuant to the DIP Credit Documents in good faith, and that the DIP Agent's and DIP Lender's claims, superpriority claims, security interests, and liens and other protections granted pursuant to this Final Order, the Interim Order, and the DIP Credit Documents will have the protections provided in section 364(e) of the Bankruptcy Code.

(ii)    *Business Judgment and Good Faith Pursuant to Section 364(e).*  The terms and conditions of this Final Order and the DIP Credit Documents, and the fees paid and to

16

be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent and sound business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Credit Documents and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Agent, and the DIP Lender and, with respect to the use of Cash Collateral, the Senior Creditor. The use of Cash Collateral and credit to be extended under the DIP Credit Documents shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code. The DIP Agent and DIP Lender are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Final Order.

K.    *Notice*.  Notice of the Final Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties-in-interest, including:  (i) the U.S. Trustee; (ii) counsel to the Prepetition Secured Parties; (iii) counsel to the DIP Lender; (iv) counsel to the DIP Agent; (v) counsel to the Debtors' prepetition unsecured noteholders; (vi) counsel to the Debtors' prepetition second lien creditors; (vii) the parties listed in the consolidated list of twenty (20) largest unsecured creditors filed by the Debtors in these chapter 11 cases; (viii) all parties holding security interests in any of the Debtors' assets; and (ix) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m) (collectively, the "Notice Parties"). Such notice is good and sufficient to permit the relief set forth in this Final Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    <u>DIP Financing Approved</u>.  The DIP Financing is authorized and approved, and the use of Cash Collateral on a final basis is authorized, subject to the terms and conditions set forth in this Final Order and the DIP Credit Documents (including the Budget).

2.    <u>Ratification of the Interim Order</u>.  Except to the extent modified hereby, the Interim Order, including all findings, reservations, protections, and orders contained therein, are hereby ratified and confirmed in all respects and is legal, valid, and binding on all parties in interest.

3.    <u>Objections Overruled</u>.  All objections to the DIP Financing and/or entry of this Final Order to the extent not withdrawn or resolved are hereby overruled.

**DIP Facility Authorization**

4.    <u>Authorization of the DIP Financing on a Final Basis and Entry into the DIP Credit Documents; Application of DIP Proceeds</u>.  The DIP Facility and the DIP Credit Documents are hereby approved for the DIP Financing on a final basis.  The Debtors are expressly and immediately authorized and empowered to incur and to perform the DIP Obligations (as defined herein) in accordance with, and subject to, the terms of this Final Order and the DIP Credit Documents, and to deliver all instruments and documents that may be necessary or required for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens provided for by this Final Order and the DIP Credit Documents.  The DIP Credit Documents evidence valid and binding obligations of the Debtors, which shall be enforceable against the Debtors, their estates, and their creditors in accordance with the terms and conditions of

18

the DIP Credit Documents and this Final Order.  The Debtors are hereby authorized to pay, in accordance with this Final Order, the principal, interest (including by payment-in-kind), fees (including original issue discount), expenses, and other amounts described in the DIP Facility and all other documents comprising the DIP Credit Documents as such become due and without need to obtain further Court approval, all to the extent provided in the DIP Credit Documents.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Final Order and the DIP Credit Documents.  All of the obligations described in the DIP Credit Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with the terms of the DIP Credit Documents.    The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used on an interim basis for:  (a) the payment of premiums, fees, expenses and costs incurred in connection with the chapter 11 cases; and (b) working capital, capital expenditures, and other general corporate purposes of the Debtors.

5.    DIP Obligations.  The Final Order and the DIP Credit Documents shall constitute and evidence the validity and binding effect of the Debtors' obligations under the DIP Facility, the other DIP Credit Documents, and this Final Order (the "DIP Obligations"), which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including any trustee appointed in these cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these chapter 11 cases, or in any other proceedings superseding or related to any of the foregoing

(collectively, the "Successor Cases"). The DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Lender or DIP Agent, under the DIP Credit Documents, the Interim Order, and this Final Order, including all principal, accrued interest, costs, fees, expenses, and other amounts under the DIP Credit Documents. The DIP Obligations shall be due and payable as provided for herein and in the DIP Credit Documents.

6.    <u>DIP Liens and Collateral</u>.    Subject to the Prepetition Intercreditor Agreement, and subject to the Carve-Out and the Senior Carve-Out (each as defined as set forth below), as security for the full and timely payment of the DIP Obligations, the DIP Term Lenders are hereby granted on a final basis:

      i.    pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in all unencumbered assets of the Debtors;

      ii.    pursuant to section 364(d) of the Bankruptcy Code, first priority priming liens on and security interests in the Prepetition Collateral (now or hereafter acquired and all proceeds thereof), subject to the Carve-Out and the Senior Carve-Out;

*provided* that, the DIP Liens (as defined below) shall not attach to or encumber the claims and causes of action (or proceeds therefrom) under chapter 5 of the Bankruptcy Code and similar laws (collectively, the "Avoidance Actions"), *except* those Avoidance Actions to be acquired by the DIP Lender under the Asset Purchase Agreement (which Avoidance Actions shall by subject to the DIP Liens and the DIP Lender's right to credit bid), nor shall the Avoidance Actions be subject to any other lien or claim provided in the

Bankruptcy Code or this Final Order, including adequate protection liens or claims, and replacement liens or claims. The liens and security interests identified in this paragraph are referred to herein as the "DIP Liens" and the collateral to which such DIP Liens attach, the "DIP Collateral."

7.    DIP Lien Priority. The DIP Liens to be created and granted to the DIP Lender, as provided herein, (a) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and (b) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the DIP Collateral, and are subject only to: (x) the DIP Credit Agreement; (y) the Carve-Out; and (z) all valid, perfected, enforceable, and unavoidable liens that (a) were senior to the liens of the Senior Creditor as of the Petition Date and (b) are held by an entity that did not have or receive actual knowledge or ▓▓▓▓▓▓▓ notice of the Motion ▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ (the "Permitted Priority Liens"); provided, however, the DIP Lien and all claims of the DIP Lender secured by the DIP Lien in this Final Order or any subsequent DIP financing extended by the DIP Lender shall be junior in all respects to the first $15 million of the Senior Secured Obligations (which amount shall (i) include all obligations, indebtedness and liabilities incurred pursuant to the Senior Credit Documents (including, but not limited to, all principal, interest, reimbursement obligations, the notional amount of any swap, hedge or other interest protection agreements, fees, costs, expenses, premiums, end of term fees, make-whole amounts or prepayment fees, yield maintenance amounts, success fees, unused fine fees, charges, attorneys' fees and indemnification obligations) (the "Senior Carve-Out"). The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the order and

21

priority set forth in the DIP Credit Documents and this Final Order. Except as otherwise provided herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the chapter 11 cases and shall be valid and enforceable against any trustee appointed in the chapter 11 cases, upon any Successor Case(s), and/or upon the dismissal of any of the chapter 11 cases. The DIP Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code or section 506(c) of the Bankruptcy Code.

8.    <u>DIP Superpriority Claims</u>. In addition to the liens and security interests granted to the DIP Lender pursuant to this Final Order, subject and subordinate to the Carve-Out and Senior Carve-Out and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims (the "<u>DIP Superpriority Claims</u>") with priority over any and all administrative expenses of the Debtors, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code; *provided,* that (a) the DIP Superpriority Claims in respect of the DIP Facility shall rank equally in priority and share on a *pro rata* basis (based on the outstanding principal amount of the DIP Facility) with respect to all amounts payable in respect of such superpriority administrative expense claims other than claims in respect of the Carve-Out and the Senior Carve-Out, and (b) the DIP Superpriority Claims shall attach to those Avoidance Actions to be acquired by the DIP Lender under the Asset Purchase Agreement .

9.      Extension of Credit.  The DIP Agent and DIP Lender shall have no obligation to make any loan or advance unless all of the conditions precedent to the making of such extension of credit under the DIP Credit Documents and this Final Order have been satisfied in full or waived by the DIP Lender in its sole discretion.

10.     Use of DIP Facilities Proceeds.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only pursuant to the terms herein and the terms of the DIP Credit Documents, including as contemplated and limited by the Budget (including any variance therefrom as may be permitted under the DIP Credit Documents).

**Authorization to Use Cash Collateral and Adequate Protection**

11.     Authorization to Use Cash Collateral.  Subject to the terms and conditions set forth in, and in accordance with, this Final Order and the DIP Credit Documents, the Debtors are authorized to use Cash Collateral.  Except as expressly permitted in this Final Order and the DIP Credit Documents, nothing in this Final Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any Cash Collateral or other proceeds resulting therefrom.  Upon the occurrence of an Event of Default (as defined in the DIP Credit Documents), the Debtors' consensual use of Cash Collateral shall terminate; *provided, however*, that nothing herein shall prevent the Debtors from seeking non-consensual use of cash collateral in the event of such termination.

12.     Adequate Protection.  As adequate protection for the interest of the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral) on account of the granting of the DIP Liens, subordinated to the Carve-Out and Senior

Carve-Out, the Debtors' use of Cash Collateral and to the extent of any decline in value arising out of the automatic stay and/or the Debtors' use, sale or disposition of the Prepetition Collateral ("Diminution in Value"), the Prepetition Secured Parties shall receive the following adequate protection:

(a)    *Milestones.*  The Milestones are approved as adequate protection for the benefit of the Prepetition Secured Parties; *provided, however,* that (i) the deadline to object to the approval of the Sale Transaction to the Stalking Horse Bidders shall be April 11, 2017, (ii) the deadline to object to the conduct of the Auction and Sale to a Successful Bidder other than the Stalking Horse Bidders shall at or prior to the Sale Hearing, and (iii) the Sale Hearing shall be April 17, 2017.[3]

(b)    *Liens on Unencumbered Assets.*  Pursuant to sections 361 and 362(c)(2) of the Bankruptcy Code, and solely to the extent of the Diminution in Value of the Prepetition Collateral, the Prepetition Lenders shall have additional security interests and liens in the unencumbered collateral, which shall be junior only to the DIP Liens, the DIP Superpriority Claims, the Senior Carve-Out, and the Carve-Out, and shall, in each case, be subject to the terms of the Prepetition Intercreditor Agreement.

---

[3]    Capitalized Terms used but undefined in this section 12(a) shall have the meanings ascribed to them in the *Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Assets, Including Approving Break-Up Fee and Expense Reimbursement, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 15].

(c)     *Prepetition Replacement Liens*. Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, in exchange for the subordination of their liens to the DIP Liens, and only to the extent of a Bid (as defined in the Asset Purchase Agreement) by the DIP Lender, the Senior Creditor, and solely to the extent applicable, the Prepetition Lenders, shall have additional and replacement security interests and liens in the DIP Collateral (the "Replacement Liens"), which shall be junior only to the DIP Liens, the DIP Superpriority Claims, the Senior Carve-Out, and the Carve-Out, and the Permitted Priority Liens and shall, in each case, be subject to the terms of the Prepetition Intercreditor Agreement.

(d)     *Prepetition Lender Superpriority Claim*.  Pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, and solely to the extent of the Diminution of the Value of the Prepetition Collateral, and subject to the DIP Superpriority Claims, the Senior Carve-Out and the Carve-Out, the Prepetition Lenders shall have an allowed superpriority administrative expense claim with priority over all administrative expense claims (other than claims in respect of the Carve-Out and the Senior Carve-Out) and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b) (subject to the Permitted Priority Liens), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, and the foregoing shall in all cases be subject

25

to the terms of the Prepetition Intercreditor Agreement. Other than the DIP Liens, the DIP Superpriority Claims, the Senior Carve-Out, and the Carve-Out, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on a parity with the Prepetition Superpriority Claims.

(e)    *Adequate Protection upon Sale of Prepetition Collateral.* The sale of any Prepetition Collateral pursuant to section 363 of the Bankruptcy Code shall be sold free and clear of all liens, claims, and encumbrances; *provided, however,* that such Senior Secured Liens and Junior Secured Liens shall be distributed and/or attach to the proceeds of any such sale in the order and priority as set forth in this Final Order, the Prepetition Intercreditor Agreement and the DIP Intercreditor Agreement; *provided, further, however,* that the sale proceeds shall only be distributed to any party other than the DIP Lender pursuant to a separate order of this Court, and subject to the terms of the Prepetition Intercreditor Agreement, and all parties in interest reserve all rights with respect to any such distribution.

13.    Section 507(b) Reservation. Subject only to the Carve-Out described in paragraph 33 hereof, nothing contained herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided in this Final Order is insufficient to compensate for any Diminution in Value of the respective interests of the Prepetition Secured Parties in the Prepetition Collateral during

26

these chapter 11 cases or any Successor Cases, and such application of section 507(b) shall be subject to the terms of the Prepetition Intercreditor Agreement.

**Provisions Common to DIP Financing and Use of Cash Collateral Authorizations**

14.    <u>Amendment of the DIP Credit Documents</u>.   The DIP Credit Documents may, from time to time, be amended, amended and restated, modified, or supplemented by the parties thereto without notice or a hearing if the amendment, amendment and restatement, modification, or supplement is (a) in accordance with the DIP Credit Documents and (b) nonmaterial and not prejudicial in any material respect to the rights of third parties; *provided, however*, that notwithstanding the foregoing, except for actions expressly permitted to be taken by the DIP Agent or DIP Lender as provided in the DIP Credit Documents, including the DIP Intercreditor Agreement, no amendment, modification, supplement, termination, or waiver of any provision of the DIP Credit Documents, or any consent to any departure by any of the DIP Borrowers or the Credit Parties therefrom, shall in any event be effective unless the consents required under the terms of the DIP Credit Documents, including the DIP Intercreditor Agreement, have first been obtained (it being understood that any necessary signatures may be on a document consenting to such amendment, modification, termination, or waiver).

15.    <u>Budget Compliance and Variance</u>.   The DIP Borrowers and the Credit Parties shall not, and shall not permit any subsidiary to, directly or indirectly, use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with the DIP Credit Documents and this Final Order.  The Budget is hereby approved, and any modification to, or amendment or update of, the Budget shall be in form and substance acceptable to and approved in writing by the DIP Lender in its sole

27

discretion.  Beginning on the Wednesday after the Petition Date and on each Wednesday thereafter, DIP Borrowers will not permit (a) the actual net cash flows (without giving effect to borrowings and repayments under the DIP Credit Agreement) for the period from the Petition Date through the most recent week ended (the "Cumulative Period") to be less than 10% of the budgeted net cash flows (without giving effect to borrowings and repayments under the DIP Credit Agreement) for the Cumulative Period, (b) the actual operating net cash flows (without giving effect to borrowings and repayments under the DIP Credit Agreement) for the Cumulative Period to be less than 10% of the budgeted operating net cash flows (without giving effect to borrowings and repayments under the DIP Credit Agreement) for the Cumulative Period, and (c) any actual line item disbursement amount for the Cumulative Period to exceed 10% of the Budgeted Line Item Disbursement Amount for the applicable line item for the Cumulative Period.

16.    Modification of Automatic Stay.  The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims and to perform such acts as the DIP Agent or DIP Lender may request in their sole discretion to assure the perfection and priority of the DIP Liens, (b) the Debtors to take all appropriate action to grant the Replacement Liens, and to take all appropriate action to ensure that the Replacement Liens granted thereunder are perfected and maintain the priority set forth herein, (c) the Debtors to incur all liabilities and obligations to the DIP Lender as contemplated under the DIP Credit Documents, (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Final Order and the DIP Credit Documents, and

28

(e) the implementation of the terms of the Interim Order, the DIP Credit Documents, and this Final Order.

17.    Perfection of DIP Liens and Replacement Liens.  This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Replacement Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, real property mortgage or aircraft security agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or the Replacement Liens, or to entitle the DIP Lender and the Prepetition Secured Parties to the priorities granted herein.    Notwithstanding the foregoing, the DIP Agent and DIP Lender are authorized to file, as they in their sole discretion deem necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Replacement Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Replacement Liens.  The Debtors are authorized to execute and promptly deliver to the DIP Agent and DIP Lender all such financing statements, mortgages, notices, and other documents as the DIP Agent or DIP Lender may request.  The DIP Agent, administrative agents of the Prepetition Secured Parties, and the DIP Lender, in its respective sole

discretion, may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

18.    <u>After-Acquired Property</u>.   Pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including all DIP Collateral pledged or otherwise granted to the DIP Lender, pursuant to the DIP Credit Documents and this Final Order is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date.

19.    <u>Proceeds of Subsequent Financing</u>.   If the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in these chapter 11 cases or any Successor Cases obtains credit or incurs debt pursuant to section 364(b), (c), or (d) of the Bankruptcy Code in violation of the DIP Credit Documents at any time prior to the indefeasible payment in full of all DIP Obligations, the satisfaction of the DIP Superpriority Claims, and the termination of the DIP Lender's obligations to extend credit under the DIP Facilities, then all of the cash proceeds derived from such credit or debit shall immediately be turned over first to the DIP Agent, to satisfy the DIP Obligations in accordance with the DIP Credit Documents.

20.    <u>Maintenance of DIP Collateral</u>.   Until the indefeasible payment in full of all DIP Obligations, all indebtedness outstanding in accordance with the Prepetition Financing Documents, and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, the Debtors shall insure the DIP Collateral as required under the DIP Credit Documents and the Prepetition Financing Documents, as applicable.

30

21.    <u>Insurance Policies</u>.  The DIP Agent and DIP Lender are, and are deemed to be, named as additional insureds and loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

22.    <u>Disposition of Collateral</u>.  Except as expressly provided for in the DIP Credit Documents and subject to the DIP Intercreditor Agreement, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or Prepetition Collateral without the prior written consent of the DIP Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Lender or an order of this Court).  Until such time as the DIP Obligations, the Senior Secured Obligations and the Junior Secured Obligations have been paid in full in accordance with the terms of the applicable DIP Credit Documents and Prepetition Financing Documents, the Debtors shall remit to the applicable DIP Lender or Prepetition Secured Party, or cause to be remitted to the applicable DIP Lender or Prepetition Secured Party, all proceeds of DIP Collateral or Prepetition Collateral, as applicable, for application against the DIP Obligations, Senior Secured Obligations, and Junior Secured Obligations in accordance with the terms of the applicable DIP Credit Documents (including the DIP Intercreditor Agreement), Prepetition Financing Documents (including the Prepetition Intercreditor Agreement), and this Final Order; *provided, however*, any proceeds remitted to any party other than the DIP Lender shall be pursuant to a separate order of this Court, and all parties in interest reserve all rights with respect to any such remittance.

23.    <u>Inventory</u>.  Unless otherwise ordered by the Court, the Debtors shall not, without the consent of the DIP Lender: (a) enter into any agreement to return any

31

inventory to any of their creditors for application against any prepetition indebtedness under any applicable provision of section 546 of the Bankruptcy Code or (b) consent to any creditor taking any setoff against any of its prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

24.    <u>Events of Default</u>.  The term "Event of Default" shall have the same meaning under this Final Order as such term has under the DIP Credit Documents and shall include, for the avoidance of doubt, failure to meet the Milestones.

25.    <u>Rights and Remedies upon Event of Default</u>.  Unless otherwise ordered by the Court in accordance with the terms hereof, as of 12:00 a.m. prevailing Eastern Time on the third (3rd) business day after the date the DIP Agent or DIP Lender files a notice of an Event of Default on the docket of the Debtors' chapter 11 cases (such period, the "<u>Default Notice Period</u>"), the automatic stay under section 362 of the Bankruptcy Code will be automatically lifted without further order of this Court to allow the applicable DIP Agent or DIP Lender to take any and all actions permitted by law, as if no case were pending under the Bankruptcy Code, subject to the terms and conditions of the DIP Credit Documents (including the DIP Intercreditor Agreement).  The Debtors and other parties-in-interest may request an expedited hearing on any motion regarding an alleged Event of Default, and the DIP Lender and Prepetition Secured Parties shall consent to such expedited hearing, *provided* that the only issue that the Debtors may raise at such hearing is whether an Event of Default has occurred.  In the event the automatic stay is lifted in accordance with this paragraph, any further order of this Court authorizing, under section 364 of the Bankruptcy Code, the obtaining of credit or the incurring of indebtedness secured by a lien or security interest that is equal or senior to a lien or

security interest held by the DIP Lender or which is entitled to priority administrative status which is equal or superior to that granted to the DIP Agent, DIP Lender or the Prepetition Secured Parties, as the case may be, shall be prohibited until the DIP Obligations have been satisfied in full.  Subject to any applicable grace periods, upon the occurrence of any Event of Default, the DIP Lender may, without notice or demand, immediately suspend or terminate all or any portion of the DIP Lender's obligations to make additional loans under the DIP Facilities.  Upon the occurrence of an Event of Default, and unless otherwise waived by the DIP Lender in its sole discretion, all loans under the DIP Facilities shall become due and payable in accordance with the DIP Credit Documents.  Nothing herein shall be construed to limit or otherwise restrict the availability of the rights and remedies provided for in the DIP Credit Agreement.

26.    Termination of the DIP Facility and Use of Cash Collateral.  The Debtors' right to use the DIP Facility and Cash Collateral shall terminate immediately upon the delivery of written notice (the "Default Notice") via electronic mail or facsimile by the DIP Lender, to the DIP Agent, counsel to the Debtors and their lead restructuring counsel, counsel to the DIP Lender, counsel to the DIP Agent, the U.S. Trustee, counsel to the Committee, and any other official committee appointed in the chapter 11 cases, of the occurrence of an Event of Default, (c) conversion of any of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, and (d) the Termination Date (as defined in the DIP Credit Agreement) (collectively, the "Term Loan Maturity Date"); *provided, however*, that the DIP Lender may waive an Event of Default and deliver a Default Notice, without such Default Notice triggering a termination, in its sole discretion.

27.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order.    The DIP Agent and DIP Lender and the Prepetition Secured Parties have acted in good faith in connection with the Motion, the Interim Order, and the Final Order, and their reliance on the Motion, the Interim Order, and the Final Order is made in good faith.    Based on the findings set forth in the Interim Order and this Final Order, and the record made during the Interim Hearing and the Final Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Agent, the DIP Lender, and the Prepetition Secured Parties are entitled to fullest extent to the protections provided in section 364(e) of the Bankruptcy Code.    Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any payments hereunder of Senior Secured Obligations, payments of Claims in respect of the Carve-Out, advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.    Any liens or claims granted to the DIP Lender or the Prepetition Secured Parties arising prior to the effective date of any such modification, amendment, or vacatur of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

28.    DIP Fees and Other Expenses.    The Debtors are authorized and directed to pay all fees and expenses of the DIP Agent and DIP Lender in connection with the DIP Facility, as provided in the DIP Credit Documents, whether or not the transactions contemplated hereby are consummated, whether or not incurred prepetition or

34

postpetition, including, without limitation, agency fees, the professional fees and expenses of Kirkland & Ellis LLP (as counsel to the DIP Lender), the professional fees and expenses of Alston & Bird LLP (as counsel to the DIP Agent), and any financial advisor and/or other consultant to the DIP Lender, in each case promptly after providing 10 days' notice of the reasonably detailed invoices to the U.S. Trustee and the Committee, and receiving no objections thereon, which may be redacted for privileged, confidential, or proprietary information.    For the avoidance of doubt, the fees and expenses described in the foregoing sentence shall include, to the extent set forth in Section 2.9, 6.3 and 12.11 of the DIP Credit Agreement, as applicable, all reasonable and documented out-of-pocket costs, fees, and expenses incurred in connection with the preparation, negotiation, execution, interpretation or administration of, any modification of any term of or termination of, any of the DIP Credit Documents, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein.    Payment of all such fees and expenses shall not be subject to allowance by this Court, and parties entitled under the DIP Credit Documents to receive such payment of fees and expenses shall not be required to provide time records and invoices in any particular format.

    29.   <u>Indemnification.</u>



The indemnity provisions set forth in Section 6.3 of the DIP Credit Agreement are hereby approved in their entirety.

ny-1278150



30.    <u>Released Parties</u>.  Without limiting the rights of the parties in interest as

set forth in paragraph 36 hereof and to the greatest extent available under applicable law,

the Debtors hereby waive any and all actions related to, and hereby release, each of (a)

the DIP Lender, (b) the DIP Agent, and (c) ███████████████████ each of

their respective shareholders, controlling persons, directors, agents, officers, ████

████ successors, assigns, directors, managers, and principals. ████████

████████████████████████████████████

█████████████████████████, each in their respective capacity as such (each such person or entity identified in sub-clauses (a) through (█) of this paragraph 30, a "Released Party" and, collectively, the "Released Parties") from any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, or any Challenge (as defined herein), whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained, or required to be paid by an indemnified party of every nature and character arising prior to the Petition Date and to the extent related to the Prepetition Financing Documents, the DIP Credit Documents, the Interim Order, or this Final Order, any documents related to the Prepetition Financing Documents, the DIP Credit Documents, the Interim Order, or this Final Order, ███████████████ ██████████████████████████ or any other acts or omissions by the Released Parties in connection with the Prepetition Financing Documents, the DIP Credit Documents, the Interim Order, or this Final Order, any documents related to the Prepetition Financing Documents, the DIP Credit Documents, the Interim Order, or this Final Order, █████████████████████████ except to the extent resulting from such Released Party's fraud, gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction.

31.    Proofs of Claim.  The DIP Agent, DIP Lender and with respect to the principal amounts owed and stipulated to by the Debtors, the Prepetition Secured Parties, shall not be required to file proofs of claim in any of these chapter 11 cases or Successor Cases for any claim allowed herein.  Any proof of claim filed by the DIP Agent, DIP Lender or Prepetition Secured Parties shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by the DIP Agent, DIP Lender.  Any order

entered by this Court in relation to the establishment of a bar date in any of these cases or Successor Cases shall not apply to the DIP Agent or DIP Lender or Prepetition Secured Parties.

32.     <u>Access to Collateral; No Landlord's Liens</u>.   Subject to applicable state law, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent or DIP Lender, contained in this Final Order or the DIP Credit Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Credit Documents and this Final Order, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Credit Documents, the DIP Lender may enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from such landlord.

33.     <u>Carve-Out</u>.

(a)     For the avoidance of doubt and notwithstanding anything to the contrary contained in this DIP Order or the DIP Credit Documents,  all liens, claims and other security interests held by the DIP Lender and the Prepetition Secured Parties (including the Senior Carve-Out) shall be subject to the payment of the Carve-Out; and

(b)     On the day on which a Carve Out Trigger Notice issued by the DIP Agent at the direction of the Required Lenders is received by the Debtors, the Carve Out Trigger Notice shall:

ny-1278150

(i)     be deemed an automatic Advance Request (as defined in the DIP Credit Agreement) and irrevocable notice of borrowing by the Debtors under Section 2.2(b) of the DIP Credit Agreement in an amount equal to the sum of (A) the Trustee's Carve-Out, and (B) the then-accrued and unpaid amounts of the Allowed Professional Fees (together, the "Pre-Carve-Out Trigger Notice Reserve"), *provided* that the Debtors shall have three (3) business days from the date of receipt of the Carve Out Trigger Notice to provide the DIP Agent with the estimate of the total amount of accrued and unpaid Allowed Professional Fees through the date that the Carve out Trigger Notice is received, whether or not invoices with respect thereto have been submitted to the Debtors (the "Professional Fee Estimate");

(ii)     constitute a demand to the Debtors to utilize all cash on hand as of the date of receipt of such notice and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Pre-Carve-Out Trigger Notice Reserve.  The Debtors shall promptly deposit and hold such amounts in a segregated account in trust to pay the Pre-Carve-Out Trigger Notice Reserve prior to any and all other claims;

(iii)     be deemed an automatic Advance Request and irrevocable notice of borrowing by the Debtors under Section 2.2(b) of the DIP Credit Agreement in an amount equal to the Post-Carve-Out Trigger Notice Cap. The Debtors shall promptly deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the

ny-1278150

Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve-Out Reserves</u>") prior to any and all other claims.

(c)    For the avoidance of doubt and notwithstanding anything to the contrary contained in this Final Order or the DIP Credit Documents, prior to the closing of a sale of all or substantially all of the assets of the Debtors, the DIP Agent shall have received the Professional Fee Estimate (for the period through the date of the sale closing), one (1) business day in advance of such closing, and the DIP Lender shall have funded an amount equal to such Professional Fee Estimate on the date of such closing to the Debtors, who shall promptly deposit and hold such amount in a segregated account in trust to pay the Allowed Professional Fees corresponding to such Professional Fee Estimate prior to any and all other claims to the extent allowed at any time, whether by interim order, procedural order, or otherwise; *provided, however*, that the DIP Agent and DIP Lender shall have a security interest in any residual interest in such segregated account, with any excess re-paid to the DIP Lender.  The Professional Fee Estimate amount payable under this paragraph 33(c) shall be deemed an automatic Advance Request and irrevocable notice of borrowing by the Debtors under Section 2.2(b) of the DIP Credit Agreement.

At all times, the DIP Borrowers shall remain subject to the DIP Budget (*provided, however* that the provisions in paragraph 33(b) and paragraph 33(c) are not limited by the DIP Budget) and available cash on hand not used for the Carve-Out Reserves may be used pursuant to the DIP Budget, including for the payment of wages and other

compensation. Within two (2) Business Days following receipt by the DIP Agent of the Professional Fee Estimate, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of any Default or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for the loans under the DIP Facility, any termination or reduction of the Term Commitments (as defined in the DIP Credit Agreement) following an Event of Default, or the occurrence of the Term Loan Maturity Date, the DIP Lender shall honor any such deemed Advance Request as provided in this paragraph 33 and shall fund the amount of the Carve Out Reserves, *provided, however*, that the DIP Lender shall have a security interest in any residual interest in the Carve-Out Reserve, with any excess re-paid to the DIP Lender in accordance with the DIP Credit Documents. For purposes of this Final Order, "Carve-Out" means the sum of: (w) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (c) below and, as to the U.S. Trustee, in such amounts as agreed to by the U.S. Trustee or as determined by the Court); (x) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice below set forth in (c) below (the "Trustee's Carve-Out"); (y) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors or the Committee pursuant to sections 327, 328, 363, and 1103 of the Bankruptcy Code (the "Estate Professionals") at any time before or on the first business day following delivery by the DIP Agent acting at the direction of the Required Lenders, of a Carve-Out Trigger

Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (z) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $500,000. incurred after the first business day following delivery by the DIP Agent, acting at the direction of the Required Lenders, of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (d) being the "Post Carve-Out Trigger Notice Cap"). For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent acting at the direction of the Required Lenders to the Debtors, their lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) and acceleration of the DIP Obligations under the DIP Facility, stating that the Post Carve-Out Trigger Notice Cap has been invoked. Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been issued, the Debtors shall be permitted to pay fees to Estate Professionals and reimburse expenses incurred by Estate Professionals to the extent set forth in the Budget (including any variance therefrom as may be permitted under the DIP Credit Documents) and that are allowed by the Court and payable under sections 328, 330 331, and 1103 of the Bankruptcy Code and compensation procedures approved by the Court and in form and substance reasonably acceptable to the Debtors, DIP Agent, and DIP Lender, as the same may be due and payable, and the same shall not reduce the Post Carve-Out Trigger Notice Cap. For the avoidance of doubt, nothing herein shall limit the amount of the fees required to be paid to the Clerk of the Court and

to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code.

34.    Payment of Compensation.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Committee, or of any person, or shall affect the rights of the DIP Agent, the DIP Lender, and the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget.

35.    Limitation on Investigation.

(a)    No DIP Collateral, Cash Collateral, proceeds of the DIP Facility, portion of the Carve-Out, the Senior Carve-Out, or any other amounts may be used directly or indirectly by any of the DIP Borrowers or any other Credit Party, the Committee, if any, or any trustee or other estate representative appointed in these chapter 11 cases or any Successor Cases or any other person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) for any of the following actions or activities (the "Proscribed Actions"):

i.    to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the liens granted under the DIP Credit Documents, the Interim Order, or this Final Order (including, the DIP Superpriority Claims); or

ii.    to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or

43

prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the DIP Agent, the DIP Lender or the Prepetition Secured Parties, and each of their respective shareholders, controlling persons, directors, agents, officers, subsidiaries, affiliates, successors, assigns, directors, managers, principals, officers, employees, agents, investors, funds, advisors, attorneys, professionals, representatives, accountants, investment bankers, and consultants with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any Avoidance Actions; (B) any so-called "lender liability" claims and causes of action; (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens granted under the DIP Credit Documents; (D) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the Senior Secured Obligations, or the Junior Secured Obligations; (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any of (1) the DIP Agent or DIP Lender under this Final Order or under any of the DIP Credit Documents, or (2) the Prepetition Secured Parties (in each case, as applicable,

including, claims, proceedings or actions that might prevent, hinder or delay any of their respective assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the DIP Credit Documents, the Interim Order, and this Final Order); or (F) objecting to, contesting, or interfering with, in any way, the DIP Agent's or DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred (as set forth in the DIP Credit Documents); *provided, however* that this paragraph shall not cover the Committee's work in reviewing, commenting on, or objecting to the approval of this Final Order or its entry.

(b)    Notwithstanding anything to the contrary herein, the Committee may use up to $50,000.00 in the aggregate amount of any Cash Collateral, or proceeds of the DIP Facilities to investigate any and all matters covered by paragraph 35 and paragraph 36, including as to perfection of collateral securing the obligations to and the conduct of the Prepetition Secured Parties (the "Committee Investigation Budget"). Any and all claims incurred by the Committee related to or in connection with any Proscribed Actions other than up to the Committee Investigation Budget shall not be (1) included in the Carve-Out or (2) satisfied by the Carve-Out Reserves, any Cash Collateral, or proceeds of the DIP Facilities; *provided, however* that nothing in this paragraph 35 shall modify the DIP Budget.

36.    Challenge Period.

(a)    Subject only to the terms of this paragraph 36, the grant of adequate protection to the Prepetition Secured Parties, and the various stipulations and waivers contained in paragraph E hereof shall be without prejudice to the rights the Committee or any party other (other than the Debtors, which have waived all such rights), upon obtaining standing, to seek to disallow the Prepetition Secured Parties' claims in respect of the Prepetition Financing Documents, pursue any claims or seek appropriate remedies against Prepetition Secured Parties in connection with the Prepetition Financing Documents or avoid all or substantially all of the security interests or liens in the Prepetition Collateral or in any other asset or property of Debtors in which Prepetition Secured Parties claim an interest, including any claim, action, or proceeding brought against the Prepetition Secured Parties in accordance with this paragraph 36 that requires Prepetition Secured Parties to give up adequate protection liens and superpriority claims, to disgorge adequate protection interest payments received or accruals credited, or to disgorge as repaid pursuant to this Final Order as a result of any of the Prepetition Secured Parties' claims against Debtors or liens upon and security interests in the assets and properties of Debtors (including the Prepetition Collateral) being invalidated, avoided, subordinated, impaired or compromised in any way, either by an order of this Court (or other court of competent jurisdiction) or by settlement. Any party that seeks to obtain standing (other than the Debtors, which have waived all such rights), including the Committee, must (i) on or before May 29, 2017 (the "Standing Motion Deadline") file a motion seeking

authority to obtain standing (the "Standing Motion), and (ii) commence, as appropriate, a contested matter or adversary proceeding raising any objection, claim, defense, suit or other challenge (a "Challenge") with respect to any claim, security interest, or any other rights of the Prepetition Secured Parties under the respective Prepetition Financing Documents,  including in the nature of a setoff, counterclaim, or defense within thirty (30) days of the filing of the Standing Motion (the "Challenge Period").  The Standing Motion Deadline and Challenge Period may only be extended by (a) written consent of the DIP Lender and the impacted Prepetition Secured Party or (b) by consent of the Court for good cause shown.  In the event of a timely and successful Challenge, this Court shall fashion the appropriate remedy with respect to the Prepetition Secured Parties, after hearing from all parties in interest.

(b)     Upon the expiration of the Challenge Period, to the extent not specifically included in a timely and properly filed pleading asserting a Challenge:  (i) any Challenge, whether such Challenge is separately filed or otherwise asserted through an amendment of any timely and properly filed pleading asserting a Challenge, shall be deemed to be forever waived and barred; (ii) all of the Debtors' agreements, acknowledgments, stipulations, waivers, releases, and affirmations as to the priority, extent, and validity of the Prepetition Secured Parties' claims, liens, and interests, of any nature, under the Prepetition Financing Documents, or otherwise incorporated or set forth in this Final Order, shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties-

in-interest in these chapter 11 cases and any Successor Cases without further action by any party or this Court, and the Committee and any other party in interest, and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto; (iii) the liens and security interests granted pursuant to the Prepetition Financing Documents shall (to the extent not otherwise satisfied in full) be deemed to constitute valid, binding, enforceable, and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable bankruptcy law; and (iv) without further order of the Court, the claims and obligations under the Prepetition Financing Documents shall (to the extent not otherwise satisfied in full) be finally allowed for all purposes in connection with these chapter 11 cases and any Successor Cases and shall not be subject to challenge by any party in interest as to validity, priority, amount, or otherwise.

(c)     Nothing in this Final Order vests or confers on any person, including the Committee or any other statutory committee that may be appointed in these chapter 11 cases, standing or authority to pursue any cause of action, claim, defense, or other right belonging to the Debtors or their estates.

(d)     For the avoidance or doubt, in the event the case is converted to chapter 7 or a chapter 11 trustee is appointed, in either case if such events occur prior to the expiration of the Challenge Period described in this paragraph 36, the Challenge Period shall not expire until 60 days after the trustee's appointment. In the event the Committee or any other party in  interest has timely commenced a Challenge prior to the conversion to chapter 7 or  appointment of a chapter 11

trustee, the trustee shall be entitled to assume the prosecution of any pending Challenge. In either event, until the later of the expiration of the Challenge Period without commencement of a Challenge or the entry of a final, non-appealable order or judgment on account of any Challenge, the trustee shall not be bound by the Debtors' acknowledgments, admissions, confirmations, stipulations and waivers in this Order.

37.    <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

38.    <u>Section 506(c) Claims</u>. No costs or expenses of administration that have been or may be incurred in these cases at any time shall be charged against the DIP Agent, the DIP Lender, the Prepetition Secured Parties, or any of their respective claims, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Agent, the DIP Lender, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

39.    <u>Section 552(b)</u>. The Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral.

40.    <u>No Marshaling; Application of Proceeds</u>. The DIP Agent, the DIP Lender, and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral and/or the Prepetition

49

Collateral or any credit bid, as the case may be, and all proceeds shall be received and applied in accordance with the DIP Credit Documents (including the DIP Intercreditor Agreement) and the Prepetition Financing Documents (including the Prepetition Intercreditor Agreement) and, without limitation, the DIP Lender can collect on any guaranty and/or any collateral provided by any entity in its sole discretion and in accordance with the DIP Credit Documents.

41.    *Joint and Several Liability.* Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates; it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Credit Documents.

42.    *Limitation of Liability.* In determining to make extensions under the DIP (subject to applicable state law) Facility, in permitting the use of Cash Collateral, or in exercising any rights or remedies solely as and when permitted pursuant to this Final Order, the Interim Order, the DIP Credit Documents, or the Prepetition Financing Documents, as applicable, none of the DIP Agent, the DIP Lender, ▌▌▌▌▌▌▌▌▌▌▌▌▌or any successor of any of the foregoing, shall be deemed to be in control of the operations of the Debtors or any affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or any affiliate of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute). Furthermore, nothing in this Final Order, the DIP Credit Documents or the Prepetition Financing Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lender, ▌▌▌▌ or any successor of any of the foregoing, of any liability for any

claims arising from the prepetition or postpetition activities of the Debtors or any affiliate of the Debtors.

43.    Credit Bidding. Any credit bid by the DIP Lender and the Senior Creditor with respect to (a) secured debt held by the Senior Creditor shall be entitled to be credit bid up to the amount of $30 million, and shall be limited to the amount of such debt that is actually contributed by the Senior Creditor to the DIP Lender pursuant to an executed Assignment of Claims dated April 6, 2017, and (b) secured by debtor-in-possession financing provided by the DIP Lender shall be limited to the amount outstanding under the DIP Facility.

44.    Intercreditor Issues.  Except as expressly otherwise set forth herein, nothing in this Final Order shall be construed to convey on any individual DIP Lender or Prepetition Secured Party any consent, voting or other rights beyond those (if any) set forth in the DIP Credit Documents and Prepetition Financing Documents, as applicable.

45.    Discharge Waiver.  Unless the DIP Lender and Senior Creditor agree otherwise, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in these cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash on or before the effective date of such confirmed plan of reorganization.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash on or prior to the earlier to occur of the effective date of such plan of reorganization or sale.

46.    Rights Preserved.  The entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the DIP Agent's, the DIP

Lender's, or the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of the DIP Agent, the DIP Lender, or the Prepetition Secured Parties under the Bankruptcy Code or under applicable non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of any of the DIP Agent, the DIP Lender, or the Prepetition Secured Parties. Notwithstanding the foregoing, the Prepetition Intercreditor Agreement remains in full force and effect except to the extent expressly modified by the DIP Intercreditor Agreement.

47.     <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies under this Final Order, the Interim Order, the DIP Credit Documents, the Prepetition Financing Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent or the DIP Lender.

48.     <u>Binding Effect of Final Order</u>. Immediately upon execution by this Court, the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, all other creditors of the Debtors, the Committee, any other statutory committee that may be appointed in these chapter 11 cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of these cases, any Successor Cases, or upon dismissal of any of these cases or Successor Cases.

49.    <u>Effect on Certain Prepetition Agreements</u>.  Except as expressly set forth in this Final Order, the terms and conditions, validity, and enforceability of the Prepetition Financing Documents shall not be affected by this Final Order.

50.    *Survival*.

(a)    The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan of reorganization in any of these chapter 11 cases, (ii) converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any of these chapter 11 cases or any Successor Cases, or (iv) pursuant to which this Court abstains from hearing any of these chapter 11 cases or Successor Cases.

(b)    The terms and provisions of this Final Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agent, the DIP Lender, and the Prepetition Secured Parties, pursuant to this Final Order, the Interim Order and the DIP Credit Documents, notwithstanding the entry of any such order, shall continue in these cases, in any Successor Cases, or following dismissal of these cases or any Successor Cases, and shall maintain their priority as provided by this Final Order until all the DIP Obligations pursuant to the DIP Credit Documents and this Final Order have been indefeasibly paid in full.    The terms and provisions concerning the indemnification of the DIP Agent and DIP Lender shall continue in these chapter 11 cases, in any Successor Cases, following dismissal of these chapter 11 cases or

53

any Successor Cases, following termination of the DIP Credit Documents, and/or following the indefeasible repayment of the DIP Obligations.

51.     <u>Final Order Controls; Priority of Terms</u>. To the extent of any conflict between or among the Motion, the DIP Credit Documents, the Intercreditor Agreement, the Interim Order, and this Final Order, the terms and provisions of this Final Order shall govern.

52.     <u>Waiver of Applicable Stay</u>.   Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Final Order.

53.     <u>Service of this Final Order</u>.  On or before April 11, 2017 the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Final Order, together with Copies of this Final Order, on the Notices Parties.

54.     <u>Retention of Jurisdiction</u>.   The Court has retained and will retain jurisdiction to implement, interpret, and enforce this Final Order according to its terms.

Dated: April 7, 2017.
Wilmington, Delaware

_____
THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

54